1

Schaun Owens
11342 West Buchanan Street
Avondale, Arizona 85323

___ FILED        ___ LODGED
___ RECEIVED   ___ COPY

SEP 0 4 2015

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

2

3

4

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Schaun Owens, | Case No. |
| Plaintiff, | CV-15-01769-PHX-SPL |
| v. | **COMPLAINT** |
| Maricopa County Community College District, Maricopa Skill Center, and Lisa Hemming, in her individual and official capacity. | **JURY DEMAND** |
| Defendants. | |

Plaintiff Schaun Owens, for her complaint against Defendants brings this action for violations of 42 U.S.C. §§ 1981 & 1983 alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction to hear this complaint and to adjudicate the claims stated herein under 28 U.S.C. § 1331, and 42 U.S.C. §§1981 & 1983 to redress the unlawful deprivation of Plaintiff's rights secured, guaranteed and protected by federal law,

2.     Venue is proper in this Court because the practices complained of occurred in the District of Arizona and Defendants can be found in the District of Arizona.

///

///

-1-

**PARTIES**

3.     Schaun Owens ("Plaintiff" or "Owens") is and was at all times relevant, an African-American women, citizen of the United States and resident of Maricopa County, State of Arizona. Plaintiff was employed as a full-time license Cosmetology Associate Instructor, at Defendant Maricopa County Community College District Skill Center.

4.     Defendant Maricopa Community College District ("MCCCD") is organized and operates under the laws of State of Arizona and directs, and controls the actions of Defendant Maricopa Skill Centers.

5.     Defendant MCCCD employs more than 500 employees.

6.     Defendant MCCCD Skill Center employs more than 15 employees.

7.     Defendant MCCCD Skill Center is also under the jurisdiction of Gateway Community College.

8.     Defendants MCCCD & MCCCD Skill Centers receive federal funding from the U.S. Department of Education.

9.     Defendant, Lisa Hemming, (hereinafter, "Defendant Hemming" or "Hemming") upon information and belief, at all times relevant, held the position of Cosmetology Program Manager, for Defendant Maricopa Skill Center, at the Northwest Campus. Defendant Hemming exercised direct and/or indirect supervisory authority over Plaintiff or, in the alternative, was involved in one or more decisions affecting Plaintiff's employment status including, but not limited to, decisions regarding hiring, firing, disciplinary actions, retention, job assignment, job performance evaluations, adjusting work schedules, and leave

approval (sick-vacation). Additionally, Defendant Hemming acted in her individual capacity and was involved in one or decisions affecting Plaintiff's employment status including, but not limited to, decisions regarding hiring, firing, disciplinary actions, retention, job assignments, job performance evaluations, and leave approval sick/vacation.

10.   Defendant Hemming currently holds the position of Associate Director of Cosmetology, and responsible for overseeing the operation of three Maricopa Skill Centers which are the following: (1) Northwest Campus; (2) Cutting Edge Style Academy Campus; and (3) Buckeye Campus. Defendant Hemming inherited the Buckeye campus that was already having serious issues regarding students and employees; however, she has failed to resolve the problems.

11.   Junior/Senior High School Students as long students are enrolled in a high school which is a member of West-MEC, all tuition hours are paid by West-MEC for the CESA and MSCNWE Cosmetology Program. Cosmetology High Scholl Students pay a tuition fee of $1200 to West-MEC for a kit, books, and lab fees for their entire two-year program. Once a student graduates from high school, cosmetology tuition is paid by the student to West-MEC at the current rate of $5.00 per clock hour. The school students must complete 1600 clock hours. Adult students pay at tuition fee of approximately $9,393.00 for a kit, books, and lab fees for their two-year period; and must complete 1600 clock hours.

///

## STATEMENT OF CLAIM

12.   Plaintiff claims that she was subjected to intentional discrimination by being made to work in a hostile work environment, harassed, and discharged in retaliation because she opposed unlawful discriminatory practices affecting Hispanic students and Plaintiff because of her race, African-American.

13.   It is the policy of Defendant MCCCD claims to promote equal employment opportunities through a positive continuing program. Defendant MCCCD will not discriminate, nor tolerate discrimination against any applicant or employee because of race, color, religion, gender, sexual orientation, national origin, age, disable, or veteran status. Additionally, it is the policy of Defendant MCCCD to provide an environment for each job applicant and employee that is free from sexual harassment, as well as harassment and intimidation on account of an individual's race, color, religion, gender, sexual orientation, national origin, age, disabled, or veteran status.

## GENERAL ALLEGATIONS

14.   A Comprehensive Adult of the Personnel Practices of the Maricopa Skills Center in a final report drafted by Dr. Sharon M. McGavick on August 31, 2007, shows there were many serious problems because students and employees lacked conference in the leadership group. The wide range of problems that affected students and employees were the following: training, unresolved staff issues, trust, communication, diversity issues, tuition issues; and no students in classrooms for various reasons.

