## UDALL | SHUMWAY
COUNSELORS AT LAW SINCE 1965

1138 NORTH ALMA SCHOOL ROAD, SUITE 101
MESA, ARIZONA 85201
Telephone: 480.461.5300 | Fax:  480.833.9392

David R. Schwartz - #009264
das@udallshumway.com
Attorney for Defendants Maricopa County Community
College District, Maricopa Skill Center and Lisa Hemming

### UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| Schaun Owens,<br><br>                              Plaintiff,<br><br>v.<br><br>Maricopa County Community College District, Maricopa Skill Center, and Lisa Hemming,<br><br>                              Defendants. | NO.  CV-15-01769-PHX-SPL<br><br>**STATEMENT OF FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants Maricopa County Community College District ("District") and Lisa Hemming ("Hemming") submit the following statement of facts in support of Defendants' Motion for Summary Judgment.  The facts stated herein are stated in the light most favorable to Plaintiff and may not be the true facts.  Defendants reserve the right to challenge any facts stated herein in connection with any other motion, hearing or at trial.

. . .

. . .

A. **Background**

1. The District operates a number of community colleges, including Gateway Community College.  (Ex. 1, Owens depo 60:4-7) (Ex. 3, Lugo affidavit ¶ 5) (Ex. 11, Scott affidavit ¶ 4) (Dkt 1- Complaint ¶ 4)

2. Gateway Community College operates a division known as the Maricopa Skill Center.   (Ex. 1, Owens depo 59:23-60:3)  (Ex. 3, Lugo affidavit ¶ 5) (Ex. 11, Scott affidavit ¶ 4) (Dkt 1 – Complaint ¶ 7)

3. The Maricopa Skill Center had three campuses  for the 2013-14 school year  which were located at: (a) 7565 W. Peoria Ave., Peoria and known as Cutting Edge Style Academy ("CESA")[1]; (b) 2931 W. Bell Rd., Phoenix and known as the "Northwest Campus"; and (c) 1265 E. Buckeye Rd., Phoenix and known as the "Buckeye Campus".  (Ex. 1, Owens depo 60:8-12) (Dkt 1 – Complaint ¶ 10)

4. Cosmetology is generally a two year program offered at the Maricopa Skill Center. A student must obtain 1600 hours of instruction to graduate and be eligible to become a licensed Cosmetologist.  One advances from the first year to the second year after completion of 800 hours of instruction.  Licensing is done through the Arizona Board of Cosmetology after successful completion of school.  (Ex. 2, Hemming  affidavit ¶ 9-10) (Dkt 1- Complaint ¶ 11)

5. A school year begins in August of one calendar year and ends in May of the next calendar year.  (Ex. 1, Owens depo 64:23-65:8)

_____

[1] CESA closed its doors in June 2016. (Ex. 7, Trott depo 8:21-9:13)

6. The District has a Governing Board who shall "[a]dopt policies for the government of the community colleges under its jurisdiction". A.R.S. § 15-1445(A)(1). (Judicial Notice) (Ex. 4, Castellanos affidavit ¶ 6, 15) (Ex. 9, Bellino affidavit ¶ 11) (Ex. 10, Bowers affidavit ¶ 5)

7. The Chancellor of the District is appointed by and reports directly to the Governing Board. A.R.S. § 15-1444(A)(6), (8). (Judicial Notice) (Ex. 4, Castellanos affidavit ¶ 6) (Ex. 10, Bowers affidavit ¶ 5)

**B. Plaintiff's Previous History At Maricopa Skill Center**

8. Plaintiff is an African-American female. (Dkt 1- Complaint ¶ 3)

9. Plaintiff initially worked as a part-time temporary Cosmetology Associate Instructor at CESA from August 2008 until May 2009. Part-time instructors were considered at-will employees, so there was no probationary period. (Ex. 1, Owens depo 60:16-61:2, 62:2-19) (Dkt 1- Complaint ¶ 20, 22)

10. In August 2009, Plaintiff obtained a full-time position as a Cosmetology Associate Instructor at CESA. As a new full-time instructor, Plaintiff was subject to a one-year probation period. Plaintiff remained in that position until April 2011 when she resigned. (Ex. 1, Owens depo 62:10 -64:8) (Dkt 1- Complaint ¶ 22-23)

11. The job description for an Cosmetology Associate Instructor indicates that its essential duties include: (1) instructing students; reviewing work and progress of students; identifies problems and makes recommendations regarding students abilities to successfully complete program; (2) keep current and accurate records of students' progress and attendance; (3) respond to request for student information; (4)

3

perform other duties as assigned.  The skill involved included communication, and interpersonal skills as applied to interaction with coworkers, supervisors, and the general public.  (Ex. 4, Castellanos affidavit ¶ 28 and ex. E)

12. In October 2011, Plaintiff returned to CESA as a part-time temporary Cosmetology Associate Instructor.  Plaintiff remained in that position through May 2013.  Part-time instructors were considered at-will employees, so there was no probationary period.  (Ex. 1, Owens depo 68:4-7, 69:1-4) (Ex. 3, Lugo affidavit ¶ 8-9) (Ex. 4, Castellanos affidavit ¶ 8-9) (Dkt 1- Complaint ¶ 28)

13. The District's Staff Policy Manual is available on-line to all employees or anyone. The Staff Policy Manual includes the Maricopa & EMCC Southwest Skill Centers Policies applicable to employees of the Maricopa Skill Center and Estrella Mountain Community College Southwest Skill Center.  (Ex. 1, Owens depo 68:18-25) (Ex. 3, Lugo affidavit ¶ 10) (Ex.4 , Castellanos affidavit ¶ 10) (Ex. 7, Trott depo 18:4-23) (Ex. 8, Wurster affidavit ¶ 15) (Ex. 9, Bellino affidavit ¶ 6) (Ex. 10, Bowers affidavit ¶ 7) (Ex. 11, Scott affidavit ¶ 6)

**C. Probationary Employees Not Covered By All Policies**

14. Under the Maricopa Skill Center's Policies effective July 1, 2012, employees could pursue a grievance process if they had been adversely affected by a violation of a specific provision of the policy manual.  This required a formal written grievance specifying the section(s) of policy allegedly violated.  Forms were available in the Human Resources' office for the filing and processing of a grievance.  Under the District's general policy, probationary employees are not eligible to file a grievance.

Policy C-2(C)(1)(c).  (Ex. 3, Lugo affidavit ¶ 11) (Ex.4 , Castellanos affidavit ¶ 11, 31 and ex. A and H) (Ex. 8, Wurster affidavit ¶ 16 and ex. A)

15. Probationary employees can be terminated or non-renewed for any or no reason. There is no requirement of cause as they are at-will employees and they are not entitled to a hearing.  (Ex. 3, Lugo affidavit ¶ 12) (Ex.4 , Castellanos affidavit ¶ 12)

16. Under the Maricopa Skill Center's Policies effective July 1, 2012, employees could be subject to formal Corrective Action for performance issues.  Under the District's general policy, probationary employees are not subject to progressive discipline under District policies on corrective action.  Policy C-4(B).  (Ex. 3, Lugo affidavit ¶ 13) (Ex.4 , Castellanos affidavit ¶ 13 and ex. B) (Ex. 8, Wurster affidavit ¶ 16 and ex. A)

17. An Incident Report is "not a disciplinary tool", but "a tool for a supervisor to document inappropriate behavior and/or performance".  An Incident Report is retained in a supervisor's records.  (Ex. 1, Owens depo 138:10-24 and ex. 12, p. 1) (Ex. 3, Lugo affidavit ¶ 14) (Ex.4 , Castellanos affidavit ¶ 14) (Ex. 9, Bellino affidavit ¶ 10)

18. An Incident Report does not become part of an employee's personnel file.  If formal discipline is entered then an Incident Report can be part of an employee's disciplinary file maintained by Human Resources.  (Ex. 3, Lugo affidavit ¶ 14) (Ex.4 , Castellanos affidavit ¶ 14) (Ex. 9, Bellino affidavit ¶ 10)

#### D. District's Anti-Discrimination Policies

19. Under Board Policy 2.0, the Governing Board declared that: "The Chancellor shall not cause or allow any practice, activity, decision, or organizational circumstances that are unlawful, imprudent, or in violation of commonly-accepted higher education, business, and professional ethics and practices."  (Ex. 4, Castellanos affidavit ¶ 16 and ex. C) (Ex. 9, Bellino affidavit ¶ 12 and ex. C)

20. Under Board Policy 5, the Governing Board declared that:

> The Maricopa County Community College District is committed to continue to promote a learning and work environment that is non-discriminatory. This commitment is demonstrated through the value of inclusion, the implementation of policies and regulations that serve to prohibit discrimination and by practicing non-discriminatory actions in both our employment and academic activities.

