# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Schaun Owens,                          )
                                       )
                Plaintiff,             )
                                       )
vs.                                    ) No.
                                       ) CV-15-01769-PHX-SPL
Maricopa County Community              )
College District, Maricopa             )
Skill Center, and Lisa                 )
Hemming,                               )
                                       )
                Defendants.            )
                                       )


DEPOSITION OF SCHAUN OWENS

Mesa, Arizona
May 23, 2016
8:56 a.m.


REPORTED BY:
MARISA L. MONTINI, RPR
Certified Reporter
Certificate Number 50176

PREPARED FOR:
ASCII/COPY

(Certified Copy)

7

1               Mesa, Arizona
                May 23, 2016
2               8:56 a.m.

3

4                   SCHAUN OWENS,

5    having been first duly sworn to tell the truth, the whole

6    truth and nothing but the truth, was examined and

7    testified as follows:

8

9                   EXAMINATION

10   BY MR. SCHWARTZ:

11       Q.    Would you state your full legal name for the

12   record and spell each word.

13       A.    First name is Schaun, spelled S as in Sam, C as

14   in Charlie, H as in Hulu, A as in apple, U as in under, N

15   as in Nancy.  Middle name is Evon, E-v-o-n.  Last name is

16   Owens, O-w-e-n-s.

17       Q.    Okay.  Ms. Owens, have you ever had your

18   deposition taken before?

19       A.    No, I have not.

20       Q.    Okay.  Again, I introduced myself outside, but

21   I'll redo it in here.  My name is David Schwartz.  This is

22   an opportunity for myself, as the attorney for the

23   Maricopa County Community College District and Lisa

24   Hemming, to ask you questions related to the lawsuit that

25   you filed.  You understand the purpose of being here;

1      A.   I had injury to my right foot and damage to the

2  car I was driving.

3      Q.   I'm sorry?

4      A.   Damage to the vehicle that I was driving.

5      Q.   Did your right foot injury incapacitate you for

6  any period of time?

7      A.   No, it did not.

8      Q.   Is your attorney, Mr. Baker, making a claim for

9  you for compensation?

10     A.   Yes, he did.

11     Q.   Has that been resolved?

12     A.   Yes, it has.

13     Q.   When was it resolved?

14     A.   That was resolved in March this year.

15     Q.   After he took his percentage and you paid any

16  expenses, did you -- did you personally receive more or

17  less than $10,000?

18     A.   Less than 10,000.

19     Q.   Okay.  And have you been, from your perspective,

20  fully compensated for your injuries that you sustained on

21  June 12th, 2015?

22     A.   Yeah.

23     Q.   All right.  You're familiar with the Maricopa

24  Skill Center; correct?

25     A.   I am.

1       Q.    You understand it's a division of Gateway

2    Community College?

3       A.    I am.

4       Q.    And Gateway Community College is one of several

5    community colleges operated by the Maricopa County

6    Community College District.  You're aware of that?

7       A.    Yes, I am.

8       Q.    Okay.  Now, currently you're aware that Maricopa

9    Skill Center has three different campuses, one at -- well,

10   Maricopa Skill Center, itself, Cutting Edge Style Academy,

11   and the northwest campus; is that correct?

12      A.    That is correct.

13      Q.    And is the Cutting Edge Style Academy sometimes

14   referred to by the initials CEA?

15      A.    That is correct.

16      Q.    Okay.  It's my understanding in early August

17   2008, you applied for a part-time associate instructor's

18   position at Cutting Edge; is that correct?

19      A.    That is correct.

20      Q.    And if I refer to Cutting Edge, you'll understand

21   that rather than me saying the whole Cutting Edge Style

22   Academy?

23      A.    Yes.  Yes.

24      Q.    Okay.  And did you obtain that position?

25      A.    Yes, I did.

1      Q.    And was it a part-time position?

2      A.    Yes, it was.

3      Q.    And when you first started, what shift did you

4  work?

5      A.    For part-time, it was kind of various because I

6  was considered a sub.  So sometimes I can cover during the

7  day.  Sometimes I'll cover at night.  It just depends on

8  what instructor -- whose shift I was covering.

9      Q.    We earlier referred to Kim Richardson.  Did you

10  ever know Kim Richardson by another last name?

11      A.    Garcia.

12      Q.    And when you first started working at Cutting

13  Edge in August of 2008, was Kim Richardson your

14  supervisor?

15      A.    Yes, she was.

16      Q.    Did you have to go through a new employee

17  orientation at the District office when you were first

18  hired?

19      A.    Yes, I was.

20      Q.    Did you sit in a room with a bunch of other new

21  employees for that?

22      A.    Yes, I did.

23      Q.    And did you understand that when you were

24  initially hired in August of 2008, that you would be

25  subject to a one-year probationary period?

1     A.     Yes, I was.

2          Q.     And how long did you remain in that part-time

3     associate instructor's position working at Cutting Edge?

4     Starting in August 2008, how long did you remain in that

5     position?

6          A.     Until 2011, April 2011.

7          Q.     Your complaint said that you resigned in May

8     of 2009.  Do you remember that?

9          A.     No, I didn't resign in 2009.

10         Q.     What happened at the end of May 2009?

11         A.     Okay.  Let me reiterate that.  When I started

12    with the school in 2008, I was not a full-time instructor.

13    I was hired as a part-time sub instructor.  At that time,

14    no, I was not required to go through any orientation

15    because there was no probationary for that position.   In

16    2009 when the new school year began is when I applied for

17    the full-time associate position.  At that time is when I

18    was hired full-time, and at that time is when I did the

19    new hire.

20         Q.     And would it be accurate to say it was

21    approximately August 2009 when you obtained the full-time

22    associate instructor's position at Cutting Edge Style?

23         A.     That is correct.

24         Q.     And if I understand, you were still under Kim

25    Richardson's supervision at that time in August of 2009?

1        A.    That is correct.

2        Q.    And you understood in August of 2009 was

3   approximately the start of your one-year probationary

4   period?

5        A.    That is correct.

6        Q.    And as part of the hiring as a full-time

7   position, you ended up going through the District's new

8   employee orientation?

9        A.    That is correct.

10       Q.    And that was done at the District office?

11       A.    That is correct.

12       Q.    And were you made aware that there were staff

13   policy manuals once you became a new employee?

14       A.    That is correct.

15       Q.    Was that one of the subjects that was at least

16   mentioned during the new employee orientation?

17       A.    Yes, it was.

18       Q.    And were you handed a new -- a staff policy

19   manual or were you just told it was available online?

20       A.    Just told it was available online.

21       Q.    And how long did you remain in a full-time

22   associate instructor's position at Cutting Edge after

23   August of 2009?

24       A.    For two years, to 2011.

25       Q.    Until approximately April of 2011?

64

1     A.    That is correct.

2     Q.    And what happened in April 2011?

3     A.    In April of 2011, I was doing a small business

4  trying to work with potential instructors.  I wanted to do

5  workshops, so I stepped away from teaching to pursue

6  trying to get my workshops up and going.

7     Q.    So you resigned?

8     A.    I did.

9     Q.    Okay.  Do you remember Lisa Hemming coming to

10  work at Cutting Edge while you were at Cutting Edge before

11  you resigned in April 2011?

12     A.    Yes, I do.

13     Q.    The records indicate she started in April

14  of 2010.  Does that sound about right?

15     A.    That sounds about right.

16     Q.    And as you understand it, when Lisa Hemming first

17  came, was she a part-time associate instructor of

18  cosmetology similar to you?

19     A.    That is correct.

20     Q.    And both of you would have been under the

21  supervision of Kim Richardson in 2010 and into 2011; true?

22     A.    That is true.

23     Q.    And just in case this is ever read to a jury who

24  may not be fully familiar with the academic world, when we

25  talk about school years, school years typically would

1    start for Cutting Edge or Northwest or Maricopa Skill

2    Center in August of whatever year, and they go to

3    approximately May of the following year; correct?

4        A.    That is correct.

5        Q.    So when we refer to the 2010/2011 school year,

6    for example, we're talking about roughly August 2010 until

7    roughly about May 2011; is that fair?

8        A.    That is correct.

9        Q.    Okay.  The records I've looked at indicate that

10   on January 14th, 2011, the associate instructors were

11   notified that a Shawn Andrews was hired and would begin to

12   serve as a lead instructor at Cutting Edge do you recall

13   that?

14       A.    Yes, I do.

15       Q.    Does that sound about the approximate time when

16   Shawn Andrews became involved?

17       A.    That is about right.

18       Q.    What is a lead instructor?

19       A.    Basically an instructor that just pretty much

20   handles the -- I guess the day-to-day questions or issues

21   that the instructors would have without going to the

22   program manager.  So they were kind of like the in between

23   for us or right hand to the manager.

24       Q.    Did you consider the lead instructor in any way

25   to be your supervisor?

68

1        Q.    Okay.  So the personal reasons are the ones

2    you've just described for me?

3        A.    That is correct.

4        Q.    Okay.  Your complaint said you returned as a

5    part-time cosmetology instructor at Cutting Edge in

6    October of 2011.  Does that sound about when you returned?

7        A.    That sounds about right.

8        Q.    And were you -- as a part-time instructor, were

9    you subject to a one-year probation period?

10       A.    No.

11       Q.    As a part-time instructor, were any evaluations

12   done of your performance?

13       A.    No.

14       Q.    Did you have to go through new employee

15   orientation at the District's office in October of 2011

16   when you were hired as a part-time instructor?

17       A.    No.

18       Q.    Even though you didn't go through the new

19   employee orientation, were you aware that the staff policy

20   manual back in October 2011 was available to you online?

21       A.    Yes, I was.

22       Q.    And are you aware that even someone who's not

23   employed by the District can go online and look at the

24   staff policy manuals?

25       A.    Yes, I am aware of that.

69

1       Q.    How long did you remain in a part-time position
2    at Cutting Edge after October 2011?
3       A.    I stayed in that position until they opened the
4    new campus.
5       Q.    Did you apply for a full-time position after
6    October 2011 before the summer of 2013?
7       A.    I did.
8       Q.    Give me a time frame when you believe you
9    applied.
10       A.    It was within the 2011/2012 school year, and they
11   just posted for a clinic supervisor position for the
12   Cutting Edge campus.
13       Q.    Did you apply for a full-time associate
14   cosmetology instructor's position after October of 2011
15   and before they opened the Northwest campus in 2013?
16       A.    No.  I don't recall applying for the associate's
17   instructor position, no.
18       Q.    Why didn't you apply?
19       A.    Because they already had -- they were already
20   saturated with instructors at that campus.
21       Q.    So is it your testimony that Cutting Edge was not
22   looking for full-time associate instructors after
23   October 2011 through at least approximately May of 2013?
24       A.    I was not aware if they were looking.  I didn't
25   see any postings for full-time employees -- or full-time

1    campus manager and then Kim. Like I said, they were just
2    implementing this structure of chain of command because we
3    didn't have that for a while.
4        Q.    Did you ever apply for any position of a daytime
5    or nighttime lead instructor position?
6        A.    I do recall applying for a lead position.
7        Q.    Do you remember when?
8        A.    I don't recall. I want to say that might have
9    been in 2012 or 2011.
10       Q.    Do you know who got that position that you
11   applied for?
12       A.    Who got the lead? Mr. Flores got the evening
13   position. I don't recall them actually hiring, at that
14   time, for a day lead because they made Lisa the clinic
15   supervisor. So they kind of didn't have a day lead
16   implemented right away.
17       Q.    But you did, if I understand correctly, applied
18   for the position of clinic floor supervisor?
19       A.    I did.
20       Q.    My understanding, from looking at the records,
21   that that position was posted in September 24th through
22   October 5th of 2012. Does that sound about generally
23   right?
24       A.    That sounds about right.
25       Q.    Okay. Did you fill out a formal written

1     A.    Yes, she was.

2     Q.    Are you claiming in this lawsuit that you were

3  discriminated against based upon your race in relationship

4  to your application to become the clinic floor supervisor?

5     A.    Say that again.

6     Q.    Sure.  Are you claiming in the lawsuit that you

7  were racially discriminated against by the Maricopa County

8  Community College District when you were in the process of

9  applying for the clinic floor supervisor in 2012?

10    A.    No.  I did not claim that I was being

11 discriminated against, no.

12    Q.    I just wanted to make sure.

13    A.    No.  For that position, no.

14    Q.    Now, you were aware that roughly the end of

15 November 2012, Lisa Hemming was selected for the Cutting

16 Edge's clinic floor supervisor position?

17    A.    Yes, I was.

18    Q.    Was Lisa Hemming, in any way, in charge or did

19 she have any supervisory powers related to your position

20 as a part-time instructor?

21    A.    From my understanding, yes, she did have that

22 supervisory.

23    Q.    What did you understand her supervisory role was

24 vis-a-vis you as a part-time associate instructor?

25    A.    Well, that's -- that was a challenge I was not

1    clear on as to all of her managerial or supervisory.   I

2    knew that she was in a supervisor position but just not

3    the depth of what her supervisory responsibilities were.

4         Q.    And did you go to Ms. Hemming and ask her?

5         A.    No.   I asked Ms. Dana, and Ms. Dana, she didn't

6    give -- I went to Ms. Heath to ask what Lisa was

7    responsible for.   She had explained to me that Lisa was

8    like her right-hand person.   She handles all of the issues

9    when the manager is not present.   She then would be the

10   one that we go to for any type of issues or whatever.   I

11   was not aware that she was responsible for any type of

12   disciplinary actions over me is what I was not aware of.

13        Q.    And I want to make sure I'm understanding the

14   last part, meaning that you now know that Lisa Hemming had

15   some power over you related to disciplinary that you

16   didn't know back in 2012?

17        A.    Yes -- no, well -- no.   Let me explain this.

18        Q.    Sure.

19        A.    When Lisa got the position, we were not clear

20   what her duties and responsibilities were.   So I went to

21   Dana Heath to find out because there was times that she

22   had came to me before Ms. Hemming had came to me before

23   and wanted me to give a report on another instructor.   So

24   that made me question what her responsibilities were as a

25   manager.   So in that, I went to Heath to ask is she a

1    disciplinary supervisor or is she just an informational

2    supervisor, is basically what I'm saying, because I do

3    understand that some supervisors, they're not going to

4    have the -- the authority to do like the write-ups or

5    things like that.  They can make the recommendation, but

6    it's left up to the manager to actually do the

7    disciplinary action of the situation.  Did that make

8    sense?

9        Q.    I think I understand.  And what did Ms. Heath

10   tell you in response to your question?

11       A.    So she did tell me that Lisa did have those

12   managerial abilities to reprimand or discipline or

13   whatever she needed to do for that employee.

14       Q.    And during the period of time that Lisa was the

15   clinic floor supervisor, who had disciplinary power over

16   you from the end of November 2012 until May of 2013 when

17   that school year ended?  Did Lisa Hemming write you up or

18   do anything in relationship to discipline?

19       A.    No.  At that time she didn't, no.

20       Q.    Did you have any complaints about how Lisa

21   Hemming supervised you as the clinic floor supervisor from

22   November 2013 through May of 2013?

23       A.    I did have questions because, for one, like I

24   said, during that period of time, I was not a full-time

25   associate instructor.  I was a part-time sub, so a lot of

1   to the attention of Ms. Hemming, and the following week,

2   there was a Caucasian student and an instructor involved.

3   What was the name of the instructor?

4       A.    I'm sorry.  Jackie Davis.

5       Q.    Spell the last name.

6       A.    Jackie Davis, D-a-v-i-s.

7       Q.    Did you hear what was actually said between

8   Jackie Davis and Ms. Hemming?

9       A.    I do remember hearing her asking if I have an

10  extra smock, can she stay, and that's what I heard.  And

11  so with that, I just saw the student still on campus.  So

12  that's how I came up with the conclusion that they allowed

13  that to happen.

14      Q.    Do you know if the student went off the clock?

15      A.    Did she go off the clock?  No.

16      Q.    So you know that she did not?

17      A.    No, she did not go off the clock.

18      Q.    And this would have been in December of 2012 is

19  your best recollection?

