# EXHIBIT 2

# UDALL | SHUMWAY
COUNSELORS AT LAW SINCE 1965

1138 NORTH ALMA SCHOOL ROAD, SUITE 101
MESA, ARIZONA 85201
Telephone: 480.461.5300 | Fax: 480.833.9392

David R. Schwartz - #009264
das@udallshumway.com
Kimberly R. Davis - # 030210
krd@udallshumway.com
Attorney for Defendants Maricopa County Community
College District, Maricopa Skill Center and Lisa Hemming

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Schaun Owens, | NO.  CV-15-01769-PHX-SPL |
| Plaintiff, | |
| v. | **AFFIDAVIT OF LISA HEMMING** |
| Maricopa County Community College District, Maricopa Skill Center, and Lisa Hemming, | |
| Defendants. | |

State of Arizona           )
                                    ) s s
Maricopa County       )

Lisa Hemming, upon her oath, states:

1. I am a defendant in this action.

2. I am over the age of eighteen and I am competent to testify.

3. I state the matters herein of my own personal knowledge unless otherwise stated.

4. I am currently employed by the Maricopa County Community College District. ("District").

5. Gateway Community College is one of the several community colleges operated by the District. A division of the Gateway Community College is the Maricopa Skill Center.

6. I have served as a part-time and full-time Cosmetology Instructor at the Cutting Edge Style Academy ("CESA") campus of the Maricopa Skill Center. I served from November 2012 to May 2013 as the Clinic Floor Supervisor at CESA. In the summer of 2013, I became the Assistant Program Manager for the Northwest Campus of the Maricopa Skill Center ("Northwest Campus").

7. As a Clinic Floor Supervisor at CESA, I supervised Plaintiff Schaun Owens, who was a temporary part-time Cosmetology Instructor at that campus at the time.

8. I have been licensed as a Cosmetologist and as a Cosmetology Instructor by the Arizona State Board of Cosmetology.

9. Cosmetology is generally a two year program offered at the Maricopa Skill Center. A student must obtain 1,600 hours of instruction to graduate and be eligible to become a licensed Cosmetologist. One advances from the first year to the second year after completion of 800 hours of instruction. Licensing is done independently by the Arizona State Board of Cosmetology.

10. The Arizona State Board of Cosmetology licenses and regulates cosmetology schools such as those conducted at the Maricopa Skill Center.

2

11. The District has adopted a policy prohibiting discrimination by its employees and students based upon race, sex and other specified criteria. These policies are reflected in, among other places, the Staff Policy Manual available to anyone on the District's website.

12. At CESA, all of the students attending the cosmetology program were high school students. Those students' tuition was paid by the Western Maricopa Education Center ("West-MEC"). West-MEC is a public school district comprised of ten member school districts and over 40 member high schools located in the West Valley.

13. West-MEC also paid the tuition for the high school students who attended school at the Northwest Campus.

14. The Northwest Campus first opened and became operational for the 2013-14 school year. August 5, 2013 was the first day of school. The instructors and staff, however, began work in July 2013 as temporary full-time employees.

15. When I was hired in the summer of 2013 to be the Assistant Program Manager at the new Northwest Campus, I was placed on probation for one year under the District's policies.

16. As the Assistant Program Manager at the new Northwest Campus, I supervised all of the instructors, as well as other employees working at the campus.

17. During the 2013-2014 school year, Shala Dveirin was the Aesthetician program's Lead Instructor for the Northwest Campus and the Buckeye Campus of the Maricopa

3

Skill Center. Dveirin worked initially as an instructor at the Northwest Campus for adults.

18. At the Northwest Campus during the 2013-14 school year, all of the instructional activities, including classroom activities, course materials, labs and clinic education, were required to be done in English. This was specified in the Cosmetology Student Handbook on page 7 under "LEARNING ENVIRONMENT".

19. A true and accurate of copy of the 2013-14 Cosmetology Student Handbook is Exhibit 6 to the deposition of Plaintiff Schaun Owens. That student handbook was available to anyone online before August 5, 2013 when students were first on campus. The same handbook applied at all three campuses for cosmetology students: the Northwest Campus, CESA and the Buckeye campus (referred to in the handbook as MSC).

20. On the first day of class, I required each of my cosmetology instructors to go over the student handbook and discuss it with the students. Instructors were, therefore, expected to be familiar with the provisions in the Cosmetology Student Handbook. This expectation was discussed at the August 1, 2013 staff meeting I held with the instructors.

21. At the Northwest Campus, there are cosmetology and aesthetics students. In addition, both high school and adult non-high school students were enrolled in the programs offered at the Northwest Campus.

22. At the Northwest Campus during the 2013-14 school year, the high school students attended class or were on the clinic floor Monday through Friday from 2 pm to 6 pm.

4

On any Saturday they attended, the high school students were there from 8 am to 5 pm. This information is reflected in the Cosmetology Student Handbook on page 8. Adult non-high school students were on a different schedule than the high school students.

23. There were some differences in the rules applicable at the Northwest Campus to high school students and the adult non-high school students. These differences included: (a) high school students could not leave the school (including going to their cars in the parking lot) during their 15 minute breaks, but adults could; (b) high schools students were graded on a scale of A (90-100%), B (86-89%), C (80-85%) and 79% or lower was not passing, while adults were on a pass-fail grading system (79% or lower is failing); and (c) high school students were subject to academic probation if they did not achieve a C or better each month and they could be removed after three consecutive months of probation, the adults were not subject to this requirement. These differences in policies are reflected in the Cosmetology Student Handbook.

24. At the Northwest campus, the 2013-14 Cosmetology Student Handbook advised the students that:

- Hazing and harassment were prohibited (Handbook, p. 10);
- They must always be respectful towards others and maintain a positive attitude (Handbook, p. 18, sec. 8);
- They must practice courtesy and professionalism at all times when dealing with other students, clients, visitors and staff (Handbook, p. 18, sec. 8);

5

- They were not permitted to eat and drink in the classrooms or on the clinic floor (Handbook, p. 18, sec. 8);
- They could not engage in offensive comments, images or gestures (Handbook, p. 18, sec. 8);
- They could not use personal electronic devices during instructional hours for personal, non-instructional purposes (Handbook, p. 18, sec. 8).

25. Plaintiff Schaun Owens failed to follow the curriculum in September 2013 when she failed to have the State Board boot camp and test as scheduled. I learned this on September 5, 2013 when I asked Ms. Owens if she was aware that State Board testing was scheduled for the next day. Ms. Owens told me she was not aware of this test. Ms. Owens was already a week behind on the curriculum calendar, which required that the curriculum be adjusted to get back on track. I suggested that Ms. Owens conduct a boot camp to prepare the students for a practical test.

26. I later learned on September 13, 2013 from a student in Ms. Owens' class that the State Boot Camp was never held and instead Ms. Owens showed a Tabitha's Salon Takeover video rather than preparing the students for the test. Paul McCray was also present during this meeting and he sent me an e-mail on September 16, 2013 recapping what the student told us that day. A true and accurate copy of that e-mail is attached hereto as Exhibit A. The name of the student mentioned in the Incident Report has been redacted under federal privacy laws.

6

27. District records showed that only 1 of the then 20 students passed the State Board test in Ms. Owens's class for which it was reported no boot camp or other preparation was done by Ms. Owens.

28. On September 13, 2013, I spoke with a substitute instructor, Ms. Rio, who was substituting for Ms. Owens on September 12-13. Ms. Rio reported to me that the students said they did not have their floor sheets reflecting completed assignments signed by Ms. Owens daily but Ms. Owens signed those sheets at the end of each week. The floor sheets by policy were required to be executed by the instructor on the day of the completion of any assignment and not at the end of the week.

29. At the October 2, 2013 staff meeting with all of the instructors, I told everyone that they could not show You Tube, Tabitha's Salon Takeover, Faceoff and other videos which were not solely instruction on cosmetology. Ms. Owens was present for this meeting.

30. On December 6, 2013 Ms. Owens was supposed to teach her class about facials. That did not happen until December 10th and only after I spoke to Ms. Owens about failing to comply with the curriculum. Ms. Owens' class did receive instruction on facials including practice on mannequins which I approved so that the instruction would actually proceed.

31. On December 10, 2013, I was informed by a student in Ms. Owens' class that Ms. Owens had been showing Tabitha's Salon Takeover video to the class. I also spoke with other instructors, including Carolyn Main (who was also known as Carolyn Cardwell), who also confirmed that they saw this happen. I spoke with Ms. Owens

7

that same day and told her in person that she could not show any video which was not part of the curriculum, including You Tube or Tabitha's Salon Takeover. Ms. Owens said she would comply going forward.

32. On December 18, 2013, Carolyn Main sent me an e-mail regarding her December 10, 2013 conversation with Ms. Owens about my previous instruction not to show videos such as Tabitha's Salon Takeover to students during class. A true and accurate copy of the email was marked as Exhibit 5 to Schaun Owens' deposition.

33. On December 19, 2013, substitute instructor Cheri Snow reported to me that students in Ms. Owens's class were used to finishing clinic floor assignments and then going to the classroom to watch Tabitha's Salon Takeover and they complained when Snow informed them they could not watch it. A true and accurate copy of the e-mail from Cheri Snow to me is attached hereto as Exhibit B.

34. On December 20, 2013, I was informed by several instructors that Ms. Owens showed the movie Jingle All the Way to her class. This is a movie unrelated to cosmetology.

35. After the October 2, 2013 staff meeting where all instructors, including Ms. Owens, were told that they could not show videos such as Tabitha's Salon Takeover, Faceoff, or You Tube videos, Ms. Owens was the only instructor reported to or observed by me violating the policy and expectations not to show such videos or any videos not directly providing cosmetology instruction.

36. Giving students credit hours for watching a movie such as Jingle All the Way or videos such as Tabitha's Salon Takeover amounts to a fraud because the student is

getting hours for instruction when they are not receiving any instruction or doing work related to learning cosmetology.

37. On January 6, 2014, a test was scheduled for Ms. Owens' class. However, Ms. Owens did not administer it claiming she misread the curriculum calendar to call for the test the following week. I learned this information because the grades from the test were not timely entered and so I e-mailed with Ms. Owens. Attached hereto as Exhibit C is a true and accurate copy of the emails between me and Ms. Owens.

38. On February 7, 2014, I learned that Ms. Owens failed to give another comprehensive test to her class. Again I learned this from Ms. Owens failure to enter the grades from the test. Ms. Owens in an e-mail acknowledged she had not tested the students because she claimed she lacked the time to do all that was listed in the curriculum. Attached hereto as Exhibit D is a true and accurate copy of the emails between me and Ms. Owens.

39. Besides Ms. Owens, no other instructors in the 2013-14 school year to my knowledge failed to follow the curriculum calendars. I did not think any Incident Report was necessary for Ms. Owens as the e-mails documented what had happened.

40. The expectation to follow the curriculum was set forth in the expectation documents provided to the instructors at the August 1, 2013 staff meeting. A true and accurate copy of the documents reflecting expectations which were provided to all full-time instructors at the Northwest Campus, including Ms. Owens, was marked as Exhibit 7 to Schaun Owens' deposition. In the documents, it states" "Follow Curriculum: do not deviate from classes to be taught." This same sentiment is reflected in the agenda

9

from the August 1, 2013 staff meeting where it states: "Follow curriculum – do not deviate". A true and accurate copy of the agenda, which as handed out to the instructors including Ms. Owens, was marked as Exhibit 9 to Schaun Owens' deposition.

41. After Ms. Owens was late reporting to work, on August 20, 2013 I sent her an email. A true and accurate copy of that email is attached as Exhibit E. I explained that I did not want Ms. Owens to get into a habit of being late as she had when she worked at CESA.

42. On November 25, 2013, I issued a revised schedule for work for all instructors including Ms. Owens. This was done because of the additions of new personnel working at the Northwest Campus. E-mail notification was issued by me to all instructors regarding the change and how to access the new schedule. Plaintiff's schedule was set for 9:30 am to 6 pm Monday through Friday. If Plaintiff was scheduled to work a Saturday one week, then her weekday schedule for that same week would be 11 am to 6 pm. A true and accurate copy of my November 25, 2013 email to all instructors, including Ms. Owens, is attached hereto as Exhibit F.

43. Between November 25, 2013 and January 27, 2014, I made only one change to the instructor's schedule. This was made by me on January 15, 2014, but the change applied only to the Aesthetics' instructors and did not change Ms. Owens' schedule for her shifts.

