# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Schaun Owens,                  )
                               )
            Plaintiff,         )
                               )
vs.                            ) No.
                               ) CV-15-01769-PHX-SPL
Maricopa County Community      )
College District, Maricopa     )
Skill Center, and Lisa         )
Hemming,                       )
                               )
            Defendants.        )
                               )


DEPOSITION OF CAROLYN CARDWELL

Mesa, Arizona
June 13, 2016
1:28 p.m.


REPORTED BY:
MARISA L. MONTINI, RPR
Certified Reporter
Certificate Number 50176

PREPARED FOR:
ASCII/COPY

(Certified Copy)

4

Mesa, Arizona
June 13, 2016
1:28 p.m.

CAROLYN CARDWELL,

having been first duly sworn to tell the truth, the whole

truth and nothing but the truth, was examined and

testified as follows:


EXAMINATION

BY MR. SCHWARTZ:

Q.   Would you state your full legal name for the
record and spell each of the words.

A.   Right now it's Carolyn, C-a-r-o-l-y-n.  Middle
name Jo, J-o.  Last name Main, M-a-i-n.

Q.   Did you -- at one point were you known as Carolyn
Cardwell?

A.   Yes.  I still am, just I'm divorced, but I
haven't gone and changed my last name on my paperwork yet.

Q.   Okay.

A.   So that's why it's still Cardwell.

Q.   So if someone refers to you as Carolyn Cardwell
or Carolyn Main, either one is at least an accurate
reference?

A.   Correct.

Q.   Okay.  I introduced myself earlier.  My name is

15

1    A.    Yes.

2    Q.    And so from, looks like, about October, maybe

3    November of 2009, until October, November of 2010, did you

4    understand you were on probation while at the Maricopa

5    County Community College District?

6    A.    Yes.

7    Q.    And were you successful in fulfilling that

8    probation?

9    A.    Yes.

10   Q.    And how long did you continue to remain a

11   full-time associate instructor of cosmetology after

12   October or November 2009?

13   A.    Until August 28th of 2015.

14   Q.    And did you remain at Cutting Edge Style Academy

15   location as an associate instructor until approximately

16   May of 2013?

17   A.    Yes.

18   Q.    In the summer of 2013, did you transfer over to

19   the new Northwest campus of the Maricopa Skill Center?

20   A.    Yes.

21   Q.    When you transferred over, did you become a new

22   probationary employee or did you retain your full-time

23   status?

24   A.    I think I became probation again.  I'm not sure.

25   That was never discussed.  Never said.

1    Q.   When you first were hired in 2009, do you
2  remember that you -- that while you were working at
3  Cutting Edge Style Academy, you had to go to a District
4  office for a new employee orientation?
5    A.   Yes.
6    Q.   Okay.  Now, let's fast forward to summer of 2013.
7  You're transferring to Northwest.  Did you ever have to go
8  to the District for a new employee orientation?
9    A.   Yes.
10    Q.   Is that part of why you think you probably were
11  considered a probationary employee?
12    A.   Yes.
13    Q.   Okay.  What period of time did you understand in
14  2013 you would be on probation for?
15    A.   I wasn't spoken to about being on probation
16  again, so I just assumed a year again -- well, actually,
17  no, because then they told us that it wasn't a year
18  anymore.  It was six months.
19    Q.   When do you believe they informed you it was six
20  months?
21    A.   The day I started at the -- at the Northwest
22  campus.
23    Q.   So roughly in August of 2013?
24    A.   It was June of 2013.  I transferred before the
25  school opened to help open it.

Carolyn Cardwell - June 13, 2016

23

1    Q.   The "there" being?

2    A.   At all three campuses at that point.  So she

3    then -- I believe it opened in 2013, 2014, and that's the

4    same year that she resigned.

5    Q.   Based on records I've seen, about the end of

6    November of 2012, Lisa Hemming became the clinic floor

7    supervisor at Cutting Edge Style Academy.  Does that sound

8    generally accurate?

9    A.   Yes.

10   Q.   Okay.  As a clinic floor supervisor, was Lisa

11   Hemming in any way your supervisor?

12   A.   Yeah -- well, not -- no.

13   Q.   What did you understand Lisa Hemming's duties

14   were in general as a clinic floor supervisor?

15   A.   Just to make sure that the clinic floor was

16   running smoothly, making sure that the clients were happy.

17   She had also done inventory and things like that, but as

18   far as the -- in charge of the instructors, no.

19   Q.   When your -- strike that.

20        At Cutting Edge in 2012/2013 school year,

21   what class were you?  Were you like first year?  Second

22   year?  What class were you in charge of?

23   A.   First years.

24   Q.   And it's my understanding first years might only

25   be on the clinic floor one day of the week.  Is that

Carolyn Cardwell - June 13, 2016

24

1    generally accurate?

2        A.    After their -- after they're there for about four

3    months.

4        Q.    Meaning the first four months, first year

5    cosmetology students are not typically on the clinic

6    floor, but after about four months, one day a week they

7    would typically be on the clinic floor?

8        A.    Correct.

9        Q.    Okay.

10       A.    Working on mannequins, not quite clients yet.

11       Q.    And it's my understanding that second year

12   students would typically be on the clinic floor like maybe

13   five days a week during their second year?

14       A.    Correct.

15       Q.    All right.  You've now worked with Lisa Hemming

16   starting in about 2010.  She was a clinic floor supervisor

17   in 2012.  Before you start at the Northwest campus in the

18   summer of 2013, what did you think of Lisa Hemming?

19       A.    I didn't.

20       Q.    Didn't think one way, good, bad or indifferent

21   about her?

22       A.    Her and I clashed a few times.

23       Q.    What kind of things did you clash about before

24   you started at Northwest?

25       A.    When her and I shared a class together, we have

Carolyn Cardwell - June 13, 2016

26

1    and I should have been on board together with the
2    students.
3        Q.   And were there any other classes between you that
4    you haven't described while -- again, before the summer
5    of 2013 when you go to Northwest?
6        A.   Meaning?
7        Q.   I don't know.  Personality clashes?
8        A.   Not really.  When I went to the Northwest campus,
9    her and I got along very, very well as working together.
10       Q.   Well, we're going to talk about Northwest
11   separate.  I'm trying to lead up to before you got to the
12   Northwest campus.  You mentioned you clashed a little bit
13   about the meeting, about the one student and the
14   attendance sheets.  You also mentioned some disagreements
15   you had about, you know, how to treat students and whatnot
16   in your shared class, and I'm just trying to understand if
17   there were any other issues or problems between you from
18   your perspective.
19       A.   No.
20       Q.   Okay.  Did you ever get the sense before you
21   started at Northwest that Ms. Hemming was in any way
22   biased due to race?
23       A.   No.
24       Q.   Did you ever hear her say anything that reflected
25   any bias about any race?

27

1    A.    Before?

2    Q.    Before you went to Northwest.

3    A.    No.

4    Q.    Did you ever hear anything that Lisa Hemming said

5    that reflected any bias against people who were Hispanic

6    or people who spoke Spanish before you go to Northwest?

