# EXHIBIT 7

Toni Trott - June 20, 2016

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Schaun Owens,                          )
                                       )
                Plaintiff,             )
                                       )
vs.                                    )  No.
                                       )  CV-15-01769-PHX-SPL
Maricopa County Community              )
College District, Maricopa             )
Skill Center, and Lisa                 )
Hemming,                               )
                                       )
                Defendants.            )
                                       )


DEPOSITION OF TONI TROTT


Mesa, Arizona
June 20, 2016
12:53 p.m.


REPORTED BY:
MARISA L. MONTINI, RPR
Certified Reporter
Certificate Number 50176

PREPARED FOR:
ASCII/COPY

(Certified Copy)

4

1                                    Mesa, Arizona
                                     June 20, 2016
2                                    12:53 p.m.

3

4                    TONI TROTT,

5   having been first duly sworn to tell the truth, the whole

6   truth and nothing but the truth, was examined and

7   testified as follows:

8

9                    EXAMINATION

10  BY MR. SCHWARTZ:

11      Q.   Would you state and spell your full legal name

12  for the record, please.

13      A.   Yes.  Do you want my middle name, too?

14      Q.   Yes, please.

15      A.   It's Toni Ellen Trott, and that's T-o-n-i, middle

16  name E-l-l-e-n, last name T-r-o-t-t.

17      Q.   I introduced myself earlier.  My name is David

18  Schwartz.  I represent the Maricopa County Community

19  College District and Lisa Hemming in a lawsuit brought by

20  Schaun Owens.  This is an opportunity for myself and

21  Ms. Owens, had she chosen to appear, to ask questions to

22  find out what your testimony will be under oath.

23                And just for the record, I put it on the

24  earlier deposition, but I'll put it again.  I spoke to

25  Ms. Owens this morning who indicated she would not be

1      Q.    It's my understanding that was approximately the

2   end of November of 2013.  Is that your recollection?

3      A.    Correct, yes.  So that will probably be the first

4   interaction that we had outside of work.

5      Q.    And what were you doing at that time at her

6   house?

7      A.    I was just there as support.

8      Q.    Was there some kind of informal wake or something

9   of that nature?

10     A.    Yes.  I had to work that day, so there was a wake

11  earlier that day, I believe, and then I just went over to

12  her house afterwards because I wasn't able to go during.

13     Q.    Did you attend the wake?

14     A.    No, I did not.

15     Q.    Do you know whether anyone else from the Maricopa

16  County -- strike that.

17             Do you know if anyone else from Maricopa

18  Skill Center, whether at the Northwest campus or the

19  Cutting Edge Style campus attended the wake?

20     A.    No, I do not.

21     Q.    Now, you're currently employed; is that correct?

22     A.    That's correct.

23     Q.    And that's by the Maricopa County Community

24  College District at Cutting Edge Style Academy?

25     A.    The location is no longer open, so at this moment

9

1    I'm actually at the Northwest campus of the Maricopa Skill

2    Center Northwest.

3        Q.   I learned something new.  How long ago did

4    Cutting Edge Style Academy close?

5        A.   It's only been since the first of June.

6        Q.   So I'm not that far out of touch.  So I'm glad to

7    hear that.

8              Is there now currently only two campuses for

9    the Maricopa Skill Center?

10       A.   As of right now, yes.

11       Q.   The main one being on Buckeye and then the

12   Northwest campus?

13       A.   Correct.

14       Q.   Okay.  And are you a full-time cosmetology

15   instructor?

16       A.   Yes.

17       Q.   And how long have you been a full-time

18   cosmetology instructor for this last stint?

19       A.   So I started in August of 2014.

20       Q.   And were you on probation for a period of time

21   when you started in August of 2014?

22       A.   Yes.

23       Q.   What period of time?

24       A.   Six months.

25       Q.   And do I understand correctly that from August

1      A.     That was this year, 2016.

2      Q.     All right.  Have you ever filed for bankruptcy?

3      A.     No.

4      Q.     Ever been convicted of any felonies or

5   misdemeanors?

6      A.     If you include speeding tickets.

7      Q.     I don't.  I consider them civil matters.  A

8   felony is something that you might theoretically get sent

9   to prison for.  Similarly, misdemeanors you might go to

10   jail or prison.  Ever been convicted of that serious of a

11   crime?

12      A.     No.

13      Q.     All right.  My understanding is your first

14   position with the Maricopa County Community College

15   District was as an associate cosmetology instructor at the

16   Northwest campus starting in about August of 2013; is that

17   correct?

18      A.     Yes.

19      Q.     Okay.  According to HR, Human Resources, at the

20   District, you were hired initially on July 21st, 2013, in

21   what they call an RPS temporary position while your formal

22   full-time hiring was still being worked out through the

23   paperwork.  Does that sound right?

24      A.     Yes.

25      Q.     Okay.  They also said that your full-time

16

1    employment began at the Northwest campus as a full-time

2    associate instructor on August 27th, 2013.  Does that

3    sound about right?

4        A.    Yes.

5        Q.    Okay.  But you understand that you started

6    working as a temporary person doing the same job that you

7    did as a full-time associate instructor?

8        A.    Correct.

9        Q.    Okay.  It's my understanding you resigned as an

10   associate instructor at the Northwest campus in

11   approximately March of 2014; is that correct?

12       A.    Yes.

13       Q.    And why did you leave in March of 2014?

14       A.    I got another opportunity.

15       Q.    Was that the Regency Beauty School?

16       A.    Yes.

17       Q.    Was there any other reason you left?

18       A.    No.

19       Q.    Now that you're at Cutting Edge Style Academy, do

20   you report in any way to Lisa Hemming -- strike that.

21             Now that you're either -- strike that.

22             While you were at Cutting Edge Style Academy

23   or now that you're now back at Northwest, do you have a

24   direct report to Lisa Hemming?

25       A.    No.  It would go to Cheri Snow first and then to

18

1    before you went to Northwest.  Am I understanding that
2    correctly?
3         A.   Yes.
4         Q.   Okay.  All right.  You started as a full-time
5    employee at the Northwest campus on August 27th.  Did you
6    understand that you were on probation?
7         A.   Yes.
8         Q.   For what period of time?
9         A.   At that time, it was a year.
10         Q.   And how did you learn that you were on probation?
11         A.   I believe it was the orientation, I think some of
12    the original when you sign your documents for hire.
13         Q.   And it's my understanding orientation and signing
14    of documents that you're being hired is handled through
15    the District?
16         A.   Correct.
17         Q.   Were you made aware that there were policies
18    which would apply to you in 2013 as a new staff member?
19         A.   Vaguely, yes.
20         Q.   Were you at least advised that there was a staff
21    policy manual available online should you decide that you
22    wanted to read it?
23         A.   Yes.
24         Q.   Were you advised that -- strike that.
25              Or did you know that part of that staff

1    policy manual included a section of policies applicable

2    just to the Maricopa Skill Center employees?

3        A.    No.

4        Q.    Okay.  Did you have to go -- as a new employee,

5    did you have to go to a class about public stewardship?

6        A.    There was an online class.  I didn't have to

7    directly go anywhere.

8        Q.    But you understood as a new employee, it was one

9    of the requirements is they wanted you to complete that

10   course online?

11       A.    Yes.

12       Q.    For the 2013/2014 school year, that would

13   generally run from about August, early to mid August 2013

14   until May of 2014?

15       A.    Correct.

16       Q.    What students were you assigned to be the teacher

17   of when you were at the Northwest campus?

18       A.    I was assigned to the first year group, which is

19   the beginning, the beginners.

20       Q.    And were you assigned high school students?

21       A.    High school students, yes.

22       Q.    And at the Northwest campus, it's my

23   understanding that in addition to the high school

24   students, there were adult nonhigh school students at that

25   campus as well; is that true?

Toni Trott - June 20, 2016

20

1      A.    Yes, there was.

2      Q.    In addition to the cosmetology students, there

3   were also aesthetician students at the Northwest campus;

4   is that true?