///

15.   Plaintiff claims that some of the same problems still exist such as the following: (1) Cosmetology students prohibited from using a certain facility and/or equipment for their vocational training; (2) Students' hours being cut without any reasons given to them; (3)  Inconsistency in instructional practices and curriculum; (4) Classes being cancelled; (5) Students not getting proper training to passed the cosmetology test to get their license; (6) Students made to work on clients without a license instructor being present; (7) Students not getting the proper credits; (8) Students being overcharged for tuition; (9) Tuition being incorrectly calculated and charged to students; (10) Students being charged for tuition that they do not owe; (11) Pell grants and financial aid awarded on false reporting hours for students with grants; (12) Dress code constantly being changed; (13) Students' applications being lost which prevents them from taking the state board cosmetology test to get their license; (14) Caucasian Students being treated more favorably when leaving the facility to get learning materials from their car that they forgot to get before classes; (15) Instructors showing up late for classes; and (16) Hispanic students reporting late for class are send home and (17) Caucasians students reporting late to class are permitted to attend class.

16.   Defendant MCCCD's Employment Service Department published Maricopa & EMCC Southwest Skill Centers Policies that became effective on July 1, 2006, and was revised on July 1, 2011, for **Probationary Status Exempt and None-Exempt Employees**.

///

17.   **Section 4.1.1** states that all Skill Center staff are required to serve a one (1) year probationary period from their date of hire. During the probationary period an employee may be terminated for any reason and such action will not be subject to the grievance procedure.

18.   **Section 4.1.2** states that two written evaluations will be completed during the probationary period, one at the end of the first four (4) months after employment, exclusive of vacation, leave of absence, and sick leave and one at the end of the first eight (8) months of employment. After that, evaluations will be done at least yearly from their date of hire.

19.   **Section 4.1.3** states each evaluation will be discussed with employee, and the employee will sign the evaluation as acknowledge of having read it. The employee's signature on the evaluation does not mean that the employee agrees with it, only that he/she had read it.

20.   Plaintiff was hired in August 2008, as a part-time Cosmetology Associate Instructor, by Kim Richardson, Cosmetology Program Manager, for Defendant MCCCD Skill Center. Plaintiff was assigned to MCCCD's Skill Center's campus located at 7565 West Peoria Avenue Peoria, Arizona. Plaintiff also reported to Shawn Andrews, Assistant Program Manager.

21.   Plaintiff's job performance was always above satisfactory, including her instructional evaluations. This evidence can be substantiated by reviewing Plaintiff's personnel file. Plaintiff during her employment has never been put on a Performance Improvement Plan ("PIP"), nor did she receive any disciplinary actions from Ms. Richardson or Ms. Andrews.

22.   Plaintiff held the position until May 2009. Plaintiff was rehired as a full-time Cosmetology Associate Instructor, in July 2009. Plaintiff held the position until April 2011, when she resigned for personal reasons.

23.   Plaintiff was told during her orientation that she was required to complete a one (1) year probationary period; and that she could be terminated during her probationary period for any reason.

24.   Plaintiff was not told during her probationary period that she could not use the grievance procedure to complain about any employment issues.

25.   Plaintiff was not told that she was supposed to receive two written evaluations during her probationary period, one at the end of the first four (4) months after employment, exclusive of vacation, leave of absence, and sick leave and one at the end of the first eight (8) months of employment. After that, evaluations will be done at least yearly from the date of her hire.

26.   Plaintiff during her employment was never told that Defendant MCCCD's Human Resources provided Interest Based Negotiation ("IBN") facilitation and conciliation services for employees, managers, and work groups to promote a collegial, respectful, and safe working and learning environment. The IBN approach encourages the parties to work together with a trained facilitator to resolve conflict or as a decision-making or problem-solving tool.

27.   Plaintiff as a probationary employee could have used the IBN services if she had knowledge that it existed to resolve the conflicts between her and Defendant Hemming, Cosmetology Program Manager.

28.   In October 2011, Plaintiff returned as a part-time Cosmetology Associate Instructor, and assigned to the same location at 7565 West Peoria Avenue Peoria, Arizona. Plaintiff held the position until May 2013.

29.   Plaintiff has been responsible for more than 300 students successfully completing 1600 hours of cosmetology training. Plaintiff's students rate her as very good Cosmetology Associate Instructor.

30.   Plaintiff's employment environment began to change in 2010 or 2011, after Defendant Hemming, Caucasian female, was hired as a part-time Cosmetology Associate Instructor. Defendant Hemming was assigned to Plaintiff's campus. Defendant Hemming resigned for personal reasons, but later returned to her former position as a part-time substitute Cosmetology Associate Instructor, and assigned to the same campus as plaintiff.

31.   Plaintiff and Defendant Hemming were part-time substitute Cosmetology Associate Instructors, when they applied for a Day-Time Lead Position in 2012. Plaintiff was given an interview and she did well. Plaintiff didn't get a second interview.  Defendant Hemming was selected for the position.

32.   Defendant Hemming after being selected for the Day-Time Lead Position tried to solicit Plaintiff to spy and document things about the job performance of Caucasian coworker, Dana Bell, a Cosmetology Associate Instructor. Defendant Hemming had no direct supervisory authority over Plaintiff at the time to give her such a directive. Plaintiff and Dana Bell had a good working relationship. Plaintiff did not submit any documentation to

Defendant Hemming about Dana Bell's job performance.