> This means that Maricopa will not discriminate, nor tolerate discrimination, against any applicant, employee, or student in any of its policies, procedures, or practices. This policy covers all selection and decision practices of the employment relationship, as well as admission to, access to, and treatment of students in Maricopa's programs and activities.

(Ex. 4, Castellanos affidavit ¶ 18 and ex. D)

21. The District, through the Chancellor, has adopted Administrative Regulations applicable at all colleges within the District.  These regulations are published on the District's website.  A number of them are also published and referenced in each college's catalog and student handbook, as well as the Staff Policy Manual.  (Ex. 4, Castellanos affidavit ¶ 7, 17) (Ex. 9, Bellino affidavit ¶ 13) (Ex. 10, Bowers affidavit ¶ 6, 8) (Ex. 11, Scott affidavit ¶ 7)

22. The District has adopted a policy prohibiting discrimination by its employees and students based upon race, sex and other specified criteria.  These policies are

reflected in, among other places, the Staff Policy Manual available to anyone on the District's website.  (Ex. 1, Owens depo 218:13-219:4) (Ex. 2, Hemming affidavit ¶ 11) (Ex. 3, Lugo affidavit ¶ 15) (Ex. 4, Castellanos affidavit ¶ 15, 18 and ex. D) (Ex. 9, Bellino affidavit ¶ 14 and ex. D) (Ex. 10, Bowers affidavit ¶ 9) (Ex. 11, Scott affidavit ¶ 8) (Dkt 1- Complaint ¶ 12)

23. Plaintiff was aware of the District's anti-discrimination policy and that procedures were established to investigate complaints under the policy.  (Ex. 1, Owens depo 218:13-219:4)

24. The District enforces its anti-discrimination policy by establishment of a process for investigating and determination of complaints of discrimination.  If discrimination is found, sanctions can be imposed against the offending persons.  Discrimination complaints at Gateway Community College by employees go to the Vice President of Administrative Services, who is required to promptly investigate the complaint and make findings, conclusions and recommendations to the College's President. The College President can adopt, reject or modify the proposed findings and conclusions. The final written decision is made by the College President and issued to the complainant.  The complainant has a right to ask for reconsideration of the written decision.  (Ex. 3, Lugo affidavit ¶ 16) (Ex. 4, Castellanos affidavit ¶ 19) (Ex. 10, Bowers affidavit ¶ 10) (Ex. 11, Scott affidavit ¶ 9)

25. An internal EEO complaint alleging discrimination based upon protected criteria such as race can be submitted by any employee, including those who are on probation.  (Ex. 3, Lugo affidavit ¶ 17) (Ex.4 , Castellanos affidavit ¶ 20) (Ex. 9,

Bellino affidavit ¶ 15-16) (Ex. 10, Bowers affidavit ¶ 11) (Ex. 11, Scott affidavit ¶ 10)

**E. <u>Cutting Edge Style Academy Dealings And Policies</u>**

26. At CESA, from November 30, 2012 through May 2013 Defendant Hemming served as the Clinic Floor Supervisor.  In that position, Hemming had a supervisory role over Plaintiff.  (Ex. 1, Owens depo 75:14-22, 76:13-77:13) (Ex. 2, Hemming affidavit ¶ 6-7)

27. From November 2012 to May 2013, as the Clinic Floor Supervisor Defendant Hemming did not write up Plaintiff for anything.  (Ex. 1, Owens depo 77:14-19)

28. Defendant Hemming at CESA asked Plaintiff if Plaintiff would report information about a Caucasian full-time instructor (Dana Bell).  Hemming supervised Bell.  The information was about whether or not the instructor followed the curriculum, about classroom management, and what was going on in the class.  (Ex. 1, Owens depo 84:24-86:18)  (Ex. 5, Main depo 15:10-17, 27:17-29:23)

29. Hemming asked CESA instructor Carolyn Main about similar performance information regarding Dana Bell and Robin Deal.  Hemming supervised those instructors at CESA.  (Ex. 1, Owens depo 84:24-86:18)  (Ex. 5, Main depo 15:10-17, 27:17-32:4)

30. At CESA, all of the students were high school students attending the cosmetology program.  Those students' tuition was paid by the Western Maricopa Education Center ("West-MEC").  West-MEC is a public school district comprised of ten member school districts and over 40 member high schools located in the West

Valley.  (Ex. 1, Owens depo 116:24-117:11) (Ex. 2, Hemming affidavit ¶ 13) (Ex. 8, Wurster affidavit ¶ 12-13) (Dkt 1- Complaint ¶ 11)

31. At CESA, all of the instructional activities, including classroom activities, course materials, labs and clinic education, were required to be done in English.  Students were not permitted to speak any other language, including Spanish, in the classroom.  Plaintiff enforced that rule because she knew it was lawful.  (Ex. 1, Owens depo 88:8-89:8)  (Ex. 5, Main depo 32:5-33:1) (Ex. 6, Flores depo 15:23-16:6)

**F. <u>Claims Limited To Treatment At The Northwest Campus</u>**

32. Plaintiff applied to be the Assistant Program Manager of Cosmetology at the new Northwest Campus.  Plaintiff is not suing because she was unsuccessful in obtaining that position.  (Ex. 1, Owens depo 91:20-92:23)

33. Plaintiff's claims in this lawsuit relate only to alleged mistreatment at the Northwest Campus and she is not making any claim based upon her treatment at CESA.  She is also not claiming discrimination related to her application in 2012 to become the Clinic Floor Supervisor at CESA.  (Ex. 1, Owens depo 73:17-24, 75:2-17)

34. When she applied to become a full-time instructor at the new Northwest Campus, Plaintiff did not think Defendant Hemming was biased against Plaintiff.  (Ex. 1, Owens depo 97:10-22)

**G. <u>Northwest Campus Opens With New Probationary Employees</u>**

35. The Northwest Campus first opened and became operational for the 2013-14 school year.  August 5, 2013 was the first day of school.  The instructors and staff, however,

began work in July 2013 as temporary employees.  (Ex. 1, Owens depo 93:3-5, 95:9-14) (Ex. 2, Hemming affidavit ¶ 14) (Ex. 3, Lugo affidavit ¶ 18)

36. Defendant Hemming was hired to be the Assistant Program Manager for the Northwest Campus for the 2013-14 school year.  As a new employee in that position, Defendant Hemming was placed on one year's probation.  Hemming supervised all of the instructors at the Northwest Campus.  (Ex. 1, Owens depo 92:24-93:2) (Ex. 2, Hemming affidavit ¶ 15)

37. Effective August 5, 2013, Plaintiff was hired as a new full-time Cosmetology Associate Instructor at the Northwest Campus.  To facilitate Plaintiff doing training and some work before this date, Plaintiff was hired in July 2013 as a part-time temporary Cosmetology Associate Instructor.  (Ex. 1, Owens depo 95:9-17) (Ex. 3, Lugo affidavit ¶ 19) (Dkt 1- Complaint ¶ 36)

38. In addition to Plaintiff, the other full-time Cosmetology Associate Instructors hired to work at the new Northwest Campus were: Carolyn Main[2]; Robert Wood and Toni Trott.  (Ex. 1, Owens depo 101:24-102:18) (Ex. 3, Lugo affidavit ¶ 20) (Ex. 5, Main depo 15:10-17, 39:5-15) (Ex. 7, Trott depo 15:13-16:8)

39. Toni Trott is an African-American female.  (Ex. 1, Owens depo 102:10-14) (Ex. 7, Trott depo )

40. Plaintiff and the three other Cosmetology Associate Instructors at the Northwest Campus were all placed on one year's probation when they were hired effective in

---

[2] Carolyn Main's legal name is Carolyn Main, but she also is known by Carolyn Cardwell as she just hasn't changed her name after her divorce.  (Ex. 5, Main depo 4:11-20)

August 2013.  (Ex. 3, Lugo affidavit ¶ 19-21) (Ex. 5, Main depo 15:18-16:12) (Ex. 7, Trott depo 15:13-16:8, 18:4-16) (Dkt 1- Complaint ¶ 35)

41. At the Northwest Campus, unlike at CESA, in addition to cosmetology students, there were also aesthetician students.  That is a one year program.  (Ex. 1, Owens depo 101:8-14) (Ex. 2, Hemming affidavit ¶ 21) (Ex. 5, Main depo 35:24-36:10) (Ex. 7, Trott depo 25:2-4)