20      A.    I would say about December, yeah, January,

21  somewhere around there.  It was shortly after she got the

22  position of a clinic supervisor.

23      Q.    Do you know -- strike that.

24            Do you recall an instructor named Dana Bell?

25      A.    Yes, I do.

1      Q.    Was she a full-time or part-time instructor in
2   the 2012/2013 school year?
3      A.    She was full-time.
4      Q.    And that was the person you were subbing for?
5      A.    That is correct.
6      Q.    And Ms. Bell is a Caucasian?
7      A.    She is.
8      Q.    And you indicate Ms. Hemming was trying to get
9   you to report information about Ms. Bell, this Caucasian
10  instructor?
11     A.    Yes, she did.
12     Q.    Did she say why she wanted the information?
13     A.    No, she did not.
14     Q.    Was Ms. Bell, as you understand it, under the
15  supervision of Ms. Hemming?
16     A.    At that time, yes, she was.
17     Q.    Was Ms. Bell a probationary employee, if you
18  recall?
19     A.    No, she was not.
20              . Let me clarify that.  Were you asking was
21  she on probation during that time?
22     Q.    Was she a probationary employee during the
23  2012/2013 year when you say Ms. Hemming asked you to
24  provide information about Ms. Bell?
25     A.    No.  Ms. Bell has been with the District since

1    the school opened so she was not a probationary employee,
2    no.
3         Q.   Did Ms. Hemming indicate what kind of information
4    she was looking for?
5         A.   Yeah.  The way she's instructing, whether or not
6    the students were getting the curriculum training if she
7    was on -- if she was following the calendar curriculum.
8    She wanted me to let her know what was going on in the
9    class as far as if Ms. Bell is attentive to her class or
10   is there classroom management.  She basically wanted me to
11   gather intel from the students as to what was going on in
12   the classroom when Ms. Bell was there.
13        Q.   So as you understood it, she was asking you not
14   for your own observations but to engage the students to
15   find out information?
16        A.   Uh-huh.
17        Q.   Is that a yes?
18        A.   Yes.
19        Q.   And you agreed to do that?
20        A.   No, sir.
21        Q.   You told her, "I'm not going to do that"?
22        A.   That is correct.
23        Q.   And how soon after that were you fired?
24        A.   I wasn't fired.
25        Q.   You refused a direct order of a supervisor.  You

88

1     Q.    So am I correct that Lisa Hemming, to your

2  knowledge, did not retaliate against you while she was at

3  Cutting Edge and you were at Cutting Edge after you

4  indicated in December 2012 or perhaps January 2013 that

5  you would not do what she was asking of you?

6     A.    No.  I wouldn't say she did any retaliation at

7  that time, no, sir.

8     Q.    At Cutting Edge, was there an English only rule

9  for the classroom?

10    A.    Yes, there was.

11    Q.    And who did that apply to, as you understood it?

12    A.    To all students.

13    Q.    So was that -- how long had that English only

14 rule or policy been in place at Cutting Edge, to your

15 knowledge?

16    A.    Since the school had been opened.

17    Q.    So you're subbing at Cutting Edge for somebody

18 and you're giving your instruction.  It's all in English,

19 your instruction; correct?

20    A.    Uh-huh, that's correct.

21    Q.    A student turns to someone next to them and

22 speaks in Spanish.  Was that a violation of the policy?

23    A.    I would have to tell them, yes.  They would have

24 to speak in English in the classroom.

25    Q.    And is that what you were telling people up until

1    May of 2013 when you would sub if that happened while you
2    were at Cutting Edge?
3        A.   Yes, I did.  I would tell them that.
4        Q.   And did you ever question whether that was a
5    lawful policy?
6        A.   Well, I knew that it was lawful because it is
7    standard practice for all instructional materials to be
8    given in English for the District, so I was aware of that.
9        Q.   A student speaks to another student.  There's no
10   instructional material involved in there, is there?
11       A.   But they're in a classroom, in the classroom.
12       Q.   So you understood it -- from your perspective, it
13   was permissible, and you never challenged whether or not
14   students could speak, say, Spanish, whether Portuguese,
15   Hebrew or any language other than English in a classroom
16   or on the clinic floor; is that fair?
17       A.   No, that's not fair.  Let me reiterate that.  I
18   had students in the classroom and some of them struggled
19   with English.  There would be times that they would be
20   translating the information.  In that case, I would have
21   to instruct the student that they cannot do that.  They
22   cannot -- I don't know the intent or extent of them
23   translating to each other, so I would tell them whatever
24   they don't understand, hold on, and I will go get a
25   Spanish-speaking instructor to come and talk to them, but

1      Q.   Did that ever happen at Northwest campus where
2   you brought in a Spanish-speaking instructor to speak to a
3   student?
4      A.   No.
5      Q.   Were you ever requested by Lisa Hemming at
6   Cutting Edge in her capacity as clinic floor supervisor to
7   prohibit students speaking Spanish outside of the
8   classroom?
9      A.   I was not told that at Cutting Edge, no.
10      Q.   Were you ever asked by Lisa Hemming at Cutting
11   Edge to not allow students to speak Spanish in a
12   classroom?
13      A.   Not at Cutting Edge, no.
14      Q.   Were you ever asked while you were at Cutting
15   Edge by Lisa Hemming to punish or discipline any students
16   for speaking Spanish at any time?
17      A.   You said at Cutting Edge?
18      Q.   At Cutting Edge.
19      A.   No.
20      Q.   All right.   In May 2013, it's my understanding
21   from reading your complaint, you applied to be the
22   assistant program manager of cosmetology at the new
23   Northwest campus; is that true?
24      A.   That is true.
25      Q.   You filled out an online application and

1  submitted it?

2      A.    Yes.

3      Q.    Did you go for an interview?

4      A.    No, I did not.

5      Q.    You were not asked for an interview?

6      A.    No, not on the assistant.  I don't believe I had

7  the qualifications for that one.

8      Q.    Are you suing either the District or Lisa Hemming

9  for you not -- any treatment or you not receiving the

10 position of an assistant program manager of cosmetology at

11 the Northwest campus?

12     A.    Because of discrimination I didn't get the

13 position?  Is that what you're asking me?

14     Q.    For any reason, are you suing the District or

15 Lisa Hemming for any reason related to you not getting --

16     A.    Oh, no, no.  For not getting any positions?

17     Q.    The position of assistant program manager of

18 cosmetology?

19     A.    No, no.

20     Q.    So that's not part of your racial discrimination

21 or retaliation claims that you're claiming in this

22 lawsuit; is that true?

23     A.    That is true.

24     Q.    Now, you are aware that Lisa Hemming was selected

25 as assistant program manager for the new Northwest campus;

1    correct?

2        A.    That is correct.

3        Q.    And the new Northwest campus opened in August of

4    2013; correct?

5        A.    That is correct.

6        Q.    When did you learn that Lisa Hemming was going to

7    be the assistant program manager?

8        A.    Prior to the campus opening.

9        Q.    Can you be any more specific?  A day before?  A

10   month before?  Two months?

11       A.    I want to say it was before the school year

12   ended.  We knew she had the position before the 2011 --

13   no, 2012/2013 school year ended.  We knew that she had the

14   position.  So I would say we knew in May when she had the

15   position.

16       Q.    In August of 2013, the Maricopa Skill Center's

17   Northwest campus opened for the first time; correct?

18       A.    Uh-huh.

19       Q.    Is that yes?

20       A.    Yes.

21       Q.    It's my understanding the first day for the

22   instructors and for any students to be there was

23   August 5th, 2013.  Does that sound approximately correct?

24       A.    That is not correct.

25       Q.    How long before August 5th do you think

1      A.    I was still reading.  I'm sorry.

2              No, I'm still going to stick to what I said

3    before.  That's not true.  If the first day -- oh, go

4    ahead.

5      Q.    My question was much more simple.  Do you

6    recognize Exhibit 4 to be a true and accurate copy of an

7    e-mail exchange you had with Lisa Hemming?

8      A.    I recognize it, yes.

9      Q.    Okay.  Lisa Hemming wrote on August 5th, "What an

10   amazing first day."  Do you remember August 5th, 2013,

11   being your first day?

12     A.    That was the first day of school.  That's what

13   I'm saying, that's the first day of school.  We started

14   before the students came.

15     Q.    Okay.  You think you started, what, two weeks

16   before August 5th?

17     A.    Yes, sir.

18     Q.    Okay.  Now, you applied to be a full-time

19   associate instructor at Northwest campus; correct?

20     A.    That is correct.

21     Q.    Filled out a formal online application; correct?

22     A.    That is correct.

23     Q.    And did you undergo interviews?

24     A.    Yes, I did.

25     Q.    How many?

1    August 5th.  When did you get your first paycheck?  Before

2    or after that?

3        A.    We were paid biweekly, so if we started two weeks

4    prior to school, then that would be within my first pay

5    period.

6        Q.    And so if we looked at your payroll records, we

7    could figure out when exactly you actually started; is

8    that fair?

9        A.    That is fair.

10       Q.    Okay.  At the time you applied to be a full-time

11   associate instructor at the new Northwest campus, you were

12   aware that Lisa Hemming was going to be the assistant

13   program manager there assigned to that facility?

14       A.    I was aware.

15       Q.    And you applied knowing that she would be your

16   supervisor, then?

17       A.    I did apply.

18       Q.    Did you think that she was biased against you at

19   the time you applied to work under her supervision?

20       A.    No, because I had not -- I hadn't worked directly

21   with Lisa like that, so I really didn't know what I was

22   getting into.

23       Q.    Why did you want to go to the Northwest campus

24   instead of Cutting Edge?

25       A.    I wanted to go to a fresh campus, and it had a

1   campus with both adult and high school students.

2       Q.    Did Cutting Edge not have both high school and

3   adults?

4       A.    No they just had high school students.

5       Q.    And why did you want to be at a campus that had

6   adults as well as high school students?

7       A.    Just for the experience of being able to be

8   around both.

9       Q.    Did you not enjoy the experience of being with

10  high school students?

11      A.    Oh, yeah, I enjoyed it.  I enjoyed being with

12  high school students.

13      Q.    It's my understanding that you were assigned at

14  the Northwest campus for the 2013/2014 school year to be

15  the instructor for the second year high school students;

16  is that correct?

17      A.    That is correct.

18      Q.    And cosmetology students, it's my understanding

19  that they don't go on the clinic floor and practice their

20  cosmetology skills until their second year; is that true?

21      A.    That's true.

22      Q.    And so by virtue -- strike that.

23            Were you assigned also to be the clinic

24  floor supervisor because you had the only class of high

25  school students in the 2013/'14 year for students on the

101

1    person?

2         A.   That is correct.

3         Q.   It's my understanding that high school students

4    at the Northwest campus had a Monday through Friday

5    schedule of 2:00 to 6:00 p.m. and Saturday of 8:00 a.m. to

6    5:00 p.m.  Am I understanding correct?

7         A.   That is correct.

8         Q.   Now, the Northwest campus housed not only

9    cosmetology students, but an aesthetician students program

10   at Northwest; true?

11        A.   That is true.

12        Q.   Was there an aesthetician program at Cutting

13   Edge?

14        A.   No, there was not.

15        Q.   How, at Cutting Edge, did you, as an instructor,

16   work with your students in terms of doing facials and

17   whatnot?

18        A.   At the Cutting Edge, they actually had an

19   aesthetics room.  They had the facial beds.  They had

20   eight facial beds available to the students to perform

21   facials.  Even though we did not have an aesthetic program

22   at the campus, we still had the equipment available to

23   those students to do that.

24        Q.   Now, you're a full-time cosmetology instructor at

25   Northwest starting in August -- roughly August of 2013.

102

1    Carolyn Cardwell was also a similar instructor; correct?

2        A.    That is correct.

3        Q.    What did you understand her racial makeup to be?

4        A.    Caucasian.

5        Q.    Robert Wood was also a full-time cosmetology

6    instructor at Northwest; true?

7        A.    That is true.

8        Q.    And what was his racial background?

9        A.    Caucasian, from my understanding.

10        Q.    Toni Trott was a full-time cosmetology instructor

11    at Northwest; is that true?

12        A.    That is true.

13        Q.    And what is her racial makeup?

14        A.    African American.

15        Q.    Was there any other full-time cosmetology

16    instructors at Northwest when you started there in August

17    of 2013?

18        A.    No, just us.

19        Q.    How much interaction did you have with the other

20    full-time cosmetology instructors?

21        A.    Daily interaction.

22        Q.    I'm sorry?

23        A.    Daily interaction.

24        Q.    And not only daily, was it frequently or it was

25    uncommon?

1    you why Carolyn sent that e-mail.  I wasn't even aware of
2    this.
3         Q.    Tabatha Takeover is a video of a TV show?
4         A.    Yes, it is.  It's a salon-related show.
5         Q.    And is that one of the approved curriculum
6    sources?
7         A.    I'm sorry.  Say that again, sir.
8         Q.    Sure.  You had certain curriculum.  You had
9    texts.  You had approved curriculum sources; correct?
10        A.    Uh-huh, that is correct.
11        Q.    And was Tabatha Takeover one of those approved
12   sources?
13        A.    So, first of all, let me explain.  When we are on
14   theory on Mondays, we have four hours of theory.  Theory
15   doesn't take four hours.  We were told that we can watch
16   videos as long as they were salon or industry-related
17   movies.  There was a time where the teachers were showing
18   movies other than salon industry movies.  Tabatha Takeover
19   is a salon industry movie, so I was letting the students
20   watch that after their theory for the end of the day.
21   Well, apparently Lisa had told them that they couldn't do
22   that.  I didn't -- I was not aware of that.  So Carolyn
23   saw that I was watching Tabatha Takeover, and that is when
24   she went and told Lisa what all of this is about, but I
25   was not aware that they could not watch Tabatha Takeover

1   until after this situation.  Prior to this, we were able
2   to do that.
3       Q.   So when Ms. Cardwell wrote in Exhibit 5 that
4   Ms. Hemming told all of us that we can't watch Face Off
5   Tabatha or YouTube videos that did not pertain to
6   cosmetology, was she being accurate?
7       A.   And then if you see right there, she said --
8       Q.   Listen to my question.  Was Ms. Cardwell being
9   accurate that Lisa Hemming had told all of us --
10      A.   No, she wasn't accurate because I stated -- I
11  told her that if Ms. Hemming would have told me, then I
12  would have complied.  So no, I did not.  She did not tell
13  everyone.
14      Q.   Well, I think you just -- your testimony was you
15  thought Tabatha Takeover was appropriate because it
16  pertained to cosmetology, did you not?
17      A.   Okay.  Mr. Schwartz, I said in previous times
18  past, we were permitted to let the students watch salon
19  industry videos.  Tabatha Takeover is one of those salon
20  industry videos.  When we got to the Northwest campus, all
21  of a sudden now Ms. Hemming does not want us to show them
22  the Tabatha Takeover.  I was still doing what I had been
23  allowed to do previously.  Carolyn stated that Hemming had
24  told all of us we could not watch that.  I stated to
25  Carolyn I did not know that.  Had I known that, I would

1    have complied, is what I told her.  And she even indicated

2    that in her statement.  So once I found out that we could

3    no longer do that, Tabatha Takeover was no longer being

4    shown in the class.

5         Q.   Same with Face Off?

6         A.   I was not watching Face Off.  I was watching

7    Tabatha Takeover.

8         Q.   Similar with YouTube videos?

9         A.   I don't watch YouTube videos.  I was watching

10   Tabatha.

11        Q.   So after December 10th, 2013, when you had your

12   conversation with Carolyn Cardwell, you would not have

13   been -- you knew it would not be proper to show Tabatha

14   Takeover to your class; true?

15        A.   This is true.

16        Q.   Okay.  The last sentence on the first page of

17   Exhibit 5 says on December 11th, you went back to Carolyn

18   Cardwell and said that Belin, B-e-l-i-n, a student, was

19   the one who told on you.  Did you, in fact, tell that to

20   Carolyn Cardwell?

21        A.   I can't -- I can't speak for what these people

22   were saying or doing.  I really can't.