44. Attached hereto as Exhibit G is a true and accurate copy of an e-mail I sent to Ms. Owens enclosing three Incident Reports I prepared regarding her violation of policies

10

and expectations as an instructor.   The name of any student that was mentioned in the Incident Reports was redacted under federal privacy laws.

45. I kept the Incident Reports I issued in my file I maintained for each employee. I did not contemporaneously send a copy of the Incident Reports to Human Resources for the District or Gateway Community College, although I understand that they were part of the documentation supporting my recommendation for Ms. Owens termination and as such were seen by the District's HR Solution Center personnel.

46. Ms. Owens was late to work for her scheduled shifts on January 2, 3, 8, 9, and 11, 2014. I wrote up an Incident Report about this violation of policy and expectations . A copy of the Incident Report was e-mailed to Ms. Owens on January 13, 2014 along with two other Incident Reports (a copy is attached as part of Exhibit G).

47. Despite the November 25, 2013 email advising about the schedule change issued November 25, 2013, Ms. Owens claimed in January 2014 that she was unaware that the schedule had been changed since October 2013. A true and accurate copy of e-mails, including the attachment, between Ms. Owns and me is attached hereto as Exhibit H.

48. Besides Ms. Owens, no other instructor at the Northwest Campus frequently clocked into work late. I did not feel any need to write up an Incident Report for any other instructor regarding being tardy for their scheduled shift.

49. Attached hereto as Exhibit I is a true and accurate copy of an e-mail from Schaun Owens to me in response to an e-mail I sent, which in turn included a previous e-mail from Ms. Owens to me. In her December 18, 2013 e-mail, Ms. Owens stated: "That

11

answer is vague and does not really justify some of the restrictions that are placed on the High School side at this campus. Such as the **closed campus,** when Cutting Edge is not." (bold added) This e-mail reflected to me that Ms. Owens was aware that the Northwest Campus was a closed campus as stated in the 2013-14 Cosmetology Student Handbook.

50. Contrary to the assertion in Ms. Owens December 18, 2013, during the 2013-14 school year, CESA was also a closed campus as reflected in on page 22 of the 2013-14 Cosmetology Student Handbook (Exhibit 6 to Schaun Owens' deposition), which applies at all three campuses.

51. On December 20, 2013, I was sent two e-mails from staff members at the Northwest Campus reporting that Ms. Owens allowed two students to leave at approximately 2:10 pm to go across the street. This was a violation of the closed campus policy. A true and accurate copy of the two e-mails I received is attached hereto as Exhibit J. The names of the students have been redacted to comply with federal privacy laws.

52. Besides Ms. Owens, no other instructors were reported to or observed by me to have allowed high school students to leave campus during class time or even during the 15 minute breaks in violation of the closed campus policy.

53. Because of complaints that instructors were allowing students into the instructor's office, on October 2, 2013 at the staff meeting with all of the instructors, including Ms. Owens, I told everyone that no students were allowed to be in the instructor's office "ever". This was also reflected in the written agenda handed out to everyone

12

at the meeting. A true and accurate copy of the agenda was marked as Exhibit 10 to Schaun Owen's deposition.

54. In January 2014, I learned that Ms. Owens allowed three students to remain in the instructor's office. I personally observed them in the office with Ms. Owens. I wrote up an Incident Report regarding this violation of policy and expectations. This Incident Report was one of three Incident Reports that I e-mailed on January 13, 2014 to Ms. Owens (a copy is attached as part of Exhibit G). The name of the students that were present in the office was redacted under federal privacy laws.

55. Ms. Owens did not challenge with me the accuracy of the Incident Report for having students in the instructor's office.

56. Besides Ms. Owens, after October 2, 2013 no other instructor was reported to or observed by me to have allowed students to remain in the instructor's office in violation of the policy and expectations affirmed at the October 2, 2013 staff meeting.

57. An instructor is required to sign off daily on attendance and floor (assignment) sheets. This policy and expectation was set forth in the packet given to instructors at or before the August 1, 2013 first staff meeting. Under Clinic Floor Expectations, it stated: "Assignments can only be signed the day they are completed". One of the "instructor Tasks" under "Daily", it listed "take attendance daily on attendance roster", and it required verification daily of attendance in the Skilltime program. These are contained in Exhibit 7 to Schaun Owens' deposition.

13

58. It was reported to me on September 13, 2013 by a substitute instructor that Ms. Owens would sign her students' attendance and assignment sheets at the end of a week rather than daily.  These would be violations of policies and expectations.

59. On December 18, 2013 Carolyn Main, an instructor, reported that a student reported to Main that Ms. Owens was signing floor (assignment) sheets to reflect completion up to weeks after the supposed completion.  A true and accurate copy of the e-mail I received was marked as Exhibit 20 to Schaun Owens' deposition.

60. Besides Ms. Owens, no other instructor was reported to or observed by me to have signed students' attendance and/or floor (assignment) sheets at the end of a week or month rather than daily as they were supposed to do.

61. On Monday, January 13, 2014, I observed empty pizza boxes and soda bottle in Ms. Owens classroom.  It was obvious to me that Ms. Owens had allowed her students to eat and drink in the classroom in violation of policy and expectations.  So I wrote up an Incident Report regarding the pizza party which Ms. Owens permitted (a copy of which was part of Exhibit G).

62. The policy and expectation that there was never to be food or drink in a classroom or on the clinic floor was set forth in the expectations packet of documents provided at or before the August 1, 2013 staff meeting (which was Exhibit 7 to Schaun Owens' deposition), in the Student Handbook (Exhibit 6 to Schaun Owens' deposition at page 18, section 8), and as part of the meeting and agenda from the October 2, 2013 staff meeting (Exhibit 10 to Schaun Owens' deposition).

14

63. I received a text from Carolyn Cardwell-Main asking why someone was making notes about having parties as Ms. Cardwell-Main stated that she and the other instructors thought food and drink was permitted for a special occasion in the classrooms. I texted back to Ms. Cardwell-Main that having food and drink was never permitted in the classrooms, even for special occasions because that would be a State Board violation.

64. Ms. Owens challenged the Incident Report regarding the pizza party. At a January 17, 2014 meeting with Ms. Owens, Kristina Scott and me, Ms. Owens admitted she had bought pizza for her students and allowed them to eat it and drink soda in the classroom on January 11, 2014 as alleged in the Incident Report. Ms. Owens claimed, however, that she did not understand food and drink were never to be permitted in the classroom because she said potlucks had been held at CESA in classrooms. I said I thought an e-mail was sent out informing the Northwest Campus instructors that no food or drink was "ever" permitted. This was included in the October 2, 2013 meeting agenda and in my text with Main. It was ultimately decided that the Incident Report, which is a written warning of a violation of policy or expectations, would be replaced by a verbal warning.

65. After the December 20, 2013 text between me and Carolyn Main, besides Schaun Owens, no other instructor was reported to or observed by me to have allowed any student to eat or drink in the classroom or on the clinic floor.

66. On Tuesday, October 1, 2013, at approximately 10:45 am, I was informed by several instructors that Ms. Owens appeared to be sleeping in the instructor's office and they

15

wondered if she was feeling well. I went into the office with Shala Dveirin, an instructor, and observed Ms. Owens with her eyes closed and not making any apparent movements or sounds. I called out Ms. Owens name three (3) separate times and she did not respond. I then asked Ms. Owens if she was okay and at first she did not respond, but eventually responded when I asked again in a louder voice. Ms. Owens responded that she was fine.

67. Ms. Owens would have been scheduled to start work on October 1, 2013 at 9:30 am and work until 6 pm.

68. I asked the instructors who came to see me about Ms. Owens to send me an e-mail reflecting what they saw. I received an e-mail from each of the three instructors. A true and accurate copy of the three e-mails I received is attached as a portion of Exhibit 15 to Schaun Owens' deposition. All three e-mails reflect that each person observed Ms. Owens sleeping for various amounts of time.

69. Based upon the e-mails and verbal reports to me, I wrote up an Incident Report for Ms. Owens sleeping on the job which would be a policy violation. A true and accurate copy of the Incident Report is the first two pages of Exhibit 15 to Schaun Owens' deposition.

70. Besides Ms. Owens, no other instructor was reported to or observed by me to be asleep in the instructor's office, any classroom, or on the clinic floor.

71. I did not ask instructor Toni Trott what she observed on October 1, 2013, because she had not come to me and verbally told me what she observed.

16

72. During a November 5, 2013 mock inspection I conducted, food and drink were discovered in the stations on the clinic floor and lockers for Ms. Owens' students. I pointed this out to all of the instructors who were present during the inspection. I also made it clear to all instructors, without naming any one of them, that there should be no food or drink on the clinic floor or the lockers because if that was found during an actual State Board inspection the facility could be shut down. I did not single out or name any instructor, including Ms. Owens in my remarks.

73. I on occasion conducted informal inspections of the clinic floor area. On Friday, December 13, I noted on my inspection that there were sanitation violations present in the area of the clinic floor used by Ms. Owens' students. The sanitation violations were that the styling stations were dirty with dirty implements, dirty towels, and personal items. On December 13, the dispensary was full of dirty towels and the break room was dirty and had not been cleaned from the previous day. I informed Ms. Owens of the policy and State Board violations that I observed and instructed her to make sure the clinic floor is being cleaned up as needed.

74. On December 19, 2013, I observed students from Ms. Owens' class eating on the clinic floor in violation of policy. I informed Ms. Owens of the policy and State Board violations that I observed and instructed her to enforce the no food or drink rule.

75. On October 21, 2013, via e-mail I issued the Personal Services Criteria setting forth when students could perform services on each other. Among the criteria was that the student had 90% or greater attendance the previous month and 90% or greater grade

17

from the previous month. If students qualified then on two specified Fridays per month, the students could perform and receive personal services. A true and accurate copy of my October 21, 2013 e-mail to all of the instructors, including Ms. Owens, is attached hereto as Exhibit K. A true and accurate copy of the criteria (without the cover e-mail) was marked as Exhibit 27 to Schaun Owens' deposition.

76. On December 18, 2013, Carolyn Main reported to me via e-mail that on October 26, 2013 Ms. Owens allowed her students to perform personal services and to service clients on a make-up day, which was in violation of policy. A true and accurate copy of the e-mail I received was marked as Exhibit 20 to Schaun Owens' deposition

77. On December 19, 2013, substitute instructor Cheri Snow reported to me that the students in Ms. Owens' class were allowed to perform personal services on each other as Plaintiff did not agree with the rule and they complained when Snow would not let them to do personal services. The instructors, including Ms. Owens, were aware that on student make-up days the students could not perform personal services. A true and accurate copy of the e-mail from Cheri Snow to me is attached hereto as Exhibit L.

78. Besides Ms. Owens, no other instructor was report to or observed by me to have allowed students to perform personal services in violation of the policy and criteria set forth on October 21, 2013 (see Exhibit K).

79. On December 13, 2013 I sent to each full-time instructor (Owens, Main, Trott, Wood and Dveirin) a packet for self--assessment of their performance. Each instructor filled out the packet and returned it to me on or about December 20, 2013.

18

80. During the 2013-14 school year, due to work overload I did not fill out any full-time employee's performance evaluation. This would include all of the instructors at the Northwest Campus. Ms. Owens received no more or less in terms of formal evaluations of her performance than any other full-time instructor.

81. I did not receive for the 2013-14 school year from my supervisor any written performance evaluation as the Assistant Program Manager.

82. I only visited any instructor's classroom once during the 2013-14 school year for purposes of a formal evaluation of the instructor's classroom teaching. That was true of Ms. Owens as well as the other full-time instructors. I did not ever share any paperwork regarding such visits with anyone being evaluated.

83. I am not biased against persons based upon their race, whether it is African-American, Hispanic, or any other race.

84. I did not treat Schaun Owens any different than any other instructor because of her race.

85. While I wrote up four Incident Reports regarding Ms. Owens, I did not write up any Incident Reports regarding Toni Trott, another full-time African-American instructor. That is because Ms. Trott did not have performance deficiencies like Ms. Owens did which led to the Incident Reports. I even asked Ms. Trott to work on developing a new curriculum for adult non-high school students because I saw she had special talents and skills.

86. At the Northwest Campus, the Aesthetician program had its own separate classroom and training room just for aesthetician students. Aestheticians are subject to different

19

regulations than cosmetologists, and so are the students from those disciplines. No cosmetology students were supposed to or did use the aesthetician's facilities because of the different rules and regulations.

87. I denied Ms. Owens request to use the Aesthetician training room for teaching her cosmetology students about facials. This was not because of Ms. Owens race or anything she may have said at any time or on any subject. I did this because no cosmetology students were supposed to use such room under the policy set forth above.