7    A.    No.

8    Q.    Okay.  Did you have any reason to think that Lisa

9    Hemming was a racist before you ever went to Northwest

10   campus?

11   A.    No.

12   Q.    Did you ever hear anybody say, "Oh, Lisa

13   Hemming's a racist" --

14   A.    No.

15   Q.    -- before you went to Northwest?

16   A.    No.

17   Q.    Did you know a Dana Bell?

18   A.    Yes.

19   Q.    Okay.  Was she an associate of cosmetology

20   instructor at Cutting Edge Style?

21   A.    Yes.

22   Q.    Was she a Caucasian or white lady?

23   A.    White.

24   Q.    Did Lisa Hemming ever ask you for any information

25   about Dana Bell's job performance?

1      A.    Yes.

2      Q.    What did she ask in that regard?

3      A.    Well, she -- I wouldn't say she asked.  I would

4  say that she -- when Lisa Hemming became the lead

5  instructor, she was not liking Dana Bell.

6      Q.    I'm sorry?

7      A.    She did not like Dana Bell, so there was like --

8  she would -- and this is truthful.  She would make fun of

9  her.  She would make fun of her weight.  She would make

10 fun of her Facebook pictures.  Lisa Hemming picked at her

11 all the time and would ask me, you know, "Is she in class

12 or is she out of class?"  Or "did you see where she went?"

13 I'm -- like I'm focused on my class.  Dana Bell and I

14 had -- I wouldn't say a falling out, but she had started

15 seeing my brother who's married, so I had an issue with

16 that.  So I did take that to my lead instructor, and my --

17 and my -- the person in charge.

18     Q.    Who was the lead instructor you took it to?

19     A.    Lisa Hemming.

20     Q.    And who was the person in charge you took it to?

21     A.    Dana Heath.

22     Q.    And you said Lisa was the lead instructor.  Was

23 this before or after she was the clinic floor supervisor?

24     A.    They're the same.  Lead instructor and clinic

25 floor supervisor are kind of the same.

Carolyn Cardwell - June 13, 2016

29

1    Q.    So from your perspective, whether called a clinic

2  floor supervisor or a lead instructor, was Lisa Hemming

3  just doing administrative duties or was she kind of more

4  like a lead instructor like you were where she was

5  teaching?

6    A.    No, she was not teaching.  She was more

7  administrative.

8    Q.    And did you understand that as a lead instructor,

9  slash, clinic floor supervisor, she had certain

10  administrative responsibilities to supervise the

11  instructors who were actually doing the teaching?

12    A.    Absolutely.

13    Q.    Okay.  So when she was asking you about Dana

14  Bell's performance, that was certainly within the scope of

15  something you would expect as supervisor perhaps to ask

16  how others -- how the people she was supervising, how they

17  were doing?

18    A.    In a sense, I would say yes.  I don't think that

19  there was every single teacher that was asked.  I think it

20  was just me being asked.  I don't think that she would say

21  to Ms. Robin, Ms. Kelly or other instructors, "How is this

22  teacher performing?"  It was always me that was asked on

23  certain things.

24    Q.    Do you know -- do you have any information that

25  would suggest that Lisa Hemming asked other instructors

1       A.      No.

2       Q.      You have no reason to believe that Dana Bell was

3   in any way disciplined by Lisa Hemming, do you?

4       A.      No.

5       Q.      When you were at Cutting Edge Style Academy, was

6   there an English only rule?

7       A.      Yes.

8       Q.      What did you understand that rule to mean?

9       A.      During class time, every student is to speak

10  English.

11      Q.      Did it apply to the instructors as well?

12      A.      Yes.

13      Q.      Okay.  And as far as you were aware, was there a

14  rule being enforced at the Cutting Edge Style in

15  2012/2013?

16      A.      Yes.

17      Q.      Did the English only rule in any way apply, from

18  your perspective, to students speaking when they're like

19  in the break rooms or not in class or on the clinic floor

20  or not in a class activity?

21      A.      No.

22      Q.      Were you ever, while at Cutting Edge Style

23  Academy, asked to enforce any rule that would not permit

24  any language other than English in the student break rooms

25  or places that instructional activities were not

33

1   occurring?

2        A.    No.

3        Q.    Now, you are aware that in addition to the

4   English only rule, students were subject to a student code

5   of conduct while they were attending any of the Maricopa

6   Skill Centers or Cutting Edge Style cosmetology programs;

7   true?

8        A.    True.

9        Q.    Okay.  And they would say, hey, as a student, you

10  can't bully.  You can't harass.  You can't verbally do

11  things that would be considered violations of the code.

12  Is that a general description?

13       A.    Correct, yes.

14       Q.    And that would apply regardless of whether the

15  bullying, harassment happened in English, Spanish, Italian

16  or any other language?

17       A.    Correct.

18       Q.    When you were at Cutting Edge Style Academy, was

19  food allowed to be eaten in the classrooms or on the

20  clinic floor?

21       A.    Sometimes.  Not the clinic floor, but classrooms,

22  yes.

23       Q.    You said sometimes.  Were there times when it

24  wasn't permitted?

25       A.    Yes.

35

1    hold unilaterally, hey, I've decided I'm -- my class has
2    been really good this week.  I'm going to have a potluck
3    on whatever the last day would be, and I'm not going to
4    tell the administrators or lead instructor.  I'm just
5    going to do it.  Is that something that was supposed to
6    happen?
7        A.    No.
8        Q.    Did it happen, to your knowledge?
9        A.    Probably.
10       Q.    Did you ever conduct a potluck without getting
11   permission?
12       A.    No.  Can I have some water?
13       Q.    Sure.  When you applied to go to Northwest, did
14   you know Lisa Hemming was going to be the assistant
15   program manager assigned to that facility?
16       A.    She was the -- yes, yes, I did.
17       Q.    Okay.  So the fact that she was going to be in
18   charge of the facility didn't in any way dissuade you from
19   applying to work at the Northwest; is that fair?
20       A.    That's fair.
21       Q.    Okay.  At the Northwest facility, what students
22   were you assigned to be instructor for?
23       A.    First years.
24       Q.    It's my understanding at Cutting Edge Style
25   Academy, that it was -- all the students there were

Carolyn Cardwell - June 13, 2016

36

1    cosmetology students; is that accurate?

2        A.    Yes.

3        Q.    It's also my understanding at Cutting Edge there

4    were no adult nonhigh school students at Cutting Edge

5    Style Academy; is that accurate?

6        A.    Correct.

7        Q.    At Northwest, however, in addition to the

8    cosmetology students, there were also esthetician

9    students; correct?

10       A.    Correct.

11       Q.    And also in addition to high school students,

12   there were adult nonhigh school students at the new

13   Northwest campus; is that correct?

14       A.    Correct.

15       Q.    Okay.

16       A.    I was in charge for, I think, the first few

17   months of the high school, and then I was moved into the

18   adult.

19       Q.    And what prompted the transfer of you from high

20   school to adults?