5      A.    Yes.

6      Q.    Do you remember that Robert Wood was assigned to

7   be the instructor for, at least initially, for the adult

8   nonhigh school first year students at Northwest?

9      A.    Yes.

10     Q.    And which students did Carolyn -- do you know her

11  Carolyn Cardwell or Carolyn Main?

12     A.    Both.

13     Q.    If I called her Carolyn Cardwell -- we took her

14  deposition.  She said her legal name was Main, which I had

15  heard for the first time.  If I call her Carolyn Cardwell

16  or Carolyn Main, you'll understand it to be the same

17  person?

18     A.    Yes.

19     Q.    Okay.  Which students did Carolyn -- was she the

20  instructor for, as you understood it?

21     A.    First year high school students.

22     Q.    And for Schaun Owens, which year was she

23  assigned?

24     A.    Second year high school students.

25     Q.    And it's my understanding from looking at the

24

1    outside of work?

2        A.    Like go to -- we went to dinner.

3        Q.    Anything else that you recall?

4        A.    No.

5        Q.    Did you associate with Mr. Wood outside of work?

6        A.    No.

7        Q.    Was he married at the time?

8        A.    Yes.

9        Q.    Shala Dveirin.  If I call her Shala, you'll

10   understand who I mean?

11       A.    Yes.

12       Q.    She was also at the Northwest campus in 2013/'14;

13   is that correct?

14       A.    Correct.

15       Q.    What did you understand her position or role was?

16       A.    She was the lead instructor for the aesthetics

17   program.

18       Q.    Did she teach a class?

19       A.    Yes.

20       Q.    And as you understood it, she had administrative

21   duties over and above her teaching responsibilities?

22       A.    To my knowledge, yes.

23       Q.    For the class that Shala was teaching, was that

24   first year or second year students, if you know?

25       A.    She did adults.  At this time, there was not a

Toni Trott - June 20, 2016

25

 1    high school program yet.

 2        Q.    And is the aesthetics program, is this a two year

 3    program or one year?

 4        A.    It's a one year.  It's actually less than a year.

 5        Q.    And what did you think of Shala?

 6        A.    Honestly, I didn't really have an opinion either

 7    way.  I didn't really talk to her as much.  She didn't

 8    really -- wasn't in our office very much, and because her

 9    classes -- the schedule was a little bit different, so we

10    didn't really cross paths very often.

11        Q.    Did you have any issues with her?

12        A.    No.

13        Q.    Since Shala was a lead instructor, did you

14    consider her some kind of like a management-type person?

15        A.    Not directly to me because she was in a different

16    department than I was.

17        Q.    But while I understood you weren't reporting to

18    her, did you think of her -- as opposed to the labor

19    employee, did you think of her as more like a management

20    person?

21        A.    Honestly, not really because, like I said, it was

22    not in my area, so I didn't -- honestly, I didn't look at

23    her that way.

24        Q.    Did Shala have her own office?

25        A.    No.  She used one of her classrooms, I believe,

26

1    as an office.

2        Q.    Did Shala office also out of the instructor's

3    office?

4        A.    Yes.  She had a station inside of the

5    instructor's office as well.

6        Q.    Who -- do you remember who the substitute

7    teachers were in 2013/'14?

8        A.    There was Katrina Austad, and then I believe

9    Cheri Snow came along at some point as well, too.  So

10   those were the two.

11       Q.    Was there a Rios, Ms. Rios, if you remember?

12       A.    I don't recall while I was there ever seeing --

13   oh, yes, now I do.  Okay.  Yes.  I do remember her coming

14   in a couple times, yes.

15       Q.    Did you have much interaction with Katrina

16   Austad?

17       A.    A little bit, yes.

18       Q.    Did you form any opinions about her?

19       A.    Not really.  I just thought she was nice.  You

20   know, we had a few conversations, but at this time, she

21   had just started, and I was kind of on my way out at that

22   point.

23       Q.    So this would have been sometime in the spring

24   of 2014?

25       A.    Correct.

1   you.  Is that just like the subpoena and whatnot?

2       A.   No.  This was just some e-mails that I printed

3   out because I believe when I read the subpoena, that it

4   says that if you had any e-mails or anything that pertain

5   to Schaun Owens to bring them.

6       Q.   Do you mind if I take those?  I'm going to call

7   my secretary in and she'll make some copies while you and

8   I talk about some other things.

9       A.   Sure.

10      Q.   We'll get to those in just a minute.  I'm going

11  to hand you a notebook.  This is a notebook of some of the

12  exhibits that were previously marked at Schaun Owens'

13  deposition.  Rather than trying to kill another tree, I'm

14  trying to re-use them as best I can.  If you would turn to

15  Exhibit 6, it's the document behind tab six.  I don't want

16  you to read the whole thing because it's really, really

17  long, but just generally flipping through the pages, does

18  it look like the cosmetology student handbook for the

19  2013/'14 school year that was used at the Northwest

20  campus?

21      A.   Yeah.

22      Q.   Was this student handbook available to the

23  students and instructors even before school began?

24      A.   Yes.

25      Q.   And it's my understanding that one of the things

1    an instructor is supposed to do on the first day is kind

2    of at least generally talk about the student handbook.

3    Was that your understanding as well?

4        A.    Yes.   The first week is strictly all orientation

5    and look over the handbook and other policies and

6    procedures at that time.

7        Q.    Do you need these documents back?

8        A.    No, I don't.

9        Q.    What we'll do is we'll mark the original

10   documents as an exhibit, and then I'll have a copy so I

11   don't have to sit there and read over your shoulder.

12              All right.   Now, if you could turn to

13   Exhibit 7 in the notebook from Ms. Owens' deposition,

14   Ms. Owens told us that the documents which comprise

15   Exhibit 7 were given to her on or before the first staff

16   meeting in August of 2013.   Does that sound right?

17       A.    Yes.   This was given to us because we --

18   actually, the RPS started in, I believe, the middle of

19   July.   So this was one of the meetings -- I believe this

20   was given in the meeting that we had.

21       Q.    It was my understanding that the first year

22   students do not typically spend a lot of time on the

23   clinic floor?

24       A.    Correct.

25       Q.    And would that be true throughout the year or did

1    it change at some point?

2        A.    No.    The only time that the first year students

3    are on the floor was on Mondays.

4        Q.    And in contrast, the second year students, as I

5    understand it, would only be in the classroom one day a

6    week and would typically be on the clinic floor the other

7    days of the week that they were attending?

8        A.    Correct.

9        Q.    And did Schaun Owens, as the instructor of the

10   second year students, did she have any more responsibility

11   regarding the clinic floor than the other instructors

12   would have?

13       A.    Anyone who uses the clinic floor is responsible

14   for it.    So if I was on the floor on Monday, that would be

15   my responsibility as well as whoever the other instructor

16   was on the floor.    The same way if the adults were on the

17   floor.    It would be their instructor's responsibility to

18   make sure the monitors and everything that needs to be

19   done was on that day.    So it's everybody's responsibility

20   if you were out there.

21       Q.    And when you say monitors, what do you mean by

22   that?

23       A.    That's what we call our duties.    So if they had

24   to clean anything, for example, if they had to clean the

25   shampoo bowls.    Per State board, we have to -- at the end

39

1      Q.   Were you a -- my question, though, is were you
2   aware the student handbook says no food or drink allowed
3   in the classrooms or on the clinic floor?
4      A.   Yes.
5      Q.   Okay.  And I think what you're telling me is that
6   even though that's in the handbook and even if it's in
7   writing in some places, Lisa Hemming gave permission for
8   certain potlucks.  Am I understanding that correctly?
9      A.   Yes.
10     Q.   Okay.  And what potlucks do you understand Lisa
11  Hemming gave permission for?
12     A.   The first initial one was Thanksgiving of 2013.
13     Q.   Any others?
14     A.   And then there was another portion that there was
15  a miscommunication with that, and all teachers thought it
16  was okay because we discussed it with Lisa, but it wasn't,
17  to have a potluck for Christmas as well, Christmas break.
18     Q.   Any other permission that you were aware of for
19  potlucks by Lisa Hemming?
20     A.   That was the only time.  After that, we were told
21  that if they did any type of food, it had to be done in
22  their break room.
23     Q.   And you learned about what you called a
24  miscommunication because someone on the staff was walking
25  down the hallways noting who was holding potlucks?