33.   Plaintiff in July 2012, to improve her opportunities for advancement into management positions took a six weeks supervisory course at Defendant MCCCD's Main Office.

34.   In May 2013, Plaintiff learned that Defendant MCCCD posted a job announcement for the position of Cosmetology Program Manager, at Maricopa Skill Center's new Northwest campus. Plaintiff and Defendant Hemming applied for the position. A selection committee was formed to review applications and resumes of individuals who applied for the position. Plaintiff was not selected for an interview. Defendant Hemming was hired for the position.

35.   In June 2013, Plaintiff learned that Defendant Maricopa Skill Center was opening a new Northwest Campus located, at 2931 West Bell Avenue Phoenix, Arizona. Plaintiff applied for a fulltime Cosmetology Associate Instructor position. Defendant Hemming was on the interview committee. Plaintiff was hired by Kim Richardson, Cosmetology Program Manager. Plaintiff as a new hire was required to complete a one year probationary period. This was not the first time that Plaintiff had to complete a one year probationary period for the same type of position.

36.   As a result of Kim Richardson being reassigned to another skill center, Defendant Hemming was given the responsible of operating the facility. Plaintiff about the third week in July 2013, transferred to Defendant Maricopa Skill Center's Northwest campus. Plaintiff was placed under Defendant

Hemming's supervisory authority.

37.   Plaintiff after transferring witnessed Defendant Hemming harassing and intimidating employees to believe they would lose their jobs if they didn't follow her rules. Defendant Hemming on numerous occasions called the new Northwest campus "her" school which means she felt that she could do anything to students and employees.

38.   In September 2013, shortly after the school began for 2013/2014 school year, Defendant Hemming on several occasions instructed Plaintiff to reprimand Hispanic students for speaking "Spanish" on their breaks in the student lounge. The student lounge is not a classroom setting environment. Defendant Hemming told Plaintiff when Hispanic students speak in Spanish they were bulling Caucasian students. Defendant Hemming stated that she had received some complaints from Caucasian students, but she failed to identify the students' names.

39.   Plaintiff had concerns about Defendant Hemming's directive because at least 80% of the individuals in Plaintiff's classes were Hispanic students.

40.   Plaintiff told Defendant Hemming that her directive prohibiting Hispanics students from speaking "Spanish" during their breaks in the student lounge could be a violation of their freedom of speech and civil rights laws. Plaintiff also told Defendant Hemming that she was not comfortable with the directive. Defendant Hemming ignored Plaintiff's concerns; and still demanded that Plaintiff reprimand Hispanic students for speaking Spanish on their breaks

in the student lounge.

41.   Plaintiff did her own research and found out if she had complied with Defendant Hemming's directive she would be in violation of the following: (a) Hispanic students' constitutional rights under the First Amendment of the United States Constitution and (b) Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq., and its implementing regulation at 34 C.F.R. Part 100, which prohibit discrimination on the basis of race, color, or national origin in programs and activities receiving financial assistance form the U.S. Department of Education.

42.   Plaintiff told Defendant Hemming what she had discovered during her research; and that she was not comfortable with the directive of reprimanding Hispanic students for speaking Spanish during the breaks in the student lounge.

43.   Defendant Hemming told Plaintiff there was something in the Student Handbook that stated the new Northwest campus was an "English" speaking campus.

44.   Plaintiff again did her research by reviewing Defendant MCCCD's Cosmetology Student Handbook and found no evidence to support Defendant Hemming's position that the campus was an "English" speaking campus. The only thing that is required is that all instructional materials must be English.

45.   Plaintiff told Defendant Hemming that her directive was not supported by Defendant MCCCD/Gateway Community Colleges' policies and procedures. Defendant Hemming still insisted that Plaintiff reprimand Hispanic

Students for speaking "Spanish" during their breaks in the student lounge

46.   Plaintiff during her research discovered that English-only policies can arise in a wide range of education and workplace situations. These policies typically limit the circumstances under which students and employees can speak foreign languages in an education and/or workplace environment. For bilingual students and workers whose primary language is not English, English-only policies can limit their opportunity to speak in the language with which they are most comfortable and expose them to discipline for inadvertently speaking their native language. For students and/or workers with limited or no English skills, English-only rules can operate to as a bar to employment, preventing otherwise qualified students and workers from being hired or resulting in their discipline and termination.

47.   In October 2013, Plaintiff being frustrated about Defendant Hemming constantly demanding her to reprimand Hispanic students for speaking "Spanish" during their breaks in the student lounge, including the disparate treatment she was receiving from Defendant Hemming brought the matters to the attention of Kristina Scott, African-American female. Ms. Scott held the position of Director, for Maricopa Skill Center's extended campus, at Northwest campus and Cutting Edge Style Academy.

48.   Ms. Scott failed to do anything to resolve the problems. Instead, she told Plaintiff to go back to Defendant Hemming with her concerns about the Hispanic students. Ms. Scott also told Plaintiff that she should try to resolve the disparate treatment she was receiving from Hemming. This is like

sending the fox that eat all the eggs back into the henhouse.