42. Shala Dveirin was the Aesthetician program's Lead Instructor for the Northwest Campus and the Buckeye Campus.  Dveirin worked initially as an instructor at the Northwest Campus for adults.  (Ex. 1, Owens depo 112:25-113:12 and ex. 10, p. 2) (Ex. 2, Hemming affidavit ¶ 17) (Ex. 5, Main depo 39:20-22) (Ex. 7, Trott depo 24:9-25:4)

## H. Northwest Campus Policies And Student Handbook

43. At the Northwest Campus, unlike at CESA, there were both high school students and adult non-high school students in the cosmetology program.  (Ex. 1, Owens depo 97:23-98:4) (Ex. 2, Hemming affidavit ¶ 21) (Ex. 5, Main depo 36:3-14)

44. The high school students' tuition at the Northwest Campus was paid by West-MEC.  (Ex. 1, Owens depo 116:24-117:11) (Dkt 1- Complaint ¶ 11)

45. At the Northwest Campus, all of the instructional activities, including classroom activities, course materials, labs and clinic education, were required to be done in English.  This was specified in the Student Handbook.  (Ex. 1, Owens depo ex. 6, p. 7 – MCCCD-O 399)  (Ex. 2, Hemming affidavit ¶ 18-19)

46. At the Northwest Campus, the high school students attended class or were on the clinic floor Monday through Friday from 2 pm to 6 pm.  On any Saturday they attended, the high school students were there from 8 am to 5 pm.  Adult non-high school students were on a different schedule than the high school students.  (Ex. 1, Owens depo 101:3-7 and ex. 6, p. 8 – MCCCD-O 400) (Ex. 2, Hemming affidavit ¶ 22)

47. Cosmetology students don't go onto the clinic floor to practice their skills on people until their second year.  (Ex. 1, Owens depo 98:18-21)

48. There were some differences in the rules applicable at the Northwest Campus to high school students and the adult non-high school students.  These differences included: (a) high school students could not leave the school (including going to their cars in the parking lot) during their 15 minute breaks, but adults could; (b) high schools students were graded on a scale of A (90-100%), B (86-89%), C (80-85%) or F (79% or lower), while adults were on a pass-fail grading system (79% or lower is failing); (c) high school students were subject to academic probation if they did not achieve a C or better each month and they could be removed after three consecutive months of probation, the adults were not subject to this requirement.  (Ex. 1, Owens depo ex. 6, p. 14-16 – MCCCD-O 406-408) (Ex. 2, Hemming affidavit ¶ 23) (Ex. 5, Main depo 38:12-39:4) (Ex. 7, Trott depo 96:7-13)

49. At the Northwest campus, the Student Handbook advised the cosmetology students that:

- Hazing and harassment were prohibited;

- They must always be respectful towards others and maintain a positive attitude;

- They must practice courtesy and professionalism at all times when dealing with other students, clients, visitors and staff;

- They were not permitted to eat and drink in the classrooms or on the clinic floor;

- They could not engage in offensive comments, images or gestures;

- They could not use personal electronic devices during instructional hours for personal, non-instructional purposes.

(Ex. 1, Owens depo ex. 6, p. 9-11, 18 – MCCCD-O 401-403, 410) (Ex. 2, Hemming affidavit ¶ 24) (Ex. 5, Main depo 49:6-50:19)

50. The requirement not to eat or drink in the classrooms or on the clinic floor was not just a policy set by the Maricopa Skill Center, but was mandated by State Cosmetology Board regulations.  (Ex. 1, Owens depo  119:18-120:4)

51. The Maricopa Skill Center published a single Maricopa Skill Center Cosmetology Student Handbook applicable for the 2013-14 school year for students at CESA, the Northwest Campus, and the Buckeye campus.  (Ex. 1, Owens depo ex. 6) (Ex. 2, Hemming affidavit ¶ 19) (Ex. 8, CJ Wurster affidavit ¶ 9, 14)

52. The 2013-14 Maricopa Skill Center's Cosmetology Student Handbook was available on-line to anyone on the Maricopa Skill Center's website.  (Ex. 1, Owens depo 122:19-22 and ex. 6)  (Ex. 2, Hemming affidavit ¶ 19) (Ex. 5, Main depo 49:6-24) (Ex. 6, Flores depo 21:8-22:11) (Ex. 8, CJ Wurster affidavit ¶ 10)

53.  The 2013-14 Maricopa Skill Center's Cosmetology Student Handbook was available by the time the school opened for students on August 5, 2013.  An instructor at the

Northwest campus was required to go over the Handbook with students on the first day of class.  (Ex. 2, Hemming affidavit ¶ 19-20) (Ex. 5, Main depo 49:6-50:19) (Ex. 7, Trott depo 31:10-32:6) (Ex. 6, Flores depo 21:8-22:23) (Ex. 8, CJ Wurster affidavit ¶ 11)

## I. Instructor's Assignments And Expectations At The Northwest Campus

54. Plaintiff was assigned at the Northwest Campus to be the sole second year instructor and her class was made up entirely of high school students.  (Ex. 1, Owens depo 98:13-17) (Ex. 6, Flores depo 9:5-17, 10:9-12, 20:18-21, 23:9-20)

55. Carolyn Main and Toni Trott were initially assigned at the Northwest Campus to be the instructor for first year high school students.  Robert Wood was initially assigned to be the instructor for the first year adult non-high school students.  (Ex. 5, Main depo 35:21-23) (Ex. 7, Trott depo 19:12-20:21)

56. One of the duties of an instructor is to monitor whether students were abiding by policies set forth in the 2013-14 Maricopa Skill Center's Cosmetology Student Handbook.  (Ex. 1, Owens depo 120:5-9)

57. At the Northwest campus, Defendant Hemming at or before the August 1, 2013 initial staff meeting provided handouts to Plaintiff and the other instructors regarding expectations of the instructors.  These expectations included: (a) arrive at least 15 minutes before a scheduled shift; (b) always follow and enforce state laws and regulations; (c) follow the curriculum and do not deviate from it; (d) always be consistent in enforcing the rules; (e) for any service performed on the clinic floor, for the instructor to check and consult with the student regarding their service being

provided; (f) check attendance daily and verify attendance was properly entered in the school's program; (g) personal services performed by students were limited to two specified days per month and must follow guidelines; and (h) no food or drink on clinic floor, other than bottled water.  The August 1, 2013 meeting also touched on the student handbook and how the instructors were expected to be familiar with its provisions.  (Ex. 1, Owens depo 127:3-129:9, 132:9-133:8 and ex. 7, 9) (Ex. 2, Hemming affidavit ¶ 40) (Ex. 5, Main depo 50:20-51:24) (Ex. 7, Trott depo 32:12-20, 44:9-46:8)

**J. Problems With Plaintiff's Performance**

***(1) Failure To Follow Curriculum***

58. Plaintiff failed to follow the curriculum in September 2013 as she was already a week behind schedule on September 5, 2013.  Plaintiff was unaware of a State Board test, which meant that the curriculum had to be adjusted to bring it back on track.  Only 1 of Owens' 20 students passed the State Board test.  (Ex. 2, Hemming affidavit ¶ 25-27 and ex. A)

59. Plaintiff failed to follow the curriculum in December 2013 when she failed to teach the students about facials on the day scheduled.  (Ex. 2, Hemming affidavit ¶ 30) Plaintiff failed to follow the curriculum in January 2014 when she failed to administer a test as scheduled.  (Ex. 2, Hemming affidavit ¶ 37 and ex. C)

60. Plaintiff failed to follow the curriculum in February 2014 when she failed to administer a test when scheduled.  Plaintiff acknowledged she failed to administer

the test as she claimed she was unable to do so with all of the material to cover. (Ex. 2, Hemming affidavit ¶ 38 and ex. D)

61. Because the curriculum is approved by the State Cosmetology Board, a failure to follow it could be a State Board violation. (Ex. 7, Trott depo 103:8-24)

62. Besides Plaintiff, no other instructors were reported to Defendant Hemming to have failed to follow the curriculum. (Ex. 5, Main depo 83:7-84:10) (Ex. 2, Hemming affidavit ¶ 39) (Ex. 7, Trott depo 103:8-24)

63. Defendant Hemming was aware that Plaintiff was not following the curriculum as Plaintiff was required to as part of her expectations for Plaintiff's job performance. The instructor expectation document stated: "Follow curriculum : do not deviate from classes to be taught." The August 1, 2013 agenda stated: "Follow curriculum – do not deviate". (Ex. 1, Owens depo ex. 7, 9) (Ex. 2, Hemming affidavit ¶ 39-40)