23        Q.   Do you have any reason to doubt the validity of

24   what Carolyn Cardwell wrote in that regard?

25        A.   Ask me your question.  You said on December 11th

112

1    A.    She contacted me by my phone.

2    Q.    On your cell?

3    A.    Yes.

4    Q.    How did she come to have your cell phone number?

5    A.    My number has been the same for the last 11

6    years, so she had it from when we worked together at

7    Cutting Edge.

8    Q.    Did the instructors exchange cell phone numbers?

9    A.    Oh, yeah, of course.  Because like I said, when I

10   started with the school, I was a part-time sub.  When I

11   resigned and came back as a part-time sub, the full-time

12   instructors had my number so they could contact me when

13   they needed me to cover for them.  So, yes, that's how she

14   obtained my number.

15   Q.    How long have you and Toni Trott been friends?

16   A.    Two years.

17   Q.    When did you first meet her?

18   A.    Working at Northwest campus.

19   Q.    How long after you first started working at

20   Northwest campus did you and Ms. Trott do anything outside

21   of work together just the two of you?

22   A.    Oh, I'd say a couple of months after that.

23   Q.    So like October, November?

24   A.    Yes.

25   Q.    Do you know a Shala Dveirin?

113

1      A.    Shala.

2      Q.    Shala?

3      A.    Uh-huh.

4      Q.    Is that a yes?

5      A.    Yes.

6      Q.    She was a full-time instructor at Northwest;

7   true?

8      A.    She was an aesthetician supervisor.  I wasn't

9   really sure what her position was, but she was over the

10  aesthetics program.

11     Q.    Shala was not a cosmetology instructor?

12     A.    No, she was not.

13     Q.    What was her racial makeup?

14     A.    Say it again.

15     Q.    What was her racial background as you understood

16  it?

17     A.    I'm not sure what Shala was.

18     Q.    What did she appear to you to be?

19     A.    I don't know.  I mean, Caucasian, I guess.

20     Q.    Could she have been African American?

21     A.    No, but she could have been from the Middle East.

22  She could have been --

23     Q.    Did you ever tell any of your cosmetology

24  students that Shala was responsible to teach them about

25  facials?

116

1    instructor at Northwest?

2        A.    Yes, she was.

3        Q.    Did you -- were you aware that she sometimes

4    substituted for you when you, on occasion, were out?

5        A.    She only subbed for me one time when I was out,

6    but, yes, I was aware.

7        Q.    Was that one day or one week?

8        A.    That was the only time.  My daughter passed away.

9        Q.    Do you remember if it was one day or one week?

10       A.    No, I was out for two weeks.

11       Q.    What did you think of Cheri Snow?

12       A.    She's a nice lady.

13       Q.    Do you have any reason to distrust her?

14       A.    No.

15       Q.    Did you ever socialize with Cheri Snow outside of

16   work?

17       A.    No.

18       Q.    Where would you put her on the category?

19       A.    Coworker.

20       Q.    Okay.  Did you ever encourage your students to

21   write to West-MEC, W-e-s-t, hyphen, M-E-C, all in

22   capitals?

23       A.    Yes, I did.

24       Q.    First of all, for the benefit of those that might

25   read this, what is West-MEC?

117

1       A.    West-MEC is the vocational side that partnered up
2   with Maricopa to do the high school cosmetology program.
3   That's pretty much all I know about West-MEC is they're a
4   partnership with Maricopa.  They're responsible for the
5   high school students as far as the tuition and whatever
6   the recruitment of the students.  I really couldn't tell
7   you how that whole partnership panned out.
8       Q.    Did you ever hear that West-MEC is a consortium
9   of a whole bunch of high schools located in the west Metro
10  Phoenix area?
11      A.    Yes, yes.
12      Q.    Okay.  What did you tell your students in regard
13  to writing West-MEC in relationship to Cheri Snow, if
14  anything?
15      A.    To write to West-MEC concerning Cheri Snow?
16      Q.    Yes.
17      A.    Oh, no.  I don't know nothing about my students
18  writing West-MEC.  In regards to Cheri Snow?
19      Q.    Yes.
20      A.    No, I don't recall anything about that.
21      Q.    Did your students ever tell you that Cheri Snow
22  wouldn't allow them to do personal services?
23      A.    I don't recall that.
24      Q.    Did your students ever tell you that Cheri Snow
25  wouldn't allow them to use cell phones?

119

1  and couldn't do; is that fair?

2      A.   Yes.

3      Q.   Lisa Hemming didn't actually talk directly to the

4  students about using their cell phones to look up

5  pictures; is that true?

6      A.   No.  She -- she would talk to them about that,

7  and they knew from her because they would ask her if it

8  was okay for them to use their phone.  So, I mean, they

9  had access to ask Lisa questions.  They didn't always have

10  to come through the instructor to ask questions.

11     Q.   So from your understanding, Lisa Hemming was

12  available to students who had questions?

13     A.   From my understanding, yes.

14     Q.   Okay.  Did your students ever tell you that Cheri

15  Snow wouldn't allow them to watch Tabatha salon videos?

16     A.   No, because by that time, we knew that we weren't

17  supposed to be watching Tabatha on TV.

18     Q.   Did your students ever tell you that Cheri Snow

19  wouldn't allow them to eat on the clinic floor?

20     A.   No, they knew that.  That was -- they were not

21  permitted to eat or drink on the clinic floor.

22     Q.   How would have students have known that?

23     A.   That's in the student handbook.

24     Q.   And is that a requirement not just of the

25  handbook but of State regulations?

120

1      A.      That is correct, State board.

2      Q.      And similarly, the State board doesn't allow

3   eating of food or drinking in the classrooms; true?

4      A.      This is correct.

5      Q.      Okay.  And one of your duties as the instructor

6   of a class was to monitor whether the students were

7   abiding by the policies set forth in the student handbook;

8   is that fair?

9      A.      That is true.

10     Q.      So if students weren't in the proper attire,

11  they're supposed to be sent home because that's what it

12  says in the handbook; correct?

13     A.      That is correct.

14     Q.      And if the students were -- at least the high

15  school students were given a 15-minute break during every

16  four-hour period.  Do you remember that?

17     A.      That is correct.

18     Q.      And it was your duty as the instructor to enforce

19  the 15-minute break time; correct?

20     A.      That is correct.

21     Q.      And under the student handbook, high school

22  students weren't allowed to leave the campus during their

23  15-minute breaks; true?

24     A.      Let's clarify that.  At the Cutting Edge, there

25  was no closed campus policies there.  Northwest didn't

121

1   have that policy either until the incident of me letting
2   one of the students go to Fry's across the street, and
3   then I was told that it was a closed campus.  That was not
4   in the policies.
5        Q.   So there was nothing in the student handbook
6   about students not leaving the campus before you let
7   someone go to Fry's in December of 2013.  Is that your
8   testimony?
9        A.   I don't recall if it was in the student handbook.
10                 (Deposition Exhibit Number 6 was marked for
11   identification.)
12   BY MR. SCHWARTZ:
13        Q.   We've handed you what's been marked as Exhibit 6.
14   Do you recognize this to be the Maricopa Skill Center
15   Cosmetology Student Handbook for Cutting Edge, West-MEC,
16   the Maricopa Skill Center and the Maricopa Skill Center
17   Northwest Campus?
18        A.   Yes, I do.
19        Q.   This would have been the handbook for the
20   2013/2014 year?
21        A.   That is correct.
22        Q.   Okay.  Turn to page 22, numbered page 22.  It has
23   a section called 18, leaving campus policy for high school
24   students.
25                 Do you see that?

122

1     A.    Yes, I see that, but this is not the -- this is

2 not the -- this is not the policy book.  When was this one

3 revised?

4     Q.    I'm sorry.  What do you mean by this is not the

5 policy book?

6     A.    This is not the campus book.  Okay.  I recognize

7 it from my statement, yes, I see that.  Number 18, leaving

8 campus policy for high school students.  Your question

9 now, again?

10    Q.    My question is you say Exhibit 6 is not the

11 policy book.  What are you referring to as the policy

12 book?

13    A.    I meant to say that this was not the -- this was

14 not the Maricopa -- the Cutting Edge handbook that I had.

15 It didn't have the Maricopa Skills.  It just had the

16 Cutting Edge handbook on there, and that's the one I

17 looked at.  So no this one I did -- I did not have this

18 one.

19    Q.    Were you aware the cosmetology student handbook

20 for 2013/2014 was available online?

21    A.    Yes, it's available.  I was aware of that,

22 uh-huh.

23    Q.    And so let me make sure I'm understanding your

24 testimony correctly.  You were in the 2013/2014 school

25 year.  You were attempting to utilize the Cutting Edge

125

1   Fry's across the street.  I was looking at the Cutting

2   Edge handbook.  The Cutting Edge handbook.

3       Q.    Cutting Edge handbook for what year?

4       A.    For 2013, what I'm saying.  So now I'm being

5   told -- then I'm being told now I violated -- I'm

6   admitting that I violated by letting the students go off

7   campus according to this handbook.  At the time it

8   happened, sir, I was not aware that they had changed this

9   in this policy that it was a closed campus.  So when I was

10  told that it was a closed campus, I then went and accessed

11  the new policies or handbook, and that's when I saw that

12  the campus was not an open campus.  It was a closed

13  campus, so I admit that.  I admit prior to getting this

14  information, I had permitted my students to leave campus.

15              Did I clear my questions up?  Did I clear it

16  up?

17      Q.    I want to make sure I'm understanding your

18  testimony.  It's your testimony that Cutting Edge has its

19  own student handbook?

20      A.    It has its own student handbook prior to the

21  Northwest campus opening, yes.

22      Q.    That would have been for the 2012/2013 school

23  year; correct?

24      A.    That is correct.

25      Q.    So when you say you went to look at the Cutting

1    Edge handbook, you're talking about the Cutting Edge

2    handbook for the 2012/2013 school year; true?

3        A.    That is true.

4        Q.    So in the 2012/2013 year, it's your testimony you

5    never looked at the student handbook to see if there were

6    any differences before December 20th, 2013.  Am I

7    understanding that correctly?

8        A.    I'm saying that I did not get a chance to review

9    the revised handbook, that is correct.

10       Q.    Well, what prevented you from getting a chance to

11   review the 2013/2014 handbook before since it was

12   available to the students?  What prevented you from

13   looking at it before December 20th, 2013?

14       A.    Because I had other administrative

15   responsibilities that I was working on.

16       Q.    And it's your testimony that when we look in the

17   2012 to 2013 Cutting Edge handbook, it will be completely

18   different in paragraph 18 in talking about whether it's an

19   open campus or closed campus; correct?

20       A.    That is correct.

21       Q.    Okay.  Did Ms. Hemming ever tell you in any of

22   the staff meetings that Northwest was a closed campus?

23       A.    That was after the fact.  It was after I had let

24   the students go off campus.

25                   (Deposition Exhibit Number 7 was marked for

1    identification.)

2    BY MR. SCHWARTZ:

3        Q.    I've handed you what's been marked as Exhibit 7.

4    These documents were produced by us with our initial

5    disclosure statement.  Do you recognize these documents?

6        A.    Uh-huh, I do.

7        Q.    Did you receive those around the beginning of

8    August of 2013 from Lisa Hemming?

9        A.    Yes, I did.

10       Q.    Had you seen similar kind of documents when you

11   were at Cutting Edge the year before?

12       A.    Yes.

13       Q.    Okay.  And did you review these documents so that

14   you would know what was being expected of you as an

15   instructor?

16       A.    Yes.

17       Q.    Turn to the third page.  It says, "Clinic floor

18   expectations."  The only underlined sentence says, "No

19   food or drink in clinic.  Only bottled water."  You were

20   aware of that?

21       A.    I was.

22       Q.    And they've had a similar policy at Cutting Edge

23   as well; is that correct?

24       A.    That is correct.

25       Q.    Turn to page -- the previous page.  The second --

1    there about the middle of the thing, it says, "Follow-up

2    curriculum.  Do not deviate from classes to be taught.  If

3    you have questions, please ask."  You were aware of that

4    in August of 2013; correct?

5        A.    Correct.

6        Q.    And then it says on the first page, third kind of

7    block, if you will, or bullet point from the bottom says,

8    "Always follow and enforce state laws and regulations."

9    You were aware that was an expectation; is that correct?

10       A.    That is correct.

11       Q.    Two bullet points above that, it says, "Arrive at

12   least 15 minutes prior to scheduled shift prepared and

13   ready for class."  You understood that was one of your

14   expectations and requirements at Northwest; fair?

15       A.    That is correct.

16       Q.    On the fourth page titled, "Instructor tasks,"

17   you were aware one of your daily tasks was to take

18   attendance daily; correct?

19       A.    Correct.

20       Q.    And you also had to verify and validate

21   attendance daily and skill times?

22       A.    That is correct.

23       Q.    What's SkillTime?

24       A.    That's the computer system or software that they

25   use for the students to clock their hours, because for

129

1    State board, they have to clock 1,600 hours.

2         Q.    Read out loud for me under daily on the

3    instructor tasks number four, please?

4         A.    "Consistently follow and enforce school rules and

5    curriculum."

6         Q.    So you were aware one of your tasks and what you

7    were expected to do was consistently follow and enforce

8    school rules and curriculum; correct?

9         A.    And I did that.

10        Q.    Number five says you're supposed to manage your

11   classroom at all times, rules, respectful behavior,

12   language and bullying.  You understood that to mean you

13   weren't to allow bullying?

14        A.    That is correct.

15        Q.    And it wouldn't matter if the bullying was in

16   Spanish, English or any language?

17        A.    That is correct.  It wouldn't matter.

18        Q.    But if it was in Spanish, you might not

19   understand it because you don't speak Spanish?

20        A.    That is correct.

21        Q.    Okay.  And then under both weekly and monthly,

22   weekly item number four and weekly item number two, you

23   had some involvement in SkillTime with verifying and

24   correcting attendance related matters; is that true?

25        A.    You said I had involvement?

132

1        Q.    Did she ever have staff meetings?

2        A.    We've had staff meetings, but not instructional.

3   We've only had one meeting since I was on that campus, and

4   that's when she gave us this packet here, one or two in

5   that time frame.

6                    (Deposition Exhibit Number 9 was marked for

7   identification.)

8   BY MR. SCHWARTZ:

9        Q.    We've handed you what's been marked hopefully as

10  Exhibit 9.

11       A.    Uh-huh.

12       Q.    Do you recognize Exhibit 9 to be a true copy of

13  an agenda from a meeting you had at or about August 1st,

14  2013, where you, the other instructors, and Lisa Hemming

15  all got together?

16       A.    Yes, I do.

17       Q.    Okay.  Besides the instructors -- because it says

18  it's a staff meeting -- who else was present?

19       A.    Carolyn Cardwell, Mr. Wood and Shala.

20       Q.    So it was just the instructors?

21       A.    Yes.

22       Q.    So when it says it was a staff meeting, to be

23  fully accurate, it was an instructors' meeting with Lisa

24  Hemming?

25       A.    That is correct.

133

1      Q.   Okay.  And were you provided -- how did you get
2   the agenda?
3      A.   I was present at this meeting.
4      Q.   And was it handed out?
5      A.   Yes, it was.
6      Q.   Okay.  Along with the packet that we mentioned
7   earlier and went over?
8      A.   That is correct.
9      Q.   Okay.  One of the topics, it says, "Handbook."
10  It's a little over halfway down.  Is it your testimony
11  that Lisa Hemming, at the August 1st, 2013, meeting, said
12  that there was a handbook from the previous year which
13  should be used or did she refer to a new handbook that
14  should be used?
15     A.   I don't recall how she referred to the handbook.
16              (Deposition Exhibit Number 10 was marked
17  for identification.)
18  BY MR. SCHWARTZ:
19     Q.   I've handed you what's been marked as Exhibit 10
20  to your deposition.  Do you recognize this to be the
21  meeting agenda from the October 2nd, 2013, meeting?
22     A.   Uh-huh.  I do recall this.
23     Q.   I know you said uh-huh.  Is that a yes?
24     A.   I said I do recall this.
25     Q.   Does this appear to be a true and accurate copy

134

1    of the meeting agenda that you were handed at that

2    meeting?