88. At CESA, a special report was provided to reflect which students met the 90% attendance and the 90% grades necessary to qualify for personal services. That report was not available to the Northwest Campus during the 2013-14 school year. However, the students could determine for themselves by looking up their attendance and grades to see if they qualified. The instructors, such as Ms. Owens, could also access the attendance for the students through the Skilltime program. Additionally, the instructors had the attendance sheets so they could determine if the students met the listed criteria. The students' grades could be accessed by instructors through the Canvas program.

89. During the 2013-14 school year, no instructor at the Northwest Campus was provided access to a 90/90 report.

90. I am aware that Mr. Wood had his second year adult non-high school students do their training regarding facials on the classroom floor with mats between them and the floor or on the tables. Ms. Owens objected to doing the training on the floor, so

we discussed it and then she and I agreed she could use mannequins to perform the necessary instruction. I agreed to this alternative so that the students could finally receive their instruction from Ms. Owens.

91. I did not ever tell Ms. Owens to reprimand or discipline any student for merely speaking Spanish in the student lounge or break room. I did not tell Ms. Owens to tell her students that they could never speak Spanish in the student lounge. I did communicate that a complaint was received from a student who felt bullied when a few of Ms. Owens' students were speaking in Spanish.

92. I met with the accused students and asked them to be respectful of other students and not to speak ill of or bully anyone in the break room or anywhere on campus whether in English or in Spanish.

93. I did not issue a blanket directive that students were not permitted to speak Spanish in the student lounge or in the halls. The only instructor I ever spoke to about speaking Spanish in the student lounge was Ms. Owens because the complaining student and the accused students were all in Ms. Owens' class.

94. Nothing Ms. Owens said to me or to anyone else, including Kristina Scott my supervisor, about the issue regarding speaking Spanish in the student lounge affected my assessment of Ms. Owens or my recommendation that she be terminated.

95. On January 10, 2014 I recommended Ms. Owens be terminated based upon just the following criteria: (1) giving permission for West-MEC students to leave campus; (2) not adhering to the curriculum; (3) excessive tardiness; (4) not adhering to State Board regulations on sanitation; playing videos for students and giving hours for this

time; and (5) matters set forth in Incident Report for sleeping on the job, pizza party, students in instructor's office, and excessive tardiness.   On January 13, 2014 at the request of Kristina Scott I forwarded the documentation and explanation of reasons for my recommendation.

96. Attached hereto as Exhibit M is a true and accurate copy of a series of e-mails I sent and received regarding the reasons why I recommended that Ms. Owens be terminated and the approval of Kristina Scott and CJ Wurster for me to move forward with a formal recommendation for termination.

97. Neither Ms. Owens' race nor any statements she made about a Speaking Spanish, the 90/90 report, the closed campus or anything else affected my assessment of and recommendation that Ms. Owens should be terminated.  The only reasons for my recommendation were the ones identified immediately above and reflected in Exhibit . M.

98. On January 27, 2014, via e-mail I formally recommended that Ms. Owens be terminated (see Exhibit M).  This recommendation was based upon the same documentation provided previously on January 13, 2014.

99. On February 12, 2014, Ms. Owens was notified of her termination at a meeting with me and a representative from Human Resources. While Ms. Owens asked why she was being terminated, she was not told any reason but was told that no reason need be given.

100.     In March 2014, Toni Trott voluntarily resigned as an employee of the District to pursue a position with the Regency Beauty College.

22

101.     The vacant positions of Ms. Owens and Toni Trott were filled through the normal posting and interview process organized through Human Resources.  Both positions were posted and handled at the same time by the same District personnel.

102.     The persons selected through the process to fill the two full-time Cosmetology Associate Instructor positions in the summer of 2014 were Timeka Prime and Katrina Austad.  Timeka Prime is an African-American female who had been hired as a full-time Cosmetology Associate Instructor at CESA during the 2013-14 school year. Katrina Austad, a Caucasian female, worked during a portion of the 2013-14 school year as a part-time Cosmetology Associate Instructor at the Northwest Campus.

103.     Dana Burns, a Human Resources employee, filled out the paperwork which reflected that Timeka Prime was filling Ms. Owens' position and that Katrina Austad was filling Toni Trott's position.  I did not decide who was filling which position nor did it make any difference to me who filled which position.  A true and accurate copy of the e-mail from Dana Burns to me about the paperwork is attached hereto as Exhibit N.

104.     I swear subject to the laws of perjury that the above statements are true and correct to the best of my knowledge and recollection.


DATED:   September 23, 2016.

Lisa Hemming

23

1     Subscribed and sworn before me by Lisa Hemming this **23** day of _September_, 2016.

2

3

4     _____
      Notary Public

5     My commission expires:

6     **OFFICIAL SEAL**
      **KIMBERLY KERSHNER**
7     NOTARY PUBLIC-ARIZONA
      MARICOPA COUNTY
      My Comm. Expires Sept. 10, 2018

8

9

10    4683280.1 \109883-5\September 23, 2016

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              24

EXHIBIT A

10/27/2015                          Maricopa Community College District Mail - Fwd: ▇▇▇▇▇



Lisa Hemming <lls2066488@gatewaycc.edu>

**Fwd:** ▇▇▇▇▇▇▇▇▇▇▇
1 message

Marty McCray <mccray@gatewaycc.edu>                                    Mon, Sep 16, 2013 at 10:57 AM
Reply-To: mccray@gatewaycc.edu
To: Lisa Hemming <hemming@gatewaycc.edu>

FYI

---------- Forwarded message ----------
From: Marty McCray <mccray@gatewaycc.edu>
Date: Mon, Sep 16, 2013 at 10:53 AM
Subject: ▇▇▇▇▇▇▇▇▇▇▇
To: Paul McCray <McCray@gatewaycc.edu>

9/13/12 ~ I met with ▇▇▇▇▇▇▇▇▇ today and Lisa Hemming regarding concerns the student has about her
instructor, Ms. Owens. She indicated she feels Ms. Owens lacks patience with her and does not understand that
it takes her longer to learn most things and that she needs additional individual instruction on clinical work and
patience from Ms. Owens due to her disability(s). As an example, she indicated that when Ms. Owens was
showing students how to do finger waves Ms. Owens got frustrated with her and said "I'm done with you ▇▇▇▇
in front of other students, and walked away from her, ▇▇▇▇▇ said she is now reluctant to ask Ms. Owens for
help. She also indicated Ms. Owens has done this with other students and said that with regard to the finger
waves Ms. Owens expressed frustration with other students who were also struggling and said something to the
effect that "I don't know why I have to keep saying the same thing over and over." Student also indicated that
her teacher the previous year would take time to work with her individually until she mastered something and that
Ms. Owens does not do this... she will give her some minor extra attention and then walk away, often giving the
appearance of impatience. I asked ▇▇▇▇ if I could share her 504 Plan with Ms. Owens and she agreed. ▇▇▇
indicated she likes Ms. Owens personally but feels she doesn't know how important it is to give her extra
attention and time when needed and to be patient with her. Ms. Hemming asked if the instructor sometimes
appeared impatient with other students and ▇▇▇▇▇ indicated that in her opinion the instructor is also is impatient
with other students. As an example, regarding recent State Board testing, ▇▇▇▇ felt, along with other students,
that they were not well prepared. She indicated Ms. Owens did not conduct the "boot camp" to prepare them.
She said most of the students she had spoken with struggled because of this. Student also indicated that she
doesn't feel she is scored fairly sometimes on her worksheet. She said as an example that recently she had
worked diligently the entire class to try and master the assigned clinical work but that she struggled with it quite
a bit. ▇▇▇▇ said that despite working diligently she was given a zero by Ms. Owns because she failed to fully
master the task. ▇▇▇▇▇ indicated this frustrates her and that this method of scoring is different from how she was
scored last year. She said last year she did receive points if she worked diligently on something even if she
didn't master it. Given the current scoring method, she is concerned that she could end up failing. At that point
Ms. Hemming indicated that students should receive credit for their effort and the fact that they are working
diligently even if they don't master the task. Ms. Hemming went on to explain that since they are students, they
are not expected to fully master everything. I brought up the issue of the curls from my previous meeting with
▇▇▇▇  ▇▇▇▇ explained to Ms. Hemming that she was not able to master the curls (or finger waves?) but that
she had learned how to do it a different way last year, and had mastered it, she didn't understand why Ms.
Owens insisted that they do it her way, which was a different method. At that point we discussed the difference
between nonessential and essential skills which must be mastered. The issue was that if a student knows how
to correctly carry out a task using one method, should they be penalized if they use that method to to achieve
the same successful outcome rather than using the other method insisted upon by their new instructor? Ms.
Hemming explained that a student should be able to use an alternative method, for nonessential skills/tasks in
some instances where a particular tasks or skill can be done in different ways. She also indicated, however, that
some skills/tasks are essential and that they must be mastered in one particular way in order to satisfy State
Board requirements. ▇▇▇▇ indicated she understood this and is willing to learn new techniques but feels Ms.
Owens needs to know that it will take her longer to learn them and she will need more individual attention, so if
she cannot learn a new method of doing something, she would like to be able to use the old method she has

MCCCD-0-137

mastered if it achieves the same successful outcome. Ms. Hemming indicated this type of accommodation would be acceptable for nonessential tasks or skills. The student said she felt like Ms. Owens may not like her but acknowledged she has not spoken with Ms. Owens about these concerns. Student went on to say that she, and some other students, commented that perhaps Ms. Owens was acting the way she was and being impatient due to her medical issues and the upcoming surgery. In my opinion, ■■■■ certainly gave the impression of a serious student who wants and career in this field and who was willing to self-advocate for herself in a positive manner and who is genuinely concerned about her ability to succeed under these circumstances. She did not given any impression of wanting to simply complain about her instructor and make excuses for her struggles in the program. She indicated she was also reluctant to bring these issues up with Ms. Owens because of concern that there might be some retaliation. She said she only came to see me initially because of her concerns and her father indicating that if she didn't come and see me he would call me. This reluctance to see me, she said, was partly because she was concerned she would get Ms. Owens in trouble. Both Ms. Hemming and I indicated that in fairness to Ms. Owens, she may not be aware of these concerns or issues because ■■■■ had not brought them to her attention. Moreover, I indicated that since ■■■■ was willing to let me share ■■■■ 504 Plan with Ms. Owens and the functional impact her combined ADD/ADHD and other impairments have on her learning and performance, that perhaps myself and Ms. Hemming would be able to help Ms. Owens implement new, individualized strategies for teaching ■■■■. In addition, I also pointed out that since she had completed the "Best Practices" and "Learning Styles" forms during our meeting last week, we would be able to share this information with Ms. Owens, too. I indicated it might also be helpful to have Ms. Owens consult with ■■■■ teacher from the previous year, Ms Little. We then invited ■■■■ to meet with us again, along with Ms. Owens, after we have the opportunity to meet with Ms. Owens. She was reluctant at first. she indicated that she feared her instructor might take it the wrong way, but she said her father who is teacher, told her she needed to speak with her instructor, so ■■■■ at least for now, has agreed to meet with Ms. Owens, myself and Ms. Hemming. PM



**Paul Martin McCray, M.S.**
Counselor/Disability Resource Specialist
MSC/Cutting Edge Style Academy
McCray@gatewaycc.edu

p: (602) 392-5077
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*

 



**Paul Martin McCray, M.S.**
Counselor/Disability Resource Specialist
MSC/Cutting Edge Style Academy
McCray@gatewaycc.edu

p: (602) 392-5077
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*

 

MCCCD-0-138

EXHIBIT B

---------- Forwarded message ----------
From: **Cheri Snow** <cheri.snow@gatewaycc.edu>
Date: Thu, Dec 19, 2013 at 1:42 PM
Subject: My Concerns
To: Lisa Hemming <hemming@gatewaycc.edu>, Lisa Hemming <lisa.hemming@gwmail.maricopa.edu>


For the last two weeks of subbing for Ms. Owens class I have noticed something's that I think I should
bring to your attention. First, I have never walked into a class and felt so unwelcome. Threw out the
two weeks of subbing the students didn't want to follow the rules, they would sit anywhere they
wanted, they would have their phones out and eat food on the clinic floor. They would also take 20 to
30 min breaks when they are only allowed to have a 15 min's. Every day this was a constant battle
with the class. I would have to stand at the break room door and ask them to go get back to work and
that break was over. Some of the students would get up and go right back to work other students I
would have to make sure I waited for them to leave and keep an eye on them otherwise they would
try to disappears back into the break room. Another thing students where used to not getting
consultations on clients and not getting the clients checked after they were finished with clients. For
example: ▉▉▉ the two times that she had clients that week she would do a consultation on the color
and once she was done with that she went right into a haircut with no consultation and then wouldn't
have me check the overall look before letting the client go. ▉▉▉ would also change formulation on
the color or just deiced that she would throw a toner on for no reason. This causes problems because
they are working under my license and if I tell them to do something they need to keep with the plan
or talk to me about why they want to change it so I can make sure they will get the same results. It
was also brought to my attention that students were allowed to refuse client and still stay in school.
So, when I sent three students home (▉▉▉▉▉ and ▉▉▉▉) it caused an up roar with all the
students. I was under the impression this rule was in the hand book and I don't understand why it is
not in forced. How do these students learn if they are able to refuse clients in a school that doesn't get

l

that many students? Also, students are used to finishing there floor sheets and then going to the classroom to watch Tabitha's Salon take over. When I would not allow the students to go to the classroom to watch Tabitha's Salon take over they began to give me attitude and would refuse to work on the extra assignment I gave them. As, the week went on students informed that they are not allowed to do personal services but that Ms. Owens doesn't agree with that rule, so she would allow them to do personal services and they didn't understand why I wouldn't let them.