21       A.    Lisa Hemming moved me.

22       Q.    Do you know why?

23       A.    She said that she thought I would be a better

24   instructor for them than the one they had at the time.

25       Q.    Do you remember who it was that you were

38

1    Q.   Okay.  So if I told you Schaun Owens stopped

2  teaching on February 12th, 2014, would that mean it was

3  after that -- after February 12th, then, that you think

4  you were moved to the first year adults?  If you don't

5  remember, tell me you don't remember.

6    A.   I don't.  I'm not quite sure if I was still first

7  year high school or first year adult.  I don't remember.

8    Q.   I try to jog memories by giving different events

9  that I know I can place, but don't take any offense.  I'm

10  just trying to jog your memory.

11    A.   You're not.  I'm sorry I don't fully remember.

12    Q.   It's my understanding that the adult cosmetology

13  students weren't necessarily subject to the same

14  limitations that like school students were?

15    A.   Correct.

16    Q.   What kind of differences were there between the

17  high school students versus the adults?

18    A.   What kind of differences?  The high school

19  students cannot leave campus during lunch.  The adults

20  could.  The adults could go out and smoke, if they smoked.

21  The high school students could not.  That was kind of the

22  main thing.

23    Q.   That was probably the main flash point between

24  the high school students and the adult students?

25    A.   Yeah, yes.

1     Q.   Were you also aware that the high school students

2   received an actual grade, A, B, C, D, F, versus the adults

3   who might be on a pass/fail?

4     A.   Yes.

5     Q.   All right.  Besides yourself at the Northwest

6   campus, you were a full-time associate instructor.  Schaun

7   Owens was also a full-time associate instructor when you

8   first started; correct?

9     A.   Correct.

10    Q.   Robert Wood was also a full-time associate

11  instructor?

12    A.   Correct.

13    Q.   And Toni Trott was also a full-time associate

14  instructor?

15    A.   Correct.

16    Q.   Were the four of you that I just named all of the

17  full-time cosmetology instructors or was there anyone else

18  who was a full-time cosmetology instructor?

19    A.   I believe that was it at the time.

20    Q.   And there was also a Shala Dveirin who was the

21  esthetician instructor or person in charge?

22    A.   Correct.

23    Q.   Okay.  Had you worked with Schaun Owens before

24  the Northwest campus?

25    A.   Yes.

Carolyn Cardwell - June 13, 2016

42

1   A.   No.

2   Q.   How about Toni Trott, what did you think of her?

3   A.   She was a really great lady.

4   Q.   Did you have any problems or issues with her?

5   A.   No.

6   Q.   Schaun Owens, what did you think of her while you

7   were working at Northwest?

8   A.   At Northwest?  She just needed to be on time.

9   I -- yeah, that was just my biggest thing is prompt.

10   Q.   From your perspective, did Ms. Owens continue the

11   problems of not being on time at Northwest that you had

12   also seen her do at Cutting Edge?

13   A.   Yes.

14   Q.   Okay.  Besides Ms. Owens, was any of the other

15   associate instructors having problems with promptness?

16   A.   A couple of times.

17   Q.   And what do you mean by a couple of times?

18   A.   Like sometimes Ms. Toni Trott would walk in 15,

19   20 minutes late, and she did that just a few times, but

20   Lisa Hemming had asked me, you know, "Let me know when

21   people get here," so I did.

22   Q.   Now, Toni Trott did it a couple of times.  I take

23   that to mean Robert Wood did not?

24   A.   I think he may have been late once or twice.

25   Q.   And were you -- do you recall being late?

Carolyn Cardwell - June 13, 2016

43

1     A.    No.   I was always the first one there before
2    everybody.
3     Q.    How often did Schaun Owens come in late when she
4    was at Northwest?
5     A.    Almost daily.
6     Q.    Did you ever notice whether Shala Dveirin was
7    ever late?
8     A.    A couple of times.
9     Q.    So, again, like Toni Trott, just a couple of
10    times?
11     A.    Yes.
12     Q.    And that would have been during the entire span
13    of that school year?
14     A.    Correct.
15     Q.    Okay.   What did you think of Shala Dveirin?
16     A.    She's very rude, and that's just being honest.
17     Q.    That's what I want you to be.
18     A.    Very rude and very nosey.
19     Q.    What do you mean she was rude?
20     A.    Rude as in just how she talked to people, like
21    not -- we're not on the same level kind of person, like
22    she's better than thou kind of person.  Anything that was
23    ever said, she -- let me think -- I'm trying to put this
24    into words to where we all understand it.  She was just
25    very -- just rude how she talked to people.  Like she

1    I think that was their first test coming up.

2       Q.   Okay.

3       A.   Because used to -- we used to test at the end of

4    December before they went on Christmas break, but then

5    that changed over at Northwest.

6       Q.   I'm going to hand you a notebook.  This has

7    exhibits that were previously marked.  If you can't read

8    something and you need to, then we'll talk about it.

9       A.   Okay.

10       Q.   Turn to Exhibit 6.  It's the documents right

11   behind tab six.  I don't want you to look at every page,

12   but does this generally look like the 2013/2014 student

13   handbook for students at the Northwest campus where you

14   were teaching?

15       A.   Yes.

16       Q.   Okay.  The -- it's my understanding this would be

17   made available online so the students could see it?

18       A.   Yes.

19       Q.   Was it also available to the instructors?

20       A.   Yes.

21       Q.   Was it available online just like the students

22   could go online and look at it, instructors could look at

23   it?

24       A.   Absolutely.

25       Q.   Were you, as an instructor, expected to be at

50

1    least generally familiar with what's in that student

2    handbook since you're going to be asked to enforce the

3    policies and procedures that were in it?

4        A.    Yes.

5        Q.    Do you have any reason to believe that this

6    handbook was not available when the students actually

7    started classes on August 12th of 2013?

8        A.    No, because we would -- I mean, we actually would

9    show them online how to -- well, I did.  I can't say every

10   class did, but show them online how to get on to find it.

11       Q.    One of the things the first day or so of

12   instruction is you would go online with your students and

13   you were supposed to at least talk to them about the

14   handbook and show them how it was available?

15       A.    Yes.

16       Q.    So from your perspective, this handbook was at

17   least available to the students and to the instructors by

18   the time school started in August of 2013?

19       A.    Yes.

20       Q.    Turn to tab seven, Exhibit 7.  We've heard some

21   testimony that these documents were provided to each of

22   the instructors from Lisa Hemming, whether directly handed

23   to them or e-mailed to them or whatever.  Do you remember

24   receiving these kinds of documents?

25       A.    Yes.

51

1      Q.    And as far as you can tell, do these appear to be

2    true and accurate copies of the documents you would have

3    received explaining the expectations for you and the other

4    instructors?

5      A.    Yes.

6      Q.    Okay.   Turn to Exhibit 9, tab nine.   Did Lisa

7    Hemming hold periodic staff meetings?

8      A.    Yes.

9      Q.    Is Exhibit 9 the agenda for the August 1st, 2013,

10   staff meeting?   If you need, I can try and find some

11   reading glasses for you.