40

1      A.    Correct.

2      Q.    And as I understand that, that happened like near

3   the last day before Christmas break?

4      A.    Correct.

5      Q.    Okay.  So when you came back in what would have

6   been early January after the break, is that when you

7   learned that, hey, there had been a miscommunication and

8   all of the instructors had misunderstood?

9      A.    Actually, part of it was said because one of the

10   instructors actually contacted Lisa immediately once she

11   found out that we were being documented for having food in

12   our room, and she contacted her directly immediately then,

13   and then again there was a follow-up e-mail when we got

14   back, I believe.

15      Q.    And as I understand it, that was Carolyn Cardwell

16   who contacted Lisa Hemming, as you understand it?

17      A.    Yes.  I was there when she did it.

18      Q.    Was that done in person or by phone?

19      A.    It was by phone.

20      Q.    So you -- did you -- was it on speakerphone?

21   Could you hear both sides?

22      A.    It was through messages.

23      Q.    So it was instant messaging or like an e-mail?

24      A.    It was -- I believe it was text message.

25      Q.    Okay.  So you were able to see the texts?

41

1      A.    Yes.

2      Q.    From both sides?

3      A.    Yes.

4      Q.    And essentially to summarize it, Carolyn was

5   saying, "Hey, Lisa, we thought it was okay to have these

6   potlucks for Christmas," and Lisa Hemming said, basically,

7   "No, you weren't supposed to."  Was there something else

8   beyond that?

9      A.    No.  That was pretty much it because we had

10  discussed it with her.  She had said something about that.

11  We had discussed what we were doing, that we were going to

12  have a potluck because she asked us, and we said yes, and

13  she was okay with it but the part -- we just didn't know

14  about the part that she didn't want it in the classroom

15  for the holiday.

16     Q.    Apparently, at least as you understood what

17  Ms. Hemming was trying to convey, was she wasn't objecting

18  to a potluck.  She was just objecting to food in the

19  classroom?

20     A.    No.  She didn't even say that.  When we said we

21  were going to have a potluck, she just said okay.  She was

22  like I was just wondering what you were doing and that was

23  the end of the discussion.

24     Q.    And I guess what I'm -- did you understand that

25  what Ms. Hemming was saying is you could hold a potluck,

1    that's not a problem.  If the food sat in the student

2    lounge, Ms. Hemming wasn't going to have a problem.  It

3    wasn't the potluck that Ms. Hemming was saying, oh, you

4    misunderstood.  It was you can hold a potluck, but the

5    food has to be in the student lounge?

6        A.    Yeah, that was found out the day we had the

7    potluck.

8        Q.    Right.  I understand.  I just wanted to make sure

9    I understood it.

10              And did you pass that information that you

11   and Carolyn saw on the texts to the other instructors?

12       A.    Yes.  I believe they were all around at the same

13   time.  It was kind of like everyone found out.  We kind of

14   floated around to let them know, hey, this is what's going

15   on.

16       Q.    Would one of those other instructors who found

17   out who was able to see the text, would that have included

18   Schaun Owens?

19       A.    Yes.

20       Q.    It's my understanding that one of the

21   responsibilities of an associate instructor at the

22   Northwest campus was to take daily attendance of which

23   students were present?

24       A.    Yes.

25       Q.    It's my understanding the students had a daily

1    attendance sheet and the instructor was supposed to sign

2    off on it in some fashion.  Was that true?

3        A.    The students, at the end of the week, they had to

4    validate their hours.  So once you filled out the

5    attendance sheet, then the students had to sign for their

6    hours, so they -- it was their responsibility at that

7    point.  You did sign their floor sheet to keep track of

8    what days they were there because they got points for

9    every day that they were there.

10       Q.    Got you.  And I appreciate that.

11                From your perspective, were the expectations

12   that are set forth in this Exhibit 7, these pages, were

13   they generally enforced at the Northwest campus in 2013

14   and '14?

15       A.    Sorry.  I just wanted to breeze through it.

16       Q.    No, make your time.

17       A.    Sometimes I felt like -- I wouldn't say I felt

18   like.  There were times where certain things were an

19   exception and certain things were not.

20       Q.    Do you remember any examples of these exceptions?

21       A.    Like the potluck would be an example.

22       Q.    Do you remember anything else?

23       A.    Not off the top of my head at the moment.

24       Q.    You worked with Lisa Hemming at the Northwest

25   campus.  Did you get the sense that she was trying to

Toni Trott - June 20, 2016

44

1   convey to the staff, you and the other staff members, that

2   she was going to be generally a by the book, you know,

3   follow the rules kind of supervisor?

4        A.    For the most part, yes.

5        Q.    Now, Ms. Hemming, as I understand it, held

6   periodic staff meetings with her meeting with all of the

7   instructors?

8        A.    Yes.

9        Q.    If you could turn in your book to Exhibit 9.

10  It's the document behind the tab rather than the one in

11  front of it.  You're on eight.

12       A.    Oh, I'm sorry.

13       Q.    That's all right.  Schaun Owens told us this is

14  the agenda from the August 1st, 2013, meeting.  Do you

15  have any reason to think this is not the agenda from that

16  meeting?

17       A.    Yeah, that's correct.

18       Q.    Again, Ms. Owens told us she believed the agenda

19  was handed out to all of the instructors at or before the

20  meeting.  Is that your recollection as well?

21       A.    I honestly don't remember when it was handed out.

22       Q.    Quite all right.

23             Do you remember that the agendas of the

24  meetings were at least provided to you in some way, either

25  they were handed out or they were made available either

45

1    through e-mail or online in some fashion?

2        A.    This?

3        Q.    Yes.

4        A.    This was not available online.

5        Q.    And you just don't recall one way or the other if

6    it was given to you at or before the meeting.  Am I

7    understanding that correct?

8        A.    Correct.

9        Q.    The first two items talking about dream team

10   expectations, clinic floor expectations, to me, those seem

11   to relate back to the exhibit we were just referring to,

12   Exhibit 7 called dream team expectations, and then the

13   following pages include clinic floor expectations.  Do you

14   believe that was the subject matter talking about those

15   kind of documents?

16       A.    Yes.

17       Q.    Okay.  All right.  Under curriculum, do you

18   remember at the first August -- first meeting, which would

19   have been about August 1st, 2013, that one of the things

20   is the third bullet point under where it says curriculum,

21   it says, "Follow curriculum.  Do not deviate."  Did you

22   understand from the beginning and was made clear to all of

23   the instructors that they were supposed to follow the

24   curriculum and not to deviate without permission of

25   Ms. Hemming?

Toni Trott - June 20, 2016

46

1    A.    Yes.

2    Q.    Okay.  And then it talks about the handbook.

3   There's a tardy policy, reference a cell phone and test

4   taking and workbooks.  So there was a discussion even

5   among the staff about the handbook that was available for

6   the students for the Northwest campus at this meeting.

7   Would you agree with that?

8    A.    Yeah, there's a brief conversation about it, yes.

9    Q.    All right.  Turn to the next exhibit, Exhibit 10

10  to Ms. Owens' deposition.  Do you recognize this as an

11  October 2nd, 2013, meeting agenda?  If you do, tell me.

12  If you don't, it's okay to say you don't remember.

13   A.    Vaguely I remember.

14   Q.    Okay.  One of the things specifically discussed

15  had to do with the teacher's office.  The fourth bullet

16  point down says, "No students, ever."  Did you, from your

17  perspective, understand that no students were allowed in

18  the teachers, slash, instructors office?