49.   Defendant Hemming created a hostile work environment for Plaintiff by repeatedly demanding her to reprimand Hispanic students for speaking "Spanish" in the student lounge during their breaks.

50.   Defendant MCCCD Skill Center's Northwest campus has a state of the art Aesthetic clinical classroom for training Cosmetology students to do their vocational training. Defendant Hemming would not allow the students to use the facility.

51.   In October 2013, Defendant Hemming continued to subject Plaintiff with harassment and retaliation. Defendant Hemming solicited three (3) Caucasian Cosmetology Associate Instructors (Mr. Wood, Ms. Caldwell, and Mrs. Shala) to send Hemming emails stating that they saw Plaintiff sleeping at her desk in the instructor's office. Plaintiff was on her 15 minute break at her desk when she leaned her heard back and closed her eyes. Plaintiff could not have been sleeping on the job because she heard co-workers' conversations as they were coming in and out of the office getting ready for their classes.

52.   Plaintiff and coworker, Toni Trott, African-American female, were the only employees setting in the office at the time. Plaintiff later discovered by talking to Ms. Trott that Defendant Hemming didn't ask Ms. Trott to submit an email stating that she saw Plaintiff sleeping on the job. Defendant Hemming decided to assess the credibility of Plaintiff's Caucasian coworkers' testimony. This is why Defendant Hemming didn't ask Mr. Trott to provide an email stating that she saw Plaintiff sleeping on the job. This is sufficient evidence to

show that Defendant Hemming continued her disparate treatment of plaintiff.

53.   Plaintiff's Caucasian coworkers (Wood, Caldwell, and Shala) were in and out of the office busy getting ready for their classes to actually notice if Plaintiff was sleeping on the job. Defendant Hemming and Mrs. Shala together returned to the office. Defendant Hemming asked Plaintiff was she alright. Plaintiff immediately responded that she was alright; and that she was just resting her eyes. Defendant Hemming failed to ask Plaintiff was she on her 15 minute break at the time.

54.   Defendant Hemming on the next day of work at the end of the work day requested that Plaintiff report to Hemming's office. Defendant Hemming told Plaintiff that she was giving her a disciplinary action for sleeping on the job. Plaintiff disputed the false allegations and refused to sign the disciplinary action. Defendant Hemming knew or should have known that she had failed to follow MCCD's Staff & Procedural Manual (Policy C-4 Corrective Action Principles), when she gave Plaintiff a corrective action claiming that Plaintiff was sleeping on the job while at work. Defendant Hemming told Plaintiff that she had received several complaints from employees stating that they saw Plaintiff sleeping on the job. Plaintiff requested copies of the complaints. Defendant Hemming refused to give her copies of the complaints. Defendant Hemming also told Plaintiff the disciplinary action would stay in Plaintiff's personnel file. Plaintiff had a right to be free from self-incrimination; and the right to face her accusers who provided emails stating that they saw her sleeping on the job.

55.  In November 2013, Defendant Hemming instructed Plaintiff to have her students set-up their sanitized tools and supplies on the classroom floor that was not sanitary. This is a violation of the Arizona State Board of Cosmetology's policies. If a board examiner would have made an inspection of the school while this situation was occurring Plaintiff could have lost her license as a Cosmetology Associate Instructor. Plaintiff presented an alternative solution to resolve the problem.

56.  Plaintiff during her employment was constantly receiving complaints from Hispanic High School Students and Adult Hispanic Students that they were not getting the necessary training to pass their State Board Tests to get their license. Subpart A of 668, § 66.8 of Title 34 Federal Regulations for the classified occupation of Cosmetology establishes the license requirements, including the training hours per subjects. All states are required to have statutes in compliance with Subpart A of 668, § 66.8 of Title 34 Federal Regulations for the classified occupation for cosmetologists, nail technicians, and estheticians.

57.  Plaintiff during her employment was constantly receiving complaints from Hispanic students about the discriminatory treatment they were receiving from the school and instructors. The students had valid complaints.

58.  Plaintiff has witnessed on several occasions Defendant Hemming treating Caucasian students more favorably than Hispanic students when reporting late for class. The Caucasian students were allowed to go to classes and Hispanic students were sent home The Caucasian students who forget

their aprons were given aprons and allowed to attended classes. However, similarly situated Hispanic students were sent home.

59.   Plaintiff became an advocate for the students; plus she opposed the discriminatory practices that Plaintiff and Hispanic Students were receiving from Defendant Hemming.

60.   Plaintiff told all of her students regardless of ethnicity and/or gender to use the student's grievance procedure to address and resolve their problems that they were having with Defendant Hemming, including the school and instructors. Plaintiff became the "lighting rod" for receiving student complaints because she would listen to their complaints and explain how to resolve them.

61.   Plaintiff on many occasions told the students that Defendant Hemming was responsible to respond and resolve student, staff and parent/guardian complaints.

62.   Plaintiff in December 2013, with 18 students was busy serving clients at the Northwest campus. Plaintiff from 8:00 AM to 5:00 PM received no assistance from other instructors. Plaintiff with her own money decided to order pizza for the students, so that they would not have to worry about missing their opportunity to eat lunch. The pizza was a mere gesture of the appreciation for the hard work the students demonstrated for the day in serving clients.