*(2) Late To Work*

64. On August 20, 2013 (approximately two weeks after school began), Defendant Hemming advised Plaintiff that she did not want Plaintiff to get into a habit of being late as she had in the past. (Ex. 2, Hemming affidavit ¶ 41 and ex. E)

65. On November 25, 2013, Defendant Hemming issued a schedule for work for all instructors including Plaintiff. E-mail notification was issued to all instructors regarding the change and how to access it. Plaintiff's schedule was set for 9:30 am to 6 pm Monday through Friday. If Plaintiff was scheduled to work a Saturday one week, then her weekday schedule for that same week would be 11 am to 6 pm. (Ex. 2, Hemming affidavit ¶ 42 and ex. F)

66. Between November 25, 2013 and January 27, 2014 only one change was made on January 15, 2014 to the instructor's schedule, but the change applied solely to the Aesthetics' instructors.  (Ex. 2, Hemming affidavit ¶ 43)

67. Plaintiff was late to work five times from January 2-11, 2014 and so she was written up by Defendant Hemming in an Incident Report for excessive tardiness.  (Ex. 2, Hemming affidavit ¶ 46 and ex. G)

68. Despite the November 25, 2013 email advising about the schedule change, Plaintiff claimed in January 2014 that she was unaware that the schedule had been changed since October 2013.  (Ex. 2, Hemming affidavit ¶ 47 and ex. H)

69. On January 13, 2014, Hemming emailed to Plaintiff three incident reports including the one on excessive tardiness to work.  (Ex. 2, Hemming affidavit ¶ 46, 54 and ex. G)

70. Plaintiff did not challenge the accuracy of the Incident Report regarding the tardiness.  (Ex. 1, Owens depo 149:21-150:6)

71. Besides Plaintiff, no other instructors were reported to Defendant Hemming to have been frequently tardy at work like Plaintiff.  The other instructors were late maybe once or twice during the entire school year.  (Ex. 2, Hemming affidavit ¶ 48) (Ex. 5, Main depo 42:14-43:14) (Ex. 7, Trott depo 79:23-80:15)

### (3) Allowing High School Students To Leave Closed Campus

72. The 2013-14 Student Handbook provision for a closed campus where high school students could not leave during 15 minute breaks applied at all campuses, including

CESA and the Northwest Campus.   (Ex. 1, Owens depo ex. 6, p. 22, ¶ 18) (Ex. 6, Flores depo 45:3-13)

73. Plaintiff claims she was using the CESA 2012-13 Student Handbook and she did not review the 2013-14 Student Handbook, which describes that all three campuses are a closed campus where high school students could not leave during 15 minute breaks. Plaintiff claims she was too busy to look at the current handbook applicable to the campus she was working at in 2013-14.  (Ex. 1, Owens depo 121:13-122:12, 125:18-126:15 and ex. 6)

74. On August 12, 2013, Defendant Hemming sent an email to all of the instructors, including the Plaintiff, which in part stated: "Please remind your students they are ONLY allowed to go on break in the break room.  **Remind them we are a closed campus . . . They will not be allowed to leave campus starting tomorrow**. . . This is something West-Mec has put in place for students safety."  (bold added) (Ex. 1, Owens depo 165:16-166:23 and ex. 16) (Ex. 5, Main depo 56:12-25 and ex. 31) (Ex. 7, Trott depo 56:20-58:11)

75. On December 18, 2013, Plaintiff wrote in an e-mail to Defendant Hemming that she was questioning why the Northwest Campus was a closed campus, where students could not leave during breaks, when CESA was not a closed campus. In fact both CESA and the Northwest Campus were closed campuses as stated in the Student Handbook applicable at both campuses.  (Ex. 1, Owens depo ex. 6, p. 22 – MCCCD-O 414) (Ex. 2, Hemming affidavit ¶ 49-50 and ex. I)

76. On Friday, December 20, 2013, at approximately 2:10 pm (so 10 minutes after class began), Plaintiff allowed two of her high school students to leave the campus and go across the street to the Fry's food store to get food in violation of the closed campus policy.  (Ex. 1, Owens depo 154:21-155:17) (Ex. 2, Hemming affidavit ¶ 51 and ex. J)

77. Defendant Hemming was informed about Plaintiff on December 20, 2013 allowing the two high school students to leave campus in violation of policy.  (Ex. 2, Hemming affidavit ¶ 51 and ex. J)

78. Besides Plaintiff, no other instructors were reported to Defendant Hemming to have allowed high school students to leave campus during class time or even during the 15 minute breaks.  (Ex. 2, Hemming affidavit ¶ 52) (Ex. 5, Main depo 57:1-9) (Ex. 7, Trott depo 94:4-12, 96:19-97:5)

*(4) Allowing Students In The Instructor's Office*

79. The instructors had a separate office just for them.  The instructor's personal belongings were kept at their desks in that office.  Work related materials, such as tests, would also be stored there as well.  (Ex. 5, Main depo 53:16-54:1) (Ex. 7, Trott depo 47:9-19)

80. Before October 2, 2013, Plaintiff allowed two students into the instructor's office.  (Ex. 1, Owens depo 134:14-135:8)

81. On October 2, 2013 there was a staff meeting involving Defendant Hemming and all of the instructors.  The agenda explains that no students were "ever" to be allowed in the instructor's office. This was also communicated verbally as well.  (Ex. 1, Owens

depo 133:19-134:18 and ex. 10) (Ex. 2, Hemming affidavit ¶ 53) (Ex. 7, Trott depo 46:9-47:6)

82. By that time, October 2, 2013, a notice was also posted on the door to the instructor's office saying no students were allowed.  (Ex. 5, Main depo 54:2-13) (Ex. 7, Trott depo 47:3-6)

83. In January 2014, Plaintiff allowed three students to remain in the instructor's office and Defendant Hemming wrote up an Incident Report about the policy violation. (Ex. 2, Hemming affidavit ¶ 54 and ex. G)

84. On January 13, 2014 Hemming emailed to Plaintiff three incident reports including the one for the three students being in the instructor's office.  (Ex. 2, Hemming affidavit ¶ 54 and ex. G)

85. Plaintiff did not challenge the accuracy of the Incident Report regarding having students in the instructor's office.  (Ex. 2, Hemming affidavit ¶ 55)

86. Besides Plaintiff, after October 2, 2013 no other instructor was reported to Defendant Hemming to have allowed students to remain in the instructor's office in violation of policy affirmed at the October 2, 2013 staff meeting.  (Ex. 1, Owens depo 146:25-147:12) (Ex. 2, Hemming affidavit ¶ 56)

***(5) Failure To Check And Sign Off On Attendance And Assignments Daily***

87. The written expectations for all instructors stated:  "Assignments can only be signed the day they are completed."  While an instructor is required to sign off daily on attendance and floor (assignment) sheets, in September 2013 it was reported by a substitute instructor to Defendant Hemming that Plaintiff would sign her students'

attendance and assignment sheets at the end of a week rather than daily.  In December 2013 it was reported again that Plaintiff was signing attendance and assignment sheets at the end of a week rather than daily as required.  (Ex. 1, Owens depo ex. 10 – MCCCD-O 90- and ex. 20) (Ex. 2, Hemming affidavit ¶ 28, 57-59 ) (Ex. 5, Main depo 68:20-70:9) (Ex. 7, Trott depo 42:20-43:9)

88. Besides Plaintiff, no other instructor was reported to Defendant Hemming to have signed students' attendance and/or assignment sheets at the end of a week or a month rather than daily as required.  (Ex. 2, Hemming affidavit ¶ 60) (Ex. 5, Main depo 68:20-70:9)

***(6) Showing Non-Cosmetology Movie And Non-Instructional Videos During Class***

89. On September 13, 2016, a student in Plaintiff's class told Defendant Hemming and Paul McCray that Plaintiff played videos of Tabitha's Takeover rather than the State Board boot camp.  (Ex. 2, Hemming affidavit ¶ 26 and ex. A)

90. Plaintiff claims instructors were told they could show videos to their class if they were salon or industry related.  (Ex. 1, Owens depo 107:3-108:2)

91. On December 10, 2013, Plaintiff was reminded by Carolyn Main that Defendant Hemming at the October 2, 2013 staff meeting told the instructors that they could not show even salon related videos like Tabitha's Takeover.  This was because Main observed Plaintiff showing the video.  (Ex. 1, Owens depo 108:3-109:15 and ex. 5) (Ex. 2, Hemming affidavit ¶ 29, 31-32) (Ex. 5, Main depo 61:3-18)