3        A.    Yes.

4        Q.    And who was present at the meeting?

5        A.    The same four people, Shala, Mr. Wood,

6    Ms. Carolyn Cardwell, Toni and myself.

7        Q.    As well as Lisa Hemming?

8        A.    And Lisa Hemming.

9        Q.    All right.  Under teachers' office on the first

10   page, the fourth bullet point down says, "No students,

11   ever."

12                Do you see that?

13       A.    Yes, "No students, ever," uh-huh.

14       Q.    So you were aware as of October 2nd, 2013, there

15   were not supposed to be any students?

16       A.    Uh-huh.

17       Q.    Is that a yes?

18       A.    Yes.

19       Q.    Okay.  Did you ever allow students in the

20   teachers' office?

21       A.    I had students in the office because we were

22   settling a dispute between two students.  I couldn't take

23   them into the dispensary because there was students in

24   there, and I took them in the office for private because

25   we were resolving a classroom issue between two students.

135

1     Q.    So that would be a yes?

2     A.    Yes.

3     Q.    Was that before or after October 2nd, 2013?

4     A.    That was before October 2013.

5     Q.    And is it your testimony there were just two

6     students in the teachers' office with you?

7     A.    That is correct, as far as my knowledge is

8     concerned.

9     Q.    Under clinic floor on page 1 of Exhibit 10,

10    there's -- in all capitals, it says, "No food or drink in

11    the classrooms or clinic floor," and this says "ever,"

12    followed by an exclamation point; is that true?

13    A.    That is true.

14    Q.    So you were aware on October 2nd, 2013, there was

15    never to be any food or drink in the classrooms or on the

16    clinic floor ever; true?

17    A.    This is true.

18    Q.    On the second page, there's reference to Shala's

19    role.   It says that Shala is the lead instructor over

20    aesthetics and then part of the management team; correct?

21    A.    That is correct.

22            (Deposition Exhibit Number 11 was marked

23    for identification.)

24            THE WITNESS:   How much longer do we have?

25    Can we take another break?

138

1    Hemming was your -- the clinic floor supervisor who was
2    involved with disciplinary matters.  It's my understanding
3    there was no incident reports written up by Ms. Hemming
4    related to you; is that fair?
5        A.    That's correct.
6        Q.    Okay.  There were, as I understand it when you
7    were at Northwest, some incident reports written up
8    related to you; is that true?
9        A.    That is correct.
10       Q.    I'm going to hand you what has been marked as
11   Exhibit 12.  Do you recognize this to be one of the
12   incident reports written up by Lisa Hemming related to
13   you?
14       A.    I do.
15       Q.    And did you receive a copy of the two pages we've
16   marked as Exhibit 12 at or about mid January of 2014?
17       A.    I do.
18       Q.    Okay.  And this one basically deals with what's
19   called a, quote, pizza party.  That's what the subject
20   matter of this one is; correct?
21       A.    That is correct.
22       Q.    Okay.  Did you read any of the first page of the
23   incident report guidelines?
24       A.    I did.
25       Q.    Okay.  So you understand that it says an incident

140

1      A.    That's correct.

2      Q.    But it is true that on January 11th, a Saturday,

3  you did order pizza for your students; correct?

4      A.    That is correct.

5      Q.    It is correct that your students ate pizza in a

6  classroom; correct?

7      A.    Not all of them ate it in the classroom, that is

8  not correct.

9      Q.    Some students ate it in the classroom?

10     A.    And some ate it in the student lounge.

11     Q.    And the pizzas were actually put in the classroom

12  and not in the student lounge?

13     A.    That is correct.

14     Q.    Okay.  And the report also says that there were

15  leftover pizza boxes and empty drink containers in the

16  classroom.  Do you have any reason to dispute that that

17  is --

18     A.    No, that's correct.  That's correct.

19     Q.    Okay.  As I understand, your position is you just

20  didn't understand that because the students were eating or

21  drinking in the classroom during noninstructional time,

22  you thought that was okay?

23     A.    No, that's not correct.

24     Q.    Well, then, explain it to me, then.

25     A.    Basically we had been permitted in time past

1    having potlucks in the classroom during noninstructional

2    time.  In this case, I ordered pizzas as an appreciation

3    to my students for their hard work on that day.  We did

4    not stop instructional time for them to have the pizza.

5    The pizza was placed in the classroom because there was

6    another class there on that day, and we didn't want the

7    other students to go in and take the pizza that I had

8    purchased for my students.  So in that case, the pizzas

9    were stored in the rooms.  When the students had their

10   time to go and have lunch, they were told that they can go

11   get a pizza and eat their lunch, but nothing was stopped

12   for them to do that.  We continued on the clinic floor

13   during our instructional time.

14        Q.    So the only reason the pizza was in the classroom

15   is so that students who weren't in your class wouldn't

16   take the pizza.  Am I understanding that correct?

17        A.    That is correct.  That is correct.

18        Q.    Okay.  Now, tell me which of your co-instructors

19   at Northwest campus had allowed food in any classroom or

20   on the clinic floor at any time.

21        A.    Oh, Ms. Toni Trott, Ms. Carolyn Cardwell,

22   Mr. Robert Wood.  We were all permitted to do potlucks

23   around October and November and December.  We were always

24   permitted to let the students do those things when it was

25   the holidays or special occasions.

142

1      Q.    Who told you that?

2      A.    That has always been the practices with our

3   cosmetology program from Cutting Edge on.

4      Q.    Is it accurate to say Lisa Hemming, while you two

5   were working at Northwest campus, did not expressly say,

6   "Instructors, you can have potlucks"?

7      A.    She never expressed that we couldn't have

8   potlucks.

9      Q.    Okay.  How do you know Toni Trott had a potluck

10  in a classroom or on the clinic floor?

11     A.    Because we all had the potluck around that time.

12  It was the holidays.

13     Q.    You saw it?

14     A.    Yes, sir.

15     Q.    So if Toni Trott testifies under oath that she

16  never allowed any students to have any food or any drink

17  or held a potluck in a classroom or on a clinic floor, she

18  would be mistaken.  Would that be your testimony?

19     A.    That would be my testimony because we have had

20  potlucks.

21     Q.    The classroom doors -- I don't remember seeing a

22  window for someone looking out into a classroom.  Are

23  there windows on the doors?

24     A.    There are.

25     Q.    And is that how you were able to see students

1  true?

2      A.    I would say that was mistaken because we all had

3  a potluck.  I'm not the only one.

4      Q.    Same with Robert Wood, if he comes in and

5  testifies he never had a potluck in his classroom where

6  food was in the classroom, you believe that was mistaken

7  because you personally observed it?

8      A.    I cannot speak on behalf of what they're going to

9  say, sir.  You asked me a question, and I'm giving you my

10  answer.  I can't speak for the other person, so with that

11  I object.

12      Q.    Okay.

13      A.    I object to that question.

14      Q.    Your testimony is you personally saw Toni Trott

15  holding a potluck with food in her classroom; correct?

16      A.    I did, and I saw Ms. Carolyn Cardwell, and I've

17  seen Mr. Wood, and if they come in and testify, then I

18  would say, yes, they were inaccurate because they did do

19  that.

20      Q.    Okay.  Did you ever hear Lisa Hemming ever say

21  any kind of racial slurs or racial animus, anything that

22  reflected that she was biased against African Americans?

23      A.    I don't recall.

24      Q.    Did anyone ever tell you that they had heard Lisa

25  Hemming say something which reflected a bias against

146

1   African Americans?

2       A.    I don't recall.

3       Q.    I'm handing you Exhibit 13 to your deposition.

4   Do you recognize this to be an incident report issued on

5   or about January 10th, 2014, regarding students being in

6   the teachers' office?

7       A.    No, I do not remember receiving this.  No, I do

8   not.

9       Q.    Are you claiming you did not receive Exhibit 13?

10      A.    Nope.  I did not receive it.

11      Q.    Okay.  Do you remember telling Kristina Scott

12  that you had received an incident report regarding having

13  students in the teachers' office and that you were not

14  challenging it?

15      A.    I don't recall -- I recall Lisa Hemming coming to

16  me and saying something to me about the students.  I do

17  not recall this document being given to me.  I do recall

18  speaking to Kristina, once again as I stated in a previous

19  question you asked me, that when I had a situation with my

20  student, that is when I brought them into the office.  We

21  did not make that a habit for the students to be in the

22  office, so there was an incident where the students were

23  in the office, and these students that are listed are

24  there, but I was never given this incident report.

25      Q.    Are you able to tell me of any other instructors

147

1   who had students in the teachers' office within violation

2   of the policy?

3       A.   Mr. Wood.

4       Q.   Anyone else?

5       A.   That's the only one I can think of.

6       Q.   Did you inform Ms. Hemming that Mr. Wood had

7   students in the office?

8       A.   No, because I'm not a tattletale.

9       Q.   Do you have any basis to believe Mr. Wood ever

10  had students in his office?

11      A.   I'm sure she probably wasn't aware if no one else

12  told her.

13      Q.   Exhibit 14.  Do you recognize this to be an

14  incident report you were provided by Lisa Hemming on or

15  about January 13th, 2014, related to tardiness?

16      A.   No, sir.  Once again, these are incident reports

17  that I have never seen.

18      Q.   Were you, in fact, tardy on the dates that are

19  indicated in Exhibit 14?

20      A.   If I was tardy during these days, they were never

21  brought to my attention, so, no, I was not aware.

22      Q.   Wouldn't you have known if you were tardy?

23      A.   I have up until ten minutes.  So ten minutes,

24  seven minutes.  On January the 8th, she had changed my

25  schedule.  I was under the impression that I was coming in

149

1    period?

2       A.    There would be several teachers.  I don't keep

3    track of the teachers when they come in and out.

4       Q.    When a teacher comes in --

5       A.    I'm in my classroom.

6       Q.    Well, how do they know that you're there?  Do you

7    log in?  Do you sign in?

8       A.    It's not the responsibility of the other teachers

9    to know whether I'm there or not.

10      Q.    That wasn't my question.

11      A.    What was your question?

12      Q.    When you as an instructor come in for the day, do

13   you log in, sign in, do something so we know when you got

14   there?

15      A.    Yes, I log in.

16      Q.    And is that done electronically?

17      A.    It is.  It's through our computer.

18      Q.    So we can just look at the computer and it will

19   tell us when you logged in; correct?

20      A.    That is correct.

21      Q.    Okay.  And if the computer says that you were

22   tardy based on the information that's also reflected in

23   Exhibit 14, do you have some reason to think the computer

24   is wrong?

25      A.    I'm not disputing the computer.  You asked if I

1    had remember receiving these incident reports.  I stated

2    to you I have not seen these incident reports.  They were

3    never presented to me.  The only incident report that was

4    presented to me was the one regarding the pizza party.

5    All these other incident reports are new.  I've never seen

6    them.  Never seen them.

7         Q.   The only incident report you've ever seen is the

8    pizza party?

9         A.   This one and the sleeping on the job.  Those are

10   the only two.  This one, once again --

11        Q.   I'm handing you what's been marked as Exhibit 15.

12   Do you recognize this incident report?

13        A.   Oh, yes.  I remember this very clearly.

14        Q.   And were you given this in October of 2013?

15        A.   Yes, I was.

16        Q.   And does this appear to be a true and accurate

17   copy of what you were given back in October of 2013?

18        A.   Yes, it was.

19        Q.   And this has to do with you allegedly sleeping in

20   your office; correct?

21        A.   Yes, sir.

22        Q.   Okay.  On October 1st, 2013, as indicated in the

23   incident report, did Lisa Hemming and Shala walk in

24   together at some point in time?

25        A.   Yes, they did.

152

1    classroom.

2        Q.    The incident report says when Ms. Hemming and

3    Shala came in together, it happened about 10:45 a.m.  Does

4    that sound about right?

5        A.    That sounds about right.

6        Q.    What time of the day did you start work?

7        A.    8 o'clock.

8        Q.    And so you would have logged in when you got

9    there that day?

10       A.    That is correct.

11       Q.    Okay.  Were your eyes closed --

12       A.    Yes.

13       Q.    -- for roughly 15 minutes?

14       A.    Yes, they were.

15       Q.    Now, attached to the incident report were those

16   e-mails from Carolyn Cardwell, whose e-mail, at least, was

17   Carolyn Main, Shala and for Robert Wood.  You saw those

18   back in the October time frame; correct?

19       A.    Yes.

20       Q.    And as I understand it, you disputed this saying

21   you were just resting your eyes and that you were not

22   sleeping on the job; is that fair?

23       A.    That is fair.

24       Q.    Okay.  And you end up having meetings with

25   Kristina Scott and Ms. Hemming about this incident report;

153

1   correct?

2       A.    That is correct.

3       Q.    You also had a meeting with Kristina Scott and

4   Lisa Hemming about the pizza party incident report;

5   correct?

6       A.    That is correct.

7       Q.    And I think, correct me if I'm wrong, at the

8   meeting, you said to Ms. Scott that, hey, there had been

9   potlucks in the classrooms beforehand, and I had no notice

10  that the no eating of food or drink in the classroom was

11  going to be enforced.  Do I understand that's what you

12  told her?

13      A.    No.   I told her I am aware that there's no eating

14  or drinking in the classroom.  I told her that in time

15  past, we were permitted to do potlucks for special

16  occasions, and we were never told that we could not do

17  these anymore.  Lisa Hemming then stated she sent an

18  e-mail out saying that we were no longer going to be

19  permitted to do potlucks, and that's when I challenged it

20  because I said, "You did not send the e-mail out," and

21  Kristina informed her that if she did not produce that

22  e-mail stating that she communicated to all of us that we

23  were no longer permitted at all to have potlucks, she

24  would have to remove that out of my file.

25      Q.    And as you understand it, it was removed and you

154

1    were given a verbal warning in place of that; is that
2    true?
3        A.    She told me -- yes.  She said that we were not to
4    have any food, and I complied.
5        Q.    And you not only complied, you told Kristina
6    Scott that you accepted the verbal warning in place of the
7    incident report.  Do you remember telling her that?
8        A.    I don't recall telling her that.
9        Q.    Did you, in fact, accept the verbal warning?
10       A.    I heard it.  I accepted it.
11       Q.    And it's your testimony, if I understand
12   correctly, that you didn't know that the Northwest campus
13   was a closed campus for your high school students until on
14   or after December 20th, 2013.  Am I understanding that
15   correctly?
16       A.    That is correct.
17       Q.    Okay.  And that's because you never read the
18   2013/2014 Northwest --
19       A.    That is correct.  I did not get a chance to
20   refamiliarize it.
21       Q.    Matthew Erbe, a security person or public safety
22   officer, said on December 20th, that you allowed two high
23   school students to leave campus at about 2 o'clock or so
24   to go to Fry's.  Did you do that?
25       A.    I did.

155

1     Q.    The class had just -- strike that.

2           This was a Saturday, as I understand it --

3     strike that.

4           Do you remember what day of the week it was?

5     A.    No, I do not.

6     Q.    Okay.  At 2 o'clock, if it was during the

7     weekday, high school -- the class would only start at

8     2 o'clock; correct?

9     A.    That is correct.

10    Q.    If it was a Saturday, it could have started at

11    8 o'clock with a lunch break followed by the afternoon

12    time until 5 o'clock; is that fair?

13    A.    That is correct.

14    Q.    Okay.  So if it was during the weekday, if it

15    happened about 2:10 or so, it would have been ten minutes

16    after class started; correct?