All of these inconsistencies' in following the rules or not following the rules is out of hand. When a classroom is ran this way it makes it very hard for a sub to come in and enforce the rules that aren't normally being enforced but should be being enforced. As a teacher I think that things need to change so that these students will be ready for the real world.

Once Ms. Owens came back she informed all of her students to write letters to West Mec about me and how I didn't follow the rules in the hand book. This was a conversation that was had between Ms., Owens and Mrs., Cardwell. When I heard about this I went straight to my supervisor to quit. I do not want to work in a school where teachers do not support one another. After speaking with Ms., Hemming I felt better about staying understanding that she would not allow this to keep happening.

Cheri Snow

2

MCCCD-0-238

EXHIBIT C

**Copy Center**

| | |
|---|---|
| **From:** | Schaun Owens <Schaun Owens <owens@gatewaycc.edu>> on behalf of Schaun Owens |
| **Sent:** | Thursday, January 09, 2014 11:44 AM |
| **To:** | Lisa Hemming; owens@gatewaycc.edu |
| **Subject:** | Re: Testing |

No when I looked at the calendar and I read it for next Monday. Is it possible for me to administer it to them today, since we do not currently have any appointments on the calendar and since this is their Saturday, they will still have time to work on this weeks boxes?? I actually told them they were taking the test next week.

Respectfully,

Schaun Owens


On Thu, Jan 9, 2014 at 8:12 AM, Lisa Hemming <hemming@gatewaycc.edu> wrote:
Hi Schaun,

Did you administer Comprehensive test #3  this past Monday 1/6/14 as stated on the curriculum?
Please let me know, thanks.

Lisa


**Lisa Hemming**
Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*




--
Schaun Owens
Associate Instructor
Cutting Edge Academy


1

MCCCD-O 1163

# EXHIBIT D

--------- Forwarded message ---------
From: Lisa Hemming <hemming@gatewaycc.edu>
Date: Fri, Feb 7, 2014 at 10:13 AM
Subject: Re: Comprehensive test #4
To: Schaun Owens <owens@gatewaycc.edu>
Cc: Karen Scott <scottk@gatewaycc.edu>

Hi Schaun,

Please understand that we are not to make any adjustments to the curriculum as I have
stated in the past. If some things need to be adjusted then you need to bring them to
my attention and let me make the adjustments necessary. These tests are to be giving
and entered in Canvas in a timely manner. We cannot deviate from the testing schedule.
This can and may impact students with accommodations. Whether they chose to use
their accommodations or not, I still am required to have a teacher available to them.
You were an accommodations teacher and should be aware of this.
This is the 2nd comprehensive test that has been changed because it was not given on
the assigned date in addition to their 1000 hour state board test in September. This
cannot happen again.
If you notice on the curriculum, these students will not be testing on Chapter 25 and 26
until February 24th, so there would have been plenty of time for the students to
complete questions, vocabulary and outlines in the coming theory days, if necessary.
The curriculum will continue to get tighter as we move these students along to the end

1

of the year, however you will have to be sure to manage your classroom time efficiently.

In order to get the comprehensive test in along with all the other items on the curriculum, I would have you adjust as such:

Monday 2/10: Administer Comp test #4 then Intro chapter 26. Do the lecture. Demo pedicures. Have students start outline, vocab and questions. Have students work on workbooks. If there is time I would have the students do a workshop.

Wednesday 2/12: Retake Comp test #4 with Mr. Wood at 2pm in his classroom. I do not want to close the clinic floor for retakes. You may keep those that passed the test on the floor to be available for clients or to work on their floor sheets.

Monday  2/17: We are closed so they will miss a theory day.

Monday 2/24 Test on Chapter 25 and 26. Then have students review Comp test 4 and write out wrong answers. Review state board procedures.

Please let me know if you have any questions or are in need of clarification.
Thanks,
Lisa



**Lisa Hemming**
Assistant Program Manager of Cosmetology and Aesthetics
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*



On Wed, Feb 5, 2014 at 6:11 PM, Schaun Owens <owens@gatewaycc.edu> wrote:
Hey Lisa,

2

MCCCD-0-331

Yeah the grades are not there, because I didn't test them on this past Monday. The calendar had theory lecture for chapter 25, the students doing outline and end of chapter questions, Comp #4 test and then a Teacher demo for manicure? I did not have enough time administer all that was on the calendar, so an adjustment had to be made . It takes them at least 45 mins to a hour to complete these Comprehensive tests and some it takes longer. I will administer the test on Monday 2/10 and have them to do their corrections the next day.  I am trying to keep them on schedule, but with this calendar it is not easy.

Respectfully

Schaun Owens

On Wed, Feb 5, 2014 at 5:05 PM, Lisa Hemming <hemming@gatewaycc.edu> wrote:
Hi Schaun,

I have noticed the grades for the Comprehensive test #4 are not in the grade book as of this evening. Grades must be entered 24 hours after testing. The test was to be given on Monday February 3rd as per the curriculum. Please let me know the status of these grades.

Thanks,
Lisa



**Lisa Hemming**
Assistant Program Manager of Cosmetology and Aesthetics
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*



--
Schaun Owens
Associate Instructor
Cutting Edge Academy

3

MCCCD-0-332

EXHIBIT E

**Copy Center**

| | |
|---|---|
| **From:** | Lisa Hemming <Lisa Hemming <hemming@gatewaycc.edu>> on behalf of Lisa Hemming |
| **Sent:** | Tuesday, August 20, 2013 10:18 AM |
| **To:** | Schaun Owens; hemming@gatewaycc.edu |
| **Subject:** | Re: Owens will be late on Tuesday 8/20/13 |

What would you suggest? I do not want this to become a habit as she has been off or late in the past. I thought this was required for the most part...



**Lisa Hemming**
Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*



On Tue, Aug 20, 2013 at 10:14 AM, Schaun Owens <owens@gatewaycc.edu> wrote:
Good Morning Lisa,

I just wanted to let you know that I am done with my doctor's appointment and am now at work... Do I really need to put time in for 45mins or can I just make it up by coming in early tomorrow morning?? Please advise

Respectfully,

Owens

On Mon, Aug 19, 2013 at 6:24 PM, Lisa Hemming <hemming@gatewaycc.edu> wrote:
Thank you for the reminder, Schaun. Please be sure to enter your time in HRMS.
Thank you!

Sent from my iPhone

On Aug 19, 2013, at 6:17 PM, Schaun Owens <owens@gatewaycc.edu> wrote:

> Hey Lisa,  just a reminder that I have a 8:30am doctor's appointment Tuesday 8/20/13.. I will be coming to work as soon as I am done..
>
> --
> Schaun Owens

MCCCD-O 1226

> Associate Instructor
> MSC- Northwest campus
>


--
Schaun Owens
Associate Instructor
Cutting Edge Academy

2

MCCCD-O 1227

EXHIBIT F

Maricopa Community College District Mail - Teachers schedule                     Page 1 of 1

 **MARICOPA COMMUNITY COLLEGES⁴**

Lisa Hemming < lis2066488@gatewaycc.edu>

## Teachers schedule
1 message

Lisa Hemming < hemming@gatewaycc.edu>                     Mon, Nov 25, 2013 at 4:22 PM
Reply-To: hemming@gatewaycc.edu
To: NWSC Instructors <dl-msc-nwsc-cosmo@gatewaycc.edu>, Shala Dvelrin <sha2067460@gatewaycc.edu>,
Amy Beck <amy.beck@gatewaycc.edu>, Cheri Snow <cheri.snow@gatewaycc.edu>, Katrina Austad
<katrina.austad@gatewaycc.edu>

Good afternoon,

I wanted to let everyone know I have completed the teachers schedule! YAY! To access the
calendar, you will need to go to:
The Cutting Edge Folder-NW Skill Center-Administrators-Student Services-Calendars-2013-
2014 Teachers schedule NW.

I have had to make a few adjustments In order to make everything work out. Please let me
know If you have any questions.

Thanks,
Lisa



**Lisa Hemming**
Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236 
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*

MCCCD-0-254

# Teachers Daily Schedule



** Week when you are scheduled for a Saturday.

MCCCD-0-28

# Aesthetics Department



| | Theory |
| | Lab |
| | Clinic |
| | Admin |
| | Lunch |
| | Other |

Shala

Amy

Crissy

8:30-9  9-9:30  9:30-10  10-10:30  10:30-11  11-11:30  11:30-12  12-12:30  12:30-1  1-1:30  1:30-2  2-2:30  2:30-3  3-3:30  3:30-4  4-4:30  4:30-5  5-5:30  5:30-6

# EXHIBIT G

**Copy Center**

| | |
|---|---|
| **From:** | Lisa Hemming <Lisa Hemming <hemming@gatewaycc.edu>> on behalf of Lisa Hemming |
| **Sent:** | Monday, January 13, 2014 4:48 PM |
| **To:** | Schaun Owens; hemming@gatewaycc.edu |
| **Cc:** | Karen Scott |
| **Subject:** | Documentation |
| **Attachments:** | Owens-Incident Reports.pdf |

Hi Schaun,

I am sending you these documents for your records. If you feel these items need to be discussed, please let me know and we will schedule a meeting this week.

Thank you,
Lisa



**Lisa Hemming**
Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*

1

MCCCD-O 1395



### INCIDENT REPORT GUIDELINES



MARICOPA SKILL CENTER

* The Incident Report Form can be used as a tool for a supervisor to document inappropriate behavior and/or performance.

* The form is not a disciplinary tool and will not take the place of progressive discipline as outlined in the employee policy manuals.

* May be used to begin the disciplinary process.

* Will be retained by the supervisor in his/her records.

### DEFINITIONS ON SOME INAPPROPRIATE BEHAVIORS:

* **Failure to perform completely.** Incompetent performance results if a supervisor communicates reasonable performance standards to an employee and after a specific period of time the employee does not improve.

* **Willful misconduct including violation of Governing Board policies, District administrative regulations or laws that affect the ability to perform a job.** Willful misconduct is not limited to violations of written or stated Governing Board policies or administrative regulations. It also includes violations of generally accepted standards. For example, the District may terminate an employee for theft of property without promulgating a rule prohibiting theft.

* **Insubordination (willful failure to perform job duties).** Insubordination results if a supervisor communicates reasonable duties to an employee and the employee willfully fails to perform.

* **Threatening or committing acts of intimidation or violence.** Violence, threats, harassment, intimidation, and other disruptive behavior in MCCCD facilities will not be tolerated. Such behavior includes, but is not limited to, oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm.

* **Inappropriate Conduct.** Examples of inappropriate conduct include, but are not limited to:

    - Job abandonment;
    - Discourtesy toward co-workers or the public
    - Sleeping on the job.
    - Chronic or repeated absenteeism or absence without a legitimate excuse and/or failure to follow proper notification procedures.



**Incident Report**



MARICOPA SKILL CENTER

Employee Name: Schaun Owens

Date: Jan. 11, 2014

Location/Department/Position: NWSC/Cosmetology/Associate Instructor

Description of Incident: (Date, Time, Place, People Involved)

Jan. 11, 2014 at 1:35pm in Classroom #130 Ms. Owen's classroom.
There was a pizza party with Ms. Owens' class in the classroom during instructional hours as evidenced
by leftover pizza boxes and empty drink containers in the classroom and an email from staff members.

Performance Impact:

This is in violation of NSWC policy and State Board regulations.