12     A.    I'm sorry.   Yes.

13     Q.    Did Lisa Hemming hand out the agendas to the

14   instructors so you would all follow along with what she

15   was talking about?

16     A.    Yes.

17     Q.    Okay.   Similarly, Exhibit 10, the next document,

18   does this appear to be a true meeting agenda from the

19   October 2nd, 2013, meeting that would have been handed out

20   to you and the other instructors?

21     A.    Yes.

22     Q.    Exhibit 11 would that have been the

23   December 23rd, 2013, meeting agenda handed out?

24     A.    Yes.

25     Q.    Okay.   All right.   From Exhibit 9, one of the

1    things -- it's referenced.  You don't have to read it.

2    I'll read it for you.  One of the things it says,

3    "Evaluations."  Then it says, "Training professional

4    development."  Do you remember what, if anything, Lisa

5    Hemming said at the first meeting about evaluations?

6        A.    I think what she did is have Ms. Pam Van Why go

7    into the classrooms and sit at the back of the classroom

8    and take notation on us and see how we're doing.

9        Q.    You're talking about once the school started --

10       A.    Correct.

11       Q.    -- rather than Lisa going in and evaluating

12   classrooms, she might send Pamela Van Why?

13       A.    Yes.

14       Q.    Okay.  My question is a little bit different.  At

15   the August 1st, first initial staff meeting, do you

16   remember what Lisa Hemming said, "Hey, you're going to

17   get" -- "this is what we're going to do about

18   evaluations."  Do you remember what she said?

19       A.    Let me think about that one, what she said.

20   Evaluated classrooms.  I mean, how I perceived it, it

21   would be of her just sending someone in and -- because

22   this only happened with me once.  She only came into my --

23   not Ms. Hemming, but Ms. Van Why came into my classroom

24   once and evaluated how I was doing.  But right offhand, I

25   don't know what you're talking about.

53

 1      Q.   Sure.  Did Lisa say, "Hey, you're going to get a
 2   four-month evaluation, eight-month evaluation" --
 3      A.   No.
 4      Q.   -- "and then your annual evaluations"?
 5      A.   No.
 6      Q.   One of the things the August 1st agenda talks
 7   about is curriculums, and it says -- there's a bullet
 8   point, "Follow curriculums.  Do not deviate."  Did you
 9   understand that one of the things is you weren't supposed
10   to deviate from the curriculum?
11      A.   Yes.
12      Q.   So if the curriculum called for a test a
13   particular day, that's the day you were supposed to do it
14   unless you got permission from Lisa Hemming to change it?
15      A.   Correct.
16      Q.   One of the things in the October 2nd meeting
17   agenda -- I recognize you can't always read everything.
18      A.   I can't see any of it.
19      Q.   It talks about no students were ever supposed to
20   be in the instructor's office.  There was a separate
21   office, was there not, just for the instructors?
22      A.   Yes.
23      Q.   And that's where the instructors would keep their
24   personal belongings as well as any work-related items as
25   well?

54

1     A.    Tests, a lot of things, yes.

2     Q.    And was there, at one point in time, a sign, in

3   fact, on the door saying "no students"?

4     A.    Yes.

5     Q.    Was that throughout -- there throughout the year

6   or did that appear somewhere in the middle?

7     A.    I think it probably appeared a month after the

8   students started.  So I would say like September.

9     Q.    What did you understand the purpose of the no

10  students in the instructor's office rule to be?

11    A.    Just as you said, our personal belongings,

12  there's tests in there.  There's answer keys in there.

13  That's our space.

14    Q.    And did you ever allow any students to remain in

15  the instructor's office?

16    A.    No.

17    Q.    Did you observe any other instructor's who did?

18    A.    Yes.

19    Q.    Which instructors?

20    A.    Ms. Owens, Schaun Owens.

21    Q.    Anyone else?

22    A.    Toni Trott.

23    Q.    Anyone else?

24    A.    No.

25    Q.    Did you ever report to Ms. Hemming that Ms. Owens

1   August 12th, 2013, to Robert Wood, to Carolyn Main,

2   yourself, to Toni Trott and Schaun Owens.  First of all,

3   can you read it?

4       A.    Barely.

5             MR. SCHWARTZ:  We're going to take a break.

6   I'm going to go try and find my reading glasses and see if

7   that will assist you.

8             THE WITNESS:  Okay.  Thank you.

9             (A recess was taken from 2:36 p.m. to

10  2:39 p.m.)

11  BY MR. SCHWARTZ:

12      Q.    We were talking about Exhibit 31.  I've now

13  provided you reading glasses so you're able to read; is

14  that correct?

15      A.    Correct.  Thank you.

16      Q.    Have you had a chance to read this e-mail to

17  yourself?

18      A.    No, no.

19      Q.    Would you read it to yourself silently?

20      A.    Yes.  Okay.

21      Q.    Basically this e-mail is a reminder about the

22  closed campus and that students won't be allowed once

23  classes formally start to be leaving for their 15-minute

24  breaks and whatnot.  Is that a fair description?

25      A.    Yes.

1    Q.    Okay.  Do you have -- did you ever allow a
2    student to leave campus in violation of the closed campus
3    policy?
4    A.    No.
5    Q.    Do you know of any instructor who did?
6    A.    Allow them to leave as in -- you're saying off
7    campus like during school, right?
8    Q.    Correct.
9    A.    No.  The adult students were allowed to do it.
10   Q.    Did you ever hear that Toni -- strike that.
11         Did you ever hear that Schaun Owens allowed
12   two of her high school students to leave class to go get
13   food at a nearby Fry's?
14   A.    I do believe I heard that.
15   Q.    Did you ever talk to Schaun Owens about it?
16   A.    No.
17   Q.    Did Schaun Owens ever tell you to mind your own
18   business?
19   A.    Not that I'm aware of.
20   Q.    Did you ever observe Schaun Owens sleeping on the
21   job?
22   A.    Yes.  She was on her break, which I was not aware
23   of.  She was on her break.  That was right after her
24   daughter died.
25              (Deposition Exhibit Number 32 was marked

1   for identification.)

2   BY MR. SCHWARTZ:

3       Q.   We've handed you what's been marked as

4   Exhibit 32.   I'll just let you know that these are three

5   different e-mails.   The top e-mail, is this an e-mail you

6   sent or about October 1st, 2013, at about 11:48 a.m. to

7   Lisa Hemming?

8       A.   Yes.

9       Q.   Okay.   And why did you send the e-mail?

10      A.   Lisa asked me to.

11      Q.   Had you already reported, verbally, information

12  to Lisa before she asked you?

13      A.   Yes.

14      Q.   Okay.   So consistent with what we talked about

15  earlier, you went and told Lisa Hemming, "Hey, I saw

16  Schaun Owens.   She appeared to be sleeping," and Lisa

17  said, "Could you confirm that in an e-mail to me"?