19   A.    Yes.  There was a sign that was eventually put on

20  the door to make sure, as a reminder, so that we knew that

21  they didn't want -- or she didn't want students in the --

22  before that, there was no -- no -- before this, there was

23  nothing saying that students weren't allowed to come in

24  there.

25   Q.    You're saying before October 2nd, 2013.  Is that

1    what you're referring to?

2        A.    Yes.

3        Q.    But certainly from October 2nd, 2013, all of the

4    instructors would have been aware no students allowed?

5        A.    Right.  Because there was something posted on the

6    door that said.

7        Q.    After October 2nd, 2013, are you aware of --

8    strike that.

9                Did you understand the reason why students

10   weren't allowed in the instructor's office?  Did you ever

11   understand the reasoning for it?

12       A.    I felt it was because students -- because we had

13   our private stuff in there.  That was kind of our private

14   area.  So if we wanted private discussion, that's being

15   disrupted if you have a student in there.  You're trying

16   to work, too.  That's distracting.

17       Q.    And would also deal with the safety, if you will,

18   of the personal items of the instructors as well?

19       A.    Yes.

20       Q.    Okay.  Any other reasons that you're aware of?

21       A.    Not to my knowledge.

22       Q.    Was there a place where -- let's say an

23   instructor needed to meet with a student or let's say a

24   small group of students.  Was there someplace other than

25   the teacher's office where that could be done?

52

1   meeting?

2       A.   I knew there was going to be a meeting, and she

3   knew, but I had already -- she had granted me the time

4   off.

5       Q.   Again, it's a question.  I don't mean to in any

6   way --

7       A.   No, you're fine.

8       Q.   Did you ever -- did Ms. Hemming ever send you a

9   copy of the agenda that you recall?

10      A.   I don't remember.

11      Q.   One of the things mentioned in this meeting

12  agenda -- I recognize you weren't there.  It says,

13  "Absolutely not Tabatha Salon Takeover."  First of all,

14  what's Tabatha Salon Takeover?

15      A.   It's a show that comes on, and she goes to salons

16  and kind of helps them get their business back running

17  proficiently, more professional, and kind of shows you how

18  the day-to-day business operations should go and how they

19  should not go.

20      Q.   And the next one referenced is Face Off.  What's

21  that?

22      A.   That is a show -- it's a competition show that is

23  about makeup.  It's a competition of different makeup

24  artists and special effects makeup artists that come

25  together and compete for whatever the prize may be.

Toni Trott - June 20, 2016

53

1      Q.    During the time you were an instructor, did you
2   ever show any Tabatha Salon Takeover episodes to your
3   students?
4      A.    I don't think so because we didn't really have --
5   being a first year teacher, you don't have that much time
6   to show many videos.
7      Q.    Do you know of any instructor who showed Tabatha
8   Salon Takeover to any of their students at the Northwest
9   campus?
10     A.    Schaun Owens used to show her students that if
11  there was time left over after their lesson.
12     Q.    And how did you learn that information?
13     A.    I believe she told me.
14     Q.    Do you know of any instructor who showed Face Off
15  episodes or shows to any of the -- their cosmetology
16  instructors?
17     A.    That, I don't know.  The only one I can vouch for
18  is Tabatha Takeover.  The other ones I don't know about.
19     Q.    Do you have any information suggesting to you
20  that any instructor at the Northwest campus in 2013/2014
21  ever showed a Face Off episode to any of the cosmetology
22  students?
23     A.    Yes.
24     Q.    What information?
25     A.    I was told about the Tabatha Takeover in class by

1    cosmetology related to any students?

2        A.    No.

3        Q.    Do you know of any instructors during the

4    2013/2014 school year that showed any movies not related

5    to cosmetology?

6        A.    No.

7        Q.    Did you ever hear that Ms. Owens showed the movie

8    Jingle All The Way?  It's an Arnold Schwarzenegger movie?

9        A.    I have no idea.

10       Q.    You hadn't heard that before?

11       A.    No.

12       Q.    Do you have any information suggesting after

13   December 23rd, 2013, that any instructor showed Tabatha

14   Salon Takeover, Face Off, YouTube movies that were --

15       A.    Not after this date, no, not to my knowledge.

16       Q.    Were you aware that the Northwest campus was

17   supposed to be a closed campus during the 2013/'14 school

18   year?

19       A.    I'm trying to remember.  Yes.

20       Q.    I'm going to show you a document.  It was marked

21   as Exhibit 31.  I don't have it with the exhibit stamp.

22   It's MCCCD-O246 and 247.  It's an e-mail dated August

23   12th, 2013.  This was an e-mail sent by Lisa Hemming to

24   the instructors at the school at that time; is that

25   correct?

57

1      A.    Yes.

2      Q.    And if you could read it silently to yourself,

3  then I'll just ask you a real quick question about it.

4      A.    Okay.

5      Q.    You're done reading it?

6      A.    Yes.

7      Q.    You can look at it in case you need to look at it

8  for some reason.

9      A.    Okay.

10     Q.    Did you understand from this e-mail that it was

11  telling you, like the student handbook also says, that

12  this Northwest campus was a closed campus for the high

13  school students?

14     A.    Yes.

15     Q.    And it was basically -- I think you told us

16  earlier where maybe there was one week when the students

17  came and the second week is when the actual classes

18  happened.  Do I understand that correct?

19     A.    No.  The students?  What do you mean?

20     Q.    Because one of the things the e-mail refers to is

21  next week, please remember next week.

22     A.    They had already started.  They started on the

23  4th or 5th of August 2013.

24     Q.    And the first week of school -- as I understand,

25  the first day was August 5th.  So that would be consistent

1  with what you're just indicating is that there was -- it

2  wasn't necessarily the same instruction that would under

3  the curriculum.  Is that incorrect or is that correct?  I

4  thought there was kind of like an orientation.

5      A.    There's an orientation week, but that's

6  considered part of their regular school time.

7      Q.    All right.  The other thing this e-mail is

8  reminding the instructors, again, that there's no food or

9  drink except in the break room.  That's what the e-mail at

10 least is doing; correct?

11     A.    Yeah.

12     Q.    Okay.

13              (Deposition Exhibit Number 36 was marked

14 for identification.)

15 BY MR. SCHWARTZ:

16     Q.    We've handed you what's been marked as Exhibit 36

17 to your deposition.  This is an e-mail Shelly Leming sent

18 to Lisa Hemming dated December 18th, 2013.  Ms. Leming

19 indicates that on July 22nd, 2013, she provided training

20 to you and to Schaun Owens related to SkillTime.  Do you

21 believe that's accurate?

22     A.    Yes.

23     Q.    Okay.  Ms. Leming said that both you and Schaun

24 Owens were present for the presentation, lecture part, if

25 you will, of the lecture.  Do you believe both of you were

Toni Trott - June 20, 2016

1  present for that presentation portion of SkillTime

2  training?

3      A.   Say that again.  I'm sorry.  I was reading at the

4  same time.

5      Q.   That's all right.  Do you believe both you and

6  Schaun Owens were present during the portion that

7  Ms. Leming was giving a presentation about the SkillTime?

8      A.   She was there during the presentation portion,

9  yes.

10     Q.   And then according to Ms. Lemming, that there was

11 an offer for hands-on practice after the presentation

12 portion and that you stayed for that hands-on experience

13 but Schaun did not?

14     A.   Correct.

15     Q.   Is that your recollection?

16     A.   Yes.

17     Q.   How long did this training -- according to

18 Ms. Leming, the training was four hours in duration.  From

19 your perspective, was the four hours just covering the

20 presentation portion or was it the presentation and the

21 hands-on after the presentation?

22     A.   It was both, yeah, the hands-on and the

23 presentation portion.

24     Q.   And do you remember what Ms. Owens said, if

25 anything, as to why --

Toni Trott - June 20, 2016

60

1      A.    That --

2      Q.    Let me finish my question.

3            Do you know what Ms. Owens said, if

4      anything, as to why she was not going to stay for the

5      hand-on portion of practice?