63.   Plaintiff didn't see this being a problem because in the past Cosmetology Associate Instructors were permitted on many occasions to have

"potlucks" for the students in the classrooms. Plaintiff did not interrupt the instruction of the class; plus the students were told they could eat pizza when their time permitted.

64.   Defendant Hemming on the following work day requested that Plaintiff report to Hemming's office.  Defendant Hemming gave Plaintiff a corrective action for having a "pizza party" in the classroom. Plaintiff disputed that she had a pizza party and refused to sign the corrective action. Defendant Hemming again failed to follow the policy and procedure in implementing a corrective action against plaintiff. During a meeting with Defendant Hemming and Kristina Scott, who has supervisory authority over Hemming, Plaintiff explained what had occurred with her and the students.

65.   Defendant Hemming during the meeting made a false statement, by saying that she had sent an email instructing the staff that "potlucks" were no longer permitted in the classrooms. Plaintiff responded by saying that she had not received such an email. Plaintiff had a file of all the emails drafted by Defendant Hemming. There was no email which stated that potlucks were no longer permitted in the classrooms. Kristina Scott told Defendant Hemming if she could not provide a copy of the email, the corrective action given to Plaintiff had to be withdrawn. Ms. Scott's directive didn't set very well with Defendant Hemming; plus she could not provide a copy of the email. Plaintiff's corrective action was withdrawn from her personnel file.

66.   Plaintiff on December 16, 2013, via email advised Defendant Hemming that Plaintiff had a meeting with two Hispanic students (Bridgette

Contreras and Marina Banuelos). Defendant Hemming gave the students gave the students false information about Plaintiff having the 90/90 list that shows a student's attendance and academics. If the students' attendance and academics are good they would get certain privileges every other Friday. The students wanted to do personal cosmetology services on each other in the classroom on Monday. Defendant Hemming told Plaintiff the students could not do personal cosmetology services on each other in the classroom on Mondays. Defendant Hemming would tell the students the opposite. This caused confusion which Plaintiff wanted clarification

67.   Plaintiff has never had access to 90/90 Report. Plaintiff on more than one occasion requested a copy of the report from a coworker responsible for generation the 90/90 Report. Plaintiff on more than one occasion requested a copy of the 90/90 Report from Defendant Hemming. Plaintiff never received the report. Caucasian co-workers upon request have received the 90/90 Report. Plaintiff has never been shown or trained how to access the total hours for students in skill time. Plaintiff on several occasions has asked for training how to access the total hours for students in skill time.

68.   On December 16, 2013, @ 8:34 AM Defendant Hemming via email responded to Plaintiff's email trying to clear-up the confusion about the 90/90 and students doing facials, manicures, and etc., during their training. Defendant Hemming accused plaintiff of not being a team player. Plaintiff has always been a team player. Defendant Hemming stated that on October 21, 2013, she sent out an email explaining the criteria for personal services.

Defendant Hemming further stated in her email of December 16, 2013, there is no place for Cosmetology students to work in the Aesthetic room. The Aesthetics department is governed by different rules and regulations, that Cosmetology students were not trained in; and for this reason she did not want the students in the room. Defendant Hemming also stated that facials for Cosmetology is a "non-essential" skill it does not need to be offered to the public. It is apparent, that Defendant Hemming had no idea about what she was talking about because facials are part of the curriculum for Cosmetology students.

69.   Plaintiff on December 18, 2013, @ 11:34 AM via email responded to Defendant Hemming's email. Plaintiff made an attempt to have a meeting with Hemming, but her door was closed because she was on the phone. Plaintiff returned to Hemming's office, but she had already left for the day. Plaintiff sent an email to Kristina Scott, Director for Maricopa Skill Center's extended campus, at the Northwest campus and Cutting Edge Style Academy.

70.   The purpose of Plaintiff's email to Ms. Scott was to challenge the process of how West-MEC and Maricopa Skill Center relationship works for plaintiff's campus. There was still confusion and restrictions placed on the high school side at plaintiff's site. Plaintiff was again trying to seek clarification because on many occasions she was told by Defendant Hemming, that the high school students were a "unique group" of students. In addition, there was still confusion about facials. Plaintiff was not comfortable for safety reasons in allowing or instructing students to setup facial beds on top of the classroom

tables. Plaintiff witnessed Mr. Wood's class doing facials on the floor when facial beds were available for instructions. Plaintiff wanted to know if facials were non-essential, then why the State Board of Cosmetology include facials in its licensing.

71. Defendant Hemming every time she held meetings with the students; she would always ask them what did plaintiff teach them in class. Defendant Hemming was trying to solicit negative information about plaintiff's teaching abilities. The students gave positive statements about plaintiff's teaching abilities. Plaintiff had a right to go outside the chain of command to get more clarification about issues because she was not getting the correct answers from Defendant Hemming. Plaintiff should have been able to talk managers without the fear of harassment and retaliation.

72. In January 2014, Defendant Hemming conducted a "Mock State Board Inspection", which in the past Cosmetology Associate Instructors was given prior notice. This area on campus was utilized by more than 80 students. Plaintiff on numerous occasions has gone to Defendant Hemming to express her frustration that instructors were not teaching and making their students to clean-up behind themselves in the area. Defendant Hemming failed to send an email to the staff to resolve the problem.