92. Defendant Hemming called Carolyn Main the eyes and ears of the facility and Main was to report any policy violations by any instructor.  Plaintiff was not singled out for

any special scrutiny.  Hemming asked Main in approximately September or October 2013 to keep her eyes and ears open because Hemming was no longer going to be at Northwest Campus every day.  (Ex. 5, Main depo 62:15-63:12, 72:6-74:23)

93. On December 19, 2013, substitute instructor Cheri Snow reported that students in Plaintiff's class were used to finishing clinic floor assignment and then going to the classroom to watch Tabitha's Salon Takeover and they complained when Snow informed them they could not watch it.  (Ex. 2, Hemming affidavit ¶ 33 and ex. B)

94. On December 20, 2013, Plaintiff showed the movie Jingle All the Way to her class. This is a movie unrelated to cosmetology.  (Ex. 5, Main depo 63:13-64:2) (Ex. 6, Flores depo 43:1-4)

95. On December 20, 2013, Defendant Hemming was informed that the Jingle All the Way Movie was shown.  (Ex. 2, Hemming affidavit ¶ 34)

96. Besides Plaintiff, no other instructor was reported to Defendant Hemming to have shown any movie during a class which was unrelated to cosmetology education.  This could be considered fraud as the students were receiving hours towards their State Board requirement for hours of classroom instruction.  (Ex. 2, Hemming affidavit ¶ 35-36)

97. Besides Plaintiff no one else at Northwest Campus showed Tabitha's Takeover videos to their students.  (Ex. 7, Trott depo 52:11-53:13)

**(7) Allowing Food And Drink In A Classroom**

98. At CESA, when potlucks were permitted, the food was in the student break room. (Ex. 6, Flores depo 19:18-20:17)

99. At the October 2, 2013 staff meeting the instructors, including Plaintiff, were informed again that "NO FOOD OR DRINK in classrooms or clinic floor –EVER!" (Ex. 1, Owens depo 135:9-17 and ex. 10)

100.     Despite the October 2, 2013 meeting directive, several instructors (Plaintiff being only one of several) held potlucks near Christmastime.  When the instructors saw the administrative assistant taking note of who was holding potlucks in classrooms, instructor Carolyn Main sent a text to Defendant Hemming saying they thought it was okay to hold Christmas time potlucks. Defendant Hemming responded that no it was not okay as no food or drink was ever to be in the classrooms or on clinic floor.  Those texts were shared with all of the instructors including Plaintiff. No one, including Plaintiff, was written up for the Christmas time potlucks.  (Ex. 2, Hemming affidavit ¶ 62-63) (Ex. 7, Trott depo 39:5-42:19)

101.     On Saturday, January 11, 2014, Plaintiff's class was on the clinic floor. Plaintiff bought pizza and drinks for her students and allowed them to eat and drink in the classroom and also the student lounge.  The pizza boxes and empty soda bottles were left in the classroom.  (Ex. 1, Owens depo 140:2-13) (Ex. 2, Hemming affidavit ¶ 61) (Ex. 6, Flores depo 56:4-21)

102.     Defendant Hemming wrote Plaintiff up in an Incident Report regarding what Hemming described as a pizza party.  (Ex. 1, Owens depo 138:10-21 and ex. 12) (Ex. 2, Hemming affidavit ¶ 61 and ex. G)

103.     On January 13, 2014 Hemming emailed to Plaintiff three incident reports including the one for the pizza party.  (Ex. 2, Hemming affidavit ¶ 61 and ex. G)

104.     Plaintiff challenged the Incident Report regarding the pizza party claiming that food or drink was previously permitted in the classroom for potlucks for a holiday or a special event.  (Ex. 1, Owens depo 141:18-25) (Ex. 2, Hemming affidavit ¶ 64)

105.     Defendant Hemming never told Plaintiff that she could have potlucks where the food was in the classroom.  (Ex. 1, Owens depo 142:4-8)

106.     Based upon Plaintiff's challenge the Incident Report about the pizza party was replaced with a verbal warning not to violate the no food or drink policy.  Plaintiff accepted the verbal warning.  (Ex. 1, Owens depo 153:25-154:10) (Ex. 2, Hemming affidavit ¶ 64)

107.     After the December 20, 2013 text, besides Plaintiff, no other instructor was reported to Defendant Hemming to have allowed any student to eat or drink in the classroom or on the clinic floor.  (Ex. 2, Hemming affidavit ¶ 65) (Ex. 7, Trott depo 93:1-8)

   *(8) Sleeping On The Job*

108.     On October 1, 2013 at approximately 10:45 am, it was reported to Defendant Hemming that Plaintiff wasn't feeling well and had been sleeping in the instructor's office.  This information was reported by Carolyn Main, Shala Dveirin, and Robert Wood and confirmed in emails from each of them.  Main reported verbally and later via e-mail that Main saw Plaintiff asleep for 10 minutes.  (Ex. 1, Owens depo 152:2-19 and ex. 15) (Ex. 2, Hemming affidavit ¶ 66) (Ex. 5, Main depo 57:20-59:20 and ex. 32)

109.     On October 1, 2013, Plaintiff was scheduled to work from 9:30 am until 6 pm. (Ex. 2, Hemming affidavit ¶ 67)

110.     It was not unusual for Defendant Hemming to ask an instructor to document a verbal report.  (Ex. 7, Trott depo 92:18-25)

111.     Defendant Hemming wrote up Plaintiff in an Incident Report for her sleeping on the job based upon the reports of the three instructors.  (Ex. 1, Owens depo 150:11-21 and ex. 15) (Ex. 2, Hemming affidavit ¶ 68-69)

112.     Defendant Hemming did not ask Toni Trott what she observed on October 1, 2013 regarding the sleeping on the job incident.  (Ex. 2, Hemming affidavit ¶ 71) (Ex. 7, Trott depo 88:10-13)

113.     Plaintiff challenged and disputed the claim that she was sleeping on the job that day.  Plaintiff claims that she just rested her eyes for 15 minutes.  (Ex. 1, Owens depo 152:11-23)

114.     Besides Plaintiff, no other instructors were reported to Defendant Hemming to have been sleeping on the job.  (Ex. 2, Hemming affidavit ¶ 70)

**(9) Failure To Follow State Regulations On Sanitation**

115.     Mock State Board inspections without any prior notice are an appropriate way to keep in compliance with state regulations.  They are done when there are no students, just the manager and the instructors.  For real inspections there is no prior notice.  (Ex. 1, Owens depo 193:22-194:16) (Ex. 5, Main depo 89:1-22) (Ex. 7, Trott depo 105:8-106:18)

116.    During a November 5, 2013 mock inspection conducted by Defendant Hemming, food and drink were discovered in the stations on the clinic floor and lockers for Plaintiff's students.  Plaintiff pointed out that all three of the other instructors also used the clinic floor.  Defendant Hemming's point made to all instructors was that there should be no food or drink on the clinic floor because if that was found during an actual State inspection the facility could be shut down.  (Ex. 1, Owens depo 194:17-196:20)  (Ex. 2, Hemming affidavit ¶ 72) (Ex. 5, Main depo 89:23-91:1)

117.    Defendant Hemming conducted her own informal inspection of the clinic floor area.  On December 13 and December 19, Hemming noted again that there were sanitation violations present in the area used by Plaintiff's students.  (Ex. 2, Hemming affidavit ¶ 73-74)

*(10) Improperly Allowing Students To Perform Personal Services*

118.    Defendant Hemming issued on October 21, 2013 Personal Services Criteria setting forth when students could perform services on each other.  Among the criteria was that the student had 90% or greater attendance the previous month and 90% or greater grade from the previous month.  If students qualified then on two specified Fridays per month, the students could perform and receive personal services.  (Ex. 1, Owens depo ex. 27) (Ex. 2, Hemming affidavit ¶ 75 and ex. K) (Ex. 7, Trott depo 63:21-64:8)

119.    Personal services referred to performing a cosmetology service only on another student.  (Ex. 7, Trott depo 63:12-20)

120.     Plaintiff never shared with her students the criteria to qualify and what days personal services were allowed.  (Ex. 1, Owens depo 205:3-9)