17    A.    That is correct.

18    Q.    Mr. Erbe's e-mail said the purpose of them going

19    to Fry's was to get food for a potluck.  Did you, in fact,

20    hold a potluck on December 20th?

21    A.    Like I said, that was during the time we were all

22    permitted to do potlucks in our class, myself, Mr. Wood,

23    Ms. Cardwell and Ms. Trott.  We were all doing potlucks on

24    that day.

25    Q.    But that was the purpose for why you allowed two

1　be high school students?

2　　　A.　I'm aware of that, but from my understanding,

3　she's 18.　I can't tell her she can't smoke, but I never

4　gave her permission to go out and smoke.　So you asked me

5　that.　You asked me if I allowed her to go out and smoke,

6　and I'm telling you no, I did not.

7　　　Q.　Well, my question was more you said Kaitlyn Culp

8　was not a high school student, but the fact that she's in

9　your class when you only had high school students meant

10　that she was a high school student?

11　　　A.　Yeah, and I correct my statement on that.　She

12　was a high school student but she was 18.

13　　　　　　　　(Deposition Exhibit Number 16 was marked

14　for identification.)

15　BY MR. SCHWARTZ:

16　　　Q.　I've handed you what's been marked as Exhibit 16.

17　Do you recognize this to be an e-mail sent to you on or

18　about August 12th, 2013, not just to you, but to other

19　instructors at Northwest?

20　　　A.　Okay.　I'm sorry.　Rephrase your question again.

21　　　Q.　Sure.　Do you recognize this to be an e-mail sent

22　to you and to the other instructors at Northwest campus on

23　or about August 12th, 2013?

24　　　A.　I don't recall the e-mail, but it was sent to us.

25　　　Q.　You've had a chance to read this silently to

166

1    yourself, Exhibit 16; true?

2       A.    Uh-huh.

3       Q.    Is that a yes?

4       A.    Yes.

5       Q.    That's all right.

6             And, in fact, it says this is -- Northwest

7    is a closed campus; correct?

8       A.    I don't see where you see the closed campus.  Oh,

9    I see.  Yes, closed campus.  Okay.

10      Q.    This e-mail is telling the instructors, "Please

11   remind your high school students that this is a closed

12   campus," and the next sentence down says, "They will not

13   be allowed to leave campus starting tomorrow."  So you

14   were put on notice in mid August that this was a closed

15   campus and high school students couldn't leave campus;

16   correct?

17      A.    According to this e-mail, that's what it says.

18      Q.    And the e-mail says, "This is something that

19   West-MEC has put in place for student's safety," and

20   West-MEC is the organization who had sent high school

21   students to the Northwest Maricopa Skill Center campus;

22   true?

23      A.    Yes, West-MEC is, that's true.

24      Q.    Did you ever hear any of your students curse, use

25   profanity, in your presence?

1     A.   Oh, yes.

2     Q.   Did it happen often?

3     A.   No.

4     Q.   Did you reprimand them or do something about it?

5     A.   I did.

6     Q.   What did you do?

7     A.   I corrected a lot of them and told them it was

8  not permitted to use that language on the campus.

9     Q.   Anything else?

10    A.   And that there will be consequences if I continue

11  to hear the language.

12    Q.   Did you enforce the policy all the time?

13    A.   I do.  I mean ...

14    Q.   All right.  Your complaint says shortly after

15  school began, Hemming spoke with you about students

16  speaking Spanish.  Did she, in fact, talk to you

17  shortly --

18    A.   She did.

19    Q.   Was it a one-on-one meeting?

20    A.   It was.

21    Q.   Was anyone else present?

22    A.   No.  We were in the hallway.

23    Q.   How long did the meeting last?

24    A.   All of maybe about ten minutes.

25    Q.   Okay.  Was anyone else nearby when you were

1    talking?

2         A.    I don't recall.

3         Q.    Okay.  What do you claim Hemming told you in that
4    meeting?

5         A.    Ms. Hemming approached me and stated was I aware
6    that our campus was an English speaking only campus, and I
7    explained to her, yes, I was aware, and she said, "Well,
8    you need to explain to your students that they are not to
9    speak Spanish in the break room," and I asked her, "Why
10   are they not permitted to speak Spanish in the break
11   room?"  And she said because it was an English speaking
12   only campus, and I told her I didn't feel that I could
13   tell them that.  So she said, "Well, it's an English
14   speaking only campus."

15              I then went to the student handbook, the
16   Cutting Edge student handbook, and it was not in there
17   that this was English only, because like I said, at this
18   time, we had not yet got the new Maricopa Skill handbooks.
19   So I was looking at the policy.  Then when I got the
20   Maricopa Skill policy as well, it didn't say anything in
21   there.

22        Q.    Anything else said?  Is that a no?

23        A.    No.

24        Q.    Okay.  Do you recall Ms. Hemming telling you that
25   certain students felt they were being bullied in Spanish?

169

1      A.    She did come and tell me that the second time she
2    told me.

3      Q.    And bullying is something that's prohibited,
4    whether at Cutting Edge, Northwest, at all of the schools;
5    correct?

6      A.    That is correct.

7      Q.    And that would be true -- bullying would be
8    impermissible whether it's in English, Spanish, Hebrew,
9    whatever the language?

10     A.    That is correct.

11     Q.    Is it possible in any way that what Ms. Hemming
12   was telling you is someone had complained that the
13   students were using Spanish to help bully them?

14     A.    I don't know what -- okay.  Ask the question
15   again.

16     Q.    Sure.  My question is:  Is it possible that what
17   Ms. Hemming was trying to convey to you was that students
18   felt bullied when other students were speaking, in the
19   break room, Spanish?

20     A.    She did convey that to me, and our conversation
21   with that was did you take the time to get those students
22   and meet with them and find out what was going on.  My
23   impression is, as a supervisor, manager, instructor, when
24   you see that there is a bullying situation, you are to get
25   together with those parties and find out what it is,

1  mediate the situation.  That did not take place.

2      Q.    I had one other question about Exhibit 16 that's

3  in front of you.  It talks about this is going to be

4  starting tomorrow.  This is an e-mail sent Monday,

5  August 12th.  Does that in any way refresh your

6  recollection of the starting date of when school started

7  that it would have been August 13th?

8      A.    School was already in session.  This was already

9  school in session.

10     Q.    Okay.  Do you know why August 13th would be

11 different than August 12th?  It says something is starting

12 tomorrow, closed campus.  Do you know why that would be if

13 school -- perhaps school wasn't in session.

14     A.    I already answered your question and admitted I

15 allowed the students to leave campus, and then Ms. Hemming

16 came back and told me that that was a policy, and when she

17 told me that, I complied to that policy.  I'm not saying I

18 was perfect in everything I did, and when it was brought

19 to my attention that I was not complying, I corrected

20 whatever it was they said.

21     Q.    You spoke to Lisa Hemming --

22     A.    Uh-huh.

23     Q.    -- about speaking Spanish in the break room;

24 correct?

25     A.    That is correct.

1     Q.   You did not in any way reprimand any students for

2  speaking Spanish in the break room, did you?

3     A.   I told them that I was informed to instruct them

4  that they could not speak Spanish in the student lounge.

5  The first time she told me that and I told them that, I

6  was told that our campus is an English speaking only

7  campus.  One of the students did go back and look in her

8  student handbook, and that is when you had asked me

9  previously about parents calling West-MEC.  That was one

10  of the incidents where parents contacted West-MEC.  I had

11  instructed the students to tell their parents to contact

12  West-MEC because they were being told something that was

13  not in the student handbook.

14     Q.   Do you have any information to suggest to you

15  that any of the students or their parents contacted

16  West-MEC?

17     A.   I don't know.  From that point, I don't know.

18     Q.   But just so I'm clear, you did not refuse to tell

19  the students that they couldn't speak Spanish.  You, in

20  fact, told the students they could not speak Spanish in

21  the break room; true?

22     A.   No, no.  I told the students I was told to tell

23  them they could not speak Spanish in the break room.  That

24  is what I said.

25     Q.   Did you leave it at that?

172

1      A.    I sure did.

2      Q.    So they were left with the impression they could

3  not speak Spanish in the break room because that's what

4  you were telling them?

5      A.    That is what I was told by Hemming.

6      Q.    So you didn't refuse to convey that message to

7  the students; true?

8      A.    I conveyed the message that was given to me by

9  Hemming that the students were not to speak Spanish in the

10 student lounge because it was an English only speaking

11 campus.  That is the message.  I relayed nothing more,

12 nothing less.

13     Q.    Good.  Did you ever tell -- which students did

14 you tell?

15     A.    All of my Hispanic students, and 80 percent of my

16 class was Hispanic students.

17     Q.    Well, why didn't you tell them all?  How do you

18 know the Caucasians didn't speak Spanish?

19     A.    Because they didn't.  I knew who was in my class

20 who spoke Spanish and who didn't.

21     Q.    Did you think it was important for the Caucasian

22 students to know that it would be improper for the other

23 students to speak Spanish in the break room?

24     A.    When I made the announcement, I made it to my

25 whole class.  I did not separate my Hispanic students.  I

173

1    told that announcement to the whole class.

2        Q.    So you didn't just tell the Hispanic students.

3    You told everybody?

4        A.    It was announced to the whole class.

5        Q.    And did you ever tell them that that changed?

6        A.    What do you --

7        Q.    Did you ever tell the whole class, "I told you

8    before no Spanish in the break room"?  Did you ever tell

9    them that changed?

10       A.    No, I didn't tell them it changed.

11       Q.    Okay.  The only person you question the no

12   speaking of Spanish in the break room with was Lisa

13   Hemming.  Do I understand that correctly?

14       A.    That is correct.

15       Q.    Okay.  And you questioned her because she was

16   asking you to perform a duty that you have to do as part

17   of an instructor, and you didn't think that was right;

18   fair?

19       A.    First of all, I was acting under a protective

20   class when I told her that that was a civil -- there was

21   some type of civil rights I feel like I'm violating.  I

22   expressed that to Ms. Hemming.  I don't feel that what

23   you're telling me is something I'm supposed to be telling

24   them.  First of all, the break room is not the classroom,

25   so I have no authority over the student lounge as to what

1  language they speak nor was that indicated specifically in

2  their handbook.  So, therefore, I'm not going to enforce

3  anything that is not in your policies and your procedures

4  and that was not in there, so I did not enforce it.

5              MR. SCHWARTZ:  Move to strike as

6  nonresponsive.

7  BY MR. SCHWARTZ:

8     Q.   My question is much more simple.

9     A.   I'm just clarifying.

10    Q.   When you told Ms. Hemming why you thought what

11  she was asking of you was wrong, you did that because you

12  were the instructor who she was asking to perform what you

13  considered to be unlawful or wrong behavior; is that fair?

14    A.   I'm still not understanding your question.

15    Q.   The reason you're having this discussion with

16  Ms. Hemming about speaking Spanish in the break room is

17  because you're an instructor of students; true?

18    A.   Yes.

19    Q.   And she wanted you to do something in your role

20  as an instructor; correct?

21    A.   That was -- yes.

22    Q.   Okay.  And you were resisting it because you

23  thought what she was asking you to do in your role as an

24  instructor was wrong; is that fair?

25    A.   That is correct.  That is fair.

1    Q.    That's all I was trying to get to.

2    A.    That's fair.  That's fair.  That's fair.

3    Q.    So do you have any -- strike that.

4          Did Lisa Hemming ever ask you to discipline

5    any particular students for speaking Spanish?

6    A.    No.

7    Q.    Did she ask you to discipline anyone for speaking

8    Spanish?

9    A.    Well, when she came and told me I had to

10   reprimand and tell them not to do it, that's a discipline.

11   So, yes, she did.

12   Q.    Who did she tell you you should be reprimanding?

13   A.    Whatever Hispanic student was speaking in the

14   break room.  At that point, she didn't give my any names

15   so I couldn't go specifically to that student.

16   Q.    Did you ask for the name?

17   A.    She didn't give it to me.  She didn't have it.

18   She came with a secondhand story so she didn't even have

19   the names.

20   Q.    Was she asking you to contact the students and

21   find out what had happened?

22   A.    No.  She did not ask me to contact the students

23   and find out what happened.

24   Q.    Well, when you say she asked you to reprimand a

25   student, an unnamed unspecified student, what did she ask

176

1   you to do?  What was the reprimand supposed to entail?

2       A.   I mean, you're asking me something that I don't

3   understand what you're saying, because first of all, to

4   me, a reprimand is like you said earlier.  If it's a

5   verbal warning, that's a reprimand.  So she's asking me to

6   verbally tell them not to speak Spanish.  That's a

7   reprimand to me in my mind.

8       Q.   So when you say she was asking her to reprimand,

9   it's just to convey what you've already told me you did

10  convey to the students?

11      A.   That is correct.

12      Q.   Okay.  You're familiar with Kristina Scott who

13  works for the District?

14      A.   Yes, I am.

15      Q.   Do you have an understanding as to where her

16  position is in relationship to Lisa Hemming's?

17      A.   No.  We did not have -- I do not have a clear

18  understanding of that.

19      Q.   Did you think in some way that Kristina Scott was

20  Lisa Hemming's supervisor?

21      A.   I did.

22      Q.   And Kristina Scott, what would you -- how would

23  you describe her racial background?

24      A.   I guess she's -- I don't know.  African American,

25  I guess.

177

1     Q.   Do you have any reason to believe that Kristina
2   Scott was biased against you because of your race?
3     A.   No.   I don't think she was biased against me
4   because of my race.
5     Q.   The other instructors we talked about, Carolyn
6   Cardwell, Robert Wood, Toni Trott or even Shala Dveirin.
7   Do you have any reason to believe that any of them were
8   biased against you because of their race?
9     A.   I can't tell you what those people -- what they
10   were.   I can't tell you that.
11     Q.   But my question is whether you have some reason
12   to believe any of those folks were biased against you
13   because --
14     A.   I do believe Shala, yes, I do.   I do believe
15   Shala has some bias against me.
16     Q.   Because of your race?
17     A.   Because of my race.
18     Q.   What makes you think that Shala was biased
19   against you because you're an African American?
20     A.   It wasn't just me alone, but I noticed that she
21   monitored what me and Toni did the most compared to what
22   Carolyn and Robert would do.   It was like we had to watch
23   our back a lot when it came to her.
24     Q.   Your only interactions with Shala would be in the
25   instructor's office; correct?

179

1    believe she was biased against African Americans?

2        A.    No.

3        Q.    Okay.  As far as I can tell, you met with

4    Kristina Scott either by yourself or with Lisa Hemming

5    about three times.  Does that sound about right?

6        A.    That sounds about right.

7        Q.    The first time, as far as I can tell, was about

8    September 18th, 2013, when you met with Scott and Hemming?

9        A.    I don't recall what that meeting was about.

10       Q.    The next meeting that I'm aware of happened on

11   October 25th, 2013, when you met with just Kristina Scott.

12   Does that sound about the right time?

13       A.    That does sound about right.

14       Q.    And the last meeting, based on the records I've

15   seen, is January 17th, 2014, when you met with Ms. Scott

16   and Ms. Hemming?

17       A.    That is correct.

18       Q.    Any other meetings you had with Kristina Scott?

19       A.    Not that I'm aware of or that I recall.

20       Q.    Did you have any phone calls with Kristina Scott

21   that were substantive as opposed to, "Hey, how are you?

22   Can we schedule a meeting?"

23       A.    Yeah.  I did call and schedule the meeting that

24   was in January, yes.

25       Q.    No.  Actually my question is:  Did you have a

180

1       phone call with Kristina Scott where it wasn't just about

2       scheduling, it was more substantive?

3           A.   No, no.  I didn't have a phone call with her.

4           Q.   All right.  It's my understanding your October

5       meeting was because you got your incident report for

6       sleeping.  Is that consistent with your own recollection?

7           A.   That's correct.

8           Q.   Do you recall about how long you met with

9       Kristina Scott in that meeting?

10          A.   No, I don't recall.  Maybe 15 to 30 minutes.  I'm

11      not sure.