Recommendations on performance/behavior:

All NWSC and State Board policies, rules and regulations must be adhered to, without exception.

Supervisor Signature _____          Employee Signature (optional) _____

_____ 1/13/14                       _____
Date                                                Date

Updated 5/2/2012





### INCIDENT REPORT GUIDELINES

MARICOPA SKILL CENTER

- The Incident Report Form can be used as a tool for a supervisor to document inappropriate behavior and/or performance.

- The form is not a disciplinary tool and will not take the place of progressive discipline as outlined in the employee policy manuals.

- May be used to begin the disciplinary process.

- Will be retained by the supervisor in his/her records.

### DEFINITIONS ON SOME INAPPROPRIATE BEHAVIORS:

- **Failure to perform completely.** Incompetent performance results if a supervisor communicates reasonable performance standards to an employee and after a specific period of time the employee does not improve.

- **Willful misconduct including violation of Governing Board policies, District administrative regulations or laws that affect the ability to perform a job.** Willful misconduct is not limited to violations of written or stated Governing Board policies or administrative regulations. It also includes violations of generally accepted standards. For example, the District may terminate an employee for theft of property without promulgating a rule prohibiting theft.

- **Insubordination (willful failure to perform job duties).** Insubordination results if a supervisor communicates reasonable duties to an employee and the employee willfully fails to perform.

- **Threatening or committing acts of intimidation or violence.** Violence, threats, harassment, intimidation, and other disruptive behavior in MCCCD facilities will not be tolerated. Such behavior includes, but is not limited to, oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm.

- **Inappropriate Conduct.** Examples of inappropriate conduct include, but are not limited to:

    - Job abandonment;
    - Discourtesy toward co-workers or the public
    - Sleeping on the job,
    - Chronic or repeated absenteeism or absence without a legitimate excuse and/or failure to follow proper notification procedures.



**Incident Report**



MARICOPA SKILL CENTER

Employee Name: Schaun Owens

Date: Jan 10th 2014

Location/Department/Position: NWSC/Cosmetology/Associate Instructor

Description of Incident: (Date, Time, Place, People Involved)

Jan. 10th 2014 in the teacher's office at 6pm. Ms. Owens, K   , I   , O   ,
P    and R.   ).
Ms. Owens had students in the teacher's office.

Performance impact:

Students are not allowed into the office. This has been discussed many times and there is a sign on the door starting students are not allowed in the office. Teachers have their personal belongings in this office. This is a private area.

Recommendations on performance/behavior:

No student will be permitted into the teacher's office for any reason. If such meetings with students are needed, there are alternative locations including the instructor's classroom and meeting rooms.

_____
Supervisor Signature

_____
Date  1/13/14

_____
Employee Signature (optional)

_____
Date

Updated 5/2/2012



INCIDENT REPORT GUIDELINES.



MARICOPA SKILL CENTER

- The Incident Report Form can be used as a tool for a supervisor to document inappropriate behavior and/or performance.

- The form is not a disciplinary tool and will not take the place of progressive discipline as outlined in the employee policy manuals.

- May be used to begin the disciplinary process.

- Will be retained by the supervisor in his/her records.

## DEFINITIONS ON SOME INAPPROPRIATE BEHAVIORS:

- **Failure to perform completely.** Incompetent performance results if a supervisor communicates reasonable performance standards to an employee and after a specific period of time the employee does not improve.

- **Willful misconduct including violation of Governing Board policies, District administrative regulations or laws that affect the ability to perform a job.** Willful misconduct is not limited to violations of written or stated Governing Board policies or administrative regulations. It also includes violations of generally accepted standards. For example, the District may terminate an employee for theft of property without promulgating a rule prohibiting theft.

- **Insubordination (willful failure to perform job duties).** Insubordination results if a supervisor communicates reasonable duties to an employee and the employee willfully fails to perform.

- **Threatening or committing acts of intimidation or violence.** Violence, threats, harassment, intimidation, and other disruptive behavior in MCCCD facilities will not be tolerated. Such behavior includes, but is not limited to, oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm.

- **Inappropriate Conduct.** Examples of inappropriate conduct include, but are not limited to:

  - Job abandonment;
  - Discourtesy toward co-workers or the public
  - Sleeping on the job.
  - Chronic or repeated absenteeism or absence without a legitimate excuse and/or failure to follow proper notification procedures.

MCCCD-O 1400



**Incident Report**



MARICOPA SKILL CENTER

Employee Name: Schaun Owens

Date: Jan. 2, 2014 through Jan. 11, 2014

Location/Department/Position: NWSC/Cosmetology/Associate Instructor

Description of Incident: (Date, Time, Place, People Involved)

Excessive tardiness:
Jan 2nd 2014-tardy-10 min
Jan 3rd 2014-tardy-7 min
Jan 8th 2014-tardy-1 hour and 15 min
Jan 9th 2014- tardy- 5 min
Jan 11th 2014-tardy-10 min

Performance Impact:

This is in violation of MSC policy. All employees are expected to arrive on time and prepared to work at designated start time.

Recommendations on performance/behavior:

All MSC policies, rules and regulations must be adhered to, without exception. Employee must report on time to work.

Supervisor Signature

Date   1/13/14

Employee Signature (optional)

Date

Updated 5/2/2012

# EXHIBIT H

---------- Forwarded message ----------
From: Lisa Hemming <hemming@gatewaycc.edu>
Date: Mon, Jan 27, 2014 at 2:15 PM
Subject: Re: Today
To: Schaun Owens <owens@gatewaycc.edu>
Cc: Karen Scott <scottk@gatewaycc.edu>

Hi Schaun,

Just so you are aware, the excel sheet will show an update anytime I adjust the
schedule. On the 15th, I made an adjustment to one of the Aesthetics teachers
schedule. This is why it reflects an update. This schedule was completed on 11/25/13
and I sent an email stating the schedule had been adjusted. This was due to having
Katrina and Cheri on board to help cover Saturdays. I haven't adjusted full time staff
with the exception of Toni since 11/25. I have attached this email.
I checked the Cutting Edge/Northwest folder's calendar and your schedule states 9:30-
6pm. Since Katrina and Cheri cover the MSC Saturdays since November, you would not
have been scheduled for this Saturday after 11/25.

1

MCCCD-0-251

I will need you to enter time for this morning and ask that you check your schedule on a regular basis. I will continue to send out emails if schedules will be adjusted.

Thanks,
Lisa



**Lisa Hemming**
Assistant Program Manager of Cosmetology and Aesthetics
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*



On Mon, Jan 27, 2014 at 1:05 PM, Schaun Owens <owens@gatewaycc.edu> wrote:
Lisa,

I was not aware that the schedule had been changed again since the last schedule change in October 2013. When I looked in the Cutting Edge files, I noticed the schedule that you are now referring to was just updated on January 15,2014. The last time you sent an email stating that the scheduled was changing, referring to the email you sent 10/4/13. The meeting notes dated 12/23/13, states that we are to check the schedule daily and when I checked for a new schedule upon returning to work on January 2 and the following week there was no new schedule, so the last schedule that was in the Cutting Edge file had me scheduled to work 11-6 and work this Saturday 8am-5pm. It would have been helpful if an email was sent out on 1/15/14 stating that a change was occurring. So it **was not** intentional for me to be late today, as I put my schedule for work into my calendar on my phone. I will report my time in HMRS.

Respectfully,

Schaun Owens

---------- Forwarded message ----------
From: Lisa Hemming <hemming@gatewaycc.edu>
Date: Mon, Jan 27, 2014 at 10:17 AM
Subject: Today
To: Schaun Owens <owens@gatewaycc.edu>

Hi Schaun,

I have you scheduled to be here at work at 9:30am. At 10am I noticed

2

MCCCD-0-252

you still were not here. Will you please let me know when you arrive?

Thanks,
Lisa

Sent from my iPhone


--

Schaun Owens
Associate Instructor
Cutting Edge Academy

3

MCCCD-0-253

EXHIBIT I

10/12/2015            Maricopa Community College District Mail - Re: Clarification


MARICOPA
COMMUNITY
COLLEGES®

Lisa Hemming <lis2066488@gatewaycc.edu>

## Re: Clarification

1 message

Schaun Owens <owens@gatewaycc.edu>           Wed, Dec 18, 2013 at 11:34 AM
Reply-To: owens@gatewaycc.edu
To: Lisa Hemming <hemming@gatewaycc.edu>

Good morning Lisa,

Thank you for getting back to me, first I want you to know that I did attempt to come in and talk with you on
Monday, however, your door was closed and you were on the phone. When I returned again to your office you
were already gone for the day. I then sent you the email. The email that I sent to Kristina was to challenge the
process of how West-Mec and MSC relationship works for this campus. I am not trying to create confusion. I
have expressed these concerns on many occasions and I have been told on many occasions, that they are a
"Unique Group" of students. That answer is vague and does not really justify some of the restrictions that are
placed on the High School side at this campus. Such as the closed campus, when Cutting Edge is not. You
have told me that this was a West-Mec decision and since that is not a decision you can make, I took the
concern to the next level, which my impression was Kristina. Did I not follow proper protocol? I do remember our
conversations regarding getting clarification from you and I thought that's what I was doing when I sent the
email.

Regarding facials, I did not feel confident in allowing or instructing the students to setup facial beds on top of
the class tables. First of all it is not safe and these tables are not designed for full body weight, I have been told
not to allow the students to sit on the tables, desk, trash can, etc. I came to you and shared with you that I had
the students to pair up and complete the "consultation and assessment" card that Shala shared with me, in
replace of the facial rubrics. Yes, Shala and I spoke regarding the facials, however, the facial room was not
ready. I understand that the aesthetics have different rules in which they have to comply. So then why don't
we teach the cosmo students the rules that the aesthetics have to follow on their clinic floor? This is a
opportunity to be set apart from other cosmetology programs in the valley with regards to curriculum. It seem
unfair to have a facial clinic and we are teaching the cosmo students facials, but they can't use the facial beds?
That goes for both sides, Adults and High School. I remember seeing Mr. Wood's class doing facials on the
floor, but why should we have to do that when we have facial beds? If facials are non-essential, then why do
State Board include that under the Cosmetology licensing? It may not be on the test, but State Board is
licensing them as cosmetologist with the ability to perform facials, manicures, pedicures, nail enhancements,
braiding and hair extensions. But yet these technical skills are constantly being referred to as "Non-Essential"
skills here at MSC-Northwest and Cutting Edge? It is my experience and understanding that every skill learned
in cosmetology is essential to their success in the industry.

Regarding the access to students hours, I have not been shown how to access total hours for students in skill
time. I have yet to receive any adequate training on Skill time, in order to know what the capabilities are
available with that software, I think that it is assumed that everyone here is comfortable with skill time. I don't
know where the information is to get the hours from the previous month (what they should have and what they
actually have in hours) It would be helpful if we could start receiving the report, like Debbie does for the Cutting
Edge, printed for the teachers at MSC-Northwest, I actually thought that is what was being worked on when
requested a few months back.

Regarding the students coming in to meet with you. Every time they come out of the meeting with you, they
return to me with reports such as, you asking them what do I teach in class, informing them that I have access
to information that I don't. When they are coming to you about the same issues I've addressed above, they are
being redirected with questions about my teaching abilities and this has happened on more than one
occasion. Being a team player is not a problem for me, but if my team continues to not communicate to me as
well, issues that have arise, how does one have confidence in their team. If leadership downplays concerns
brought to their attention, which is done quite often with the students, then once again, how does one
have confidence in their leadership. These are clarifications that I am needing, so when you instruct me to ask
for clarity, know that my concerns are not about dress code, tardy plans, but of fairness and giving the students

MCCCD-0-5

the right tools to be successful in the industry and helping them with life skills. Black and white is good, but there is no compassion or patience without a little grey. I understand rules are to be followed and they will. I do follow the curriculum and as for the notes that you have on your calendar, that meeting was a meeting in passing, for if it were an official meeting I would have brought my calendar or notepad to take notes, so that we were on the same page. The booking contest was not solidified between you and I, i.e, Rules and requirements.

I apologize if you felt that I went outside the loop of things with the email to Kristina, but I should be able to talk to either of my managers without fear of reperousslons. I'm not sneaking behind anybody's back to get clarification or to cause the team division. There are issues that are not going to come to you first and I may have to take them to Kristina or CJ of HR, but if I have to do so, then there should not be a problem. When I need clarification I will come to you.