18      A.   How it happened is Lisa said, "Did you see

19  Ms. Owens sleeping in the office," because somebody else

20  had went to her, and I said, "Yes, I did," and she asked

21  me to send it to her in an e-mail.

22      Q.   And obviously that conversation between you and

23  Ms. Hemming happened at least by 11:48 a.m.?

24      A.   Yes.   She came to my class and took me out of

25  class.

1       Q.   Your e-mail says, "She," meaning Ms. Owens, "was
2    sleeping in the office for, from what I saw, at least ten
3    minutes."  So were you in the instructor's office with
4    Schaun Owens for about ten minutes?
5       A.   Yes.
6       Q.   And during that time, from what you observed, you
7    thought Schaun Owens was sleeping?
8       A.   Yes.
9       Q.   Did you see any -- from what you perceived, any
10   intentional movement of Schaun Owens?
11      A.   No.
12      Q.   Was she talking during that ten minutes?
13      A.   No.
14      Q.   Was anyone else in the room besides the two of
15   you?
16      A.   Shala.
17      Q.   Anyone else?
18      A.   I believe Mr. Wood.
19      Q.   Anyone else?
20      A.   Not that I can remember.
21      Q.   What were you doing in the instructor's office
22   that morning?
23      A.   It was our lunch break, and I was doing stuff on
24   the computer.
25      Q.   When you say it was your lunch break, I notice

Carolyn Cardwell - June 13, 2016

61

1    2 o'clock?

2        A.    Correct.

3        Q.    Turn to Exhibit 5 in the notebook.  If you could

4    read that silently to yourself, and tell me when you're

5    done.

6        A.    Yes.

7        Q.    Did you, in fact, send this December 18, 2013,

8    e-mail to Lisa Hemming that we see in Exhibit 5?

9        A.    Yes.

10       Q.    And did you try and be as accurate as you could

11   about what your interaction on December 10th and 11th in

12   reporting it to Ms. Hemming?

13       A.    Yes.

14       Q.    So Ms. Owens basically asked you if you were out

15   to get her?

16       A.    Yes.

17       Q.    And as you understood it from talking to

18   Ms. Owens, it had to do about reporting that Ms. Owens was

19   showing Tabatha, and that's Tabatha Takeover, a video --

20       A.    Yes.

21       Q.    -- all day.  You reported that, "Ms. Hemming told

22   all of us that we can't watch Face Off, Tabatha or YouTube

23   videos that don't pertain to cosmetology."  Had, in fact,

24   Ms. Hemming told all of the instructors?

25       A.    Yes.

62

1     Q.    That was at one of the staff meetings?

2     A.    Yes.

3     Q.    And did that predate December 10th when you had

4   your conversation?

5     A.    Yes.

6     Q.    After Ms. Hemming had told all of the instructors

7   not to show those videos, did you ever show those videos?

8     A.    I didn't prior to.

9     Q.    Did you -- did you see Ms. Owens showing those

10  videos after Lisa Hemming instructed all of the

11  instructors not to show those kind of videos?

12    A.    Yes.

13    Q.    On more than one occasion?

14    A.    Yes.

15    Q.    And I know eventually Ms. Owens realized that

16  Ms. Belen, one of her students, is the one who informed

17  that she had been showing that.  Is it also true that you

18  informed Ms. Hemming on occasions when you saw Ms. Owens

19  showing Tabatha Takeover and Face Off and other videos

20  after Hemming had said you can't be showing these videos?

21    A.    Yes.  Ms. Hemming told me I was the eyes and

22  ears, to let her know everything that's going on.

23    Q.    And was that just limited, in any way, to Schaun

24  Owens?

25    A.    No.

Carolyn Cardwell - June 13, 2016

63

1       Q.   Okay.  So if you saw -- just a pure example,

2   hypothetical, if you saw Robert Wood violating a policy

3   from your perspective, Ms. Hemming -- if you saw it and

4   could attest to it, Ms. Hemming would expect you to be

5   telling that to Ms. Hemming?

6       A.   Absolutely.

7       Q.   It wouldn't matter if it was Schaun Owens, Robert

8   Wood, Toni Trott or Shala?

9       A.   No.

10       Q.   You weren't in any way asked to single out, only

11   report to me bad things about Schaun Owens?

12       A.   No.

13       Q.   Okay.  On December 20th, like one of the last

14   days before the Christmas break, Schaun Owens showed a

15   movie Jingle All The Way in her class?

16       A.   Yes.

17       Q.   Did you observe that?

18       A.   Yes.

19       Q.   Did you report that to Ms. Hemming?

20       A.   Yes.  How those always came about was when my

21   class would say, "How come we can't do that?"  And I'm

22   like, "Do what?"

23       Q.   And so how did you know that the movie Jingle All

24   The Way or Tabatha Takeover -- would you go to the door

25   and you can see because there's a part window on the door?

64

1    A.    Yes.  Or I'd open the door and say, "What are you
2    watching?"
3    Q.    All right.  At some point in time, Lisa Hemming
4    had a staff meeting, tells everyone, certainly before
5    December 10th, don't show Tabatha Takeover, don't show
6    Face Off, don't show YouTube videos that don't
7    particularly specifically pertain to cosmetology.  Besides
8    seeing Schaun Owens after that using those videos and
9    showing them, did you see any other instructors?
10   A.    Sure.
11   Q.    What other instructors?
12   A.    Mr. Wood and Toni Trott.
13   Q.    I just want to make sure I'm clear.  So after
14   Hemming said don't show Tabatha Takeover or movies that
15   don't relate to cosmetology, you believe you saw Mr. Wood
16   also showing those kinds of things?
17   A.    Uh-huh.
18   Q.    Is that a yes?
19   A.    Yes.
20   Q.    That's all right.  Same with Toni Trott?
21   A.    Yes.
22   Q.    And did you report that information to Lisa
23   Hemming?
24   A.    Yes.
25   Q.    Did she ask you to document it?

1       A.    No.

2       Q.    Turn to Exhibit 20 -- do you have Exhibit 20?

3       A.    I think this is it.

4       Q.    Oh, yes.  I couldn't see the 20 for a moment and

5    I thought how come my notebook doesn't have it.  Sorry.

6             Exhibit 20.  Is this an e-mail you sent on

7    or about December 18th to Lisa Hemming?

8       A.    I'm going to read it.  Okay.  Yes.

9       Q.    And just so you know, we changed where the

10   student's name would appear.  We put the letter M, as in

11   Mary, in place of that student's name, but does it

12   otherwise appear to be a true and accurate copy of the

13   e-mail you sent?

14      A.    Yes.

15      Q.    This reflects that on October 26th, 2013, you and

16   Ms. Owens were working a Saturday makeup hours.  What are

17   Saturday makeup hours?

18      A.    For those students that need to make up hours, so

19   they're less eight hours.  I mean, it's like say they're

20   sick, if they have a note -- they're not excused days, but

21   those notes allow them to do makeup hours which run

22   Saturdays once a month.

23      Q.    And just so the record is clear, if they didn't

24   have such a note, they would have an unexcused absence and

25   they weren't allowed to make up those hours?