6      A.    She had already been working there as a sub so

7      she already had some training.  So I don't remember

8      exactly word for word what she said, but she was

9      comfortable with it and that's why she did not stay for

10     that portion.

11     Q.    Ms. Leming indicated that Ms. Owens stated to

12     Ms. Leming that Ms. Owens was well aware of how to correct

13     errors and so she didn't feel she needed to stay.  Is that

14     an apt description?

15     A.    Uh-huh.

16     Q.    Is that a yes?

17     A.    Yes.  Sorry.

18     Q.    That's all right.

19           If a student wanted to know whether or not

20     they had 90 percent attendance in a particular month, is

21     that something the student could figure out?

22     A.    A student could figure out?

23     Q.    Yeah.

24     A.    They could.  It's a little work to try to do it.

25     There's no actual system that shows us that they have a

61

1   90 percent attendance.

2       Q.   But each week the student would know how many

3   hours they were being credited for because they had weekly

4   attendance; correct?

5       A.   Correct.

6       Q.   So the students would know, unless something

7   happened to their mind, they would know how much they had

8   attended during the past month?

9       A.   Correct.  They should know, yes.

10      Q.   And with a little effort, could they also figure

11  out -- is there a means by which a student could look back

12  retroactively and figure out what their attendance was?

13      A.   They can look at the previous month at their

14  attendance.  It doesn't give you a percentage.  It just

15  tells you how many hours you have.

16      Q.   And so each day there would be four hours of

17  credit if someone was there from 2 o'clock to 6:00 p.m.

18  during the weekday?

19      A.   Yes.

20      Q.   And basically -- and if they were there on the

21  weekend, it runs from 9:00 to 5:00 so there would be eight

22  hours?

23      A.   They would get -- they were there from 8:00 to

24  5:00, so they would get eight and a half hours because a

25  30-minute lunch is taken out.

62

1      Q.    And is there a means by which the student could
2   determine whether or not where they stood in terms of
3   their grades?
4      A.    They can look on Canvas to do that.
5      Q.    And could an instructor also look on Canvas and
6   determine how a student had done in a particular month?
7      A.    Yes.  It doesn't necessary show -- let me
8   rephrase that.  It doesn't show you just the month.  It
9   shows you from the time they start until the end of that
10  semester.  So if you looked at -- if only August was in
11  there in, yes, you could see just for that month, but once
12  you start adding September, October, it does not break it
13  down that way.
14     Q.    Does it break down -- I'm not all that familiar
15  with cosmetology and how Canvas worked for the cosmetology
16  students.  The portals I've seen for general District
17  students would break down every test and every assignment,
18  how many points you got for that?
19     A.    Yes.
20     Q.    Is that something similar shown in Canvas?
21     A.    Yes.  That's what Canvas shows is every test that
22  they've done, every assignment that has been completed.
23     Q.    So the instructor, as well as the student, would
24  know which ones happened during a particular month?
25     A.    The instructors, yes.  I'm not entirely sure what

63

1    the student portal looks like.  I don't know if they can

2    see every test or not.  I have never seen it from their

3    point of view.

4        Q.    Were you -- strike that.

5              For first year students, were they allowed

6    to do personal services at all?

7        A.    Only if it was like instruction, like if we were

8    practicing shampooing, that was -- it technically wasn't

9    really a personal service.  They have to do it, and they

10   don't have clients yet, so they had to do those services

11   on each other.

12       Q.    As I understand the term personal services in

13   connection with the cosmetology program, it's when one

14   student performs, whether it's makeup, haircutting,

15   whatever, on another student?

16       A.    Correct.

17       Q.    Does it apply -- let's say you're doing services

18   on another student's friends or family members or is it

19   just student to student?

20       A.    Student to student.

21       Q.    Okay.  Were you at least aware that there were

22   certain criteria the students had to meet before they were

23   allowed to do personal services?

24       A.    That's when the 90-90 was reeled out.  I don't

25   know the exact date that it was put out, but there was

 1    procedure -- a policy that was put out saying that the
 2    students had to maintain a 90 percent in order to receive
 3    any personal services, and that meant 90 percent
 4    attendance, 90 percent on their grade.
 5        Q.    Look at Exhibit 27, and this is Exhibit 27 to
 6    Ms. Owens' deposition.  Is this the personal service
 7    criteria document you were just referring to?
 8        A.    Yes.
 9        Q.    From your perspective at that -- certainly in
10    October of 2013, you only had first year students, so did
11    this policy, in any way, directly impact you?
12        A.    No.
13        Q.    Okay.  When you were at Cutting Edge Style
14    Academy, did you ever see what's called a 90-90 report?
15        A.    There was a sheet that would be put up for the
16    students to know if they were on 90-90 or not.  It wasn't
17    necessarily a report.  It was just something that was put
18    together.
19        Q.    Do you know who put it together?
20        A.    I believe the supervisors were putting it
21    together.
22        Q.    So someone like the lead super --
23        A.    Yes.
24        Q.    Strike that.
25              I said lead super.  As you understood, I

67

1      Q.   And the e-mails you're referring to is you helped

2   proofread e-mails that Schaun Owens was sending to Lisa

3   Hemming and sometimes to Kristina Scott?

4      A.   Yes.

5              MR. SCHWARTZ:   Let's go ahead and take a

6   break.   We've been going on a little bit.   Take five, ten

7   minutes.   Is that satisfactory?

8              THE WITNESS:   Sure.

9              (A recess was taken from 2:20 p.m. to

10   2:29 p.m.)

11   BY MR. SCHWARTZ:

12      Q.   You understand you're still under oath; correct?

13      A.   Correct.

14      Q.   All right.   While you were at the Northwest

15   campus, did you ever hear any instructor or any person

16   utter any racial slurs or make any racially derogatory

17   remarks?

18      A.   No.

19      Q.   Okay.   Did you ever hear Lisa Hemming ever utter

20   any statements that you considered reflecting that she had

21   a racial bias against anyone?

22      A.   Not that I can recall.

23      Q.   Do you remember anyone ever telling you they

24   heard Lisa Hemming say something that was a racial slur or

25   reflected any racial bias by Lisa Hemming?

Toni Trott - June 20, 2016

69

```
1   else that anyone has ever told you that would suggest to
2   you that Lisa Hemming was, in any way, racially biased?
3       A.   Just the incident about students speaking Spanish
4   on the clinic floor, that she didn't want students to
5   speak Spanish on the clinic floor.
6       Q.   Did Lisa Hemming ever, in your presence, say
7   anything about students speaking Spanish on the clinic
8   floor, in the classroom or in the break room?
9       A.   Not to me directly, no.
10      Q.   Were you present when Lisa said it to someone
11  else?
12      A.   No, I was not.
13      Q.   How did you learn any information about students
14  not speaking Spanish on the clinic floor?
15      A.   Schaun Owens.
16      Q.   And what did Schaun Owens tell you?
17      A.   That she was told that students weren't allowed
18  to speak Spanish anywhere in the building.
19      Q.   And do you recall about when that happened?
20      A.   I don't recall when that happened.
21      Q.   Do you remember if it was early in the year?
22  Late in the year?
23      A.   It was probably during the first semester, in the
24  middle of it maybe.
25      Q.   I'm sorry.  In the middle?
```

70

1      A.    Middle of the first semester, yes.

2      Q.    And did Ms. Owens tell you how that subject had

3   come up?

4      A.    I believe a student complained.

5      Q.    And were you aware that students at Northwest

6   campus were subject to a student code of conduct?

7      A.    Yes.

8      Q.    And were you aware that that student code of

9   conduct didn't permit things like bullying or racial

10  harassment or any kind of harassment, verbally or

11  otherwise?

12     A.    Correct.

13     Q.    And would you agree with me that if you're going

14  to be verbally violating that student code of conduct, it

15  didn't matter what language you were using in terms of

16  whether it's English, Spanish, German, Italian, it's the

17  substance of what you're saying, not the language you're

18  saying it in?