73. Defendant Hemming during the inspection put plaintiff on display by implying that she was jeopardizing everyone's job. There were no other employees put on display like plaintiff. This was another form of harassment and retaliation against plaintiff.

74.   In the latter part of January 2014, Plaintiff who was frustrated by what she perceived to be discrimination against herself, as well as Defendants to adequately deal with the allegations of discrimination, contacted John Naughton, Assistant Director of Human & Administrative Services, to get information about filing an Internal EEO Complaint against Defendant Hemming. Plaintiff being a probationary employee didn't prevent her from filing an EEO Complaint which is not part of the grievance procedure.

75.   John Naughton is responsible for recruitment and hiring for the Maricopa Skill Centers and was knowledgeable about the information that Plaintiff needed to file an Internal EEOC Complaint against Defendant Hemming.

76.   John Naughton instead of giving plaintiff the information that she requested for filing an Internal EEO Complaint referred her to Alice Corrnelius, Manager of Employee Services, at Gate Way Community College. Plaintiff made several telephone calls trying to reach Ms. Corrnelius but her attempts were unsuccessful.

77.   Plaintiff believes a scheme had already been put in place to terminate her during the probationary period because she had opposed unlawful discrimination that affected plaintiff and her students.

78.   Defendant Hemming never told plaintiff during any of their meetings. that she would be recommending "non-retention" before plaintiff completed her probationary period. Furthermore, it would have been difficult for Defendant Hemming to recommend "non-retention" because she failed to give plaintiff

any job performance evaluations during plaintiff's probationary period.

79.   Plaintiff during a meeting asked Defendant Hemming and a HR Representative, employed by Gateway Community College why was she being terminated. Plaintiff was told they didn't have to give her a reason. Plaintiff was terminated after the death of her daughter which occurred on November 26, 2013.

80.   On February 12, 2014, via letter Christopher Wurster, Interim Director, for Defendant Maricopa Skill Center, informed plaintiff in accordance with **Section 4.1.1** of the Maricopa & EMCC (Estrella Mountain Community College) Skill Centers policy manual, which addresses non-retention during a probationary period, that Vice Chancellor for Human Resources, Mr. James Bowers, has approved Mr. Wurster's recommendation that plaintiff be terminated from her employment. Plaintiff's last day of work was on February 12, 2014.

81.   Christopher Wurster and James Bowers in order to terminated plaintiff as a probationary employee based their decision only on ***Section 4.1.1, which state that all Maricopa/EMCC Southwest Skill Center Staff are required to serve a one (1) year probationary period from their date of hire. During the probationary period an employee may be terminated for any reason, and such action will not be subject to the grievance procedure.***

82.   Christopher Wurster and James Bowers knew or should have known when they terminated plaintiff during her probationary period that they violated ***Section 4.1.2, which state two written evaluations will be completed***

***during the probationary period, one at the end of the first four (4) months***

***after employment, exclusive of vacation, leave of absence, and sick leave***

***and one at the end of the first eight (8) months of employment. After that,***

***evaluations will be done at least yearly from their date of hire.***

83.   Defendant Hemming failed to give plaintiff any job performance evaluations during her probationary period. Defendant Hemming intentionally discriminated against plaintiff because she opposed unlawful discrimination.

84.   Defendant Hemming began immediately recruiting to fill plaintiff's position after she was terminated. Defendant engaged in an illegal activity by trying to cover up her disparate treatment against plaintiff during the hiring process to fill plaintiff's position.

85.   Plaintiff's coworker, Carolyn Cardwell, Caucasian female, who was on the hiring committee can provide testimony that there were two (2) Caucasian females and (1)  African-American female, that applied for plaintiff's position. The Caucasian females had higher interview scores than the African-American female.

86.   Defendant Hemming told Ms. Cardwell that she needed to hire another ethnic person to fill plaintiff's position. Defendant Hemming selected the African-American female, with the lowest interview scores to fill plaintiff's position. Ms. Cardwell has recently resigned from her employment because of the harassment and retaliation that she has been receiving from Defendant Hemming.

87.   In the employment arena a manger and/or supervisor making a hiring decision based on race or age is illegal, even if it's done to make a work environment more diverse; and is in violation  Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967 (ADEA).  A general desire for race or age diversity in the workplace does not constitute a BFOQ unless the employer has a specific defensible business need to give preference in the hiring process to people who are non-white and/or under a certain age, the practice is illegal.

## CAUSE OF ACTION ONE
### (Race Discrimination, Harassment & Retaliation, 42 U.S.C. § 1981)

88.   Plaintiff hereby incorporates the foregoing paragraphs, as if fully set forth herein.

42 U.S.C. § 1981 reads, in pertinent part, as follows: (a) Statement of equal rights  all persons with the jurisdiction of the United States shall have the same rights in every State or Territory to make and enforce contracts,…. and to the full and equal benefits of all las and proceedings for the security of persons and property as is enjoyed by white citizens,….