121.     On December 18 and 19, 2013, Carolyn Main and substitute instructor Cheri Snow reported to Defendant Hemming that the students in Plaintiff's class were allowed to perform personal services on each other as Plaintiff did not agree with the rule and they complained when Snow would not let them to do personal services. Main questioned why Plaintiff was allowed to violate the rules without any consequence.  (Ex. 2, Hemming affidavit ¶ 76-77)

122.     Plaintiff acknowledged that she did bend the rules and not follow them as to the criteria for and when personal services could be performed.  (Ex. 1, Owens depo 206:21-207:11)

123.     The instructors, including Plaintiff, were aware that on student make-up days there were no clients allowed to be seen by the students.  This was because there was no one to take money for the services.  (Ex. 1, Owens depo 200:5-201:5 and ex. 20) (Ex. 5, Main depo 65:6-66:13)

124.     The instructors, including Plaintiff, were aware that on student make-up days the students could not perform personal services.  (Ex. 1, Owens depo 201:6-9 and ex. 20) (Ex. 5, Main depo  65:6-67:15)

125.     Plaintiff did allow her students to violate policy by performing services on Saturday, October 26, 2013, which was a make-up day, for a client (a student's boyfriend).  Plaintiff acknowledged violating the policies  (Ex. 1, Owens depo

201:10-20 and ex. 20) (Ex. 2, Hemming affidavit ¶ 76) (Ex. 5, Main depo 65:6-68:14) (Ex. 6, Flores depo 50:1-4)

126.     Plaintiff did allow her students to violate policy by performing personal services on October 26, 2013, which was a make-up day, on each other.  Plaintiff acknowledged violating the policies.  (Ex. 1, Owens depo 201:10-202:2 and ex. 20) (Ex. 2, Hemming affidavit ¶ 76) (Ex. 5, Main depo 65:6-68:14)

127.     Besides Plaintiff no other instructor was reported to Defendant Hemming to have allowed students to perform personal services in violation of the criteria.  (Ex. 2, Hemming affidavit ¶ 78)

**K. <u>Performance Evaluation Policy And Practice</u>**

128.     From July 1, 2011 through February 2014 the Maricopa Skill Center' Policies provided that new full-time employees would serve a one year probationary period from the date of hire.  During the probationary period an employee could be terminated for any reason.  Probationary employees were supposed to receive written evaluations from their supervisors: one at the end of the first four months; one at the end of eight months; and the annual evaluation at the end of the year.  (Ex. 3, Lugo affidavit ¶ 23-24) (Ex. 4, Castellanos affidavit ¶ 25-26) (Dkt 1 – Complaint ¶ 16-19)

129.     An employee is shown their written evaluation and the employee signs off on the evaluation form.  (Ex. 3, Lugo affidavit ¶ 22) (Ex. 4, Castellanos affidavit ¶ 23) (Ex. 9, Bellino affidavit ¶ 19)

130.     Although District policies have required annual written performance evaluations of most employees, these are not always completed each year.  (Ex. 4, Castellanos affidavit  ¶ 21-22) (Ex. 9, Bellino affidavit ¶ 17-18)

131.     The Maricopa Skill Center's Policies were amended and the provision for a four month and eighth month written evaluation of probationary employees was removed from the previous policies.  The new provision only discusses an annual evaluation.  However, while those policies were supposed to go into effect November 1, 2013, the old policies were still being followed with regard to employees of the Maricopa Skill Center.  (Ex. 1, Owens depo 264:1-10 and ex. 23) (Ex. 3, Lugo affidavit ¶ 23) (Ex. 4, Castellanos affidavit ¶ 25) (Ex. 8, Wurster affidavit ¶ 16-18 and ex. A, p. 6 – MCCCD-O 2108)

132.     Defendant Hemming in December 2013 sent to each instructor a packet for self –assessment of their own performance.  Each instructor filled out the packet and returned it to Hemming on or about December 20, 2013.  (Ex. 1, Owens depo 264:11-19, 293:21-294:5 298:25-299:3 and ex. 26, 29) (Ex. 2, Hemming affidavit ¶ 79) (Ex. 7, Trott depo 117:3-118:1)

133.     Neither Plaintiff nor any of the other instructors at the Northwest Campus received any written feedback or a written performance evaluation completed by Defendant Hemming.  (Ex. 1, Owens depo 264:20-25, 299:21-300:5) (Ex. 2, Hemming affidavit ¶ 80) (Ex. 4, Castellanos affidavit ¶ 24) (Ex. 7, Trott depo 117:3-118:13, 120:5-9)

134.     The personnel files of Plaintiff, Carolyn Main, Robert Wood, Toni Trott, Shala Dveirin, and Defendant Lisa Hemming do not show a written performance evaluation for the 2013-14 school year.  Defendant Hemming also did not receive a written performance evaluation from her supervisor for the 2013-14 school year.  (Ex. 2, Hemming affidavit ¶ 81) (Ex. 4, Castellanos affidavit ¶ 24)

135.     First year students were working on the clinic floor one day a week, on Mondays, and were in the classroom the other days.   Second year students were in the classroom one day a week and on the clinic floor for the other days.  (Ex. 1, Owens depo 273:3-6) (Ex. 5, Main depo 23:24-24:14) (Ex. 6, Flores depo 10:10-12, 12:7-12, 20:18-21, 23:21-24:15) (Ex. 7, Trott depo 32:21-33:8)

136.     Defendant Hemming visited Plaintiff's classroom of second year students one time for evaluation purposes.  (Ex. 1, Owens depo 255:18-256:3) (Ex. 2, Hemming affidavit ¶ 82)

137.     Defendant Hemming visited the classroom of other instructors at most one time.  (Ex. 1, Owens depo 272:12-15) (Ex. 2, Hemming affidavit ¶ 82) (Ex. 5, Main depo 51:25-52:25)  (Ex. 7, Trott depo 118:14-17, 119:4-5)

**L. No Evidence Of Racial Animus Or Bias**

138.     Defendant Lisa Hemming never said anything reflecting any racial bias or animus against African-Americans.  (Ex. 1, Owens depo 145:20-146:2, 219:23-220:3) (Ex. 5, Main depo 26:20-27:16) (Ex. 6, Flores depo 50:14-18) (Ex. 7, Trott depo 67:14-22)

139.     Toni Trott, another African-American, never felt there was any racial discrimination at the Northwest Campus.  (Ex. 1, Owens depo 225:4-7) (Ex. 7, Trott depo 73:10-13)

140.     Toni Trott had no Incident Reports written up by Defendant Hemming regarding Trott's performance at the Northwest Campus.  Trott had no performance issues like Owens did.  Hemming even asked Trott to work on developing a new curriculum because of Trott's special talents and skills.  (Ex. 1, Owens depo 249:7-10) (Ex. 2, Hemming affidavit ¶ 85) (Ex. 7, Trott depo 75:3-22)

141.     Toni Trott had no issues with Defendant Hemming while at the Northwest Campus.  (Ex. 7, Trott depo 78:5-8) (Ex. 2, Hemming affidavit ¶ 85)

142.     Plaintiff did not ever file any EEO complaint under the District's anti-discrimination policy asserting that she felt she was being discriminated against due to her race or other protected criteria.  (Ex. 1, Owens depo 219:9-13)

143.     Plaintiff did not ever verbally allege to anyone at the District that she was discriminated against due to her race.  (Ex. 1, Owens depo 219:14-22)

144.     Plaintiff testified:

What makes you believe you were terminated because of your race?

A. I never said I was terminated because of my race.

Q. Are you not claiming that in this lawsuit?

A. Discrimination wasn't based on my race. It was based on the fact that I was being treated differently than other instructors, that I was being isolated from other instructors.

Q. Do you believe that you were treated differently because of your race and isolated

from other instructors because of your race?

A. I believe I was treated differently because of the fact that I did speak up against

some of the unfair practices at our campus.