12          Q.   And where was the meeting?

13          A.   In her office at the Northwest campus.

14          Q.   Okay.  Anyone else present besides the two of

15      you?

16          A.   Just she and I at that time.

17          Q.   Was there anything discussed with Ms. Scott other

18      than the sleeping on the job incident report that you

19      recall on October 25th?

20          A.   That's when I began to talk with her about being

21      instructed to tell the Hispanic students about not

22      speaking Spanish in the break room and the campus being an

23      English only speaking campus.

24          Q.   Anything else?

25          A.   And that's pretty much all I can really remember

181

1   at that time that I spoke with her.

2       Q.   The last meeting you had on January 27th, 2014,

3   was primarily about the incident report related to the

4   pizza party; is that correct?

5       A.   Primarily, yes, that's correct.

6       Q.   What other students were discussed?

7       A.   We went back and revisited the write-up about the

8   sleeping on the job.  I had expressed to Kristina that I

9   still felt that that write-up should not be in my file

10  because no one asked me if I was on my break.  I basically

11  pleaded -- stated my case as to why I was contesting that

12  write-up as well, and Ms. Hemming stated in the meeting

13  that she stood by that write-up and she wasn't going to

14  remove it, and that's when Kristina had advised both of us

15  that -- she said if Lisa Hemming could not produce the

16  e-mail stating that potlucks were no longer permitted,

17  then she had to remove that write-up.  She said,

18  "Ms. Owens, if she produces the e-mail, then the write-up

19  stands," and I expressed to her that I understood that.

20      Q.   Anything else you recall being discussed in your

21  January 27th, 2014, meeting?

22      A.   The difference between the treatment of the high

23  school students than the adult students at the Northwest

24  campus.  The fact that the students -- you know, this is

25  supposed to be a college course.  The relationship between

182

1    West-MEC and Maricopa Skill.  The fact that there's a lot
2    of inconsistencies there.  You've got one person telling
3    you one thing and another person telling you something
4    else.  So these are the other topics we talked about.
5        Q.    Tell me what was discussed about the high school
6    versus adult students.
7        A.    The fact that they had the open and closed
8    campus.
9        Q.    Meaning adults, because they were not West-MEC,
10   high school students couldn't come and go as they pleased?
11       A.    That is correct.
12       Q.    And, in fact -- strike that.
13             Was there anything else that you were
14   raising?
15       A.    Well, the fact that the Cutting Edge was not
16   considered a closed campus at that time.  They didn't
17   enforce that until after all this scenario happened, but
18   Cutting Edge was never a closed campus in all the years
19   that I worked there.  The students were permitted to come
20   in and out of the building with no problem.
21       Q.    Did you -- in the 2013/2014 school year, did you
22   talk to the folks over at Cutting Edge that you used to
23   work with to say, "Hey, what's going on?  Is there
24   anything different?"
25       A.    No.

1       Q.    Do you know whether in the 2013/2014 school year,
2    Cutting Edge was still an open or a closed campus as
3    you've described it?
4       A.    No.
5       Q.    Okay.  Did you ever, in any of your three
6    meetings with Kristina Scott, say, "Hey, I feel I'm being
7    discriminated based upon my race"?
8       A.    No.
9       Q.    Did you ever tell Kristina Scott that you felt
10   you were being retaliated against because of anything?
11      A.    Yes, I did.
12      Q.    When do you claim to have said that to Kristina
13   Scott in one of the three meetings?
14      A.    In the last meeting, I felt that I was being
15   retaliated because of the fact that I was disputing the
16   Spanish speaking because that was -- the first meeting I
17   had with Kristina was about the fact I was being
18   instructed to tell the students not to speak Spanish.  So
19   in that meeting, I came in with all my documentation, the
20   student handbook and things like that.  So that was about
21   the time that I had the first meeting.
22      Q.    Did you -- so you told -- at some point in time
23   in your last meeting on January 27th, 2014, you claim to
24   have told Kristina Scott, "I feel I'm being retaliated
25   against for resisting the Spanish speaking directive"; is

184

1    that fair?

2       A.    Yes.

3       Q.    Did you say you were being retaliated for

4    anything else to Ms. Scott?

5       A.    Not that I recall.

6       Q.    Did you make any notes of your -- of any of your

7    three meetings?

8       A.    If I did, I don't have them.

9       Q.    Did you record any of those three meetings?

10      A.    No, I did not.

11      Q.    To your knowledge, did anyone record them?

12      A.    Not that I know of.

13      Q.    Did you ever have any meetings with John

14   Naughton?

15      A.    Not in person.  I spoke with him on the phone.

16      Q.    About how many times did you speak to John

17   Naughton on the phone that wasn't just about can we

18   schedule something, it's more something about substance?

19      A.    I only spoke to John one time.

20      Q.    And did you actually speak with him?

21      A.    I did.

22      Q.    How long was the telephone call?

23      A.    I want to say it probably wasn't ten minutes.

24      Q.    And do you recall a time frame when you spoke to

25   him?

187

1  time frame?

2      A.   This was shortly -- I don't recall.  I say

3  redo -- restate your question.

4      Q.   Sure.  When it says January 28th, Carolyn Main,

5  Carolyn Cardwell, sent you a text, that would have been

6  January 28th, 2014; true?

7      A.   That would be true.

8      Q.   Okay.  Because you wouldn't have been talking

9  about sleeping in the office the previous year?

10     A.   So I printed it off ten days after she sent it.

11     Q.   This was one of the e-mails which prompted you,

12 because you got one from Robert Wood, you got one from

13 Toni Trott, for you to contact John Naughton; is that

14 correct?

15     A.   That is correct.

16     Q.   So you earlier said you thought your conversation

17 with Mr. Naughton was maybe in the fall of 2013.  I'm now

18 suggesting to you, and would you agree with me, no, it's

19 more likely it was sometime near the end of January, maybe

20 the beginning of February of 2014?

21     A.   Yes.  I will correct my answer to that, yes.

22               (Deposition Exhibit Number 18 was marked

23 for identification.)

24 BY MR. SCHWARTZ:

25     Q.   I've handed you what's been marked Exhibit 18, a

1  document we produced in response with our disclosure

2  statement.  This is not -- wasn't directed to you, so

3  other than us giving it to you as part of this lawsuit,

4  you might not have known it, but the top e-mail dated

5  February 7th, 2014, said, "Schaun contacted me today," and

6  that sounds now consistent that February 7th, 2014, was

7  about the time you talked to John Naughton; fair?

8      A.    That's fair.

9      Q.    Then it says you contacted him to inquire as to

10 how to have concerns regarding your supervisor addressed,

11 and I think that's consistent with what you've testified;

12 is that fair?

13     A.    That is fair.

14     Q.    And then he says he advised you to follow your

15 chain of command within the Skill Center and identify the

16 reporting structure.  Do you recall him talking to you

17 about that subject?

18     A.    I'm sorry.  I was reading this.  Say your

19 question again.

20     Q.    Mr. Naughton says he advised you when you said

21 you had concerns about your supervisor and how to get them

22 addressed, he said he advised you to follow our chain of

23 command within the Skill Center and identify the reporting

24 structure.  Do you believe that happened in your phone

25 call with him?

190

1      Q.    So Mr. Naughton suggested that there is a

2   Solutions Center and you might want to contact them.   That

3   would be consistent with Alice Cornelius giving you her

4   phone number so you could contact them; is that fair?

5      A.    That is fair.   I would assume that's what it was.

6      Q.    Is it true you did not ever tell Mr. Naughton

7   that you wanted to make a complaint or claim of racial

8   discrimination?

9      A.    No.   I never told him that it was a complaint of

10   racial discrimination.

11      Q.    It's my understanding from reading your complaint

12   that you tried to contact Alice Cornelius.   You left a

13   message, but you did not hear back from her.   Is that your

14   recollection?

15      A.    No, we didn't talk, but I did call her, left a

16   message.   She called me back, left a message.   We kind of

17   played phone tag but never actually talked, and I do

18   believe that the last time I left her a message, I told

19   her that something -- I might have told her to disregard

20   it or I didn't follow all the way through on it, but

21   before that could even been said or done, they had already

22   terminated me.

23      Q.    And you would have contacted Alice Cornelius on

24   or after February 7th, 2014, after you spoke with

25   Mr. Naughton; is that true?

191

1      A.    That's true.

2                 (Deposition Exhibit Number 19 was marked

3      for identification.)

4      BY MR. SCHWARTZ:

5      Q.    I've handed you what we've marked as Exhibit 19.

6      Do you recognize this to be an e-mail you sent to yourself

7      but that originally you had sent off to Karen Scott?

8      A.    That is correct.

9      Q.    And is Karen Scott also known as Kristina Scott?

10     A.    That is correct.

11     Q.    Okay.  And did you send this on or about

12     February 12th, 2014, at about 4:33 p.m.?

13     A.    I did.

14     Q.    You originally sent the one to Ms. Scott at about

15     11:28 a.m. that morning; is that correct?

16     A.    That is correct.

17     Q.    Okay.  By the time you sent it to yourself at

18     4:33 p.m., had you been notified that you were being

19     terminated?

20     A.    I had.

21     Q.    So after being told you were being terminated,

22     you forwarded an e-mail to yourself; correct?

23     A.    I did.

24     Q.    This was -- Exhibit 19 was not the only e-mail

25     you forwarded to yourself, was it?

193

1   had over at the District office.  I didn't have much

2   conversation with him, no.

3        Q.   Did you ever talk to CJ Wurster about any issues

4   you had with Lisa Hemming at the Northwest campus?

5        A.   No, I did not speak to him directly about that.

6        Q.   Did you ever meet or talk on the phone with Maria

7   Bellino, a coordinator of HR Solutions Center after you

8   started working at Northwest campus?

9        A.   I don't recall who she is.

10       Q.   Ever have any communication with Anthony Asti,

11  the interim vice president of Administrative Services at

12  Gateway after August 5th, 2013?

13       A.   No.

14       Q.   Ever have any communication with Steven Gonzales,

15  the president of Gateway Community College after

16  August 5th, 2013?

17       A.   No.

18       Q.   Did you ever have any communication, whether in

19  person or on the phone, with James Bowers, the Vice

20  Chancellor for Human Resources after August 5th, 2013?

21       A.   No.

22       Q.   Did Lisa Hemming, while she was your supervisor

23  at Northwest, did she ever conduct a mock State board

24  inspection?

25       A.   Yes, she did.

194

1       Q.   And it's my understanding when that happened,

2    students were not present; is that true?

3       A.   That is true.

4       Q.   Okay.  So the only people that would have been

5    present would have been Ms. Hemming and instructors?

6       A.   That is correct.

7       Q.   Had you undergone mock inspections at Cutting

8    Edge?

9       A.   Yes, I have.

10      Q.   These mock inspections, did you consider those a

11   good way to keep the instructors on their toes?

12      A.   I felt it was a way of making sure we were

13   staying in compliance with State board, yes.

14      Q.   So there's nothing necessarily inappropriate from

15   having a mock inspection; is that true?

16      A.   That's true.

17      Q.   My understanding on November 5th, 2013, there was

18   a mock inspection.  Do you have a recollection of there

19   being such one about that time frame?

20      A.   I do.

21      Q.   Okay.  It's my understanding that during that

22   mock inspection, Lisa Hemming found the clinic floor had

23   food and drink in the stations, is that true, or do you

24   remember?

25      A.   I do remember that, and as I stated to her, she

195

1    can't just automatically say that that was the clinic

2    students.  Like I said to you before, there were three

3    other classrooms that shared that clinic floor, and we

4    don't know who put the food and the drinks in those

5    cabinets.  The students sneak stuff in all the time.

6    They're high school students.

7        Q.   So I make sure the record is clear, there was, in

8    fact, evidence of food and drink in the stations?

9        A.   Yes.  Yes.

10       Q.   What makes you think she was just -- strike that.

11            Lisa Hemming said something about food and

12   drinks during this mock inspection; is that true?

13       A.   Yes.

14       Q.   What makes you think what she said was directed

15   only at you?

16       A.   Because she kept stressing that this would

17   jeopardize all of our jobs, and she -- the fact that I am

18   the clinic teacher out there, and a lot of times it was

19   impressed upon me that it was my responsibility to make

20   sure that the clinic floor was clean, which I protested

21   with that, because I'm not the only one that cleans --

22   that utilizes the clinic floor.  So, yes, I was aware that

23   there was food evidence on the floor and that this mock

24   was to keep us on our toes.

25       Q.   And did you tell Ms. Hemming during that mock

1    inspection when she was talking about, hey, everyone, you
2    might lose your licenses, did you tell her then, hey, I'm
3    not the only one that has students on the floor?
4        A.    Yes, I did.
5        Q.    And so you were challenging that the other
6    instructors may have been responsible; correct?
7        A.    Correct.
8        Q.    So you were tattling, if you will, on the other
9    instructors to defend yourself; is that fair?
10       A.    I didn't tattle.  I made a point that I am not
11   the only instructor utilizing the clinic floor.
12       Q.    And did you identify to Ms. Hemming who the other
13   instructors were?
14       A.    I did not.  She was aware.
15       Q.    Who were the other instructors?
16       A.    Mr. Wood, Ms. Cardwell, Ms. Trott.
17       Q.    And did Ms. Hemming, when it was all said and
18   done, basically tell you all that you can't have food or
19   drink on the clinic floor?
20       A.    Yes, she did.
21       Q.    Ms. Hemming's report said there were dirty
22   implements, dirty towels and dirty personal items, near
23   the stations.  Would you agree that that was present?  I'm
24   not asking who was responsible for it.
25       A.    To be honest with you, when I got to work that

197

1    morning, they were already in progress with the mock

2    inspection.  So by the time I got there, everything was

3    already pulled out.  Whatever she found in the stations,

4    they were already sitting on the counter, so I don't know

5    what she found in the stations because I was not there.

6    She had already came through and did all that, so we don't

7    know where the stuff came from.

8        Q.   But when you were there, regardless of where it

9    came from, you could see dirty implements, dirty towels

10   and personal items?

11       A.   In the student locker, they can -- if it's in the

12   student locker, I'm not going in there because they all

13   have a lock on their lockers.  So why would I be going

14   into the student's lockers to inspect?

15       Q.   Let me rephrase.  You could see dirty implements,

16   dirty towels and personal items on the clinic floor near

17   the stations?

18       A.   No.

19       Q.   So you're saying if Ms. Hemming reported that

20   that's what was present on November 5th, 2013, you don't

21   recall that?

22       A.   I don't recall where she got the stuff from, no.

23       Q.   It's my understanding that the week of -- I'm

24   sorry.  Strike that.

25                It's my understanding that the week of

198

1  December 6th, 2013, you were supposed to teach your
2  students about facials but did not do so; is that true?
3      A.    That is not true.
4      Q.    Did you teach your students the week of December
5  6th, 2013, about facials?
6      A.    Yes, I did.
7      Q.    And how long did you take in teaching them?
8      A.    I took the two and a half to three hours of their
9  theory class and taught it.
10     Q.    And were the students forced to be on the floor
11 as part of it?
12     A.    Yes, they were.
13     Q.    And how many hurt themselves while they were on
14 the floor?
15     A.    I did not have my students do it on the floor
16 because that was unsanitary.
17     Q.    Well, then, where did the students do their
18 facial work?
19     A.    Well, this is what happened.  I went to
20 Ms. Hemming as our campus had a fully equipped aesthetics
21 room with facial beds, everything in there.  I asked
22 Ms. Hemming if the students could utilize those facial
23 beds for me to do facials on them.  She told me no because
24 the aesthetics program had a separate set of rules.  So I
25 asked her, "What do you want me to do in place of because

1    it's not sanitary to put these students on the floor doing

2    facials?"  We agreed that I was going to do a rubric's

3    cube, and that is what I did.  I demoed one facial but the

4    students did not get to do the facials because we were not

5    going to get on the floor.

6         Q.   I'm sorry.  What kind of cube?

7         A.   A rubric's cube.

8         Q.   What is that?

9         A.   It's a grading scale that we use when they do

10   hands-on trainings or rubrics measurement.