Respectfully,

Schaun Owens

On Wed, Dec 18, 2013 at 8:34 AM, Lisa Hemming <hemming@gatewaycc.edu> wrote:
: Hi Schaun,

: Thank you for your email. After we spoke last week regarding clarification with students,
: I thought if there was a misunderstanding you would have come in to speak with me.

. We spoke last week regarding students possibly misunderstanding information and that if you
, or I need clarification on something that we agreed to discuss this together. We agreed to
: work as a team. We also talked about our meeting back in October with Kristina regarding
: West-Mec, their students and issues that may arise with that population. We discussed in
: October and again last week about trying to keep things in house, for example, if there is an
: issue with a West-Mec student that the protocol is to first go to the teacher, then to bring it to
: me and if it is still not resolved this is when we would involve Kristina. We need to be able to
: address our school issues within our own facility. It is always good to inform West-Mec
: through Shelly Thome as the liaison, if there is a student issue. However, we need the chance
: to address issues in house and through the proper channels.
:
: Bridgett and Marina did speak with me. We discussed the fact that we do NOT have a 90/90
: list here at Northwest. I told them their teacher, like all teachers have access to their grades
: and will know if they are on a 90/90 from the previous month. When it comes to attendance,
: the teacher should be aware how many hours a student has from the prior month. This is an
: easy solution to the 90/90 list. I sent out an email on Monday October 21, 2013 (see attached)
: explaining the criteria for personal services. In this email I mentioned to read the email
: carefully and mentioned if there were any questions, to please ask.

: On the Mondays you are teaching theory, if you have a chapter that requires hands on, such
: as, facials, manicures, etc. I would expect that you would provide a demonstration and then
: instruct students to do a workshop. This is what is listed on the curriculum. This is not
: considered a personal service when what is being demonstrated is in theory and a part of the
: lesson. As you recall, you and Shala had talked about doing facials during the Monday's
: assigned to that chapter. There is no place for the Cosmetology students to work in
: the Aesthetics room. The Aesthetics department is governed by different rules and
: regulations, that Cosmetology students are not trained in. This is why I do not want
: Cosmetology students in this room. Not to mention, that facials for Cosmetology is a non-
: essential skill so it does not need to be offered to the public.This is why it was suggested they
: were to have their demonstration and workshop in your classroom. I was told by the students
: that this never did occur. As the teacher, you will need to provide that opportunity to
: demonstrate and do workshops during these Monday's as it is assigned. If you need further
: clarification, please do not hesitate to ask.

The calendar that I showed the students was the same calendar/curriculum that I had written my notes on when we sat down to discuss the events up through the end of the semester. This is when you sat in my office to discuss the booking contest. You should have had the same information as I did as we sat down together to discuss this. If you would like to see this calendar/curriculum again, I would be happy to show you.



**Lisa Hemming**
Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*

 

On Mon, Dec 16, 2013 at 4:40 PM, Schaun Owens <owens@gatewaycc.edu> wrote:

Hey Lisa,

I had Bridgette Contreras and Marina Banuelos come to me today and informed me that they had a meeting with you and you had informed them of a few things. They reported to me that you informed them that I should have access to the 90/90 list and that they should be able to use this privileges every other Friday?? First and foremost, I do not, nor have I had access to the 90/90 report. I have requested this information from Debbie, Brandi and yourself on more than one occasion. So I am a little confused as to why they are being instructed that I have this information?

Bridgette and Marina informed me that you had informed them that they are allowed to do personal services on each in the classroom on Mondays?? This is confusion because I have been told on more than one occasion that the high school students are NOT allowed to do personal services. Regarding facials, do you recall you and I having a conversation regarding the 2nd year students doing facials on each other and at the time the facial room was not organized for doing facials and you agreed that having them do the consultation work sheets for facials replacing the rubrics for facials?

I'm not sure what is going on because one minute I am instructed not to allow the students to do personal services and then the next I am told they can?? I keep every email that you send to me and I have not received any correspondence regarding any changes to personal services, other than the one sent regarding them having to pay and I have never received or have been shown how to access the 90/90 report, so I do not have that information. Also they stated that you showed them a calendar and the information on your calendar does not have the same information that my calendar has. Please Advise

Respectfully,

--
Schaun Owens
Associate Instructor
MSC-Northwest Campus

MCCCD-0-7

10/12/2016                                   Maricopa Community College District Mail - Re: Clarification

Schaun Owens
Associate Instructor
Cutting Edge Academy

MCCCD-0-8

EXHIBIT J

---------- Forwarded message ----------
From: Matthew Erbe <matthew.erbe@gatewaycc.edu>
Date: Fri, Dec 20, 2013 at 3:18 PM
Subject: off campus students 12/20/2013
To: hemming@gatewaycc.edu

Today (12/20/2013) two students left campus around 2:10pm.  The students names were ████████ and ██████ Ms. Owens stated that the students were leaving to pick up some items from Fry's for the potluck and whatever happens she (Ms. Owens) will takes responsibility.

If you need any more information feel free to e-mail me back.

1

---------- Forwarded message ----------
From: Brandi Srodawa <brandi.srodawa@gatewaycc.edu>
Date: Fri, Dec 20, 2013 at 3:20 PM
Subject:
To: Lisa Hemming <hemming@gatewaycc.edu>

Today 12/20/13 two students left the campus to go to Fry's Market Place while on clock around 2:10 PM. Their teacher Schaun Owens came up to the front to ask/tell myself and Matt Erbie our security officer that she was allowing them to go to Fry's. ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ both left the campus at the same time and walked over to Fry's to get items for their Potluck. The girls did end up returning back to campus about 15 minutes later. Owens stated that the blame was on her for letting the students leave to go to Fry's.


Brandi Srodawa
Student Service Specialist
Northwest Skill Center
brandi.srodawa@gatewaycc.edu

p: (602) 392-5030  |  f: (602) 392-5015
2931 W. Bell Road Phoenix, AZ 85053

*A Division of GateWay Community College*

1

MCCCD-0-259



2

MCCCD-0-260

EXHIBIT K

Maricopa Community College District Mail - Personal services                    Page 1 of 1

 **MARICOPA COMMUNITY COLLEGES®**                      Lisa Hemming < lis2066488@gatewaycc.edu>

## Personal services
1 message

Lisa Hemming < hemming@gatewaycc.edu>                              Mon, Oct 21, 2013 at 11:38 AM
Reply-To: hemming@gatewaycc.edu
To: NWSC Instructors <dl-nsc-nwsc-cosmo@gatewaycc.edu>, Brandi Srodawa
<brandi.srodawa@gatewaycc.edu>, Alexandria Mason <alexandria.mason@gatewaycc.edu>

All,

Here is the revised personal service form and criteria. Please be sure to read it carefully. All
monies collected will be for SkillUSA and Student Council fundraising. This criteria applies to
any student that is on the floor; high school and adults.

Brandi and Alex: Please collect these forms from the teachers and put them with the money
in our bag. BTW, Brandi, did we get a bag? :) This will not go through the front desk as
clients.

Please let me know if you have any questions.
Thanks,

 

Lisa Hemming
Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236 [ . ]
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*

📱 📱

📎 **Personal Service (1).docx**
   19K

MCCCD-0-9

# Personal Service

Chemical  ($5.00)
Not-Chemical  ($1.00)           **Paid** (must be initialed by person that received payment)

Date/Time     _____     Service_____

Price $_____Teacher Approval     _____

To receive personal services all of this form must be completed, or you will not be approved for the service. All services must be approved by your instructor. Personal services are only offered on pre-selected Fridays. Limited to no more than 4 students from each class may have personal services on the same day.

**Both grade and attendance must be at or above a 90%**

# Personal Service

Chemical  ($5.00)
Not-Chemical  ($1.00)           **Paid** (must be initialed by person that received payment)

Date/Time     _____     Service_____

Price $_____Teacher Approval     _____

To receive personal services all of this form must be completed, or you will not be approved for the service. All services must be approved by your instructor. Personal services are only offered on pre-selected Fridays. Limited to no more than 4 students from each class may have personal services on the same day.

**Both grade and attendance must be at or above a 90%**

# Personal Service Criteria

- Personal services days are pre-assigned to 2 Friday's a month.

- The student receiving the service **MUST** have a 90% attendance or higher **AND** a 90% grade average for the previous month or higher.

- All services **MUST** be approved by the instructor **BEFORE** the service may begin.

- Students are not allowed to take themselves off the books prior to the day of their personal service. The teacher will take the student off at the beginning of class provided the student is not assign a client already.

- No more than 4 students from each class may receive a personal service. This will take a total of 8 students off the floor.

- Chemicals are considered color, relaxers, bleach, toner, acrylics, gels and gel polish.

- Non-chemical are considered haircuts, styles, scalp massage, mani or pedi.

- A student may have 1 chemical service for each $5. For instance, if a student wants a highlight, toner and gel polish, it would be a total of $15.

- Each additional mix or service will need to be charged. $5 color will consist of 2oz of color with 2oz of developer.

- All funds collected will go towards Student Council or Skills USA. This will still be collected at the front desk. Please let the front desk know that it is fundraiser money.

- A personal service sheet must be filled out PRIOR to the service, signed by a teacher and turned in with the money to the front desk.

Assigned Fridays are:

October 18th

November 1st

November 15th

December 6th

December 20th

EXHIBIT L

---------- Forwarded message ----------
From: **Cheri Snow** <cheri.snow@gatewaycc.edu>
Date: Thu, Dec 19, 2013 at 1:42 PM
Subject: My Concerns
To: Lisa Hemming <hemming@gatewaycc.edu>, Lisa Hemming <lisa.hemming@gwmail.maricopa.edu>

For the last two weeks of subbing for Ms. Owens class I have noticed something's that I think I should bring to your attention. First, I have never walked into a class and felt so unwelcome. Threw out the two weeks of subbing the students didn't want to follow the rules, they would sit anywhere they wanted, they would have their phones out and eat food on the clinic floor. They would also take 20 to 30 min breaks when they are only allowed to have a 15 min's. Every day this was a constant battle with the class. I would have to stand at the break room door and ask them to go get back to work and that break was over. Some of the students would get up and go right back to work other students I would have to make sure I waited for them to leave and keep an eye on them otherwise they would try to disappears back into the break room. Another thing students where used to not getting consultations on clients and not getting the clients checked after they were finished with clients. For example: ▓▓▓ the two times that she had clients that week she would do a consultation on the color and once she was done with that she went right into a haircut with no consultation and then wouldn't have me check the overall look before letting the client go. ▓▓▓ would also change formulation on the color or just deiced that she would throw a toner on for no reason. This causes problems because they are working under my license and if I tell them to do something they need to keep with the plan or talk to me about why they want to change it so I can make sure they will get the same results. It was also brought to my attention that students were allowed to refuse client and still stay in school. So, when I sent three students home (▓▓▓▓▓▓ and ▓▓▓▓ it caused an up roar with all the students. I was under the impression this rule was in the hand book and I don't understand why it is not in forced. How do these students learn if they are able to refuse clients in a school that doesn't get

that many students? Also, students are used to finishing there floor sheets and then going to the classroom to watch Tabitha's Salon take over. When I would not allow the students to go to the classroom to watch Tabitha's Salon take over they began to give me attitude and would refuse to work on the extra assignment I gave them. As, the week went on students informed that they are not allowed to do personal services but that Ms. Owens doesn't agree with that rule, so she would allow them to do personal services and they didn't understand why I wouldn't let them.

All of these inconsistencies' in following the rules or not following the rules is out of hand. When a classroom is ran this way it makes it very hard for a sub to come in and enforce the rules that aren't normally being enforced but should be being enforced. As a teacher I think that things need to change so that these students will be ready for the real world.

Once Ms. Owens came back she informed all of her students to write letters to West Mec about me and how I didn't follow the rules in the hand book. This was a conversation that was had between Ms., Owens and Mrs., Cardwell. When I heard about this I went straight to my supervisor to quit. I do not want to work in a school where teachers do not support one another. After speaking with Ms., Hemming I felt better about staying understanding that she would not allow this to keep happening.

Cheri Snow

MCCCD-0-238

# EXHIBIT M

---------- Forwarded message ----------
From: Lisa Hemming <hemming@gatewaycc.edu>
Date: Mon, Jan 27, 2014 at 10:49 AM
Subject: Fwd: Schaun Owens
To: Christopher Wurster <wurster@gatewaycc.edu>, Karen Scott <scottk@gatewaycc.edu>

Good morning,

I am sending this email in request for termination of Schaun Owens.
Please let me know if you have any questions.