Carolyn Cardwell - June 13, 2016

66

1    A.    Unless there was -- sometimes they would allow
2    students to come in.  Not always.
3    Q.    So, for example, if they got in an unexpected car
4    wreck or something totally unforeseen had happened, they
5    might be allowed to make them up?
6    A.    No.  I would say if the Saturday wasn't full and
7    there was students that needed to make up hours, they
8    would allow them to come in.
9    Q.    Your e-mail says that, "Everyone," meaning
10   instructors, "were told that there were no clients on
11   makeup days because there's no one there to take money for
12   the services."  Was that accurate?
13   A.    Yes.
14   Q.    And it also says, "We were also told no personal
15   services to be done"; correct?
16   A.    Correct.
17   Q.    If you turn just real quickly to Exhibit 27 in
18   the notebook, do you recognize this to be the personal
19   service criteria at the Northwest campus for the 2013/'14
20   school year?
21   A.    Yes.
22   Q.    And the first bullet point basically says
23   personal service days are preassigned to specific Fridays
24   in a month; correct?
25   A.    Correct.

67

1     Q.   And at the bottom, it says the assigned Fridays

2    and gives the dates; correct?

3     A.   Correct.

4     Q.   So personal services were only to be on Fridays

5    and only the specific Fridays that were assigned?

6     A.   And if they had a 90 percent or better, correct.

7     Q.   Meaning these were the days when personal

8    services could be, but there were criteria you had to

9    fulfill the 90 percent attendance and 90 percent grade to

10   be allowed to do personal services on that Friday?

11    A.   Correct.

12    Q.   Okay.  But now getting back to Exhibit 20, the

13   e-mail, you said there were no personal services to be

14   done.  That's in part because it's not a Friday; correct?

15    A.   Correct.

16    Q.   Okay.  And on October 26th, that Saturday,

17   Ms. Owens was allowing her students to provide personal

18   services.  Am I understanding that correctly?

19    A.   Yes.

20    Q.   And that was not in conformance with the

21   policies?

22    A.   Correct.

23    Q.   Okay.  And then it also says that her students

24   were doing waxing, makeup and roller sets on each other on

25   the floor.  Was that against the policy?

68

1    A.    Yes.

2    Q.    Why?

3    A.    Well, that's considered personal services.

4    Q.    Okay.  Did you ask Ms. Owens about why she was

5    allowing these things to go on that were in violation of

6    the policy?

7    A.    Yes.

8    Q.    And what did she tell you?

9    A.    I believe she did tell me to mind my own

10   business, the question you asked earlier.

11   Q.    Did she also tell you, that's reflected in the

12   e-mail, that she was doing it so these students needed to

13   make up the grades?

14   A.    Yes.

15   Q.    Okay.  Then you also reported, "Her students were

16   out of dress code wearing ripped jeans and slippers."

17   What was supposed to happen for students who were out of

18   dress code who were wearing ripped jeans and slippers?

19   A.    They were sent home.

20   Q.    And then you also reported that one of Ms. Owens

21   students asked you to sign a box from the beginning of the

22   month on her floor sheet.  First of all, what's a floor

23   sheet?

24   A.    A floor sheet is something they work on.  It's

25   75 percent of their grade, so if they have ten roller

1    sets, ten haircuts, ten this, ten that, whatever they had

2    to do to work on that sheet.

3        Q.    And when is the instructor supposed to be filling

4    it out?

5        A.    The day of.

6        Q.    So it's something that's supposed to be done

7    daily?

8        A.    Yes.

9        Q.    But one of the students asked you if you would

10   sign for an entire month.  Am I understanding that

11   correctly?

12       A.    Yes.

13       Q.    So this would have been roughly three weeks of

14   October?

15       A.    Yes.

16       Q.    And you tell her, no, you can't do that.  What

17   did the student tell you about whether Ms. Owens was

18   allowing them to do that?

19       A.    Yeah.  She was did tell me that Ms. Owens would

20   do that to allow them to bring up their grades so they

21   wouldn't fail.

22       Q.    But you told the student you wouldn't do that;

23   correct?

24       A.    Absolutely not.

25       Q.    And then it says you told the student to go talk

70

1    to Ms. Owens because you weren't going to sign it;
2    correct?
3        A.    Correct.
4        Q.    Did the student get her floor sheet signed?
5        A.    Yes.
6        Q.    Did Ms. Owens sign it?
7        A.    Yes.
8        Q.    Was that in violation of policy?
9        A.    Absolutely.
10        Q.    And you end your e-mail of December 18th, this
11    Exhibit 20, saying, "Hey, where's the consistency?  You
12    need to be consistent with enforcement of policies"; is
13    that fair?
14        A.    Yes.
15        Q.    Have you ever heard -- you mentioned earlier
16    about the personal services.  You had to have 90 percent
17    attendance and 90 percent or better from grades to do
18    personal services.  Had you ever heard of something called
19    a 90-90 report?
20        A.    Yes.
21        Q.    What is that, as you understand it?
22        A.    It's the 90 percent attendance, 90 percent GPA.
23        Q.    And is that, as you as an instructor, if you
24    wanted to know whether your students in your class
25    qualified for that 90-90 criteria, could you, as an

72

1    computer.

2        Q.   And while a 90-90 report might be more

3    convenient, you could find out the same information as an

4    instructor for the people in your class, could you not?

5        A.   Yes, yes.

6        Q.   Did you ever tell Toni Trott that you were asked

7    to just watch Ms. Owens?

8        A.   I don't believe I told her that.

9        Q.   Were you ever asked to just watch Ms. Owens?

10       A.   I was asked to watch Ms. Owens, but not just to

11   watch Ms. Owens.

12       Q.   In essence, you were asked to watch all of the

13   instructors?

14       A.   Pretty much.  Like I said, she said I was the

15   eyes and ears of the school.

16       Q.   Is that the extent of the instruction about

17   watching people?

18       A.   Meaning?

19       Q.   Well, I want to know did Lisa Hemming actually

20   come to you and say, "Carolyn, please watch, whether it's

21   Schaun, it's Toni, please" -- did she actually say,

22   "Please watch them"?

23       A.   Yes.

24       Q.   Okay.  When approximately did that happen?

25       A.   Shortly after -- shortly after Kim Richardson

1    left because Lisa Hemming wasn't on campus every day,

2    so -- and we didn't have a lead instructor yet.  That was

3    before Ms. Pam had taken the position, so if she -- I

4    mean, I was the first one there every day, and just let me

5    know if somebody comes in late, let me know dress code,

6    even for the instructors.  A couple of times she had

7    talked to me about Ms. Owens, her clothes.

8        Q.   And as you understand it, the reason Ms. Hemming

9    was asking you was she wasn't going to physically be at

10   the Northwest campus so that she couldn't see like she had

11   in the past?

12       A.   Correct.

13       Q.   Okay.  So at least from your perspective, it

14   wasn't necessarily nefarious.  It was just a practical

15   matter that Lisa Hemming wasn't going to be there, she

16   wanted someone to at least keep an eye out?