19     A.    Correct.

20     Q.    Okay.  All right.  As you understood from

21  Ms. Owens, at least one student had complained about other

22  students speaking Spanish?

23     A.    Correct.

24     Q.    Okay.  Did you have any understanding of where

25  that had occurred?

1      A.     I think it was on the clinic floor.

2      Q.     And what, if anything, else did Ms. Owens tell

3   you at least initially?  Do you remember anything else?

4      A.     No.

5      Q.     Did you have further verbal communication with

6   Schaun Owens about that subject?

7      A.     No.

8      Q.     Did you edit any letters or e-mails for Schaun

9   Owens related to that subject?

10      A.     No.

11      Q.     So I'll be honest.  I don't remember seeing any.

12      A.     I don't either.  No, I don't believe I did.

13      Q.     When did -- when about did you start to help

14   Schaun Owens with e-mails she was sending either to Lisa

15   Hemming or to Kristina Scott?

16      A.     I did not help her.  She asked me to read them

17   just for grammatical errors and to, you know, I guess for

18   wording purposes to make sure it was being worded

19   correctly, but I don't -- the reason why I don't like the

20   word "help" because to me that means I helped write half

21   of it.

22      Q.     What term would you prefer I use?

23      A.     That I proofread.

24      Q.     Okay.  About when did you start to proofread

25   these e-mails to Lisa Hemming and/or Kristina Scott from

1    the first one on December 16th is the one that I looked

2    over for, like I said, again, grammatical errors mainly is

3    what I did look at.  It wasn't more than that.

4        Q.   Were you aware that Schaun Owens had sent e-mails

5    before December 16th to Kristina Scott?

6        A.   I believe she may have mentioned it to me.

7        Q.   But your best recollection is you didn't help

8    proofread any prior e-mails before December 16th?

9        A.   Correct.

10       Q.   Okay.  Did you ever feel that you were being

11   discriminated based upon your race on the Northwest campus

12   while you were there?

13       A.   No.

14       Q.   Did Schaun Owens ever tell you that she felt she

15   was being discriminated based upon her race while one or

16   both of you were at the Northwest campus?

17       A.   Not for race directly.  I don't believe she said

18   anything to me about race.

19       Q.   Did she say some other thing that she felt she

20   was being discriminated for, if not race, for some other

21   reason?

22       A.   Not directly.  I wouldn't say discrimination.

23   More retaliation.  I remember statements being said about

24   that.

25       Q.   And what -- what -- strike that.

1  time?

2       A.    Not to my knowledge, no.

3       Q.    Okay.  All right.  If you'd look in the book, the

4  notebook, Exhibit 19.  Just look at the first page -- I'm

5  sorry, Exhibit 12.  I apologize.  I don't know why I have

6  19 in my notes.  This is a form for an incident report,

7  and the incident report specifics I don't need to talk to

8  you about, but have you ever seen this form before, this

9  cover page?

10      A.    No.

11      Q.    Okay.  Did Schaun Owens ever show you any of the

12  incident reports she received?

13      A.    No.

14      Q.    Did you ever have an incident report written up

15  related to your performance, either at Northwest or any of

16  the time you've been at Cutting Edge Style Academy?

17      A.    Yes.

18      Q.    When, approximately, did you have an incident

19  report written up?

20      A.    I would say probably early 2015.

21      Q.    So it would have been at Cutting Edge?

22      A.    Yes.

23      Q.    Was Lisa Hemming, in any way, involved in the

24  incident report that was written up?

25      A.    No.

78

1    for you ever made it to your personnel file?
2        A.   No idea.
3        Q.   You said no idea; right?
4        A.   Yes.
5        Q.   Okay.  While you were at Northwest campus, did
6    you have any personal issues or problems with Lisa
7    Hemming?
8        A.   Not personally, no.
9        Q.   And I know you said not personally.  Other than
10   Schaun Owens, your good friend, did you know anyone else
11   who had -- who told you they were having problems with
12   Lisa Hemming?
13       A.   Yes.
14       Q.   Who else?
15       A.   Carolyn Cardwell.
16       Q.   And what did Carolyn tell you her issues or
17   problems she was having with Lisa Hemming?
18       A.   She felt like she was being picked on and
19   targeted for different things.
20       Q.   Did Schaun Owens tell you that she felt she was
21   being picked on?
22       A.   Yes.
23       Q.   And Schaun Owens told you that she felt Lisa
24   Hemming was picking on her?
25       A.   Yes.

79

1    Q.   And Schaun Owens told you that she felt Lisa

2  Hemming was targeting her?

3    A.   Schaun Owens?  Yes.

4    Q.   And so someone who was black and someone who was

5  white were both telling you they felt Lisa Hemming was

6  picking on them and targeting them?

7    A.   Yes.

8    Q.   Okay.  When, approximately, did Carolyn tell you

9  she thought Lisa Hemming was picking on her and/or

10  targeting her?

11    A.   Probably the middle of 2013.

12    Q.   And when you say the middle, because you're in

13  school years, are you talking in the middle of that school

14  year?

15    A.   Yes, middle of the school year.  Sorry.

16    Q.   That's all right.  I know you live in an academic

17  world, and you forget the rest of us don't work on that

18  July to May time frame.

19          Besides Carolyn and Schaun Owens, did anyone

20  else ever tell you they were having any problems or issues

21  with Lisa Hemming?

22    A.   No.

23    Q.   Were you ever tardy for a shift?

24    A.   Yes.

25    Q.   It's my understanding that you said to one of the

80

1    lawyers who interviewed you, that that maybe happened once
2    during the time you were at the Northwest campus.  Is that
3    accurate?
4        A.   Yeah.
5        Q.   Did you receive any kind of verbal warning or
6    write-ups that you're aware of related to the one time you
7    may have been tardy?
8        A.   No.
9        Q.   Do you know of anyone besides Schaun Owens who
10   was ever written up for tardiness for not showing up at
11   work?
12       A.   Not that I know of, no.
13       Q.   Did anyone ever tell you, "Hey, I got a write-up
14   from Lisa Hemming for tardiness," any instructors?
15       A.   No.
16       Q.   Did Schaun Owens, on occasion, show up late not
17   at the 9:30 scheduled time, if you know?
18       A.   I think I remember like maybe one occasion.  I
19   don't remember if there was more than that.  I don't know.
20       Q.   If there's documentation that Schaun Owens was
21   written up for a number of tardies in January 2014, do you
22   have some reason to agree or disagree or don't have a
23   recollection about it one way or the other?
24       A.   I couldn't tell you either way because I don't
25   recall.

1    Schaun's name one time and asked if she was okay and then

2    Schaun then replied"; correct?

3        A.    Yes.

4        Q.    Did Lisa Hemming say Schaun's name more than

5    once?

6        A.    Not to my recollection.

7        Q.    Was there anything unusual about Lisa's voice

8    that day?

9        A.    You could barely hear.  She had laryngitis.

10       Q.    And it's my understanding that Lisa Hemming

11   didn't ask you about what you observed whatever day the

12   alleged sleeping on the job happened?

13       A.    Yes.  That's correct.

14       Q.    And what makes you think -- strike that.

15             Do you think that the failure to ask you was

16   related to race?

17       A.    I wouldn't per se say race.  I did feel like it

18   was not discriminatory, but I felt I wasn't asked because

19   of the fact I sat right next to Schaun and we had built a

20   rapport together from working next to each other, and I

21   was the one that was in the office the whole time so I

22   could tell you -- do you know what I mean?  I had more

23   because I was sitting right next to her.

24       Q.    Do you believe your close relationship with

25   Schaun was known by Lisa Hemming on or about October 1st

92

1    presented and an e-mail that was exchanged between both of

2    us that she was actually included on, and I just wanted to

3    clarify the information and discuss why it was sent.

4        Q.    It sounds like from an outsider's perspective

5    there was nothing really to document?

6        A.    No.

7        Q.    It was already in the underlying e-mails?

8        A.    Correct.

9        Q.    So you don't know whether or not Lisa Hemming has

10   a habit or practice of when someone comes and provides

11   information of a negative nature, asking them to document

12   that.  You don't know one way or the other; is that fair?