(b) make and enforce contracts defined for purposes of this section, the term "make and enforced contracts" includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

(c) Protection against impairment the right protected by this section against impairment by non-government discrimination and impairment under color of State law."

89.   42 U.S.C. § 1981 does not require plaintiffs of employment discrimination to exhaust their administrative remedies.

90.   Plaintiff has provided sufficient information that she was a victim of intentional unlawful employment discrimination while under the direct

supervisory authority of Defendant Hemming.

91.   Defendant Hemming has been empower by Defendant MCCCD to take tangible employment actions against employees under her direct supervision, including plaintiff.

92.   Defendant Hemming knew or should have known that she was required to give plaintiff two (2) job performance evaluations during plaintiff's probationary period before she recommended "non-retention" for plaintiff. Defendant Hemming failed to give plaintiff any job performance evaluations during plaintiff's probationary period.

93.   Defendant Hemming knew or should have known that she failed to follow the proper policies and procedures when taking corrective actions against plaintiff.

94.   Defendant Hemming knew that plaintiff had opposed the harassment and retaliation that she was constantly receiving about reprimanding Hispanic students for speaking "Spanish" in the student lounge during their breaks.

95.   Plaintiff opposed the unlawful discrimination when she advocated for equal treatment for Hispanic students.

96.   Defendant Hemming retaliated against plaintiff when she submitted the paperwork for "non-retention" for plaintiff before plaintiff completed her probationary period. The relevant question regarding this situation is how Defendant Hemming could even think about "non-retention" for plaintiff without giving her any job performance evaluations during plaintiff's probationary period.

97.  Defendants MCCCD and Maricopa Skill Center's Representative, Kristina Scott failed and/or refused to take corrective action to protect plaintiff from unlawful discrimination harassment and retaliation.

98.  Plaintiff was subjected to adverse employment actions by defendants.

99.  Similarly situated individuals outside of Plaintiff's protected class were treated more favorably than Plaintiff.

100.  A causal link exits between Plaintiff's protected activity and Defendants' adverse action.

101.  As a result of Defendants' actions, Plaintiff has suffered loss of income and fringe benefits, mental anguish and emotional distress, embarrassment and humiliation, inconvenience, loss of quality and enjoyment of life and reputation, and other damages to be proven at trial. Plaintiff is entitled to recover her compensatory damages pursuant to 42 U.S.C. § 1981.

102.  Defendants' actions were done with malice or with reckless indifference to Plaintiff's federally protected rights.

## CAUSE OF ACTION TWO
### (42 U.S.C. § 1983 Violation---Equal Protection)

103.  Plaintiff hereby incorporates the foregoing paragraphs, as if fully set forth herein.

104.  42 U.S.C. § 1983 reads in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of ant State or Territory or the District of Columbia, subjects, o causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suite in equity, or other proper proceedings or redress.

105.  42 U.S.C. § 1983 does not require plaintiffs in employment discrimination to exhaust their administrative remedies.

106.  In the discriminatory and retaliatory treatment of Plaintiff, Defendants acting under the color of state and local law, denied Plaintiff her Constitutional right to equal protection of law, to be free from racial discrimination and retaliation, as guaranteed by the Fourteenth Amendment to the United States Constitution, and other provisions of federal law, in violation of 42 U.S.C. § 1983.

107.  Specifically, Defendants MCCCD and Maricopa Skill Center through Defendant Hemming discriminated and retaliated against plaintiff as follows:

(a)    By Hemming constantly demanding that plaintiff reprimand Hispanic students for speak "Spanish" in the student lounge during their breaks created a racial hostile work environment in which plaintiff was required to work;

(b)    In repeatedly denying Plaintiff an opportunity to be rated fairly during her probation period created a racial hostile work environment in which Plaintiff was required to work;

(c)    Failing to follow established official adopted or promulgated policies and procedures by not giving Plaintiff job performance evaluations during her probationary period, the Defendants engaged in a pattern and practice of discriminating against Plaintiff that created a racial hostile work environment in which plaintiff was required to work;

(d)    Failing to follow established official adopted or promulgated policies and procedures regarding the corrective actions taken against Plaintiff, the

Defendants engaged in a pattern and practice of discriminating against Plaintiff; thus creating a racial hostile environment which Plaintiff was required to work;

(e)   In retaliating against Plaintiff for her opposition to racial discrimination and retaliation regarding issues that affected Hispanic students and plaintiff, the Defendants created a hostile work environment in which Plaintiff was required to work; and

(e)   In other acts of racial and retaliation against plaintiff.

108.   Defendants are liable for the violation of plaintiff's Constitutional rights on the grounds that the violations arose from Defendant Hemming's official and individual capacity by not being in compliance with policies and procedures, by failing to give plaintiff job performance evaluations during her probationary period and deliberating taking corrective actions against plaintiff because she opposed unlawful discrimination.

109.   Plaintiff opposed the unlawful discrimination when she advocated for equal treatment for Hispanic students and herself.

110.   Defendants willfully, intentionally and unlawfully discriminated against Plaintiff in violation of 42 U.S.C. § 1983.