(Ex. 1, Owens depo 220:10-23)

145.     Plaintiff felt she was singled out and treated differently from every other

instructor, including Toni Trott another African-American.  Plaintiff has no reason to

believe Trott was treated differently because of her race.  (Ex. 1, Owens depo

102:10-14, 223:4-16)

146.     Carolyn Main, a Caucasian, felt she was being singled out by Defendant

Hemming at the Northwest Campus.  (Ex. 7, Trott depo 78:9-19, 79:4-15)

**M. Spanish In Student Lounge**

147.     Under District policies, bullying was not allowed whether done in English or

Spanish.  Students were aware of these policies.  (Ex. 1, Owens depo 129:10-20 and

ex. 6, p. 10, 18) (Ex. 5, Main depo 33:2-17) (Ex. 6, Flores depo 19:7-17)

148.     Shortly after school began in mid-August, Plaintiff claims that Defendant

Hemming in the hallway said Plaintiff needed to tell her students they could not

speak Spanish in the student lounge.   Plaintiff said to Hemming that Plaintiff could

not tell the students that they couldn't speak Spanish in the lounge.  This

conversation happened in the scope of Plaintiff's employment as the instructor and

what she was asked to do as the instructor.  (Ex. 1, Owens depo 167:14-168:23,

174:10-25)

149.     Defendant Hemming did not ask Plaintiff to discipline any specific student(s) for speaking Spanish.  (Ex. 1, Owens depo 175:4-19)

150.     Plaintiff has no knowledge that Defendant Hemming directly spoke with any of Plaintiff's Hispanic students.  (Ex. 1, Owens depo 259:15-260:10)

151.     A second meeting, which happened before September 17, 2013, occurred between Defendant Hemming and Plaintiff where the subject was the speaking of Spanish by students.  At this meeting, Hemming said that complaints had been received about students bullying other students in Spanish.  Plaintiff said if there was bullying then Hemming should get students together to try to mediate.  (Ex. 1, Owens depo 168:24-170:1, 301:10-15, 301:16-25) (Dkt 1- Complaint ¶ 38)

152.     Plaintiff testified that she told all of her students (eighty percent of whom were Hispanic) that she was instructed to tell them they could not speak Spanish in the student lounge.  Plaintiff told the students that they should have their parents contact West-MEC because this requirement for the student lounge was not in the student handbook.  (Ex. 1, Owens depo 171:1-13, 171:18-173:10) (Ex. 6, Flores depo 34:17-21)

153.     Plaintiff did tell her students that they could not speak Spanish in the classroom or on the clinic floor.  That was the policy at Northwest Campus and at CESA.  (Ex. 1, Owens depo 255:11-17) (Ex. 5, Main depo 88:16-22)

154.     Plaintiff has no knowledge that the students or their parents contacted West-MEC about the directive not to speak Spanish in the student lounge.  (Ex. 1, Owens depo 171:14-17)

155.     Defendant Hemming did not direct other instructors to notify their students or a portion of their students that they could not speak Spanish in the student lounge. (Ex. 2, Hemming affidavit ¶ 91, 93) (Ex. 5, Main depo 87:1-88:11) (Ex. 7, Trott depo 69:6-15, 104:8-20)

156.     The request not to speak Spanish in the student lounge was communicated because a student complained about being bullied.  That student was crying and saying that she felt that certain Hispanic girls were talking bad about her.  This information was conveyed by Defendant Hemming to the Hispanic girls as the reason why they were requested not to speak Spanish in the student lounge.  (Ex. 2, Hemming affidavit ¶ 91-92) (Ex. 6, Flores depo 30:19-31:21, 35:21-36:11) (Ex. 7, Trott depo 69:6-71:10)

157.     After the meeting with the Hispanic girls from Plaintiff's class, although those students spoke Spanish in the lounge they were never disciplined for speaking Spanish in the student lounge.  (Ex. 6, Flores depo 33:8-20)

**N. Plaintiff's Meetings With Kristina Scott**

158.     Kristina Scott was an African-American female who was Defendant Hemming's supervisor.  (Ex. 1, Owens depo 176:12-25) (Ex. 11, Scott affidavit ¶ 16)

159.     Plaintiff has no reason to believe Kristina Scott was biased against Plaintiff due to Plaintiff's race.  (Ex. 1, Owens depo 177:1-4)

160.     Plaintiff met with Kristina Scott and Defendant Hemming on September 18, 2013.  Plaintiff claims that this meeting was about the instruction to her students that

they could not speak Spanish in the student lounge.  (Ex. 1, Owens depo 179:3-9, 183:12-21) (Ex. 11, Scott affidavit ¶ 11)

161.     Plaintiff met with just Kristina Scott on October 25, 2013.  That meeting was prompted by the Incident Report Plaintiff received for allegedly sleeping on the job.  In this meeting Plaintiff claims to have again told Scott about being instructed to tell students they could not speak Spanish in the student lounge.  (Ex. 1, Owens depo 179:10-13, 180:4-181:1) (Ex. 11, Scott affidavit ¶ 12)

162.     Plaintiff met with Kristina Scott and Defendant Hemming on January 17, 2014.  This meeting was primarily about the Incident Report Plaintiff received for the alleged pizza party.  The sleeping on the job Incident Report was also discussed.  Plaintiff also brought up the difference in treatment of high school students and adult non-high school students at the Northwest Campus.  Plaintiff claims that she told Scott that she felt she was being retaliated for challenging the no Spanish in the student lounge directive.  (Ex. 1, Owens depo 179:14-19, 181:2-182:20,183:22-184:5) (Ex. 11, Scott affidavit ¶ 13)

163.     Plaintiff did not ever tell Kristina Scott that she felt she was being discriminated against due to Plaintiff's race.  (Ex. 1, Owens depo 153:5-8) (Ex. 11, Scott affidavit ¶ 15)

164.     If an employee such as Plaintiff had an issue they were to first raise it with Defendant Hemming, their supervisor.  If the issue was still not resolved, then the issue could be brought to Kristina Scott.  For issues relating to high school students,

if the matter was still not resolved then the employee could contact West-MEC's

liaison, Shelly Thome.  (Ex. 1, Owens depo ex. 11, p. 1)

### O. **Plaintiff's Reports About Matters Relating To Her Job**

165.     At the Northwest Campus, the Aesthetician program had its own separate

classroom and training room just for aesthetician students.  Aestheticians are subject

to different regulations than cosmetologists, and so are the students from those

disciplines.  No cosmetology students were supposed to or did use the aesthetician's

facilities because of the different rules and regulations.  (Ex. 2, Hemming affidavit ¶

86)

166.     Plaintiff wanted to use the aesthetician training room for her class to teach

them how to perform facials.  Defendant Hemming denied the request as no

cosmetology student was to use the aesthetician's training room.  Plaintiff saw Mr.

Wood's students doing their facial training on the floor of Wood's classroom.  (Ex. 1,

Owens depo 197:25-199:24) (Ex. 2, Hemming affidavit ¶ 87, 90) (Dkt 1 – Complaint

¶ 50)

167.     Plaintiff's class did their facial training using mannequins because Plaintiff

did not think it was sanitary to do the training on the floor as Wood's class had done.

Plaintiff also thought it would be unsafe to do the facial training using the desks in

the classroom.  (Ex. 1, Owens depo 197:25-199:24) (Ex. 2, Hemming affidavit ¶ 90)

168.     On December 17, 2013 Plaintiff sent an e-mail to Kristina Scott.  The e-mail

raised a number of issues relating to Ms. Owen's duties as an instructor and the

support she was or was not receiving from her supervisor.  Among the issues raised

was the denial of access to the aestheticians' training room by cosmetology students. (Ex. 11, Scott affidavit ¶ 17 and ex. A)

169.     There is a report called the 90/90 report which would reflect students who achieved 90% or better attendance during the preceding month and 90% or better in grades from the preceding month.  Such report was made available for CESA, but not the Northwest Campus.  (Ex. 2, Hemming affidavit ¶ 88)

170.     Whether a student was on the 90/90 report as having met those standards mattered for determining if the student qualified to perform personal services.  (Ex. 1, Owens depo ex. 27) (Ex. 2, Hemming affidavit ¶ 88)

171.     Plaintiff requested that she be provided the 90/90 report.  Defendant Hemming denied the request as no instructor at the Northwest Campus had access to such report.  The information about attendance and grades could be ascertained by the instructors without the 90/90 report.  The instructors had the attendance sheets and could look up attendance through the Skilltime program.  Grades could be viewed by an instructor through the Canvas program.  (Ex. 2, Hemming affidavit ¶ 88) (Ex. 7, Trott depo 62:1-63:3)

172.     No instructor was provided the 90/90 report at the Northwest Campus.  (Ex. 2, Hemming affidavit ¶ 89)

173.     Plaintiff raised the lack of access to a 90/90 report with Kristina Scott in the December 17, 2013 e-mail.  This was an issue relating to the performance of Plaintiff's job.  (Ex. 11, Scott affidavit ¶ 17 and ex. A)

174.    Plaintiff and Toni Trott received training in July 2013 regarding use and entry of data in the Skilltime program.  Plaintiff declined to stay for the portion to practice what they were taught because she said she already knew how to use the program. (Ex. 7, Trott depo 58:16-60:17 and ex. 36)

175.    Students would know whether they achieved 90% attendance and the 90% for the grades through Canvas.  (Ex. 7, Trott depo 61:2-62:4)