11        Q.   It's my understanding from reading documents that

12   you saw Mr. Wood have his cosmetology students do facial

13   work while they were on the floor; correct?

14        A.   That is correct.

15        Q.   For your students, I'm still unclear where

16   were -- did the students actually do hands-on facial work?

17   That's what I'm unclear on.

18        A.   No.  What we did in place of them actually doing

19   the facials is they did the mock manipulations of the

20   massage on -- they did all of that on their mannequin

21   faces.  They didn't get to do it on each other is

22   basically what it was.

23        Q.   You used the mannequins?

24        A.   That is correct.

25        Q.   Okay.  Now I at least understand.

200

1      A.     That is correct.

2                  (Deposition Exhibit Number 20 was marked

3      for identification.)

4      BY MR. SCHWARTZ:

5      Q.     I've handed you what's been marked as Exhibit 20.

6   This is an e-mail, Carolyn Cardwell, also Carolyn Main,

7   sent to Lisa Hemming on or about December 18th, 2013.

8   Ms. Cardwell reports on October 26th, 2013, she and you

9   were working a Saturday make-up hours.  Did you at some

10  time in, approximately, October work make-up hours one

11  Saturday with Carolyn Cardwell?

12     A.     I do.

13     Q.     Okay.

14     A.     I do.

15     Q.     Ms. Cardwell says that, "We were all told there

16  are no clients on make-up days."  Were, in fact, all of

17  the instructors informed there are no clients on make-up

18  days?

19     A.     I was -- this was never even brought to my

20  attention, so I know nothing about this e-mail.

21     Q.     That's not my question.  My question was:  Were

22  the instructors told and informed that there were no

23  clients allowed on make-up days?

24     A.     Oh, yeah, yeah.  We were told.  We were told

25  that.

201

1      Q.   And the reason for that is, as Ms. Cardwell

2   explains, there's no one to take money for the services;

3   is that accurate?

4      A.   That is accurate as to why we were told, that's

5   correct.

6      Q.   Then Ms. Cardwell says, "We were also told

7   there's no personal services to be done on make-up days."

8   Were you aware of that as well?

9      A.   I was aware of that as well, uh-huh.

10     Q.   Ms. Cardwell reports that, nevertheless, you

11  allowed one of your students to bring her boyfriend in and

12  do a manicure, haircut and style on him, and you told her,

13  Ms. Cardwell, that you were allowing her to do it because

14  the student needed a grade?

15     A.   I did.

16     Q.   So even though no personal services were allowed,

17  you were allowing the violation to help the student; is

18  that fair?

19     A.   First of all, he was not a paying -- yes, I would

20  say yes, yes, I did.

21     Q.   Then Ms. Cardwell reported on that October 26th

22  date, that your students were doing waxing, makeup and

23  roller sets on each other on the floor, and Ms. Cardwell

24  asked you about it, and you said you were allowing it

25  because they needed the grade.  Do you believe that to be

202

1  accurate?

2      A.   That is accurate.

3      Q.   Ms. Cardwell reports in the next paragraph, it's

4  a one-sentence paragraph, that your students were out of

5  dress code wearing ripped jeans and slippers.  Do you

6  believe that to be accurate?

7      A.   No.

8      Q.   If your students were out of dress code wearing

9  ripped jeans and slippers, what was supposed to happen to

10  them?

11      A.   They get sent home.

12      Q.   Okay.  Ms. Cardwell, in the next paragraph, says,

13  "One of the students asked Cardwell to sign a box from the

14  beginning of the month on her floor sheet."  What's a

15  floor sheet, first of all?

16      A.   That's the way they get graded for the hands-on

17  training that they're doing on their mannequins or live

18  people.

19      Q.   Ms. Cardwell said she wouldn't do that because

20  you weren't allowed to go back weeks.  Is that your

21  understanding of what the policy is, instructors aren't

22  supposed to do, go back weeks?

23      A.   To be honest with you, they were always changing

24  the policy.  Every week or every other week, something was

25  being changed or alternated or no longer doing this.  So I

1    you forgot; is that fair?

2         A.    That is true.

3         Q.    Okay.  Two of your students reported to

4    Ms. Hemming that you did not ever share with them, through

5    at least December 16th, 2013, the criteria and days when

6    personal services could be performed.  Would that

7    information from your students to Ms. Hemming have been

8    accurate?

9         A.    It was accurate, yeah.

10        Q.    So you never told your students before

11   December 16th, the criteria for them to do personal

12   services or what days they were limited to do personal

13   services?

14        A.    I did not give them that information, because at

15   that time, I did not have the information correctly.  So I

16   did not give them the information I did not have clarity

17   on.

18        Q.    So before December 16th, 2013, your best

19   recollection is you never received an e-mail, a memo,

20   agendas that talk about what criteria for personal

21   services there were?

22        A.    No, I didn't say I didn't receive.  I said I

23   needed clarity on that personal service.

24        Q.    What clarity were you waiting for as of December

25   16th?

1      A.    Because the information -- if I recall, they were

2   charging students for personal services, and I needed to

3   find out first of all how did I get access to the 90-90

4   report, which is what permits the students to give

5   personal service.  If they're not on a 90-90 report, then

6   they're not permitted to give personal service.  At this

7   time, I did not have access to the information to know who

8   was on a 90-90, and I brought that information to Lisa's

9   attention, and that is why they were not getting permitted

10   the personal services.

11      Q.    So before December 16th, 2013, any of your

12   students were allowed to perform personal services because

13   you didn't have access to a 90-90 report.  Am I

14   understanding that correctly?

15      A.    I did not have clarity on the 90-90 and on the

16   personal service criteria, that is correct.

17      Q.    And you did not allow any of your students before

18   December 16th, 2013, since you didn't have clarity to

19   perform personal services; is that true?

20      A.    I can't recall.

21      Q.    Well, why would you have allowed students to

22   perform the personal services if you were unclear as to

23   what the criteria were and whether they met them?

24      A.    Because, first of all, in our industry, there are

25   certain things you cannot do on a mannequin.  You need an

207

1    actual person, and if the student is required by State

2    board to have performed X amount of services in the

3    1,600 hours, I need to find a way necessary to get the

4    student what they need in order to fulfill their

5    educational obligations.  So our school, we didn't have

6    clients that come in on a regular basis for certain

7    services, such as manicures or pedicures or facials or

8    anything like that.  So in those services, when the

9    students needed that grade, yes, I did -- I did bend the

10   rule and allow them to do the personal service for them to

11   get the grade.

12       Q.   Lisa Hemming reported that in January --

13   the first week in January, around January 6th, 2014, you

14   were supposed to administer a test that week but did not.

15       A.   I don't recall that.

16       Q.   Were there occasions when you do recall that

17   Ms. Hemming was coming to you and saying, "Hey, you were

18   supposed to have done a test, but you didn't enter grades

19   to reflect that you had done the testing."  Do you

20   remember that ever happening?

21       A.   I only recall her coming to me one time on

22   something that she said I didn't do, but other than that,

23   she never came to me.

24       Q.   When, approximately, was the one time?

25       A.   The one time she came to me about the -- just

209

1       Q.    So even though it might not be easy for you, you
2    could combine the two to come up with who was 90-90 for
3    both grades and attendance; isn't that true?
4       A.    At the time, I was not aware that I could do
5    that.   That was not brought to my attention until Hemming
6    stated we can do it that way.   So prior to that, no.
7       Q.    Well, you knew Canvas had the grades of the
8    students, and you knew SkillTime had their attendance;
9    true?
10      A.    That is correct.
11      Q.    Did Ms. Hemming ever tell all of the instructors
12   they might lose their jobs if they didn't follow the
13   rules?
14      A.    Yes, she did.   She was always telling us that.
15      Q.    So that happened not at just the beginning of the
16   year but throughout the year?
17      A.    Yes.
18      Q.    And that wasn't just to you.   It was to all of
19   the instructors?
20      A.    Yes.
21      Q.    Okay.   Did you interpret what she was telling you
22   is she was a by-the-book kind of person?   You have to
23   follow the rules exactly as they're written?
24      A.    No, I didn't get that, that she was by the book
25   on everything.

218

1    disciplinary issues?

2        A.   Not to my knowledge.  I'm not aware of that.

3        Q.   Have they told you that happened at Cutting Edge

4    while you were there?

5        A.   Not that I recall.  I heard that complaint more

6    so from the Maricopa downtown campus.

7        Q.   Did you ever tell anyone that you could attest

8    students were losing hours as a disciplinary due to

9    discipline?

10       A.   Did I ever attest to that?

11       Q.   Yes.

12       A.   No.

13       Q.   Now, you're aware that Maricopa County Community

14   College District has a policy prohibiting discrimination

15   on the basis of race, national origin, and a whole bunch

16   of other identified criteria; true?

17       A.   That's true.

18       Q.   And that's in part printed in the staff policy

19   manual; true?

20       A.   True.

21       Q.   And you're aware that if there is an equal

22   employment opportunity complaint for that kind of specific

23   discrimination, that there's a procedure for it to be

24   investigated?

25       A.   Yes.

219

1      Q.   Okay.  And you were aware of that information,

2   say at least from 2010 forward, because you had been an

3   employee by that time by roughly about two years?

4      A.   That is correct.

5      Q.   Before February 12th, 2014, did you ever file a

6   written complaint alleging racial discrimination at any

7   time?

8      A.   Say the question again.

9      Q.   Sure.  Before February 12th, 2014, before the day

10   you were terminated, did you ever file a written complaint

11   alleging racial discrimination at Maricopa County

12   Community College District?

13      A.   Not that I recall.  I didn't.

14      Q.   And I think we've kind of gone over your

15   discussions that you had with Kristina Scott, Mr. Naughton

16   and whatnot, and it doesn't sound like before February

17   12th, 2014, you ever allege verbally that you were subject

18   to any kind of racial discrimination at Maricopa County

19   Community College District.  Did you ever voice that to

20   anyone at Maricopa County Community College District

21   before February 12th, 2014?

22      A.   No.

23      Q.   Okay.  Correct me if I'm wrong, before

24   February 12th, 2014, before that day, you had -- you don't

25   recall Lisa Hemming ever using racial slurs or saying

1    anything that overtly suggested to you that she was biased
2    against African Americans; is that fair?
3        A.    That's fair.
4        Q.    Okay.  Were you informed after you were
5    terminated that your position was filled by another
6    African American woman?
7        A.    I heard.  I heard.
8        Q.    You heard that from Carolyn Cardwell?
9        A.    That is correct.
10       Q.    All right.  What makes you believe you were
11   terminated because of your race?
12       A.    I never said I was terminated because of my race.
13       Q.    Are you not claiming that in this lawsuit?
14       A.    Discrimination wasn't based on my race.  It was
15   based on the fact that I was being treated differently
16   than other instructors, that I was being isolated from
17   other instructors.
18       Q.    Do you believe that you were treated differently
19   because of your race and isolated from other instructors
20   because of your race?
21       A.    I believe I was treated differently because of
22   the fact that I did speak up against some of the unfair
23   practices at our campus.
24       Q.    And while I appreciate that.  That was going to
25   be my next series of questions.

223

1    that Lisa Hemming asked any instructors to provide

2    information about the performance of Toni Trott?

3        A.   I don't know.

4        Q.   In fact, one of the things you told to Lisa

5    Hemming, you told to Kristina Scott, was you felt you were

6    singled out over and above every other instructor; isn't

7    that true?

8        A.   That is true.

9        Q.   That includes Toni Trott; true?

10       A.   I guess that would be true.

11       Q.   Okay.  So if we look at how Toni Trott was

12    treated versus the Caucasians, do you have any reason to

13    think Toni Trott was treated differently because of her

14    race?

15       A.   I don't know how Toni Trott was treated because I

16    didn't discuss that with her.

17       Q.   You and Toni Trott, either while you were working

18    together or even through today, have never discussed how

19    Toni Trott felt she was being treated by Lisa Hemming at

20    Northwest campus?

21       A.   I can't speak for Toni Trott.  I'll let Toni

22    Trott give you her testimony on that, so, no, I can't

23    answer that.

24       Q.   It's a very simple question.  Did you and Toni

25    Trott ever talk about how Toni Trott felt she was being

225

1    NAACP that, hey, Toni Trott felt she was discriminated

2    based upon her race as well as me?

3        A.    No.

4        Q.    From your conversations with Toni Trott, do you

5    believe she felt she was being discriminated based upon

6    her race when she was at the Northwest campus?

7        A.    No.

8        Q.    The two things you said about why you thought

9    race was related was, one, you were always being singled

10   out as the noncompliant when you thought other people were

11   doing something similar, am I understanding?

12       A.    That is correct.

13       Q.    But you also told me that when that happened, you

14   didn't know whether Lisa Hemming was aware of what other

15   people were doing which was similar.  Am I understanding

16   that correctly?

17       A.    That is correct.

18       Q.    Okay.  Then you said -- the other thing was Lisa

19   Hemming never came to you directly and asked you about

20   things directly.  Am I understanding that correctly?

21       A.    Other than Dana Heath, that is correct, she

22   never --

23       Q.    I'm sorry.  What does Dana Heath have to do with

24   this?

25       A.    I mean, Dana Bell.  I'm sorry.

1  BY MR. SCHWARTZ:

2      Q.   I've handed you what's been marked as Exhibit 22.

3  Do you recognize this to be the letter you were given on

4  February 12th, 2014?

5      A.   Yes.

6      Q.   This basically is notifying you that you're not

7  being retained by the District?

8      A.   Yes.

9      Q.   You took that to mean that that's the

10 termination; correct?

11     A.   That is correct.

12     Q.   Okay.  Was any reason given to you as to why you

13 were terminated, either verbally -- we don't see one in

14 the letter.  Was anything told to you verbally?

15     A.   No.

16     Q.   Did you ask?

17     A.   I did.

18     Q.   What did they say?

19     A.   And they told me they didn't have to give me a

20 reason.

21     Q.   Okay.  And what was your reaction to the notice?

22     A.   I said, "Okay.  Thank you for your time," and I

23 left.

24     Q.   Did you tell them that you were going to file

25 something with the EEOC?

1    Q.   Sure.  We know you've talked about this earlier.

2  Lisa Hemming wrote up incident reports related to you.  My

3  question to you is do you have any information as to

4  whether or not Lisa Hemming wrote up any incident reports

5  for anyone but you?

6    A.   No, I'm not aware of it.

7    Q.   You have no information suggesting Toni Trott,

8  another African American, had any incident reports written

9  up on here, do you?

10   A.   Not to my knowledge.

11   Q.   Okay.  After you were told you were being

12  nonretained on February 12th, 2014, did you try and get

13  any information from any of the former Cutting Edge

14  personnel you knew about Lisa Hemming?

15   A.   No.

16   Q.   Did you send them e-mails?

17   A.   No.

18   Q.   Did you phone over to some of the people you knew

19  at Cutting Edge?

20   A.   No.

21   Q.   Did you text them?

22   A.   For Lisa Hemming, no.

23   Q.   After February 12th, 2014, did you try and

24  contact any of your former students from the Northwest

25  campus?

1    student we talked about earlier, received special

2    treatment, and she did, in fact, receive certain special

3    accommodations; correct?

4        A.    That's correct.

5        Q.    Now, Ms. Trujillo said there was racism because

6    two students were pushed to the extent of quitting because

7    they weren't allowed to speak different language in the

8    classroom.  Are you aware of what students she may have

9    been referring to?

10       A.    You would have to ask Noslen on that one.

11       Q.    And I think you told us earlier that you told

12   students in your class that they could not speak Spanish

13   in the classroom?

14       A.    That is correct.

15       Q.    And similarly, you told your students they could

16   not speak Spanish on the clinic floor?

17       A.    That is correct.

18       Q.    Okay.  Did Lisa Hemming ever look in on your

19   class?

20       A.    She sat in my class one time that I know of.

21       Q.    And by sat in, she sat for, what, 20 minutes?  An

22   hour?  Tell me.