Thanks,
Lisa



Lisa Hemming
Assistant Program Manager of Cosmetology and Aesthetics
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

1

MCCCD-0-182

*A Division of GateWay Community College*



---------- Forwarded message ----------
From: **Lisa Hemming** <hemming@gatewaycc.edu>
Date: Mon, Jan 13, 2014 at 4:54 PM
Subject: Fwd: Schaun Owens
To: Karen Scott <scottk@gatewaycc.edu>
Cc: Christopher Wurster <wurster@gatewaycc.edu>

Hi Kristina and CJ,

Please see the attached documentation regarding Schaun Owens. Let me know if you need any other information from me.

Thank you,

Lisa



Lisa Hemming
Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*



---------- Forwarded message ----------
From: **Kristina Scott** <scottk@gatewaycc.edu>
Date: Fri, Jan 10, 2014 at 4:57 PM
Subject: Re: Schaun Owens
To: Lisa Hemming <hemming@gatewaycc.edu>

Hi Lisa,

I spoke with CJ about the situation and we agree that action should be taken. In order for this to move forward, for each of the bulleted items listed below, please explain what happened by identifying the following:

2

- The date the incident(s) occurred
- What happened (brief summary, 1-2 sentences, that includes facts)
- Why it should not have occurred (per policy, etc.)
- What you did to correct it

Your essential supporting documentation can be scanned in corresponding order to your bullet list and attached to the email. I know you are very detailed and thorough, however, try to limit the information to what is most relevant (i.e. incident reports). All other supporting documentation can be available upon request.

I would suggest keeping your email as is and attaching two documents: 1. explains what happened, 2. essential supporting documentation.

Let me know if you have any questions.

Kristina

On Fri, Jan 10, 2014 at 3:16 PM, Lisa Hemming <hemming@gatewaycc.edu> wrote:
HI Kristina,

Here a some of the current challenges I am having with Schaun Owens dating back to her hire date of 8/13.

- Giving permission to West-Mec students to leave campus
- Not adhering to the curriculum
- Excessive tardiness
- Not adhering to State Board regulations (Sanitation)
- Playing videos for students and giving hours for this time (falsifying hours)
- Incident reports

Please note that I have several items of documentation to support this list. I am attaching her incident report dated 10/2/13. I will be working on her incident report for her most recent issue of not adhering to the curriculum.
Please let me know if you have any questions.

Thanks,
Lisa


Lisa Hemming

3

Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*




**Kristina Scott**
Assistant Director, Northwest Campus
scottk@gatewaycc.edu

p: (602) 238-4368  |  f: (602) 218-4528
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*

4

MCCCD-0-185



## INCIDENT REPORT GUIDELINES



- The Incident Report Form can be used as a tool for a supervisor to document inappropriate behavior and/or performance.

- The form is not a disciplinary tool and will not take the place of progressive discipline as outlined in the employee policy manuals.

- May be used to begin the disciplinary process.

- Will be retained by the supervisor in his/her records.


## DEFINITIONS ON SOME INAPPROPRIATE BEHAVIORS:

- **Failure to perform completely.** Incompetent performance results if a supervisor communicates reasonable performance standards to an employee and after a specific period of time the employee does not improve.

- **Willful misconduct including violation of Governing Board policies, District administrative regulations or laws that affect the ability to perform a job.** Willful misconduct is not limited to violations of written or stated Governing Board policies or administrative regulations. It also includes violations of generally accepted standards. For example, the District may terminate an employee for theft of property without promulgating a rule prohibiting theft.

- **Insubordination (willful failure to perform job duties).** Insubordination results if a supervisor communicates reasonable duties to an employee and the employee willfully fails to perform.

- **Threatening or committing acts of intimidation or violence.** Violence, threats, harassment, intimidation, and other disruptive behavior in MCCCD facilities will not be tolerated. Such behavior includes, but is not limited to, oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm.

- **Inappropriate Conduct.** Examples of inappropriate conduct include, but are not limited to:

  - Job abandonment;
  - Discourtesy toward co-workers or the public
  - Sleeping on the job.
  - Chronic or repeated absenteeism or absence without a legitimate excuse and/or failure to follow proper notification procedures.



**Incident Report**



Employee Name: Schaun Owens

Date: Jan. 11, 2014

Location/Department/Position: NWSC/Cosmetology/Associate Instructor

**Description of incident: (Date, Time, Place, People Involved)**

Jan. 11, 2014 at 1:35pm in Classroom #130 Ms. Owen's classroom.
There was a pizza party with Ms. Owens' class in the classroom during instructional hours as evidenced by leftover pizza boxes and empty drink containers in the classroom and an email from staff members.

**Performance impact:**

This is in violation of NSWC policy and State Board regulations.

**Recommendations on performance/behavior:**

All NWSC and State Board policies, rules and regulations must be adhered to, without exception.

Supervisor Signature

1/13/14
Date

Employee Signature (optional)

_____
Date

Updated 5/2/2012



### INCIDENT REPORT GUIDELINES



- The Incident Report Form can be used as a tool for a supervisor to document inappropriate behavior and/or performance.

- The form is not a disciplinary tool and will not take the place of progressive discipline as outlined in the employee policy manuals.

- May be used to begin the disciplinary process.

- Will be retained by the supervisor in his/her records.

### DEFINITIONS ON SOME INAPPROPRIATE BEHAVIORS:

- **Failure to perform completely.** Incompetent performance results if a supervisor communicates reasonable performance standards to an employee and after a specific period of time the employee does not improve.

- **Willful misconduct including violation of Governing Board policies, District administrative regulations or laws that affect the ability to perform a job.** Willful misconduct is not limited to violations of written or stated Governing Board policies or administrative regulations. It also includes violations of generally accepted standards. For example, the District may terminate an employee for theft of property without promulgating a rule prohibiting theft.

- **Insubordination (willful failure to perform job duties).** Insubordination results if a supervisor communicates reasonable duties to an employee and the employee willfully fails to perform.

- **Threatening or committing acts of intimidation or violence.** Violence, threats, harassment, intimidation, and other disruptive behavior in MCCCD facilities will not be tolerated. Such behavior includes, but is not limited to, oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm.

- **Inappropriate Conduct.** Examples of inappropriate conduct include, but are not limited to:

  - Job abandonment;
  - Discourtesy toward co-workers or the public
  - Sleeping on the job.
  - Chronic or repeated absenteeism or absence without a legitimate excuse and/or failure to follow proper notification procedures.



**Incident Report**



MARICOPA SKILL CENTER

Employee Name: Schaun Owens

Date: Jan 10th 2014

Location/Department/Position: NWSC/Cosmetology/Associate Instructor

Description of Incident: (Date, Time, Place, People Involved)

Jan. 10th 2014 in the teacher's office at 6pm. Ms. Owens, ████████████████████████████
████████████ and ████████
Ms. Owens had students in the teacher's office.

Performance Impact:

Students are not allowed into the office. This has been discussed many times and there is a sign on the door starting students are not allowed in the office. Teachers have their personal belongings in this office. This is a private area.

Recommendations on performance/behavior:

No student will be permitted into the teacher's office for any reason. If such meetings with students are needed, there are alternative locations including the instructor's classroom and meeting rooms.

Supervisor Signature

Employee Signature (optional)

Date    1/13/14

Date

Updated 5/2/2012



### INCIDENT REPORT GUIDELINES



- The Incident Report Form can be used as a tool for a supervisor to document inappropriate behavior and/or performance.

- The form is not a disciplinary tool and will not take the place of progressive discipline as outlined in the employee policy manuals.

- May be used to begin the disciplinary process.

- Will be retained by the supervisor in his/her records.

### DEFINITIONS ON SOME INAPPROPRIATE BEHAVIORS:

- Failure to perform completely. Incompetent performance results if a supervisor communicates reasonable performance standards to an employee and after a specific period of time the employee does not improve.

- Willful misconduct including violation of Governing Board policies, District administrative regulations or laws that affect the ability to perform a job. Willful misconduct is not limited to violations of written or stated Governing Board policies or administrative regulations. It also includes violations of generally accepted standards. For example, the District may terminate an employee for theft of property without promulgating a rule prohibiting theft.

- Insubordination (willful failure to perform job duties). Insubordination results if a supervisor communicates reasonable duties to an employee and the employee willfully fails to perform.

- Threatening or committing acts of intimidation or violence. Violence, threats, harassment, intimidation, and other disruptive behavior in MCCCD facilities will not be tolerated. Such behavior includes, but is not limited to, oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm.

- Inappropriate Conduct. Examples of inappropriate conduct include, but are not limited to:

  - Job abandonment;
  - Discourtesy toward co-workers or the public
  - Sleeping on the job.
  - Chronic or repeated absenteeism or absence without a legitimate excuse and/or failure to follow proper notification procedures.



**Incident Report**



Employee Name: Schaun Owens

Date: Jan. 2, 2014 through Jan. 11, 2014

Location/Department/Position: NWSC/Cosmetology/Associate Instructor

Description of Incident: (Date, Time, Place, People Involved)

Excessive tardiness:
Jan 2nd 2014-tardy-10 min
Jan 3rd 2014-tardy-7 min
Jan 8th 2014-tardy-1 hour and 15 min
Jan 9th 2014- tardy- 5 min
Jan 11th 2014-tardy-10 min

Performance Impact:

This is in violation of MSC policy. All employees are expected to arrive on time and prepared to work at designated start time.

Recommendations on performance/behavior:

All MSC policies, rules and regulations must be adhered to, without exception. Employee must report on time to work.

Supervisor Signature

1/13/14

Date

Employee Signature (optional)

Date

Updated 5/2/2012

 

**INCIDENT REPORT GUIDELINES**

- The Incident Report Form can be used as a tool for a supervisor to document inappropriate behavior and/or performance.

- The form is not a disciplinary tool and will not take the place of progressive discipline as outlined in the employee policy manuals.

- May be used to begin the disciplinary process.

- Will be retained by the supervisor in his/her records.

### DEFINITIONS ON SOME INAPPROPRIATE BEHAVIORS:

- **Failure to perform completely.** Incompetent performance results if a supervisor communicates reasonable performance standards to an employee and after a specific period of time the employee does not improve.

- **Willful misconduct including violation of Governing Board policies, District administrative regulations or laws that affect the ability to perform a job.** Willful misconduct is not limited to violations of written or stated Governing Board policies or administrative regulations. It also includes violations of generally accepted standards. For example, the District may terminate an employee for theft of property without promulgating a rule prohibiting theft.

- **Insubordination (willful failure to perform job duties).** Insubordination results if a supervisor communicates reasonable duties to an employee and the employee willfully fails to perform.

- **Threatening or committing acts of intimidation or violence.** Violence, threats, harassment, intimidation, and other disruptive behavior in MCCCD facilities will not be tolerated. Such behavior includes, but is not limited to, oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm.

- **Inappropriate Conduct.** Examples of inappropriate conduct include, but are not limited to:

    - Job abandonment;
    - Discourtesy toward co-workers or the public
    - Sleeping on the job.
    - Chronic or repeated absenteeism or absence without a legitimate excuse and/or failure to follow proper notification procedures.



**Incident Report**



Employee Name: Schaun Owens

Date: October 1, 2013

Location/Department/Position: NWSC/Cosmetology/Associate Instructor

**Description of Incident: (Date, Time, Place, People Involved)**

On October 1, 2013 at approximately 10:45am I walked into the teacher's office and noticed Schaun Owens sitting unusual in her chair at her desk. I asked if she was okay which she said yes, the second time I asked her, I asked again if she was sure she was okay, and she said yes. She then told me she was sitting at the desk looking at the computer when she realized how tired she was, so she just closed her eyes for a second.

I have 3 witness that came forward to me stating Schaun was asleep at her desk for anywhere from 10-20 minutes.

**Performance impact:**
Sleeping on the job is inappropriate conduct.

**Recommendations on performance/behavior:**

The Instructor will follow all policies and procedure outlined in the MCCCD and MSC Northwest manuals.