17       A.   Yes.

18       Q.   You referenced it until the time period when Kim

19   Richardson left.  Can you give me a time frame when you

20   understand Kim Richardson left?

21       A.   I believe it was before -- it was shortly after

22   the first year of them opening.  It was like right after.

23   I mean, I don't believe she was there a full year.  I know

24   she wasn't.  I'm pretty sure.

25       Q.   By the time -- we know Schaun Owens was let go on

74

1    February 12th, 2014.  Had Kim Richardson left by then?

2        A.    Yes.

3        Q.    Do you remember if it was before or after the

4    Christmas break that Kim Richardson left?

5        A.    I believe it was before.

6        Q.    Okay.  Do you remember if it was before

7    Thanksgiving?

8        A.    I think it was before.

9        Q.    Okay.  I'm just trying to jog memories.

10       A.    I literally think it was probably --

11       Q.    September or October of 2013?

12       A.    Very early, yeah.

13       Q.    And it was shortly, meaning, say, within a couple

14   of weeks after Kim Richardson left, that as you understand

15   it, that Ms. Hemming stopped coming as often to the

16   Northwest campus?

17       A.    Yes.

18       Q.    Okay.  And that because she was coming less often

19   to the Northwest campus is when she asked you to keep a

20   watch out?

21       A.    Yeah.

22       Q.    Okay.

23       A.    Yes.

24       Q.    All right.  At the Northwest campus, did you ever

25   hear Lisa Hemming ever say anything that would suggest to

83

1    Q.   Okay.  Mr. Wood told you he received one incident

2    report.  You don't remember receiving any incident

3    reports, and you certainly didn't sign for any incident

4    report in the 2013/2014 school year; is that fair?

5    A.   I believe that's fair.  I believe I got my first

6    one in 2015.

7    Q.   Now, did you follow the curriculum that you were

8    assigned, whether you were in the high school or adult

9    class?  Did you follow the curriculum?

10   A.   To a T.

11   Q.   So you would have administered the tests when

12   they were called for in the curriculum?

13   A.   Yes.

14   Q.   Are you aware of any instructors who didn't

15   follow the curriculum and give the assigned tests when

16   they were supposed to?

17   A.   Yes.

18   Q.   Who are you aware of?

19   A.   Ms. Owens.

20   Q.   Anyone else?

21   A.   I think the only other times if we weren't -- if

22   we didn't have access to Ms. Pam's office, and she --

23   that's where the tests are, then it would be a whole, but

24   I mean as far as with Ms. Owens, it was I'm not testing

25   them today.  They're not ready.

84

1    Q.   And how did you know about that?

2    A.   Her telling us, and it would be like myself and

3    her venting in the office, like myself, Mr. Wood, you

4    know, whoever else is in there.

5    Q.   And the "her" being Schaun Owens would say this

6    to you?

7    A.   Correct.

8    Q.   Okay.

9    A.   She didn't know there was a test, she would say,

10   but we all have access to get when the dates are.

11   Q.   Is the curriculum kept online?

12   A.   Yes.

13   Q.   The Ms. Pam you're referring to is Pam Van Why?

14   A.   Yes.

15   Q.   Do you know whether or not the curriculum

16   calendar was posted in each of the classrooms as it's

17   supposed to by state regulations?

18   A.   It's supposed to be.

19   Q.   Do you know whether it was?

20   A.   I always had it in mine.  I didn't go around

21   looking at those kind of details.  I believe Ms. Owens had

22   almost her whole year posted up there, but it should have

23   had the test on there as well, dates.

24   Q.   Did you ever hear that Ms. Owens allowed a

25   student, a high school student, to smoke just outside the

87

1    Q.    Students were not prohibited in the break room

2    from using their cell phones; correct?

3    A.    Correct.

4    Q.    Students were not prohibited in the break room

5    from speaking Spanish?

6    A.    Correct.

7    Q.    And that was true for both the cell phone and

8    speaking Spanish at Northwest?

9    A.    Yes.

10    Q.    Okay.  Was that also true at Cutting Edge Style,

11    that students in the break rooms could use their cell

12    phone and speak Spanish?

13    A.    Yes.

14    Q.    Did you ever have -- hear Lisa Hemming, while at

15    Northwest, say, "Oh, no.  Students can't speak Spanish

16    even in the break room"?

17    A.    No.

18    Q.    Were you ever asked to reprimand students for

19    speaking Spanish in any way in the break room?

20    A.    No.

21    Q.    Did any instructor ever tell you, "Hey, Lisa

22    Hemming is coming to me and telling me I need to reprimand

23    these students for speaking Spanish in the break room"?

24    A.    No.

25    Q.    At a staff meeting, did Lisa Hemming ever say,

88

1     whether directed to you or to everybody, "Students cannot
2     speak Spanish in the break room"?
3         A.    No.
4         Q.    From your understanding at Northwest as well as
5     Cutting Edge Style, students could speak any language they
6     wanted in the break room?
7         A.    In the break room.
8         Q.    They would still be subject to the code of
9     conduct, so you couldn't say, "I'm going to kill you" in
10    Italian or any other language?
11        A.    Yes.
12        Q.    Okay.  Did Schaun Owens ever tell you, hey, she
13    had been told her students can't speak Spanish in the
14    break room?
15        A.    No, just the classroom.
16        Q.    You understood from Lisa Hemming, both at Cutting
17    Edge Style as well as at Northwest, the students weren't
18    supposed to be speaking Spanish in the classroom or on the
19    clinic floor?
20        A.    Correct.
21        Q.    And that was true at both campuses?
22        A.    Yes.
23        Q.    At Buckeye, while that was the policy, it wasn't
24    enforced at Buckeye, if I'm understanding that correctly?
25        A.    Correct.

89

1       Q.   Okay.  It's my understanding that Lisa Hemming

2    did, like, a mock inspection to get the instructors ready

3    as if it was the state board inspection?

4       A.   Yes.

5       Q.   It's my understanding that no notice of the mock

6    inspection was given.  Is that your recollection?

7       A.   It happened a few times, yes.

8       Q.   When the state board does an examination, they

9    don't give notice to who they're inspecting, do they?

10      A.   No.

11      Q.   So from your perspective, was it unusual that

12   you, as an instructor, didn't get notice of a mock

13   inspection?

14      A.   No.

15      Q.   Okay.  Had these mock inspections happened, not

16   just at Northwest, had they also happened at Cutting Edge

17   Style Academy?

18      A.   Yes.

19      Q.   During the mock inspections, it's my

20   understanding the students are not present.  It's just the

21   instructors and the administrators walking around?

22      A.   Correct.

23      Q.   Do you remember anything unusual happening at

24   Northwest during any of the mock inspections by Lisa

25   Hemming?

1    A.    Yes.

2        Q.    Tell me what you remember.

3        A.    I remember walking around to the clinic floor,

4    and there would be food in Ms. Owens' students' lockers

5    from the day before, drinks, bowls full of color that

6    should have been cleaned out the day before full of

7    cholesterol, dirty cholesterol.  It's what we use to

8    mock -- like mock applications.