13       A.    It depends on what it is, but most of the time,

14   depending on what it is, if it's documented -- like I

15   said, it was already documented, so I didn't have to

16   document, but any other time with any incident or

17   anything, it's always asked to document it.

18       Q.    So there have been occasions when Lisa Hemming

19   has asked you or others in your presence to document

20   information that wasn't already in a written form?

21       A.    Yes.

22       Q.    So that's not unusual that Lisa Hemming might ask

23   an instructor to document information that they may have

24   conveyed to her verbally?

25       A.    No.

93

1      Q.   All right.  After December -- we talked earlier

2   about one of the staff members coming around documenting

3   the miscommunication about potlucks and whatever.  After

4   December, the end of December in 2013, are you aware of

5   any instructors, other than Schaun Owens, who allowed food

6   or soda in any classroom?

7      A.   After that incident, I don't recall anyone doing

8   any potlucks after that.

9      Q.   Do you recall reviewing e-mails for Schaun Owens

10  that related to a pizza party incident report she

11  received?

12     A.   I remember hearing about it.  I don't recall if I

13  saw the e-mail or not.

14     Q.   Did you hear about it from Schaun Owens?

15     A.   Yes.

16     Q.   What did Schaun Owens tell you?

17     A.   That she had -- she got talked to about a pizza

18  party.  I don't remember the whole conversation.  I just

19  remember that she said she got talked to about a pizza

20  party.

21     Q.   Did -- do you remember Schaun Owens telling you

22  that she had received an incident report, a written

23  write-up about it?

24     A.   I don't recall.

25     Q.   Do you remember Schaun telling you that the

1    written write-up was being withdrawn in favor of just a

2    verbal warning?

3        A.    Not that I recall.

4        Q.    On December 20th, 2013, Schaun has told us she

5    allowed two of her students, two high school students,

6    Jessica Diaz and Isabel Flores, to leave the campus at

7    about 2:10 or so to go to Fry's to get some food for a

8    potluck or whatever.  Are you aware of any other

9    instructors who have allowed students to leave during

10   class or during any of the 15-minute breaks that students

11   get?

12       A.    Not to my knowledge.

13       Q.    Were the students supposed to be leaving for

14   an -- allowed to leave and come back to the campus other

15   than during the lunchtime, the 30-minute lunch?

16       A.    If you're not clocked in -- I mean, we can't

17   control if you leave, if we know you're here or not, you

18   know.  If you don't come into class and you decide that

19   before you come to class you're going to leave, we don't

20   have control over that.  So if that's ever happened, if

21   someone has came and decided that instead of coming

22   straight into the classroom, they're going to leave before

23   they clock in, we don't have control over that.

24       Q.    If a student clocks out, they don't need the

25   permission to leave.  Is that what you're saying?

96

1     Q.   It's not like you can stop them --

2     A.   No.

3     Q.   -- but if they stop them, you're supposed to

4 report it?

5     A.   Right.

6     Q.   Do you know of any -- strike that.

7           It's my understanding that adult students

8 could, if they wanted, leave the building during their

9 15-minute breaks?

10    A.   Yes.

11    Q.   That wasn't true of high school students;

12 correct?

13    A.   Correct.

14    Q.   And everybody, high school or nonhigh school

15 students, adults, could leave during the 30-minute break

16 as long as they're back within the 30 minutes?

17    A.   Right.

18    Q.   Okay.  Besides -- strike that.

19           Are you aware of any instructor who

20 intentionally allowed a student or students to leave when

21 they weren't supposed to under the closed campus policy?

22    A.   The only incident was the one that you stated

23 before.

24    Q.   The one involving Schaun?

25    A.   Yeah, where she said she -- that was the only one

1   I was aware of.

2       Q.   And did Schaun admit to you that she did

3   intentionally allow the two students to go to the Fry's

4   that day?

5       A.   Yes.

6       Q.   What role, if any, did Lisa Hemming play in

7   enforcing the dress code?  I know you're supposed to have

8   a smock and certain things.  What role, if any, was Lisa

9   Hemming to play in that?

10      A.   It's really mainly up to the instructors to work

11  collectively, if you see something to, you know, try to

12  correct it or if it's not your student, sometimes the

13  instructors would go to their -- their actual instructor

14  and tell them, hey, so and so is not in dress code.

15  Sometimes, but that didn't always happen that way.

16      Q.   Are you aware of anything that would suggest that

17  Lisa Hemming, in any way, discriminated based upon race

18  related to the dress code?

19      A.   Not to my knowledge.

20      Q.   Did Schaun Owens ever complain to you that she

21  thought the dress code was unfair or somehow she didn't

22  agree with it?

23      A.   I don't remember.

24      Q.   Did Schaun Owens ever tell you she thought that

25  the closed campus for high school students but not for the

1   to report it directly to my supervisor.  Now, if I've

2   already told you, "Hey, did you know this," and then you

3   continued to do it, then, yes, that is an issue that I

4   will follow up with a supervisor, but my thing is, to me

5   you should go directly to that person because you don't

6   know if they knew or not if what they were doing was wrong

7   or in violation.

8        Q.   And I think we talked about this briefly, you

9   followed the curriculum for the 2013/2014 school year when

10  you were an instructor?

11       A.   Yes.

12       Q.   Okay.  And I think you've already talked about

13  earlier that all of the instructors were aware that they

14  were supposed to follow the curriculum and not deviate

15  from it without Ms. Hemming's permission?

16       A.   Correct.

17       Q.   Okay.  Are you -- strike that.

18            Were you aware the curriculum needs to be

19  approved by the State board?

20       A.   Yes.

21       Q.   So a failure to follow the curriculum could be a

22  State board violation, one of the things we talked about

23  earlier?

24       A.   Yes.

25       Q.   Okay.  Were you ever made aware that Ms. Owens

1   allowed a student to smoke on campus but outside the
2   building?
3       A.   Not to my knowledge.
4       Q.   Do you have any information suggesting any
5   instructor ever allowed a student, a high school student,
6   to smoke outside the building?
7       A.   Not to my knowledge.
8       Q.   Did Lisa Hemming, at any of the meetings with the
9   staff, ever tell the staff, "Students are not allowed to
10  speak Spanish at any point in time"?
11      A.   I don't recall it ever being said vocally to
12  everyone.
13      Q.   Was it ever put in writing?
14      A.   I don't know if it was or not.
15      Q.   You don't recall?
16      A.   No, I don't.
17      Q.   Okay.  But you were at least aware that the
18  instruction that was done by the instructors was all to be
19  done in English?
20      A.   Correct.
21      Q.   So if a question was asked in Spanish, if the
22  instructor, presuming they even understood Spanish, their
23  response was supposed to be in English?
24      A.   Sure.  I don't know.  I've never gone into that
25  much detail about whether responding or anything about

1    Spanish.  I didn't even know it was an issue until that

2    situation came about that the students couldn't speak

3    Spanish.  I didn't see it anywhere in the handbook that

4    said they couldn't speak their own language to each other.

5        Q.   Are you aware of any student who was disciplined

6    for speaking Spanish?

7        A.   Not to my knowledge.

8        Q.   It's my understanding that Lisa Hemming held some

9    mock inspections?

10       A.   Yes.

11       Q.   Have you ever undergone a State board inspection?

12       A.   It was done -- the one that was done was done all

13   together.

14       Q.   That was -- you're referring to a mock State

15   board?

16       A.   Right.

17       Q.   I'm asking if you've ever undergone a real State

18   board inspections?

19       A.   Yes.  I've been in the school when one was

20   happening, and they came into my classroom, yes.

21       Q.   And the reason I ask that is so at least now,

22   currently, you would know what's involved in a real State

23   board inspection; correct?

24       A.   Yes.

25       Q.   But at the time that Lisa Hemming started doing

Toni Trott - June 20, 2016

106

1    the mock ones, you hadn't gone through a real one so you

2    didn't know what would be involved; is that fair?