111.   As a proximate result of Defendants' violations of Plaintiff's Constitutional rights, Plaintiff has suffered damages, including loss of income and fringe benefits, mental anguish and emotional distress, embarrassment and humiliation, inconvenience, loss of quality and enjoyment of life, loss of reputation, and other damages to be proven at trial.   Plaintiff is entitled to

recover her compensatory damages pursuant to 42 U.S.C. § 1983.

## CAUSE OF ACTION THREE
### (42 U.S.C. § 1983 Violation---First Amendment)

112.  Plaintiff hereby incorporates the foregoing paragraphs, as if fully set forth herein.

113.  The issues of race discrimination and hostile work environment are matters of public concern to the citizens who pay property taxes and live in Maricopa County, State of Arizona. In 2014, Defendant MCCCD's Governing Board approved a $3.00 tuition increase to generate millions of dollars in new revenue. The Cosmetology students were not getting the proper vocational training to pass the test to get their license.

114.  Plaintiff in In her efforts to get information about filing an Internal EEO Complaint about racial discrimination regarding harassment and a racially hostile work environment, Plaintiff exercised her right to free speech under the First Amendment to the United States Constitution, reporting on matters and issues of public concern to the citizens and students who attend Defendants MCCCD and Maricopa Skill Center to get an education.

115.  Defendant Hemming acting under the color of state and local law, retaliated against Plaintiff by playing a part in the decision recommending "non-retention" hoping to prevent plaintiff from exercising her First Amendment rights to free speech in violation of 42 U.S.C. § 1983.

116.  Mr. Naughton and Ms. Corrnelius had prior knowledge that Plaintiff had requested information about filing an Internal EEO Complaint against Defendant Hemming. Plaintiff was not given the information to process her

complaint. Defendant Hemming retaliated against Plaintiff by submitting the paperwork recommending "non-retention" for plaintiff.

117.  Defendants are liable for the violation of Plaintiff's Constitutional rights on the grounds that the violations arose from the Defendants' official action, policy or custom in condoning and failing to address the racial discrimination, including the harassment and retaliation that Plaintiff was experiencing under Defendant Hemming's supervisory authority.

118.  As a proximate result of defendants' violations of plaintiff's Constitutional right to free speech, plaintiff has suffered damages, including loss of income and benefits, mental anguish and emotional distress, embarrassment and humiliation, inconvenience, loss of quality and enjoyment of life, loss of reputation, and other damages to be proven at trial. Plaintiff is entitled to recover her compensatory damages pursuant to 42 U.S.C. § 1983.

## DEMAND FOR JURY TRIAL

119.  Plaintiff hereby requests a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff hereby respectfully request that this Court provide the following:

A.  A declaratory judgment that the acts, practices and policies of Defendants were in violation of 42 U.S.C. §§ 1981 & 1983, and the Constitution of the United States;

B.  Order Defendants to make whole Plaintiff by providing compensation for past and future and non-pecuniary losses and

compensatory damages resulting from the unlawful practices complained of above, including damages loss of income and fringe benefits, mental anguish and emotional distress, embarrassment and humiliation, inconvenience, loss of quality of and enjoyment of life, loss of reputation, and other damages to be proven at trial;

C. An injunction requiring immediate reinstatement of Plaintiff to a full-time  Cosmetology Associate Instructor's position without having to serve a one (1) year probationary period;

D. Order Defendants to make Plaintiff whole by providing appropriate lost wages with prejudgment interest in amounts to be proven at trial and other affirmative necessary relief necessary to eradicate the effects of defendants' unlawful practices and to pay plaintiff compensatory and punitive damages;

E. Order Defendant MCCCD to take appropriate remedial disciplinary action against Defendant Hemming who discriminated and retaliated against plaintiff;

F. Order Defendants to remove from Plaintiff's personnel file all disciplinary actions that were not done in accordance with policies and procedures;

G. Order Defendants in providing oral and written references about plaintiff as may be requested by the same or by prospective future employers, Defendants will mention only the nature and duration of Plaintiff's employment;

H.  Order Defendants to immediately implement training and monitoring programs regarding discrimination and retaliation, by an entity external to defendants;

I.  Grant a permanent injunction enjoining Defendants from retaliating against individuals who oppose unlawful discrimination;

J.  Order Defendants to re-emphasize its equal employment policy and disseminate it to all employees particularly those who perform in supervisory or lead capacity positions;

K.  Order Defendants to follow its policies and procedures for probationary exempt and non-exempt employees;

L.  Order Defendants to follow its policies and procedures regarding corrective actions before probationary employees are terminated;

M.  Order Defendants to institute and carry out policies, practices, and programs which provide equal opportunities for qualified individuals, including those whose race is like plaintiff, which eradicate the effects of its past and present unlawful employment practices;

N.  Award Plaintiff her reasonable attorney's fees and costs;

O.  Award Plaintiff pre-judgment interest and post-judgment interest on any awards at the highest rate allowed by law; and

P.  Such other and further relief as the Court deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury with respect to all issues raised herein.

Dated this 4th day of September 2015.

By: _Schaun Owens_

Schaun Owens
11342 West Buchanan Street
Avondale, Arizona 85323
schaunowens@yahoo.com
(602) 505-4700