176.    Plaintiff in a December 17, 2013 e-mail to Kristina Scott questioned why the disparity of treatment existed between high school students and adult non-high school students regarding the closed campus and performing personal services on classmates.  (Ex. 11, Scott affidavit ¶ )

**P. Decision To Terminate Plaintiff**

177.    Defendant Hemming was always telling all of the instructors that they could lose their jobs if they did not follow the rules.  Plaintiff heard this statement.  (Ex. 1, Owens depo 209:11-20)

178.    Beginning on January 10, 2014, Defendant Hemming communicated to Kristina Scott and CJ Wurster issues and problems with Plaintiff which suggested to Hemming that action needed to be taken regarding Owens.  The problems according to Hemming with Plaintiff were: (1) giving permission for West-MEC students to leave campus; (2) not adhering to the curriculum; (3) excessive tardiness; (4) not adhering to State Board regulations on sanitation; playing videos for students; and giving hours for this time; and (5) matters set forth in Incident Report for sleeping on

the job, pizza party, students in instructor's office, and excessive tardiness.   (Ex. 2, Hemming affidavit ¶ 94-97 and ex. M) (Ex. 11, Scott affidavit ¶ 18)

179.     On January 10, 2014, Kristina Scott and CJ Wurster agreed to move forward with action towards Owens.  Scott asked for documentation and a brief explanation for the reasons for termination.  (Ex. 2, Hemming affidavit ex. M) (Ex. 8, Wurster affidavit ¶ 19 and ex. B) (Ex. 11, Scott affidavit ¶ 18-19 and ex. B)

180.     On January 13, 2014, Defendant Hemming sent to Kristina Scott and CJ Wurster a brief explanation for the reasons for the requested termination and supporting documentation.  The reasons for termination according to Hemming continued to be: (1) giving permission for West-MEC students to leave campus; (2) not adhering to the curriculum; (3) excessive tardiness; (4) not adhering to State Board regulations on sanitation; playing videos for students and giving hours for this time; and (5) matters set forth in Incident Report for sleeping on the job, pizza party, students in instructor's office, and excessive tardiness.   (Ex. 2, Hemming affidavit ¶ 95 -96 and ex. M) (Ex. 8, Wurster affidavit ¶ 19 and ex. B) (Ex. 11, Scott affidavit ¶ 18 and ex. B)

181.     On January 27, 2014, Defendant Hemming formally recommended that Plaintiff be terminated.  The recommendation was based upon the material sent on January 13, 2014 by Hemming to Kristina Scott and CJ Wurster.  (Ex. 2, Hemming affidavit ¶ 83-84, 94, 97-98 and ex. M) (Ex. 8, Wurster affidavit ¶ 19 and ex. B)

182.     As of January 30, 2014, Kristina Scott (Director Extended Campuses for Maricopa Skill Center), CJ Wurster (Interim Director Maricopa Skill Center), John

Naughton (Gateway Community College's Assistant Director Administrative and Support Services for Human Resources), Anthony Asti  (Gateway Community College's Interim Vice President for Administrative Services), and Steven Gonzales (Gateway Community College's President) all supported the request for termination of Plaintiff based upon the information sent by Hemming on January 13, 2014.  The decision to support termination was not based upon race or any protected activity.  (Ex. 8, Wurster affidavit ¶ 20, 22 and ex. C) (Ex. 9, Bellino affidavit ¶ 20, 22 and ex. E-F) (Ex. 11, Scott affidavit ¶ 18-22 and ex. B)

183.     After securing the necessary approvals, the request to terminate Plaintiff was sent to District HR where Maria Bellino was assigned to the matter.  (Ex. 9, Bellino affidavit ¶ 21)

184.     On February 6, 2014, District HR approved and supported the termination of Plaintiff.   (Ex. 4, Castellanos affidavit ¶ 29 and ex. F, p. 2 – MCCCD-O 67) (Ex. 9, Bellino affidavit ¶ 22-23)

185.     On February 7, 2014, Plaintiff telephoned and spoke with John Naughton, Gateway Community College's Assistant Director Administrative and Support Services for Human Resources.  Plaintiff raised concerns about her treatment and Naughton referred Plaintiff to Alice Cornelius in Human Resources at Gateway Community College.  Plaintiff did not say to Naughton that she wanted to make a complaint or claim of racial discrimination.  (Ex. 1, Owens depo 184:13-21, 187:16-188:13, 190:1-10 and ex. 18)

186.     After the February 7, 2014 referral to Alice Cornelius, Plaintiff left a message for Cornelius but they never directly communicated.  (Ex. 1, Owens depo 190:11-191:1)

187.     On February 7, 2014, Judy Castellanos (Senior HR Manager for the District) forwarded the request to District Vice Chancellor for Human Resources James Bowers for his approval of Plaintiff's termination.  (Ex. 4, Castellanos affidavit ¶ 29-30 and ex. F-G)

188.     Vice Chancellor James Bowers made the final decision to terminate Plaintiff. Bowers was provided the information reflecting the reasons for Plaintiffs' termination were due to: (1) giving permission for West-MEC students to leave campus; (2) not adhering to the curriculum; (3) excessive tardiness; (4) not adhering to State Board regulations on sanitation; playing videos for students; and giving hours for this time; and (5) matters set forth in Incident Report for sleeping on the job, pizza party, students in instructor's office, and excessive tardiness.   (Ex. 4, Castellanos affidavit ¶ 29-30 and ex. F-G) (Ex. 8, Wurster affidavit ¶ 23) (Ex. 10, Bowers affidavit ¶ 12-17 and ex. A)

189.     The decision by Bowers was not based upon race or any alleged protected speech.  Bowers was unaware of Plaintiff's racial background, and he had no reason to believe the recommendation for termination or other approvals for termination were based upon Plaintiff's race.  Bowers was unaware of any protected activity by Plaintiff, and he had no reason to believe the recommendation for termination or other approvals for termination were based upon Plaintiff's protected activity.

Plaintiff's race and any protective activity she may have engaged in would not have affected Bowers' decision to terminate Plaintiff.  (Ex. 10, Bowers affidavit ¶ 14-17)

190.     Plaintiff was notified on February 12, 2014 that she was terminated by the District.  No reason was given for the termination.  (Ex. 1, Owens depo 236:11-20 and ex. 22) (Ex. 2, Hemming affidavit ¶ 99) (Ex. 8, Wurster affidavit ¶ 23)

191.     The District would have terminated Plaintiff without regard to her race and without regard to any protected speech or activity.  (Ex. 2, Hemming affidavit ¶ 83-84, 94-98) (Ex. 8, Wurster affidavit ¶ 20-21) (Ex. 9, Bellino affidavit ¶ 2-24 and ex. E-F) (Ex. 10, Bowers affidavit ¶ 12-17) (Ex. 11, Scott affidavit ¶ 18-22 and ex. B)

**Q. Post-Termination Matters**

192.     Toni Trott resigned her position in March 2013 to pursue a job at a beauty school.  (Ex. 2, Hemming affidavit ¶ 100) (Ex. 7, Trott depo 16:9-18)

193.     The vacant positions of Plaintiff and Toni Trott were filled through the normal posting and interview process organized through Human Resources.  (Ex. 2, Hemming affidavit ¶ 101)

194.     The persons selected to fill the two vacant positions were Timeka Prime, an African American woman, and Katarina Austad, a Caucasian woman.  Prime had been working at CESA as a full-time instructor during the 2013-14 school year. Austad had worked at the Northwest Campus as a part-time instructor during a portion of the 2013-14 school year.  (Ex. 2, Hemming affidavit ¶ 102) (Ex. 4, Castellanos affidavit ¶ 27) (Ex. 7, Trott depo 26:6-25)

195.     Dana Burns, a Human Resources employee, filled out the paperwork which reflected that Timeka Prime was filling Plaintiff's position and that Katrina Austad was filling Toni Trott's position.  (Ex. 2, Hemming affidavit ¶ 103 and ex. N)

DATED:  October 4, 2016.

UDALL SHUMWAY PLC


_____/s/ David R. Schwartz_____
David R. Schwartz
1138 North Alma School Road
Suite 101
Mesa, AZ  85201
Attorneys for Defendants


## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2016, I electronically filed the attached document using ECF for filing and transmitted the document as follows:

By mail to:

Schaun Owens
16808 N. 20th Street
Phoenix, AZ  85022
Plaintiff

___/s/ Kimberly Kershner___
Kimberly Kershner

4674371.1\109883-5

43