23       A.    She came to my class, and she was already sitting

24   in the back of my class.  I assumed she was doing some

25   type of evaluation, which I never got any feedback on so I

1    don't know what the purpose of her being in my classroom

2    for about 20 minutes in there, 20, 30 minutes, maybe

3    longer.

4        Q.    Besides yourself, did any of the other

5    instructors at the Northwest campus lose any family

6    members in the 2013=2014 school year?

7        A.    Not that I know of.

8        Q.    You mentioned earlier that you advocated for one

9    student who initially you thought may have been improperly

10   dropped, and as I understand it, you later came to learn

11   that she was properly dropped.  Did I understand that

12   correctly?

13       A.    No.  I still -- I still disputed the drop, but at

14   that time, there was nothing I could do because I was

15   terminated.

16       Q.    What was the name of the student?

17       A.    Belen.

18       Q.    Is she also known as Mirna?

19       A.    Yes.

20       Q.    Last name of Guarista?

21       A.    Yes.

22       Q.    And are you aware that Ms. Guarista, the student,

23   and her parents, all agreed to her dropping out of the

24   program?

25       A.    No I was not aware of that.

1   didn't really need me, and what year was she referring

2   that to because she was at Cutting Edge her first year.

3       Q.   Did Isabel Flores Cherno get into any trouble in

4   your class?

5       A.   No.

6       Q.   What kind of student was she?

7       A.   She was a typical teenager.  She'd come to class.

8   She was -- she would apply herself some days and some days

9   she didn't want to apply herself, but I didn't have no

10  problems with her that I had to be writing up disciplinary

11  things on.

12      Q.   How about Noslen Trujillo?  Ever have any

13  problems with her in class?

14      A.   No.

15      Q.   Ms. Cherno said there was a time when Lisa

16  Hemming wanted to have a meeting with certain girls about

17  talking bad about another student.  Do you have any idea

18  what she may have been talking about?

19      A.   I do not.

20      Q.   Were there five Hispanic girls of which

21  Ms. Cherno was one who kind of hung around as a group?

22      A.   No, they didn't hang around in a group.

23      Q.   And I think, to your knowledge, Lisa Hemming

24  never directly went to any of the students to tell them

25  they couldn't speak Spanish, whether in the classroom,

1    whether in the break room, and that she only conveyed that

2    information to you, to your knowledge; is that true?

3        A.    To my knowledge, I don't know if she did speak to

4    anyone else about that.

5        Q.    And so the information Isabel Flores Cherno may

6    be conveying about Hemming wanting to have a meeting with

7    four or five girls, to your knowledge, would only have

8    come through you.  You don't have any knowledge that

9    Hemming conveyed anything else outside of you?

10       A.    Not that I know of.

11       Q.    Did the Cutting Edge handbook that you did look

12   at, did it basically convey to the students they weren't

13   supposed to gossip?

14       A.    I don't know.  To be honest with you, I didn't

15   read the whole student handbook, so I don't know.  I can't

16   recall.

17       Q.    Were there any significant changes -- strike

18   that.

19             Did you ever read the student handbook at

20   any time between 2008 and when you left in February 2014?

21       A.    When necessary yes, sir.

22       Q.    What do you mean by necessary?

23       A.    Well, necessary.  When I needed to go reference

24   something, I would look in the student handbook.

25       Q.    So only if there was someone raising an issue?

264

1    Q.    Is that, in fact, the way you read Section 4.1 in

2    Exhibit 23?

3    A.    It says additional evaluations.  Let me see here.

4    Okay.  Your question was?  I'm sorry.

5    Q.    Sure.  Do you see anything in the November 1st,

6    2013, policies that required anything other than an annual

7    evaluation for any of the employees of the Skill Centers

8    no matter which of the three campuses they were at.  Do

9    you see anything?

10   A.    No, I don't see anything.

11   Q.    Do you recall in December of 2013 Lisa Hemming

12   sending to you an evaluation packet?

13   A.    I do.

14   Q.    Did you fill them out and return them to Lisa

15   Hemming?

16   A.    I did.

17   Q.    Were you aware that the same packet was sent to

18   all of the other instructors at Northwest campus?

19   A.    Yes, I was.

20   Q.    Do you have any information that suggests to you

21   that the other instructors, Mr. Wood, Ms. Cardwell or

22   Ms. Trott received any evaluation, written evaluation,

23   from Lisa Hemming before February 12th of 2014 when you

24   were terminated?

25   A.    No.  I have no knowledge of their evaluations.

272

1    January 27th, 2014, which was new?

2        A.    No, not that I can recall.

3        Q.    Would you agree with me it's the responsibility

4    of the managers to monitor the activities of their staff?

5        A.    I would agree.

6        Q.    You felt you were the only one being monitored;

7    is that true?

8        A.    More so, yes, than anybody else.

9        Q.    What do you mean more so?

10       A.    I understand that you monitor, but it seems as

11   though I was being monitored by everybody.

12       Q.    Do you have any information that Lisa Hemming

13   went and observed any of the other instructors more than

14   once in their classroom?

15       A.    Not that I know of.

16       Q.    Well, it sounds like you, as the clinic

17   instructor, had more responsibilities and dealings with

18   students so you got to assign duties, for example, that

19   the other instructors did not; fair?

20       A.    That's fair.

21       Q.    The other instructors would teach class like you

22   did; correct?

23       A.    That's correct.

24       Q.    And they would have at least some occasion to be

25   on the clinic floor from what you told me earlier;

273

1  correct?

2      A.   That is correct.

3      Q.   Would your students -- second-year students spend

4  more time on the clinic floor than the first-year

5  students?

6      A.   Yes, they do.

7      Q.   Okay.  Your e-mail, this formal complaint, says

8  that when you came to Kristina Scott, you expressed

9  confusion in regards to the curriculum that we're

10  currently using and how there are a lot of

11  inconsistencies.  Are you able to tell me what

12  inconsistencies you're referencing?

13      A.   Well, the inconsistencies, as I was stating to

14  Kristina, was the fact like where I expressed before where

15  you had the Cutting Edge, which was all high school

16  students, and it was not a closed campus.  If it was a

17  closed campus, they weren't enforcing it because I have

18  witnessed students leaving and going where they want to

19  go.  That was inconsistent with what we were doing at

20  Northwest.  The curriculum was constantly changing.  One

21  minute we're being told we're going to do this, and the

22  next minute we're told, no, don't do this.  Switch it

23  around.  Do that.  The fact that they could not utilize

24  the aesthetics room and were being told that they had to

25  do facials on the floor or on the table, which the table

293

1    group --

2        A.    Okay.

3        Q.    -- designation.  Do you recall that that group

4    designation was used to send e-mails to you, to Toni

5    Trott, to Robert Wood and Carolyn Cardwell?

6        A.    What I'm saying is I don't recall seeing this

7    e-mail.

8              And, also, are we on the record?  From my

9    understanding, have we been on the record for more than

10   seven hours?

11       Q.    No.

12       A.    Okay.  I just want to make sure.

13       Q.    And just so you're aware, lunch breaks and other

14   breaks don't count.

15       A.    I understand that, but even prior to 1 o'clock or

16   before we were taking lunch, it was four hours, and it's

17   now almost 5:00.

18             (Deposition Exhibit Number 26 was marked

19   for identification.)

20   BY MR. SCHWARTZ:

21       Q.    I'm handing you what's been marked as Exhibit 26.

22   Do you recognize this to be an e-mail you sent to Lisa

23   Hemming on or about December 20th, 2013, with your

24   completed employee evaluation?

25       A.    Yes.

294

1       Q.    And delta, slash, plus?

2       A.    Yes.

3       Q.    Appear to be a true and accurate copy of the

4    original, including the attachments to the e-mail?

5       A.    Yes.

6                (Deposition Exhibit Number 27 was marked

7    for identification.)

8    BY MR. SCHWARTZ:

9       Q.    I'm handing you what's been marked as Exhibit 27.

10   Do you recognize this to be a document that was provided

11   to you by Lisa Hemming?

12      A.    I don't recall this service criteria being given

13   to me.

14      Q.    Do you have any explanation why the other

15   instructors might have received it but you claim not to

16   recall having received it?

17      A.    I recall asking initially when this went out, I

18   did not receive this, and I remember when the topic of the

19   personal services came up, then Lisa gave me this copy,

20   but not this.  She gave me something else, so I don't

21   remember this particular form.

22      Q.    Just so I understand, you're saying you got a

23   different document related to personal service criteria?

24      A.    It wasn't in this.  She sent it in an e-mail

25   after I had questioned about the 90-90 list.  Then she

298

1    yes.

2         Q.   Okay.  And you don't know whether or not that

3    applies to you because you don't know whether or not you

4    were entitled to file a grievance; is that correct?

5         A.   That is correct.  That's what I was looking for.

6                   (Deposition Exhibit Number 29 was marked

7    for identification.)

8    BY MR. SCHWARTZ:

9         Q.   I'm handing you what's marked as Exhibit 29.  Do

10   you recognize Exhibit 29 to be a copy of an e-mail sent to

11   you on or about December 13th, 2013, by Lisa Hemming?

12        A.   That's the packet I submitted.

13        Q.   I'm sorry?

14        A.   I was under the impression that was the packet I

15   submitted right there.

16        Q.   Well, actually Exhibit 29 is when it first came

17   to you and Ms. Hemming was asking you to complete it.

18        A.   Okay.  Okay.

19        Q.   And we earlier talked about a different exhibit

20   where you did complete it, but I'm just asking is

21   Exhibit 29, as far as you can tell, a true and accurate

22   copy --

23        A.   Yes.

24        Q.   -- of the -- you have to let me finish.

25                   Is Exhibit 29 a true and accurate copy of

1    the original e-mail that you received on or about

2    December 13th, 2013, related to this 90-day review packet?

3        A.    Yes.

4        Q.    Okay.    The e-mail says this is for some kind of

5    90-day review.    Did you have an understanding of what this

6    90-day review, why it was happening?

7        A.    Because I was under my probationary period.

8        Q.    And then the last sentence in the first paragraph

9    says, "We will have four this year, which will include

10   your annual review."   So did you have an understanding

11   there would be three assessments over and above the annual

12   review?

13       A.    Yes, I did.

14       Q.    And looking at the 2011 policies that were in

15   effect back in 2011 going forward, there was supposed to

16   be a four-month review, an eight-month review and your

17   annual review, three total.   Do you have any explanation

18   of why there would be four in December of 2013?

19       A.    My understanding is the fourth one was a

20   classroom evaluation one from my understanding.

21       Q.    And I think you kind of told us this, but I just

22   want to make the record clear.   The e-mail says that Lisa

23   Hemming would schedule a meeting with you in January to

24   discuss the review.   I think you told us earlier she never

25   did schedule that?

300

1       A.    That is correct.

2       Q.    And you have no knowledge whether she scheduled a

3    similar interview or meeting with any of your other

4    cosmetology instructors; is that fair?

5       A.    That is fair.

6       Q.    We talked a little bit earlier about your

7    complaint in paragraph 38 says, "In September 2013,

8    shortly after the school began, Lisa Hemming on several

9    occasions instructed you to reprimand Hispanic students

10   for speaking Spanish on their breaks in the student

11   lounge." Can you tell me what the timing of the last time

12   you claim she instructed you to reprimand Hispanic

13   students?

14      A.    I know several sound like it should be multiple,

15   but it was actually really two times that I can actually

16   attest that she approached me on that matter.  The first

17   time, like I said, she addressed me when I informed her

18   that I didn't feel comfortable telling them that because

19   that wasn't the classroom.  I was told that it was a

20   policy of the District.

21             The second time she approached me on the

22   matter, and I stated, again, that I felt that I was

23   violating some civil rights of the students by telling

24   them that.  She then told me that there was -- that

25   someone -- another student had said they felt they were

1    being bullied, and that was basically the gist of that.

2        Q.   Can you be more specific, though, when in

3    September the second conversation happened?

4        A.   I wouldn't even say it was in the same month.  I

5    want to say it was possibly like a month or so after the

6    first event, so it didn't happen twice in the same month.

7        Q.   Can you give me a time frame, then, of when you

8    claim the second one happened, approximately?

9        A.   I would say approximately about October maybe.

10       Q.   Was it before or after you met with Kristina

11   Scott on September 18th, 2013?

12       A.   No.   Then it wasn't in October when she told me

13   that the second time because the second time is what

14   prompted me to go talk to Kristina.  So I do apologize on

15   that, but yeah.

16       Q.   Did Ms. Hemming ever identify for you what

17   student or students had complained about Spanish in the

18   break room?

19       A.   No, she did not.

20       Q.   Did she tell you any information about those

21   students?

22       A.   She did not go into specifics with me.

23       Q.   Did she tell you whether they were Caucasian or

24   Hispanic?

25       A.   She did say that they were Caucasian students.

304

1   this.

2                There is technically one more question.

3   When this is all done and transcribed into a book, you

4   have the right to read and sign it and make changes, if

5   you wish, and I mentioned this at the beginning, or you

6   can waive signature.  That decision is solely up to you.

7   So the question to you is do you want to retain your right

8   to read it, sign, correct or waive signature?

9                THE WITNESS:  I'll retain and read.

10                MR. SCHWARTZ:  Okay.  And we're all done.

11   We'll go off the record now.

12                (Whereupon, the proceedings were concluded

13   at 5:03 p.m.)

14

15

                        SCHAUN OWENS
16

17

18

19

20

21

22

23

24

25

305

1    STATE OF ARIZONA        )
                            ) ss.
2    COUNTY OF MARICOPA     )

3            BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
4    duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
5    the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
6    shorthand and thereafter reduced to print under my
     direction.

7
             I CERTIFY that I am in no way related to any of
8    the parties hereto, nor am I in any way interested in the
     outcome hereof.

9

10           [X]  Review and signature was requested.
             [ ]  Review and signature was waived.
11           [ ]  Review and signature not required.

12
             I CERTIFY that I have complied with the ethical
13   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
     J(1)(g)(1) and (2).
14           Dated at Phoenix, Arizona, this 10th day of
     June, 2016.

15

16

17                        Marisa L. Montini, RPR
                             Certified Reporter
18                         Arizona CR No. 50176

19
                     *      *      *      *      *
20

21           I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                        GRIFFIN & ASSOCIATES, LLC
                          Registered Reporting Firm
25                          Arizona RRF No. R1005

5-23-16       EXH # 5
WITNESS Owens
MARISA L. MONTINI, RPR
CERTIFIED COURT REPORTER #50176

---------- Forwarded message ----------
From: Carolyn Main <main@gatewaycc.edu>
Date: Wed, Dec 18, 2013 at 1:41 PM
Subject: Owens
To: Lisa Hemming <hemming@gatewaycc.edu>

On December 10th 2013 Ms. Owens came to me at 4:15 and told me she needed to speak with me outside. We went out back and she asked me if I was out to get her. I asked her what she was talking about. She asked why I went to Mrs. Hemming and told her that her class was watching Tabitha all day. She said that she feels I'm out to get her. I told her no, however, Mrs. Hemming told ALL of us that we can't watch Face off, Tabitha, or you tube videos that do not pertain to Cosmetology. Ms. Owens said she didn't hear that and if she did she would comply. I told her that yes Mrs. Hemming let us all know. She then went into the week she was gone and Cheri was subbing for her class. She told me that her students were not happy with Cheri and she said she told them to look up the handbook and if Cheri didn't do things that were in the handbook that they need to go to Greg Donovin. She told them that he is the main guy to talk to at West-Mec. She told her students that if there is anything that isn't right or if they were unhappy to first read the handbook and then take it to West-Mec.

On December 11th she came to me again and said that Belin (her student) was the one who told on her and that she was sorry for thinking I was out to get her.

*Carolyn Cardwel*
Associate Instructor
Northwest Skill Center

1

MCCCD-0-280

Cosmetology
main@gatewaycc.edu
Phone: (602)-392-5000

2