**Employee response (optional):**

*No Signing because I don't agree with accusation. I was not Sleeping on the Job.*

**Additional comments (optional):**

MCCCD-0-193

Did not sign- see above

_____
Supervisor Signature

_____
Employee Signature (optional)

10/2/13
_____
Date

_____
Date

Updated 5/2/2012

Maricopa Community College District Mail - Ms. Ownes                                    Page 1 of 1

                                  Lisa Hemming< lis2066488@gatewaycc.edu>

## Ms. Ownes
1 message

Carolyn Main< main@gatewaycc.edu>                              Tue, Oct 1, 2013 at 11:46 AM
Reply-To: main@gatewaycc.edu
To: Lisa Hemming <hemming@gatewaycc.edu>

Lisa,

Just wanted to let you know, I'm not sure if Ms. Owens is ok or not. She was sleeping in the office for from
what I saw at least 10 minutes.
*Carolyn Cardwell*
Associate Instructor
Northwest Skill Center
Cosmetology
main@gatewaycc.edu
Phone: (602)-392-5000

MCCCD-0-195

Maricopa Community College District Mail - 10/1/13                    Page 1 of 1

 **MARICOPA COMMUNITY COLLEGES®**

Lisa Hemming< lls2086488@gatewaycc.edu>

## 10/1/13
1 message

Shala Dveirin< shala.dveirin@gatewaycc.edu>                    Tue, Oct 1, 2013 at 5:01 PM
To: Lisa Hemming <hemming@gatewaycc.edu>

On 10/1/13 I entered the office and noticed ms. Shaun asleep in her chair. I was at my desk for
approximately 5 minuets and she was asleep. I left the office and reentered with Lisa Hemming, who
asked her if she was O.K.? she said yes she was looking at the computer and her eyes were tired so she
decided to rest her eyes.

Shala Dveirin

MCCCD-0-196



Lisa Hemming< lls2066488@gatewaycc.edu>

## Today
1 message

Robert Wood < robert.wood@gatewaycc.edu>                    Tue, Oct 1, 2013 at 9:47 PM
Reply-To: robert.wood@gatewaycc.edu
To: Lisa Hemming <hemming@gatewaycc.edu>

   I went on break at 10:00, as I walked into the office I noticed that MS.Owens was curled up in her chair and it appeared she was asleep. I thought to myself that doesn't look comfortable.

   Truly I don't know if it was before break or after, either way I did notice Ms. Owens looking quite relaxed. I know how hard it is to sit at the computer and become relaxed and want to nap and chill. I have to get up and change what I am doing to get focused again, plus a cup of coffee helps somewhat.  Mr Wood

MCCCD-0-197

| Incident: | Date(s): | Description: | Impact: | Action: |
|---|---|---|---|---|
| Students leaving campus | 9/16/13 and 12/20/2013 | 9/16/13 Ms Owens gave ▇ permission to smoke outside. 12/20/13 Ms Owens Gave ▇ and ▇ permisson to go to Fry's. | Closed campus. Violation of handbook. | verbal warning with intent of follow up with write up. |
| Not adhering to curriculum | 9/5/2013, 12/6/13 and 1/6/14 | 9/5/13 did not adhister State Board and bootcamp or test as instructed-I had to redo curriculum for the week. 12/6/13 did not teach students facials as listed on curriculum for 4 days. 1/6/14 did not administer test as instructed. I had to redo curriculum for the week. | Students grades are not entered on time. Students lack of learning. Teacher coverage for ADA. | Verbal warning and write up. |
| Excessive Tardies | Total tardies per month: Aug -2 Sept -1 Oct -1 Dec-4 Jan -5 | Ms Owens sometimes will text me if she is going to be late. Time is not always entered. On 12/24 she was LWP. She has taken off 1/13/14 with out approval as her time is "frozen" per Alice Cornelius. | Misuse of company time. | Verbal warning and write up. |
| Not adhering to State Board Regulations on Sanitation. | 11/5/13 12/13/13 12/19/13 1/11/14 | I did a State Board inspection on 11/5/13. There was food and drink in stations. Stations were dirty with dirty implements, dirty towels and personal items. 12/13/13 dispesary was full of dirty towels. Break room was dirty and not cleaned from prior day. Monitors are not being checked by Ms Owens. 12/19/13 Students eating on the clinic floor. 1/11/14 towel bins overflowing with dirty towels. Food and drink in classrooms and pizza boxes left in classroom. Garbages overflowing in breakroom and clinic.These duties are all assigned to Ms Owens class. | This is violation of State Board Laws and Rules. We could suffer a heft fine if we are in violation and possibly shut down. | Reviewed at every meeting. Laws and Rules were printed out so all teachers were reminded of our responsibilities as licensed instructors. Verbal warning and write up. |

MCCCD-0-198

| | | | | |
|---|---|---|---|---|
| Playing movies and videos for students during classtime. | 9/13/2013<br>12/10/13<br>12/20/13 | 9/13/13 ▓▓▓▓ told Paul McCray and I that Ms. Owens plays videos (Tabetha's take over and Faceoff) during class time instead of State Board boot camp. 12/10/13 ▓▓▓▓ told Paul McCray, Cheri Snow, ▓▓▓▓ parents and myself that Ms. Owens continues to play videos during classtime. 12/20/13 Ms Owens played the movie "Jingle All the Way" for students during classtime. | This is falsifying hours and is not permitted by State Board. | This has been addressed many time with staff. This is not permitted in our school or by State Board. Verbal warning with intent to follow up. |
| Multiple incident reports | 10/2/2013<br>1/13/14 | I wrote Schaun up for sleeping in the office on 10/2/13. I have written up Schaun today for violation of sanitation, tardiness and students in teachers office for 1/10/14 and 1/13/14 | Verbal discussions do not seem to correct the behavior. | I will write up any teacher if I have given a verbal warning and the behavior has not been corrected. |

I have a file of documentation in the forms of emails, word documents and text messages that will support this information and I am willing to provide if requested.

# EXHIBIT N

---------- Forwarded message ----------
From: Dana Burns <burns@gatewayco.edu>
Date: Mon, Jun 16, 2014 at 8:17 AM
Subject: PARs/Associate Instructor/Timeka Prime & Katrina Austad
To: Lisa Hemming <hemming@gatewayco.edu>

Hi Lisa,

Part of the hiring process is for the chair to complete the PAR (which is mentioned in the "interview packet" email). Being we are late in the process, I have taken it upon myself to do so for you.

Please find attached the a PAR for Timeka Prime and Katrina Austad. Please review (make sure the information provide is correct) sign and scan back to me asap for further processing.

Kind regards,

Dana Burns

Administrative Support Specialist

GateWay/MSC Human Resources

602-238-4300: main

1

MCCCD-0-261

602-238-4320: desk

602-238-4307: fax

Maricopa Skill Center a division of GateWay



2

MCCCD-0-262



# HUMAN RESOURCES

## PERSONNEL ACTION REQUEST

### EMPLOYEE INFORMATION

| Name Timeka Prime | Employee ID | | Date 6/16/2014 |
|---|---|---|---|
| Daytime Phone | | Message Phone | |

### TYPE OF ACTION REQUESTED (APPLIES TO ALL POLICY GROUPS UNLESS INDICATED)

| | | | |
|---|---|---|---|
| ☐ New Employment Regular hire | ☐ New Specially Funded Hire | ☐ Temporary reassignment | ☐ SPF Renewals/Changes |
| ☐ Short Term Hire (OSO) | ☐ Athletic Specialist Hire | ☐ Transfer | ☐ Return to Reg. Assign |
| ☐ Short Term Hire (OYO) | ☐ Administrative reassignment | ☐ Separation | ☐ Other ____ |
| ☒ Employee Selected through Posting | ☐ Voluntary ☐ Management Initiated | ☐ Supervisor change: | |

Complete Department Table Change Form
http://www.maricopa.edu/employees/divisions/hr/forms/salary/DeptTableChange.pdf

### POSITION INFORMATION

Position Title Associate Instructor    Requisition # 14337

| Grade 330 | Calendar 12  12 Mos. 10.5 Mos. 10 Mos. 9.5 Mos. 9.0 Mos. Irreg, | Recommended start date 6/16/2014 |
|---|---|---|
| | FTE 1.00   1.00  .75  .60  .25  Other ____ | End Date |

| College/Division Maricopa Skill Center/NW Campus | Supervisor Lisa Hemming | Phone # 602-392-5236 |
|---|---|---|
| Department/Office NWSC Cosmetology | Days Mon-Fri w/ Sat | |
| Department ID 220-256370 | Hours Varies including evenings and Saturdays | |

### SPECIALLY FUNDED INFORMATION

| Funding Start Date | End Date | Grade 330 | Step 4 |
|---|---|---|---|

| Funding Source/Grant Name | | |
|---|---|---|
| ☐ Internally Funded | ☐ Externally Funded | Salary |

### SEPARATION INFORMATION

| Last Day Worked | Reason | Separation Date |
|---|---|---|

### BUDGET INFORMATION

New ☐   Reallocation ☐   Non-Budgeted ☐   Replacement ☒   If replacement, give name/reason: Schaun Owens

#### Budget Code(s)/Percentage:

| Position charge to: | | If Funding & FTE coming from different accounts, please identify: | | | |
|---|---|---|---|---|---|
| | | FUNDING/FTE | | DIFFERENTIAL/PAY PERIOD | |
| CFS#1 230-220-256375-51111 | % | CFS#1 | % | Earnings Code | Total Hours |
| CFS#2 | % | CFS#2 | % | | |
| CFS#3 | % | POS#1 | % | | |
| | | POS#2 | % | | |

### SIGNATURE/BUDGET APPROVAL

| Supervisor/Committee Chair | Date | College President/Vice-Chancellor or designee | Date |
|---|---|---|---|
| Vice President/Administrator | Date | Budget Department | Date |
| College Budget Approval | Date | District Human Resources | Date |

Maricopa Community Colleges   2411 W. 14th Street   Tempe, AZ 85281-6942          Human Resources Division
02/08/12                       Fax 480 731-8599/6704

MCCCD-0-263



**HUMAN RESOURCES**

**PERSONNEL ACTION REQUEST**

### EMPLOYEE INFORMATION

| Name **Katrina Austad** | Employee ID | Date **6/16/2014** |
|---|---|---|
| Daytime Phone | Message Phone | |

### TYPE OF ACTION REQUESTED (APPLIES TO ALL POLICY GROUPS UNLESS INDICATED)

| | | | |
|---|---|---|---|
| ☐ New Employment Regular hire | ☐ New Specially Funded Hire | ☐ Temporary reassignment | ☐ SPF Renewals/Changes |
| ☐ Short Term Hire (OSO) | ☐ Athletic Specialist Hire | ☐ Transfer | ☐ Return to Reg. Assign |
| ☐ Short Term Hire (OYO) | ☐ Administrative reassignment | ☐ Separation | ☐ Other _____ |
| ☒ Employee Selected through Posting | ☐ Voluntary ☐ Management Initiated | ☐ Supervisor change: Complete Department Table Change Form http://www.maricopa.edu/employees/divisions/hr/forms/salary/DeptTableChange.pdf | |

### POSITION INFORMATION

Position Title **Associate Instructor**      Requisition # **14337**

| Grade **330** | Calendar **12**  12 Mos. 10.5 Mos. 10 Mos. 9.5 Mos. 9.0 Mos. Irreg. | Recommended start date **6/23/2014** |
|---|---|---|
| | FTE **1.00**   1.00  .75  .50  .25  Other _____ | End Date |

| College/Division **Maricopa Skill Center/NW Campus** | Supervisor **Lisa Hemming** | Phone # **602-392-5236** |
|---|---|---|
| Department/Office **NWSC Cosmetology** | Days **Mon-Fri w/ Sat** | |
| Department ID **220-256370** | Hours **Varies Including evenings and Saturdays** | |

### SPECIALLY FUNDED INFORMATION

| Funding Start Date | End Date | Grade **330** | Step **3** |
|---|---|---|---|
| Funding Source/Grant Name ☐ Internally Funded | ☐ Externally Funded | Salary | |

### SEPARATION INFORMATION

| Last Day Worked | Reason | Separation Date |
|---|---|---|

### BUDGET INFORMATION

New ☐   Reallocation ☐   Non-Budgeted ☐   Replacement ☒   If replacement, give name/reason:  **Toni Trott**

### Budget Code(s)/Percentage:

| Position charge to: | | If Funding & FTE coming from different accounts, please identify: | | | |
|---|---|---|---|---|---|
| | | FUNDING/FTE | | DIFFERENTIAL/PAY PERIOD | |
| | | | | Earnings Code | Total Hours |
| CFS#1 **230-220-256375-51111** | % | CFS#1 | % | | |
| CFS#2 | % | CFS#2 | % | | |
| CFS#3 | % | POS#1 | % | | |
| | | POS#2 | % | | |

### SIGNATURE/BUDGET APPROVAL

| Supervisor/Committee Chair | Date | College President/Vice-Chancellor or designee | Date |
|---|---|---|---|
| Vice President/Administrator | Date | Budget Department | Date |
| College Budget Approval | Date | District Human Resources | Date |

Maricopa Community Colleges      2411 W. 14th Street      Tempe, AZ 85281-6942      Human Resources Division
02/08/12      Fax 480 731-8599/8704