9        Q.    I think of cholesterol being in my blood, and I

10   need to take medication for it.

11       A.    Cholesterol is just something we use to like mock

12   lighteners, mock colors so they're not actually using full

13   color.

14       Q.    It's something similar to like a lightening or a

15   dye of some sort?

16       A.    No.  It's just cholesterol.  It's this big tub of

17   yellow stuff, cholesterol.

18       Q.    Okay.  And what I hear you kind of telling me,

19   and correct me if I'm wrong, is that there were a number

20   of violations that were observed during the mock

21   inspections?

22       A.    A few times.

23       Q.    And on the clinic floor by Ms. Hemming.  And were

24   all of you instructors together?

25       A.    Yes.

1      Q.   Okay.  Now, is that addressed by Ms. Hemming when
2   it was observed?  Did she say anything?
3      A.   She said, "Unbelievable.  This place is filthy
4   and this cannot happen."  I think she may have addressed
5   it another time in an e-mail.  I don't recall, but, yeah,
6   I mean, she was livid.  I would have been, too.
7      Q.   Why would you have been livid?
8      A.   It's our school.  It's supposed to be clean.  It
9   can get us closed down.  It's not teaching the students
10  responsibility.
11     Q.   So if instead of a mock inspection it had been a
12  state board inspection, that kind of condition that was
13  observed by Ms. Hemming and the rest of you might have
14  been something that could have been grounds for getting
15  the school shut down?
16     A.   Probably.
17     Q.   Did Ms. Hemming, in any way, unfairly single out
18  Ms. Owens as part of these mock inspections?
19     A.   No.  She wasn't the only one that had dirtiness
20  and unclean stuff.  The other instructors, if it happened,
21  she told them.
22     Q.   And so Ms. Hemming, would she note -- so, for
23  example, things she found on the clinic floor, would she
24  say, "Hey, Schaun, you need to do this" or people would
25  just already understand it was Schaun Owens'

111

```
 1   STATE OF ARIZONA        )
                             )  ss.
 2   COUNTY OF MARICOPA      )

 3           BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7
             I CERTIFY that I am in no way related to any of
 8   the parties hereto, nor am I in any way interested in the
     outcome hereof.
 9

10           [ ]  Review and signature was requested.
             [X]  Review and signature was waived.
11           [ ]  Review and signature not required.

12
             I CERTIFY that I have complied with the ethical
13   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
     J(1)(g)(1) and (2).
14           Dated at Phoenix, Arizona, this 1st day of
     July, 2016.
15

16

17                    Marisa L. Montini, RPR
                         Certified Reporter
18                     Arizona CR No. 50176

19
              *      *      *      *      *
20

21           I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                    GRIFFIN & ASSOCIATES, LLC
                      Registered Reporting Firm
25                     Arizona RRF No. R1005
```

13-14   EXH #31
WITNESS Cardwell
MARISA L. MONTINI, RPR
CERTIFIED COURT REPORTER #50176

---------- Forwarded message ----------
From: Lisa Hemming <hemming@gatewaycc.edu>
Date: Mon, Aug 12, 2013 at 4:29 PM
Subject: Students breaks
To: Robert Wood <robert.wood@gatewaycc.edu>, Carolyn Main <main@gatewaycc.edu>, Toni Trott
<toni.trott@gatewaycc.edu>, Schaun Owens <owens@gatewaycc.edu>

Just so you are aware, there was a group of students on the clinic floor during break.
They had some guy on speaker phone they were talking to, laughing and caring on when
I told them they were not allowed to "break" on the floor. What if a prospective student
were to walk in, or a client or even MSC staff...They are doing tours on a regular basis.
How unprofessional.
Please remind your students they are ONLY allowed to go on break in the break room.
Remind them we are a closed campus and if they need to bring snacks that we have a
fridge in the break room. They will not be allowed to leave campus starting tomorrow.
They must have their break in the break room only. This means they do not go out the
front door and sit or go to their cars...etc.. This is something West-Mec has put in place
for students safety.
We all want to have a positive learning environment as well as a
professional atmosphere. This requires that we set the expectations from the beginning.
Please ensure that we are all following the policies we have put into place.
Thank you for your help in this matter. I appreciate your hard work!

1



**Lisa Hemming**
Assistant Program Manager/Cosmetology
Northwest Skill Center
hemming@gatewaycc.edu

p: (602) 392-5236
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*



2

MCCCD-0-247

Maricopa Community College District Mail - Ms, Ownes                    Page 1 of 1



    Lisa Hemming< lis2066488@gatewaycc.edu>

## Ms, Ownes
1 message

Carolyn Main< main@gatewaycc.edu>                    Tue, Oct 1, 2013 at 11:48 AM
Reply-To: main@gatewaycc.edu
To: Lisa Hemming <hemming@gatewaycc.edu>

Lisa,

Just wanted to let you know, I'm not sure if Ms. Owens is ok or not, She was sleeping in the office for from
what I saw at least 10 minutes.
*Carolyn Cardwell*
**Associate Instructor**
**Northwest Skill Center**
Cosmetology
main@gatewaycc.edu
Phone: (602)-392-5000

10-13-16    EXH # 32
WITNESS Cardwell
MARISA L. MONTINI, RPR
CERTIFIED COURT REPORTER #50176

MCCCD-0-14



Lisa Hemming< lis2066488@gatewaycc.edu>

**10/1/13**
1 message
_____

Shala Dvelrin< shala.dvelrin@gatewaycc.edu>                          Tue, Oct 1, 2013 at 5:01 PM
To: Lisa Hemming <hemming@gatewaycc.edu>

On 10/1/13 I entered the office and noticed ms. Shaun asleep in her chair. I was at my desk for
approximately 5 minuets and she was asleep. I left the office and reentered with Lisa Hemming, who
asked her if she was O.K.? she said yes she was looking at the computer and her eyes were tired so she
decided to rest her eyes.

Shala Dvelrin

MCCCD-0-15

Maricopa Community College District Mail - Today                                    Page 1 of 1

 **MARICOPA COMMUNITY COLLEGES®**                            Lisa Hemming< lle2066488@gatewaycc.edu>

---

## Today
1 message

---

Robert Wood < robert.wood@gatewaycc.edu>                                    Tue, Oct 1, 2013 at 9:47 PM
Reply-To: robert.wood@gatewaycc.edu
To: Lisa Hemming <hemming@gatewaycc.edu>

I went on break at 10:00, as I walked into the office I noticed that MS.Owens was curled up in her chair and it appeared she was asleep. I thought to myself that doesn't look comfortable.

Truly I don't know if it was before break or after, either way I did notice Ms. Owens looking quite relaxed. I know how hard it is to sit at the computer and become relaxed and want to nap and chill. I have to get up and change what I am doing to get focused again, plus a cup of coffee helps somewhat.  Mr Wood

MCCCD-0-16