3         A.    Yeah, because I had only been living here a few

4    months at that time, so I didn't even know all the

5    regulations.  I was still learning them at that time.

6         Q.    For the real State board inspection, it's my

7    understanding they don't give you an advance notice.  They

8    just show up?

9         A.    They just show up.

10        Q.    And similarly for the mock inspection, Lisa

11   Hemming didn't give any advance notice, did she?

12        A.    No.

13        Q.    And the mock inspection conducted by Lisa Hemming

14   was done when there were no students.  Is that your

15   recollection?

16        A.    Yes.  I believe there was no students.  There

17   might be have been adult students because it was in the

18   morning.

19        Q.    But they would have been in a classroom?

20        A.    Yes, they were in class.

21        Q.    The mock inspection was all -- all of the

22   instructors who might not have been teaching at the time,

23   did they go along with Lisa Hemming to all of the various

24   areas she inspected?

25        A.    All of the clinic floor areas, yeah.  It was done

1    The first two pages aren't filled out, but the second
2    part -- who filled this out?  Did I?

3        Q.    That's going to be my question to you.  As I
4    understand it, what happened is about a week before or
5    maybe December 13th -- I apologize.  On December 13th,
6    Lisa Hemming sent to you and sent to each of the
7    instructors teaching at Northwest, here's a packet of
8    information for a self-assessment, and that each of the
9    instructors were then to fill it out and send it back to
10   Lisa Hemming, and Exhibit 39 is what you sent back to Lisa
11   Hemming on December 16th.  Do you believe this is a true
12   and accurate copy of what you sent on December 16th?

13       A.    Yeah.  I actually saw an e-mail saying that part
14   of it when it sent, it was blank, and I remember that
15   conversation happening because I've done that a couple
16   times by accident or, actually, on this date, something
17   happened when I sent it.  It cleared it out for some
18   reason or something, and I had to re-send it again.

19       Q.    And I've seen those e-mails back and forth.  I
20   just picked one at random about that.  You did do a
21   self-assessment back in December of 2013 of your own work;
22   correct?

23       A.    Yes.

24       Q.    Okay.  Did you ever get any feedback after you
25   sent this in December 2013 from Lisa Hemming?

118

1     A.    No.

2     Q.    Are you aware that no one, not Mr. Wood, not

3  Carolyn Cardwell, not Shala Dveirin and not Schaun Owens

4  ever received any kind of feedback from Lisa Hemming to

5  these completed self-assessments?

6     A.    I don't know if they did or not.

7     Q.    Did anyone ever tell you, "Hey, I got a written

8  evaluation from Lisa Hemming during the 2013/2014 school

9  year"?

10    A.    The only thing I knew is that some people said

11  that she came into their classrooms and sat in their

12  classrooms, but that was it, but never heard anything

13  about a follow-up after.

14    Q.    Did Lisa Hemming ever come to your classroom?

15    A.    Yes.

16    Q.    On more than one occasion?

17    A.    For evaluation, she came in there once.

18    Q.    Did Ms. Hemming come into your classroom for

19  other nonevaluation purposes?

20    A.    Yes, once.

21    Q.    Did you think it was unusual that Ms. Hemming

22  only came in and sat to evaluate your classroom

23  performance only once?

24    A.    Honestly, I didn't know what the protocol or how

25  many times it was supposed to be done.  I know she had

119

1   said, which was in one of the expectations, that

2   evaluations would be done, I believe it said it in there,

3   and I only got the one.

4       Q.   Do you know of anyone who got more than one?

5       A.   Not to my knowledge.

6       Q.   Do you have any knowledge as to whether or not

7   any of the other instructors got -- had Lisa Hemming come

8   into their classroom for evaluation purposes at any time?

9       A.   A couple other instructors said she came in the

10  one time.  I don't know if she did any more than that, but

11  I know that Cardwell and Schaun Owens both said that she

12  had come into their classrooms.

13      Q.   So as far as you know, the one classroom visit

14  was the standard for what Ms. Hemming was giving in

15  2013/2014 in terms of classroom evaluation visits?

16      A.   I can't say yes or no because I don't know what

17  the standard was.  I just went -- when he came into my

18  classroom, that's all I can say.

19      Q.   But you also know what the other instructors

20  said, and as far as you know, based on what they told you,

21  one classroom visit for evaluation purposes is all anyone

22  was receiving from Lisa Hemming in that school year; is

23  that fair?

24      A.   That I know of, yes.

25      Q.   And not only -- you only received the one

Toni Trott - June 20, 2016

120

1    classroom, but you never received any written performance
2    evaluation or written response even to your
3    self-assessment from Lisa Hemming; is that true?
4         A.    Correct.
5         Q.    The only response you may have been is, hey, your
6    first early efforts to get me the self-assessment may not
7    have -- the packet didn't come out the way it should.  You
8    have to re-scan it and re-send it?
9         A.    Right.
10        Q.    Okay.  Now, Schaun Owens' daughter passed away in
11   November of 2013, near the end.  Was there like a card
12   circulated for condolences or things of that nature?
13        A.    I believe so.
14        Q.    Do you know whether Lisa Hemming signed it or
15   not?
16        A.    I don't remember.  I don't know.  I couldn't even
17   tell you who signed it, honestly.
18        Q.    Did you sign it?
19        A.    Yeah.  I can tell you I did, yes.
20        Q.    Was there any, like, flowers or gifts or anything
21   that was -- were done by the staff?
22        A.    I'm trying to remember.  Maybe flowers.  I don't
23   know for sure, so don't quote me on that.  I don't know.
24        Q.    If you don't remember or remember, it's okay to
25   say I don't remember.  I don't want you to speculate or

Toni Trott - June 20, 2016

136

1    STATE OF ARIZONA          )
                               ) ss.
2    COUNTY OF MARICOPA        )

3              BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
4    duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
5    the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
6    shorthand and thereafter reduced to print under my
     direction.

7
               I CERTIFY that I am in no way related to any of
8    the parties hereto, nor am I in any way interested in the
     outcome hereof.

9

10             [X]  Review and signature was requested.
               [ ]  Review and signature was waived.
11             [ ]  Review and signature not required.

12
               I CERTIFY that I have complied with the ethical
13   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
     J(1)(g)(1) and (2).
14             Dated at Phoenix, Arizona, this 8th day of
     July, 2016.

15

16

17                      Marisa L. Montini, RPR
                           Certified Reporter
18                       Arizona CR No. 50176

19
                   *      *      *      *      *
20

21             I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                      GRIFFIN & ASSOCIATES, LLC
                         Registered Reporting Firm
25                        Arizona RRF No. R1005

Griffin & Associates Court Reporters, LLC
602.264.2230

## Copy Center

| | |
|---|---|
| From: | Shelly Leming <Shelly Leming <leming@gatewaycc.edu>> on behalf of Shelly Leming |
| Sent: | Wednesday, December 18, 2013 1:39 PM |
| To: | Lisa Hemming; leming@gatewaycc.edu |
| Subject: | Skill Time Training |

Lisa,

This is to confirm your instructors Toni Trott and Shaun Owens received Skill Time training on July 22, 2013. The training was four hours in duration.

Both Toni and Shaun were present for the presentation part of the lecture which included manual interring of time, interpretation of the error report for time correction, detailing many forms correcting errors and validations.

I had saved many errors from attendance for both instructors to practice with hands on in Skill Time. Shaun did not stay for this part of the instruction. She stated to me that she was well aware of how to correct errors.

Toni stayed to complete the training.

Shelly



**Shelly Leming**
Day Clinic Floor Supervisor
Cutting Edge Style Academy
Leming@gatewaycc.edu

p: (623) 979-9883
1245 East Buckeye Road, Phoenix, Arizona 85034

*A Division of GateWay Community College*

1

6-20-16   EXH #3e
WITNESS Trott
MARISA L. MONTINI, RPR
CERTIFIED COURT REPORTER #50176